IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| GRANT PRIDECO, INC., REEDHYCALOG UK, LTD., REEDHYCALOG, LP, NATIONAL OILWELL VARCO, LP,<br><br>*Plaintiffs/Counter-Defendants*,<br>v.<br><br>SCHLUMBERGER TECHNOLOGY CORP., SMITH INTERNATIONAL, INC.; ULTERRA DRILLING TECHNOLOGIES, L.P., ROCKBIT INTERNATIONAL SUBSIDIARIES, LLC.; VAREL INTERNATIONAL ENERGY SERVICES, INC., and VAREL INTERNATIONAL INDUSTRIES, L.P.,<br><br>*Defendants*. | Civil Action No. 4:23-cv-00730 |

**EXHIBIT L**

**TO**

**PLAINTIFFS' MOTION TO DISMISS AND REMAND**

Appellate Division of the Supreme Court of New York, Second Department

# Cohn v. Compax Corp.

87 A.D.2d 364 (N.Y. App. Div. 1982)   ·   451 N.Y.S.2d 171

Decided Jun 14, 1982

June 14, 1982

Appeal from the Supreme Court, Nassau County, ALEXANDER VITALE, J.

*Skadden, Arps, Slate, Meagher Flom* ( *James E. Lyon, Michael H. Diamond, Timothy G. Reynolds* and *Robert W. Wien* of counsel), for appellant.

*Irving A. Cohn, P.C.* ( *Allan D. Goldstein* and *Robert W. Fiddler* of counsel), for respondents.

MOLLEN, P.J.

On this appeal, we are called upon to examine the doctrine of patent misuse. The issue at bar arises out of the defendant's efforts to avoid its obligations under a contract for the transfer of rights to certain patent applications and resulting patents. We turn first to a brief review of the pertinent facts.

The Cohn family has been involved in the manufacture of textile machinery since 1929. In 1957, Eugene Cohn and his brother Joseph played a major part in the invention of a process to eliminate shrinkage in the laundering of tubular 365 *365 knit garments. The process was performed by a machine, known as the compactor, which would preshrink knitted goods by rolling and compressing the fabric.

In February, 1957, the Cohns filed an application for a patent in connection with their invention. In January, 1958, they filed two additional patent applications for the compactor. In July, 1958, while the three applications were pending, the Cohns formed the Compax Corporation (Compax) and entered into a contract with it for the transfer of rights under the patent applications. The contract provided in pertinent part that the Cohns "herewith sell, set over, assign and transfer to COMPAX CORP., all of their right, title and interest in and to" the three pending patent applications and any patents "which may issue thereon". The Cohns further assigned "all of their right, title and interest in and to any and all applications for letters patent and the patents which may be issued thereon, and which may be filed in any foreign jurisdiction on the basis of the United States applications for letters patent and the patents which may be issued."

As consideration for the transfer of these rights, Compax agreed to pay a "purchase price" consisting, *inter alia*, of "$2,000, together with 1/4th of all rents, royalties or commissions collected by COMPAX CORP. during the life of the patents on all machinery which it may license and which embodies the methods, apparatus or equipment described in the applications for patents aforementioned or the patents to be issued thereon in the United States or elsewhere." Contemplating a subsequent reduction in the payments due, the contract provided additionally that, if "the machinery, method, apparatus or equipment which is sold or licensed embodies the * * * patents, as well as methods, improvements and apparatus covered by other patents, or embodies the standard finishing operations, methods and apparatus not covered by patents, then * * * the rent, royalties, commissions, costs and profits shall be pro-rated and allocated in such a manner that an equitable sum be reflected as the royalty or profit * * * for the subject invention giving proper effect and

valuation to the royalty or profit applicable to the other patented items as well as the standard finishing operations." *366

All payments described in the contract were to continue "until the expiration of the last patent to be issued in the United States or elsewhere."[1]

[1] In 1961, the parties to the contract agreed to reduce the payments due under the contract from 25% to 10% of all royalties, rents and commissions collected by Compax.

On January 2, 1962, patents were issued on two of the Cohns' patent applications. On April 2, 1963, a third patent was issued. Thereafter, some 15 foreign patents were issued throughout the world. The last of these, issued in Austria, is due to expire on June 15, 1985.

Compax, which passed out of the Cohns' hands in 1968, abided by the contract and did not question its obligations thereunder until July, 1979, when the corporation's president gave notice that the Cohns had been overpaid and that future royalties, if due, would be reduced to reflect the overpayment. It was Compax' position that it was entitled to a proportionate reduction in payments as various patents encompassed by the contract expired. Eugene Cohn and the successors in interest of his now-deceased brother rejected this suggestion, relying on the language of the contract which required Compax to make full royalty payments "until the expiration of the last patent to be issued in the United States or elsewhere."

When Compax refused to make the payments called for under the contract, plaintiffs commenced this action seeking an accounting and damages for breach of contract.[2] Compax interposed two counterclaims, one of which sought a judgment declaring (1) that payments under the contract be limited to royalties, rents and commissions for the use of those processes for which patents have not yet expired, and (2) that, pursuant to the contract, there be a pro rata reduction in payments due for the period between January 3, 1979, the date upon which the first two United States patents expired, and April 2, 1980, the date on which the third and last United States patent expired. Subsequently, Compax moved for partial summary judgment on this counterclaim, seeking a judgment declaring (1) that there be a pro rata reduction in payments due for the period between January 3, 1979 and April 2, 1980, (2) that Compax *367 not be obligated to make payments based upon the use of processes embodied in the United States patents after April 2, 1980, and (3) that, with respect to any period after April 2, 1980, Compax be obligated to make payments based only on the use of processes embodied in unexpired foreign patents and only to the extent that such use is related to the foreign country in which the patent is in effect.

[2] The plaintiffs in this action are Eugene Cohn and the successors in interest of the deceased Joseph Cohn under his will and the will of his wife.

Special Term denied the motion, and Compax now appeals.

Compax does not deny that the plain language of the contract obligates it to pay full royalties until the expiration of the patent last issued — here, the Austrian patent due to expire in 1985. Nevertheless, Compax argues that the contractual provisions are unenforceable because they constitute patent misuse and, therefore, are contrary to public policy. Plaintiffs contend that the doctrine of patent misuse has no application in the context of this case since the contract is not a licensing agreement, but rather an unencumbered sale of all rights to patent applications and resulting patents. Compax replies that the form of the transaction — whether a licensing or a sale — is immaterial to the policy considerations underlying the doctrine of patent misuse.

At the outset, we agree with the plaintiffs' contention, which is not seriously disputed by Compax, that the contract here represents not a

licensing agreement but a full assignment and sale of all the Cohns' rights. (See, e.g., *Waterman v Mackenzie*, 138 U.S. 252; *Hook v. Hook Ackerman*, 187 F.2d 52; *Hooker Chems. Plastics Corp. v. United States*, 591 F.2d 652.) Contrary to the plaintiffs' view, however, we see no conceptual significance in the distinction. (See *Compton v. Metal Prods.*, 453 F.2d 38, 46, cert den 406 U.S. 968.) Nor is it of any particular importance that the contract was entered into before any patents were issued on the Cohns' applications. (See *Reich v. Reed Tool Co.*, 582 S.W.2d 549 [Tex], cert den 446 U.S. 946.) The issue before us, therefore, may be framed as whether a sale of rights under pending patent applications is enforceable where the consideration consists of periodic payments, based on use, to continue unabated and undiminished until *368 the expiration of the last patent issued on the basis of the pending applications. We hold that such a contract may indeed be enforceable and that, on the papers submitted, Compax' motion for partial summary judgment was properly denied.

A patent is a limited monoply which, for a term of 17 years, confers upon an inventor the right to exclude others from making, using or selling his invention. (See US Code, tit 35, § 154.) By rewarding inventive genius, the patent laws serve to promote the progress of science and the useful arts. (See, e.g., *United States v. Masonite Corp.*, 316 U.S. 265, 278.) And, by restricting the reward to a limited period of time, the patent laws assure "not only that members of the public shall be free to manufacture the product or employ the process disclosed by the expired patent, but also that the consuming public at large shall receive the benefits of the unrestricted exploitations, by others, of its disclosures." (*Scott Paper Co. v. Marcalus Co.*, 326 U.S. 249, 255.)

Although the terms of the patent monopoly are limited, patent holders have often been known to seek benefits not contemplated within the grant. Among the devices employed to this end is the imposition of unrelated conditions upon the sale or licensing of the patent. Early cases viewed these attempts as permissible and merely incidental to the lawful implementation of the patent rights. (*Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co.*, 77 F. 288, 296; see, also, *Henry v. A.B. Dick Co.*, 224 U.S. 1.) With the passage of time, however, our "historical antipathy to monopoly" (*Deepsouth Packing Co. v Laitram Corp.*, 406 U.S. 518, 530) led to the imposition of "strict limitations on the power of the patentee to attach conditions to the use of the patented article." (*United States v. Masonite Corp.*, 316 U.S. 265, 277, *supra.*) And, in order to enforce those limitations, the courts developed the doctrine of patent misuse which, operating much like the doctrine of unclean hands in equity, embraces "[t]he idea that a patentee should be denied relief against infringers if he has attempted illegally to extend the scope of his patent monopoly" (*Dawson Chem. Co. v. Rohm Haas Co.*, 448 U.S. 176, 180).

An analysis of the cases dealing with patent misuse strongly suggests that the underlying policy of the doctrine *369 is twofold: to prevent distortions in free competition in the marketing of unpatented products, and to prevent unfair bargaining leverage arising out of the patent grant. (See *American Securit Co. v. Shatterproof Glass Corp.*, 268 F.2d 769, 777, cert den 361 U.S. 902; *Columbia Broadcasting System v American Soc. of Composers, Authors Publishers*, 620 F.2d 930, 935, cert den 450 U.S. 970.) In some instances, these considerations overlap, the use of unfair patent leverage resulting in distortion of free competition in the marketing of unpatented goods. An example of this overlapping is found in the so-called "tying agreement" which coerces the purchase of unpatented material as a condition to the use of a valid patent. Hence such agreements have generally been held to be unlawful and unenforceable as patent misuse. (See *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502; *Carbice Corp. of Amer. v American Patents Dev. Corp.*, 283 U.S. 27; *Leitch Mfg. Co. v*

*Barber Co.*, 302 U.S. 458; *Morton Salt Co. v. Suppiger Co.*, 314 U.S. 488; *B.B. Chem. Co. v. Ellis*, 314 U.S. 495; see, also, *National Lockwasher Co. v. Garrett Co.*, 137 F.2d 255; but see *Dawson Chem. Co. v. Rohm Haas Co.*, 448 U.S. 176 , *supra*.)

Similarly, courts have found patent misuse in the practice of "mandatory packaging" whereby a prospective licensee is coerced into accepting unwanted licenses in order to gain the use of a desired patent. (See, e.g., *American Securit Co. v. Shatterproof Glass Corp.*, 268 F.2d 769, *supra*.) This practice is proscribed because it is said to permit the patentee to employ "one patent as a lever to compel the acceptance of a license under another." ( *Supra*, at p 777.) Nevertheless, the courts have been careful to distinguish between mandatory packaging agreements and voluntary ones. If business convenience, rather than the patentee's insistence, dictates a packaging provision, the agreement will be upheld against a claim of patent misuse. (See *Zenith Corp. v. Hazeltine*, 395 U.S. 100; *Automatic Radio Co. v Hazeltine*, 339 U.S. 827.)

A third category of patent misuse — and the one claimed to be at issue in the case at bar — is the practice of attempting to extend the patent monopoly beyond the expiration of the patent. Most frequently such misuse is *370 charged where an agreement calls for the payment of royalties after the patent has expired.

Early cases operated under the implicit assumption that, if a contract unambiguously provided for such royalties, they could be lawfully collected. (See, e.g., *Squibb Sons v. Chemical Foundation*, 93 F.2d 475, 477; *Pressed Steel Car Co. v. Union Pacific R.R. Co.*, 270 F. 518, 525; *Sproull v. Pratt Whitney Co.*, 108 F. 963, 965; *Tate v. Lewis*, 127 F. Supp. 105; *H-P-M Dev. Corp. v. Watson-Stillman Co.*, 71 F. Supp. 906; *McLeod v. Crawford*, 176 Neb. 513; *Adams v. Dyer*, 129 Cal.App.2d 160; *Six Star Lubricants Co. v. Morehouse*, 101 Col 491.) This view began to change, however, with the advent of the Supreme Court's decision in *Scott Paper Co. v. Marcalus Co.* ( 326 U.S. 249, *supra*).

There, a patentee assigned his patent to another, and then himself infringed upon the assigned patent. When the assignee commenced an infringement action, the patentee raised as a defense the contention that the machine in question was a copy of that of an expired, prior art patent. The assignee argued that the patentee was estopped from attacking the validity of the patent he had assigned, but the Supreme Court, rejecting this estoppel argument, observed (326 US, at pp 255-256): "If a manufacturer or user could restrict himself, by express contract, or by any action which would give rise to an `estoppel,' from using the invention of an expired patent, he would deprive himself and the consuming public of the advantage to be derived from his free use of the disclosures. The public has invested in such free use by the grant of a monopoly to the patentee for a limited time. *Hence any attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws."* (Emphasis supplied.)

Seizing upon the emphasized language above, several subsequent cases began to question the validity of agreements which called for royalties beyond the life of the patent. (See, e.g., *April Prods. v. Schirmer, Inc.*, 308 N.Y. 366, 373; *Scapa Dryers v. Abney Mills*, 269 F.2d 6; *Prestole Corp. v. Tinnerman Prods.*, 271 F.2d 146; *Technograph Printed Circuits v. Bendix Aviation Corp.*, 218 F. Supp. 1, *371 affd 327 F.2d 497, cert den 379 U.S. 826.) And, finally, in 1962, the Third Circuit Court of Appeals unequivocally declared that any attempt to exact royalties after the expiration of the patent was unenforceable. ( *Ar-Tik Systems v. Dairy Queen*, 302 F.2d 496, 510.)

Two years later, the Supreme Court addressed the issue in *Brulotte v. Thys Co.* ( 379 U.S. 29), the case upon which Compax here places almost complete reliance in attempting to have its contract held unenforceable. We turn, therefore, to an examination of the holding of *Brulotte.*

In *Brulotte*, the respondent, who owned patents for hop picking, sold several machines to the petitioners. Each machine incorporated seven of the respondent's patents. The machines were sold for a flat sum and, in addition, the respondent issued to each petitioner a license for the use of the machine. Under the licenses, the respondent was to receive from each petitioner a royalty of $500 for each hop picking season, or $3.33 1/3 per 200 pounds of dried hops harvested by the machine, whichever was greater. It was also agreed that the licenses could not be assigned nor could the machines be removed from the county of sale. All seven patents incorporated in the machines expired prior to the expiration date of the licenses.

In addressing the legality of the licensing agreements, the Supreme Court wrote (379 US, at pp 32-33):

"`[W]hatever the legal device employed' * * * a projection of the patent monopoly after the patent expires is not enforceable. The present licenses draw no line between the term of the patent and the post-expiration period. The same provisions as respects both use and royalties are applicable to each. The contracts are, therefore, on their face a bald attempt to exact the same terms and conditions for the period after the patents have expired as they do for the monopoly period * * *

"[W]e conclude that a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se.* If that device were available to patentees, the free market visualized for the post-expiration period would be subject to monopoly influences that have no proper place there * * * *372

"A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly. But to use that leverage to project those royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent by tieing the sale or use of the patented article to the purchase or use of unpatented ones."

Ultimately the court held that the judgment rendered for the respondent in the State court "must be reversed insofar as it allows royalties to be collected which accrued *after the last of the patents incorporated into the machines had expired"* ( *supra*, at p 30; emphasis supplied). In reaching its conclusion, the court distinguished its earlier holding in *Automatic Radio Co. v. Hazeltine* ( 339 U.S. 827, *supra*).

There the respondent was a radio research organization which derived its income from licensing its patents. It entered into a contract with the petitioner, a manufacturer of radio broadcasting receivers, whereby, in return for royalties amounting to a percentage of petitioner's selling price of its receivers, the petitioner obtained a nonexclusive license to use any or all of the 570 patents which the respondent held and any others to which it might acquire rights. Under the contract, the petitioner was required to pay the royalty whether or not it used any of the respondent's patents. The Supreme Court upheld the contract essentially as a voluntary packaging agreement.

Significantly, the *Brulotte* court, in distinguishing *Automatic Radio*, observed that there, "[w]hile some of the patents * * * apparently had expired, *the royalties claimed were not for a period when all of them had expired."* ( *Brulotte v Thys Co., supra*, p 33; emphasis supplied.) Thus, the precise holding of *Brulotte* appears to be that, although it is generally unlawful to project royalties beyond the life of a patent, where a package of patents is involved, it is unlawful only to collect royalties after the last of the patents has expired.

372

Nevertheless, some courts have extended the *Brulotte* rule to require a proportionate reduction in royalties as individual patents encompassed by an agreement expire. (See *Rocform Corp. v Acitelli-Standard Concrete Wall*, *373 367 F.2d 678; *American Securit Co. v. Shatterproof Glass Corp.*, 268 F.2d 769, *supra.*) But those cases generally involve mandatory packaging agreements whereby the inclusion of several patents is at the patentee's insistence. In contrast, in post- *Brulotte* cases involving voluntary packaging agreements, courts have found no prohibition against fixed royalties, based on total sales, payable until the expiration of the patent last issued. (See *Well Surveys v. Perfo-Log, Inc.*, 396 F.2d 15, 18; *Beckman Instruments v. Technical Dev. Corp.*, 433 F.2d 55, 60-61, cert den 401 U.S. 976; *GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1236.)

We are not persuaded that the *Brulotte* holding ought to be extended so as to require a proportionate reduction in royalties to reflect individual patent expiration in all cases involving the sale or licensing of several patents. Instead, we hold that a contract which calls for royalties based on total use until the expiration of the patent last issued is lawful and enforceable if the total-use royalty provision is the product of the mutual convenience of the parties and not of unfair patent leverage exerted by the patentee.

The contract at bar, in essence, is a packaging agreement, assigning rights to three separate patent applications and to any resulting patents, domestic or foreign, based on those applications. The enforceability of the total-use royalty provision at issue, therefore, must depend upon the nature of the negotiations which led to it. In its papers submitted in support of its motion for partial summary judgment, Compax has failed to demonstrate that the negotiations which resulted in the contract were marked by the Cohns' use of unfair patent leverage. Whether Compax can establish the use of such leverage, therefore, is a question which must await a plenary trial and, hence, we hold that Compax' motion for partial summary judgment was properly denied.

Accordingly, the order appealed from should be affirmed.

WEINSTEIN, GULOTTA and THOMPSON, JJ., concur.

Order of the Supreme Court, Nassau County, dated December 18, 1980, affirmed, with $50 costs and disbursements.

374 *374