**EXHIBIT 1**

**Varel's Appendix of Cases**

Varel-Appx-#

1. *Adams v. Pearl River Valley Water Supply Dist.*, No. 21-60749,

    2022 WL 2829756 (5th Cir. July 20, 2022).........................................002

2. *Ameranth, Inc. v. Chownow, Inc.*, 3:20-cv-02167-BEN-BLM,

    2021 WL 3686056 (S.D.Cal. Aug. 19, 2021) ....................................006

3. *Board of Regents Univ. of Tex. Sys. v. Mission Pharm. Co.*,

    2006 WL 8436935 (N.D. Tex. June 12, 2006) ..................................032

4. *Bradley Corp. v. Lawler Mfg. Co., Inc.*,

    2020 WL 7027875 (S.D. Ind. Nov. 30, 2020) ...................................035

5. *Cohn v. Compax Corp.*, 87 A.D.2d 364 (N.Y. App. Div. 1982) ................045

6. *Corrosion Prevention Technologies LLC v. Hatle*, 4:20-cv-2201,

    2020 WL 6202690 (S.D.Tex. October 22, 2020) (Hanen, J.)...........050

7. *Green v. Rocket Rsch. Corp.*, 12 Wash. App. 613; 530 P.2d 1340 (1975).................056

8. *Landeros v. Transamerica Life Ins. Co.*, 2019 WL 9123531
    (S.D. Tex. Sept. 17, 2019) .................................................061

9. *Levi Strauss & Co. v. Aqua Dynamics Sys.*, 2016 WL 1365946
    (N.D. Cal. Apr. 6, 2016) ...................................................068

10. *McLeod v. Crawford*, 176 Neb. 513 (Neb. 1964) ...................................076

11. *Regents of Univ. of Minn. v. Med., Inc.*, 405 N.W.2d 474 (Minn. Ct. App. 1987)....085

12. *Recif Res., LLC v. Juniper Capital Advisors, L.P.*, 2019 WL 5457705

    (S.D. Tex. Oct. 24, 2019)..................................................088

13. *Reich v. Reed Tool Co.*, 582 S.W.2d 549 (Tex. Civ. App. 1979) ...........097

Varel's Response in Opposition to Plaintiffs' Motion to Dismiss and Remand

Case 4:23-cv-00730 Document 37-1 Filed on 04/26/23 in TXSD Page 2 of 102

Adams v. Pearl River Valley Water Supply District, Not Reported in Fed. Rptr. (2022)

2022 WL 2829756

2022 WL 2829756
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

John Quincy ADAMS, on behalf of themselves and all others situated; Alean Adams, on behalf of themselves and all others situated, Plaintiffs—Appellants,

v.

PEARL RIVER VALLEY WATER SUPPLY DISTRICT; Jennifer Hall; Ben Evans; Billy Cook; Jack Winstead; Samuel Mitchell; Lonnie Johnson; Tedrick Ratcliff; Kenny Windham; Bruce Brackin; Phillip Crosby; John Pittman; Kenny Latham; W. C. Gorden, Defendants—Appellees.

No. 21-60749
|
Filed: July 20, 2022

Appeal from the United States District Court for the Southern District of Mississippi, USDC No. 3:20-CV-469, Henry T. Wingate, U.S. District Judge

**Attorneys and Law Firms**

David Daniel O'Donnell, Esq., Clayton O'Donnell, P.L.L.C., Oxford, MS, Ellis Turnage, Turnage Law Office, Cleveland, MS, for Plaintiffs—Appellants.

Justin Lee Matheny, Esq., Wilson Douglas Minor, Esq., Assistant Attorney General, Office of the Attorney General, Jackson, MS, for Defendants—Appellees.

Before King, Elrod, and Southwick, Circuit Judges.

**Opinion**

Per Curiam:[*]

**\*1** Two Mississippi residents sued a state agency and its directors. They alleged violations of federal and state law arising out of that agency's failure to notify them of the sale of property they formerly owned. The plaintiffs cannot show an imminent threat of injury. We AFFIRM the dismissal but

conclude that the dismissal must be revised to one without prejudice. Thus, we also VACATE and REMAND.

**FACTUAL AND PROCEDURAL BACKGROUND**

John Quincy Adams and Alean Adams are Mississippi residents who once owned and lived on a parcel of land near what is now the Ross Barnett Reservoir. The Reservoir is the second largest lake in the state. Caleb Smith, *Lakes*, Miss. Enc. 702–03 (2017). In 1958, the Mississippi Legislature created the Pearl River Valley Water Supply District, tasking it with acquiring necessary real property, creating the Reservoir by constructing a dam on the Pearl River, and then managing the lake and adjacent acquired land.[1] Miss. Code. Ann. § 51-9-103. The waters released from the dam flow unvexed to the Gulf of Mexico, first along the eastern limits of the nearby city of Jackson, then southerly until forming, for the last 100 miles or so, the boundary between Mississippi and Louisiana.

The District is empowered "[t]o acquire by condemnation all property of any kind ... within the project area." Miss. Code. Ann. § 51-9-121(f). If the District decides that any of the land it has acquired is to be "rented, leased, or sold ... for the purpose of operating recreational facilities thereon for profit," the District must solicit bids, determine the highest bid, then notify the former owner of the "amounts, terms, and conditions" of that bid. *Id.* A former owner then will "have the exclusive right at his option, for a period of thirty (30) days after the determination of the highest and best bid by the board, to rent, lease, or purchase said site or plot of land by meeting such highest and best bid and by complying with all terms and conditions of the renting, leasing, or sale as specified by the board." *Id.*

In July 2020, the Adamses filed their complaint in the United States District Court for the Southern District of Mississippi. Six weeks later they filed an amended complaint. The defendants include the thirteen directors of the District in their official capacities, and the complaint alleged numerous federal and state law claims.

According to the amended complaint, the District acquired the relevant land in two separate deeds from the plaintiffs and other family members in 1960. One transaction involved 2 acres on which the plaintiffs lived, while the other was a conveyance of 118 acres to the District by John Quincy Adams's father. Later in his father's will, John Quincy Adams

Case 4:23-cv-00730   Document 37-1   Filed on 04/26/23 in TXSD   Page 3 of 102

Adams v. Pearl River Valley Water Supply District, Not Reported in Fed. Rptr. (2022)

2022 WL 2829756

received a 1/11 share of any property in which his father "may have [had] an interest." The amended complaint sets out claims for a class of all former owners of property that was acquired by the District. No motion to certify the class was ever filed. In general terms, without ever identifying any particular transaction, the amended complaint alleged that the District has failed to provide the requisite notice to former owners when it sells or leases property that it acquired.

 *2  The Adamses claim that the District violated Section 51-9-121(f) when it failed to give them notice of pending sales or leases of their former property. The Adamses further alleged that these violations form the basis of Fourteenth Amendment procedural and substantive due process violations and Fifth Amendment Takings Clause violations, enforceable under 42 U.S.C. § 1983. The Adamses requested a declaratory judgment that the District's sales and leases of property without notice were ongoing constitutional violations and asked the court to fashion whatever injunctive relief it deemed necessary to correct the violations going forward, including ancillary monetary relief.

In September 2020, the District moved to dismiss. With their opposition filed in October, the plaintiffs included ten exhibits reflecting some past advertisements by the District for bids on property (there is no assertion this was the plaintiffs' property) along with other evidence. In October 2020, counsel for the plaintiffs filed a response which contains, as far as we can tell, the only reference to the District's sale or lease of part of the 118 acres. The claim was that a residential subdivision is on part of the former family tract. In February 2021, an affidavit from each named plaintiff was filed. The affidavits gave more details on the family's sale of property to the District, including their doing so only on threat of condemnation, and also some details on the probate of the will of John Quincy Adams's father. The only allegation about a specific sale or lease by the District is in John Quincy Adams's affidavit. In one sentence, he claims that at some point after the sale, a church "was built on *or near* our land deeded" to the District (emphasis added.) The affidavit also asserts that the District never notified them of an opportunity to match the highest bid on the property. There is nothing in the affidavits about a subdivision on any of the father's former land nor when the District offered any of their former property for public bidding.

In September 2021, the district court dismissed the lawsuit on the basis that there was no jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). The court concluded that the District was entitled

to sovereign immunity and that the plaintiffs failed to show that an exception for injunctive relief announced in *Ex parte Young*, 209 U.S. 123 (1908), applied here. Consequently, the action was dismissed. The Adamses timely appealed.

## DISCUSSION

This court "review[s] Eleventh Amendment immunity determinations, like other questions of subject matter jurisdiction, *de novo* as a question of law." *United States v. Texas Tech Univ.*, 171 F.3d 279, 288 (5th Cir. 1999). The plaintiffs filed several exhibits and also two affidavits. The district court did not explicitly rely on any of that evidence when dismissing the case. If the court did rely in some manner, there was no error in doing so. When considering a Rule 12(b)(1) motion, a district court may go beyond the pleadings to affidavits and other evidence to determine its jurisdiction. *See Williamson v. Tucker*, 645 F.2d 404, 413–14 (5th Cir. 1981).

At the 12(b)(1) stage, the plaintiffs bear the burden of demonstrating jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). This court, though, can affirm "on any grounds supported by the record, including a party's lack of standing." *Hosein v. Gonzales*, 452 F.3d 401, 403 (5th Cir. 2006). Although the district court analyzed the case on the basis of sovereign immunity, we instead will analyze standing, which can "significantly overlap" that analysis. *See City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (quotation marks and citation omitted).

 *3  A litigant seeking redress in federal court must show that he has standing to pursue his claims. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish standing, a plaintiff must demonstrate an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

Litigants must also demonstrate standing with respect to the *type* of relief they seek. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). The Adamses recognize that they must seek prospective injunctive relief to even attempt to escape the state's sovereign immunity defense. To proceed with such a claim for prospective injunctive or declaratory relief, a plaintiff must demonstrate continuing harm or a "real and immediate threat of repeated injury in the future."

Case 4:23-cv-00730   Document 37-1   Filed on 04/26/23 in TXSD   Page 4 of 102
Adams v. Pearl River Valley Water Supply District, Not Reported in Fed. Rptr. (2022)

2022 WL 2829756

*Society of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992). The threat of future injury must be "certainly impending"; mere "[a]llegations of *possible* future injury" do not suffice. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis omitted) (quotation marks and citations omitted). Past wrongs, of course, can be "evidence bearing on whether there is a real and immediate threat of repeated injury," but alone they may be insufficient to establish standing for prospective relief. *See Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021) (quoting *Lyons*, 461 U.S. at 102).

*Lyons* is particularly relevant to our analysis. There, the Supreme Court considered whether a plaintiff had standing to pursue prospective relief against police officers who had performed an illicit chokehold on him. *See Lyons*, 461 U.S. at 105. The Court noted that his standing to pursue that relief "depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* In concluding that he could not make such a showing, the Court noted that the alleged incident — which occurred only five months earlier — did "nothing to establish a real and immediate threat that he would again be stopped" and subjected to that method of restraint. *Id.*

Here, although the Adamses purport to act on behalf of a class, no motion to certify was filed. The Adamses must demonstrate that *they* have been injured, regardless of any class certification, and we will consider the allegations only as to them. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016). We identify two relevant assertions. First, John Quincy Adams submitted an affidavit stating that the two acres sold to the district in 1960 were subsequently sold or leased and notice was not given. Second, the plaintiffs allege that John Quincy Adams's father, Joseph, sold 118 acres of land to the District, some of which were later sold or leased. Further, 15 named heirs, including John Quincy Adams, were not given notice.

The Adamses' response in opposition to the District's motion to dismiss contains only nonspecific allegations of "ongoing present and future development" of the District's land. We are not required, though, to accept "a legal conclusion couched as a factual allegation," and we instead look to the actual facts alleged. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The Adamses identify only a possible *past* wrong: they "have suffered and been deprived of statutory notice of the impending lease or sale" of their former property. They do not allege, plausibly or otherwise, that there is a real and immediate possibility that the property will be leased or sold in the future.

**\*4** Once any claims for monetary relief were properly dismissed because of sovereign immunity, all that remains was in essence a demand for the court to order the District to comply with state law in the future as to any of the family's former land. Even if the Adamses' rights were violated in the past, the Adamses have at best offered "[a]llegations of *possible* future injury" that they have not claimed is imminent, or "*certainly impending*," or anything other than speculative. *See Clapper*, 568 U.S. at 409 (quotation marks and citation omitted).

We uphold the dismissal of the complaint for lack of standing. The complaint, though, should not have been dismissed with prejudice. The suit was dismissed on a Rule 12(b)(1) motion. If the court did not have jurisdiction, it could not enter an order on the merits; declaring that the plaintiff cannot bring another suit is a merits decision. *Heaton v. Monogram Credit Card Bank of Ga.*, 231 F.3d 994, 1000 (5th Cir. 2000).

We AFFIRM the dismissal but VACATE and REMAND for the limited purpose of allowing the district court to enter a revised order dismissing the claims without prejudice.

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 2829756

---

Footnotes

\*    Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

1    The District describes itself this way: "The Pearl River Valley Water Supply District is the state agency created to construct and manage the 33,000-acre Barnett Reservoir and the 17,000 acres surrounding the lake.... A Board of Directors approves plans and projects for the District. The board members represent four state agencies and five counties

**Adams v. Pearl River Valley Water Supply District, Not Reported in Fed. Rptr. (2022)**

2022 WL 2829756

that it serves in Central Mississippi." *About Us*, Barnett Reservoir, Pearl River Valley Water Supply District, https://www.therez.ms.gov/Pages/About.aspx.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3686056
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

AMERANTH, INC., a
Delaware corporation, Plaintiff,
v.
CHOWNOW, INC., a Delaware
corporation, Defendant.
ChowNow, Inc., a Delaware
corporation, Counter-claimant,
v.
Ameranth, Inc., a Delaware
corporation, Counter-defendant.

Case No.: 3:20-cv-02167-BEN-BLM
|
Signed 08/18/2021
|
Filed 08/19/2021

**Attorneys and Law Firms**

William J. Caldarelli, Caldarelli, Hejmanowski, Page & Leer, LLP, San Diego, CA, for Plaintiff/Counter Defendant.

Leiv Blad, Lowenstein Sandler LLP, Palo Alto, CA, for Defendant/Counter Claimant.

**ORDER DENYING PLAINTIFF'S MOTION TO:**

**(1) DISMISS THE COUNTERCLAIM FOR (A) FAILURE TO STATE A CLAIM AND (B) LACK OF SUBJECT MATTER JURISDICTION AND**

**(2) REMAND TO STATE COURT PURSUANT TO 28 U.S.C. § 1447(c)**

**ECF No. 12, 13, 15, 19, 20, 24, 28, 29, 30]**

ROGER T. BENITEZ, United States District Judge

**I. INTRODUCTION**

**\*1** Plaintiff/Counter-defendant Ameranth, Inc., a Delaware corporation ("Plaintiff" or "Ameranth") brings this action for breach of a patent licensing agreement against Defendant/ Counter-claimant ChowNow, Inc., a Delaware corporation ("Defendant" or "ChowNow"). ECF No. 1; *see also* ECF No. 12-1 at 6:3-4.

Before the Court are the following Motions: Plaintiff's Motion to (1) Dismiss for (a) Failure to State a Claim for Relief and (b) Lack of Subject Matter Jurisdiction and (2) Remand to State Court, ECF No. 12 (the "Motions"). Defendant opposed both motions. ECF No. 19. Plaintiff replied. ECF No. 24. The Motions were submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure. ECF No. 25. After considering the papers submitted, supporting documentation, and applicable law, the Court **DENIES** both of Plaintiff's Motions.

**II. BACKGROUND**

A judge in this district recently noted that this is by no means the first patent infringement case brought by Ameranth and will undoubtedly not be the last. *See, e.g., Ameranth, Inc. v. Domino's Pizza, Inc.*, No. 3:12-cv-00733-DMS-WVG, 2021 WL 409725, at \*1 (S.D. Cal. Feb. 5, 2021), *reconsideration denied*, No. 12CV0733 DMS (WVG), 2021 WL 1853553 (S.D. Cal. May 10, 2021) (listing forty-three (43) patent infringement cases filed by Ameranth in the Southern District of California).[1] The instant case arises from Ameranth's ownership of several patents licensed to Defendant. *See generally* ECF No. 1. Defendant eventually ceased paying royalties to Plaintiff on the basis that, *inter alia*, it believed it did not practice the patents covered by the underlying license agreement and most of those patents had been declared invalid. *Id.* Plaintiff contends that Defendant's failure to continue paying royalties constitutes a breach of the agreements between the parties. *Id.*

**A. Statement of Facts**[2]
**\*2** Plaintiff is a San Diego-based online and mobile food ordering technology and software company that provides web and mobile data synchronization solutions as part of its food and beverage technology systems to restaurants throughout the United States. Complaint, ECF No. 1-2 ("Compl.") at 3:6-9[3]; *see also* Motion to Dismiss and Remand, ECF No. 12-1 ("Mot.") at 7:12-14. The United States Patent and Trademark Office ("USPTO") issued

2021 WL 3686056

multiple utility patents to Plaintiff, including Patent Nos. 6,384,850 (the "850 Patent"), 6,871,325 (the "325 Patent"), 6,982,733 (the "733 Patent"), 8,146,077 (the "077 Patent"), 9,009,060 (the "060 Patent"), and 9,747,651 (the "651 Patent") (collectively, the Licensed Patents"). Plaintiff also has other related patent applications pending. Mot. at 7:14-17; *see also* Opposition to Motion to Dismiss and Remand, ECF No. 19 ("Oppo.") at 7:25-28. These patents pertain to a "synchronous communications system and method for generation of computerized menus." Cross-Complaint, ECF No. 1-4 ("Cross-Compl.") at 4:11-13. Plaintiff readily admits that it licenses "its patents to dozens of companies in the hospitality industry." Mot. at 7:17-18.

Defendant is also an online and mobile food ordering company that provides food and beverage ordering technology systems and services to restaurants throughout the United States, including in San Diego, California. Compl. at 3, ¶ 4. Defendant provides its local restaurant customers with Software as a Service tools to help them grow their business by allowing them to process an unlimited number of customer orders through their own websites and mobile applications for a fixed monthly cost. Cross-Compl. at 3, ¶ 2.

**1.** *Initial Lawsuit*

On May 18, 2012, Plaintiff sued ChowNow in the Southern District of California in *Ameranth, Inc. v. ChowNow, LLC*, Case No. 3:12-cv-01201-JLS-NLS ("*ChowNow I*"), alleging three counts of infringement pertaining to the 850, 325, and 077 patents, arising out of Defendant's alleged use of Plaintiff's three aforementioned patents. *ChowNow I*, ECF No, 1; *see also* Mot. at 7:22-23; Oppo. at 7:19-22. This case was voluntarily dismissed pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure ("FRCP"), *with prejudice*, due to a settlement between the parties. *ChowNow I*, ECF No. 8.

**2.** *ChowNow I Settlement Resulting in Licensing Agreements*

On June 22, 2012, as part of the settlement reached in *ChowNow I*, Plaintiff and Defendant entered into an original licensing agreement pursuant to which Plaintiff granted a non-exclusive license[4] to Defendant to certain patents owned by Plaintiff in consideration for Defendant's agreement to (1) mark its system with Plaintiff's patents; (2) submit quarterly

reports to Plaintiff of Defendant's royalty producing activities within the Fields of Use[5]; and (3) make royalty payments to Plaintiff." Mot. at 8:3-7; Oppo. at 8:9-15; *see also* Compl. at 3:13-17; Licensing Agreement, ECF No. 14-1 at 3, § 2.1.1. The licensing agreement (the "Licensing Agreement") pertained to the 850 Patent, 325 Patent, 733 Patent, and 077 Patent. ECF No. 14.

**\*3** This Licensing Agreement does not preclude Plaintiff from suing Defendant for patent infringement arising out of Defendant's use of the Licensed Patents outside the Field of Use or for Defendant's discontinuation of royalty payments, which would cause the Agreement to terminate. Other sections of the Agreement, such as Section 2.2.1, governing Plaintiff's "Release of Claims" confirm this:

> Ameranth hereby releases and forever discharges, and covenants not to sue ChowNow ... from any and all claims, causes of action ... known or unknown, actual or potential, suspected or unsuspected,... which Claims have been, or could have been, made ***as of the Effective Date of this Agreement***, or ***which might be made at any time in the future***, **that arise out of**, or relate to, directly or indirectly, the **alleged infringement**, prior to the Effective Date, of the Licensed Patents by any ChowNow ... product, device, article of manufacture, service or system used or to be used ***in the Field of Use.***

Licensing Agreement, ECF No. 14-1 at 3, § 2.2.1 (emphasis added). Thus, the release only applied to infringement occurring before the Agreement within the Field of Use. *See id.*; *see also id.* at 5, § 3.1 (providing that "[t]he Patent License grant set forth herein to ChowNow is limited to the Fields of Use").

On December 20, 2013, Plaintiff and Defendant entered into the First Amended License Agreement (the "FAA"), the operative contract in dispute in this lawsuit, which pertains to the same four Licensed Patents, contains similar terms, and provides Defendant with non-exclusive licensing rights in exchange for Defendant's obligation to pay certain running royalties. Mot. at 8:8-14; Oppo. at 8:16-22; Compl. at 3:21-28. Both the Licensing Agreement and FAA (collectively, the "Agreements") contain a provision, Section 5.3, stating that "[t]he Royalty Payments shall no longer be due if all claims under the Licensed Patents are finally held invalid and/or the Licensed Patents are held to be unenforceable (after all appeals are exhausted) prior to the due date for such Royalty Payments." Licensing Agreement, ECF No. 14 at 7, FAA, § 5.3; *see also* Compl. at 4:14-18 (quoting

Amaranth, Inc. v. ChowNow, Inc., Slip Copy (2021)
Case 4:23-cv-00730   Document 37-1   Filed on 04/26/23 in TXSD   Page 8 of 102

2021 WL 3686056

same"). Additionally, pursuant to Section 6.3 of the FAA, if one party "materially defaults in the performance of any provision of this Agreement," the non-defaulting party may provide written notice to the defaulting party, and if the defaulting party fails to cure the default "within sixty (60) days of provision of such notice, the Agreement will terminate." FAA at 8, § 6.3. Upon termination of the Agreements "for any reason, all rights granted to ChowNow under Section 2 of this Agreement, and any responsibility of ChowNow to make future payments to Amaranth beyond the date of termination, will immediately terminate." *Id.* at 8, § 6.4. Thus, based on these provisions, if one party, like Defendant, breached the Agreements and failed to cure that breach within sixty days, the Agreements terminated, "all bets were off," and Plaintiff could sue Defendant for patent infringement.

### 3. *Federal Circuit Invalidation of Three of the Licensed Patents*

In 2016, the Federal Circuit (1) affirmed the PTAB's determination that "[c]laims 1-11 of the 850 patent, claims 1-10 of the 325 patent, and claims 1-16 of the 733 patent are all unpatentable under § 101" and (2) reversed the PTAB's determinations that the other claims were patentable. *Apple, Inc. v. Amaranth, Inc.*, 842 F.3d 1229, 1245 (Fed. Cir. 2016).[6] A few years later, in *Amaranth, Inc. v. Domino's Pizza, LLC*, 792 F. App'x 780, 782, 788 (Fed. Cir. 2019), *cert. denied*, ––– U.S. ––––, 141 S.Ct. 249, 208 L.Ed.2d 23 (2020), the Federal Circuit affirmed the district court's entry of judgment that claims 1, 6-9, 11, and 13-18 of Plaintiff's 077 Patent were "patent ineligible." Thus, the aforementioned claims have been adjudicated as unpatentable, and this Court is bound by those rulings. *See, e.g., Pfaff v. Wells Electronics, Inc.*, 5 F.3d 514, 518 (Fed. Cir. 1993) (providing that "where a determination of the scope of patent claims was made in a prior case, and the determination was essential to the judgement there on the issue of infringement, there is collateral estoppel in a later case on the scope of such claims."). Further, the United States Supreme Court denied Plaintiff's petition for writ of *certiorari* on October 5, 2020, declining to reverse the ruling of invalidity as to the 077 Patent. ECF No. 18 at 7:18-20. Thus, the only remaining valid patents appear to be the 060 Patent and the 651 Patents, which were not subject to either licensing agreement. *See* ECF No. 14 - 14-1. However, the 060 and 651 Patents "claim priority from the applications that issued as the '077, '733, and/or '850 Patents." Cross-Compl. at 7:18-21. Because these patents claim priority from the 077, 733, and 850 Patents, they

fall under the Agreements' based upon their plain language. However, within the past year, a court in Delaware invalidated the 651 Patent. *See, e.g., Natera, Inc. v. ArcherDX, Inc.*, No. CV 20-125-LPS, 2020 WL 6043929, at *7 (D. Del. Oct. 13, 2020) (finding that even after applying Amaranth's proposed construction for the 651 Patent for an "information management and synchronous communications system for use in the hospital services industry," the claims are not patentable). As a result, only the 060 Patent appears to remain at issue.[7]

### 4. *ChowNow's Post-Invalidation Default under the Agreements*

 **\*4** Defendant claims that in 2018, it concluded that it finally had sufficient resources to evaluate its alleged use of Plaintiff's Licensed Patents in the ChowNow Platform, and as a result of this investigation, "ceased making royalty payments to [Plaintiff] after April 30, 2018—the payment due date for the first quarter of 2018." Oppo. at 8:24-9:7.

On August 31, 2018, Plaintiff served Defendant with a written Notice of Default of License Agreement for Failure to Pay Royalties. Compl. at 6:4-5. On September 28, 2018, Plaintiff's legal counsel sent another letter to Defendant demanding that the parties engage in mediation by no later than November of 2018, as required by section 9.2.2 of the FAA. Compl. at 6:15-17.

On October 11, 2018, Defendant's legal counsel sent Plaintiff a responsive letter. *Id.* at 6:19-20. Subsequently, on November 1, 2018, representatives for both Amaranth and ChowNow met but were unable to resolve their dispute. *Id.* at 7:9-11.

The 077, 733, 325, and 850 Patents expired on September 21, 2019. Cross-Compl. at 8:27-28. As Plaintiff notes, "[u]nder section 6.1, the license agreements remain in effect until all of the Licensed Patents expire, unless otherwise terminated earlier."[8] Mot. at 9:13-14. Plaintiff admits that the remaining 060 Patent "is a continuation in part of the '077 Patent, which is one of the patents specifically identified in section 1.3 of the License Agreement," and "[t]hus, the '060 patent is one of the Licensed Patents under the License Agreement" even though the other patents specifically mentioned in the FAA are no longer valid (either due to judicial declaration or expiration). Mot. at 9:25-28. Further, the 060 Patent issued on April 24, 2015, before the expiration of the patents preceding it. *See also* Mot. at 15:25-28 (stating that "[i]t is undisputed

that, as of the filing date of the Complaint, Amaranth holds patents and patent claims that have not been found invalid or unenforceable, including but not limited to all claims of the '060 patent.").

### B. Procedural History

On October 1, 2020, Plaintiff filed suit against Defendant in the San Diego Superior Court, *Amaranth, Inc. v. ChowNow, Inc.*, San Diego Superior Court Case No. 37-2020-00034944-CU-BC-CTL, alleging causes of action for (1) breach of written contract; (2) declaratory relief; and (3) unjust enrichment, while also seeking damages, declaratory relief, and costs. Compl. at 1-12. The declaratory relief sought to require Defendant to provide quarterly reports and pay Plaintiff royalty payments through October 1, 2020,[9] which Plaintiff alleges were required under the FAA. Compl. at 11:1-7.

On November 4, 2020, Defendant timely filed a General Denial and Statement of Affirmative Defenses in the state court action, asserting affirmative defenses pertaining to Defendant's non-infringement of the Licensed Patents, the invalidity of the Licensed Patents, patent misuse, and preemption by federal law. Answer, ECF No. 1-3 ("Ans."). That same day, Defendant also filed a cross-complaint, seeking declaratory judgments pursuant to 28 U.S.C. § 2201, pleading five causes of action for a declaration of non-infringement of the 077, 060, and 651 Patents as well as a declaration of invalidity of the 077 and 060 Patents. Cross-Compl. at 1-31. Also on November 4, 2020, after filing its General Denial and Cross-Complaint in the San Diego Superior Court, Defendant filed a Notice of Removal, asserting that the federal court "has original jurisdiction under 28 U.S.C. §§ 1331 and 1338," and that removal is proper "pursuant to 28 U.S.C. §§ 1441(a), 1446, and 1454." ECF No. 1 at 4:11-13.

**\*5** On November 19, 2020, Plaintiff timely filed the instant Motions. *See* Mot. On December 7, 2020, Defendant opposed. *See* Oppo. On December 11, 2020, Plaintiff filed its reply. Reply, ECF No. 24 ("Reply").

On December 7, 2020, Defendant filed amended counterclaims, containing the same claims for relief as its cross-complaint filed in the superior court while adding eight additional claims for relief for (1) declaration of invalidity as to the 651 Patent; (2) unenforceability of the 077 Patent; (3) declaration of unenforceability of the 060 Patent; (4)

declaration of unenforceability of the 651 Patent; (5) bad faith enforcement of patents, 15 U.S.C. § 2; (6) bad faith enforcement of patents through a pattern of sham litigation, 15 U.S.C. § 2; (7) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200; and (8) unjust enrichment. ECF No. 18.

On February 16, 2021, Defendant filed a Notice of Supplemental Authority in Support of Plaintiff's Motion. ECF No. 28. On June 24, 2021, Defendant provided another Notice Supplemental Authority. ECF No. 29. On June 25, 2021, Plaintiff filed an Objection to Defendant's second Notice of Supplemental Authority. ECF No. 30.

### III. LEGAL STANDARD

#### A. Motion to Dismiss

#### 1. *Lack of Subject Matter Jurisdiction (FRCP 12(b)(1))*

FRCP 12(b)(1) allows a defendant to seek dismissal of a claim or lawsuit by asserting the defense of lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). In patent cases, Federal Circuit precedent governs the determination of whether the court possesses subject matter jurisdiction. *See Minnesota Mining & Mfg. Co. v. Norton Co.*, 929 F.2d 670, 672 (Fed. Cir. 1991); *see also 3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1377 (Fed. Cir. 2012) ("Whether an actual case or controversy exists so that a district court may entertain an action for a declaratory judgment of non-infringement and/or invalidity is governed by Federal Circuit law.").

Federal courts are courts of limited jurisdiction; however, district courts possess "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Consequently, district courts are presumed to lack jurisdiction unless the Constitution or a statute expressly provides otherwise. *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989). Article III of the United States Constitution limits the subject matter jurisdiction of federal courts to (1) legal and equitable cases "arising under this Constitution, the Laws of the United States, and Treaties made" and (2) controversies, *inter alia*, to which the United States is a party, between two or more states, and citizens of different states. U.S. CONST. ART. III, § 2. The "case or controversy" requirement of Article III requires courts to find that a case presents a "justiciable" controversy by determining that (1) the plaintiff has demonstrated standing, "including 'an injury that is

concrete, particularized, and imminent rather than conjectural or hypothetical,' " and (2) the case is "ripe," or in order words, "not dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Trump v. New York*, ––– U.S. ––––, ––––, 141 S.Ct. 530, 535, 208 L.Ed.2d 365 (2020); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (noting that standing and ripeness become the same question when a licensee seeks a declaration of invalidity). An appropriate action for declaratory relief qualifies as a case or controversy within Article III. *MedImmune*, 549 U.S. at 118, 128, 127 S.Ct. 764.

**\*6** As to the requirement that a case arises under a law of the United States, generally, federal subject matter jurisdiction exists due to statutory authorization resulting from the presence of a federal question, *see* 28 U.S.C. § 1331, or complete diversity between the parties, *see* 28 U.S.C. § 1332.[10] Additionally, in 2011, Congress enacted the Leahy-Smith American Invents Act (the "AIA"), which amended 28 U.S.C. sections 1338 ("Section 1338") and 1295(a)(1) as well as added section 1454 ("Section 1454") to provide federal courts "with a broader range of ... jurisdiction over claims arising under the patent laws *even* when asserted in counterclaims." *Vermont v. MPHJ Technology Instruments, LLC*, 803 F.3d 635, 643-44 (Fed. Cir. 2015). As amended, Section 1338 vests district courts with "original jurisdiction of any civil action" that (1) arises "under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks" or (2) asserts "a claim of unfair competition when joined with a substantial and related claim under the ... patent ... or trademark laws." 28 U.S.C. § 1338(a)-(b). Section 1454, in turn, provides for removal of patent cases to federal court by providing that "[a] civil action in which any party asserts a claim for relief arising under any Act of Congress relating to patents ... may be removed to the district court of the United States for the district and division embracing the place where the action is pending .... in accordance with section 1446." 28 U.S.C. § 1454(a)-(b). Further, Section 1338(a) even goes so far as to prohibit states courts from handling patent cases by providing: "No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents ..."

If a court determines at any time it lacks subject matter jurisdiction under Article III or a federal statute, it "must dismiss the action." Fed. R. Civ. P. 12(h)(3). "Dismissal for lack of subject matter jurisdiction is appropriate if the complaint, considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984-85 (9th Cir. 2008). The party seeking to establish federal jurisdiction bears the burden of establishing it. *McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

**2.** *Failure to State a Claim (FRCP 12(b)(6))*

Under FRCP 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts which, if true, would entitle the complainant to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (holding that a claim must be facially plausible to survive a motion to dismiss). The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). On a motion to dismiss, a court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, a court is not required to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

In evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents of the complaint and material properly submitted with it. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). However, under the incorporation by reference doctrine, the court may also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading" without converting a motion to dismiss to a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1121 (9th Cir. 2002). The court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "Plaintiffs may plead themselves out of court by attaching exhibits inconsistent with their claims because the court may

2021 WL 3686056

disregard contradictory allegations." Phillips & Stevenson, *California Practice Guide: Federal Civil Procedure Before Trial* § 9:212a (The Rutter Group April 2020); *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007-08 (9th Cir. 2015) (noting that courts "need not accept as true allegations contradicting documents that are referenced in the complaint"). Courts may also consider any statements made in a pleading or motion, including concessions made in plaintiff's response to the motion to dismiss as well as in response to any other pleading or motion. FED. R. CIV. P. 10(c).

### B. **Motion to Remand**

**\*7** A motion to remand challenges the propriety of an action's removal to federal court. 28 U.S.C. § 1447. A motion to remand is "the functional equivalent of a defendant's motion to dismiss for lack of subject-matter jurisdiction" under FRCP 12(b)(1). *See Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014). "Like plaintiffs pleading subject-matter jurisdiction under Rule 8(a)(1), a defendant seeking to remove an action may not offer mere legal conclusions; it must allege the underlying facts supporting each of the requirements for removal jurisdiction." *Leite*, 749 F.3d at 1122.

"Except as otherwise expressly provided by Act of Congress," where a plaintiff files in state court a civil action over which the district courts of the United States have original jurisdiction, the defendant may remove that case "to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). However, removing a case does not deprive another party "of his right to move to remand the case." 28 U.S.C. § 1448. Courts strictly construe the removal statute against removal jurisdiction, and the defendant always has the burden of establishing that removal is proper. *Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1087 (9th Cir. 2009); *Luther v. Countrywide Home Loans Servicing, LP*, 533 F.3d 1031, 1034 (9th Cir. 2008).

Where a party bases removal solely on Section 1454, the district (1) *must* "remand all claims that are neither a basis for removal under subsection (a) nor within the original or supplemental jurisdiction of the district court under any Act of Congress," and *"may*, under the circumstances specified in section 1367(c), remand any claims within the supplemental jurisdiction of the district court under section 1367." 28 U.S.C. § 1454(d) (emphasis added). District courts may decline to exercise supplemental jurisdiction over related claims where (1) the related "claim raises a novel or complex issue of State law," (2) "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction," (3) "the district court has dismissed all claims over which it has original jurisdiction," or (4) "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). "The decision to retain jurisdiction over state law claims is within the district court's discretion, weighing factors such as economy, convenience, fairness, and comity." *Brady v. Brown*, 51 F.3d 810, 816 (9th Cir. 1995). Further, district courts do not need to "articulate why the circumstances of [the] case are exceptional" to dismiss state-law claims pursuant to 28 U.S.C. section 1367(c)(1)-(3). *See San Pedro Hotel Co., Inc. v. City of L.A.*, 159 F.3d 470, 478-79 (9th Cir. 1998)).

## IV. DISCUSSION

Federal "subject matter jurisdiction in patent cases is, surprisingly, one of the thorniest issues in all of civil procedure." Paul R. Gugliuzza, *Rising Confusion About "Arising Under" Jurisdiction in Patent Cases*, 69 Emory L.J. 459, 461 (2019). With respect to Plaintiff's complaint, Plaintiff could either (1) file a breach of contract claim for Defendant's failure to meet its royalty obligations (as it did in the San Diego Superior Court) or (2) sue for patent infringement because Defendant's breach of the licensing agreement allowed Plaintiff to terminate the Agreements and pursue infringement. *See* FAA, ECF No. 14-1 at 8, §§ 6.3-6.4. In the former, there would be no federal question in the well-pleaded complaint,[11] only in Defendant's answer, which would raise defenses of patent invalidity and non-infringement. However, affirmative defenses do not create federal question jurisdiction. *Akiachak Native Cmty. v. United States DOI*, 827 F.3d 100, 107 (D.C. Cir. 2016). In the latter, federal question appears in the well-pleaded complaint under 28 U.S.C. § 1338, which grants federal jurisdiction over "any civil action relating to patents." In this case, however, Defendant did not just plead invalidity and non-infringement as an affirmative defense, it also filed counterclaims, which the Court analyzes as if they were their own complaint. *See* Fed. R. Civ. P. 8. In those counterclaims, Defendant seeks to invalidate the Licensed Patents, which raises a federal question under the AIA.

**\*8** In its Motions, Plaintiff asks the Court to dismiss Defendant's counterclaims seeking declaratory judgments of patent non-infringement and invalidity pursuant to FRCP 12(b)(1) and 12(b)(6) on the grounds that they fail to

2021 WL 3686056

state a claim for relief. Mot. at 2:7-18. Plaintiff asks the Court to (1) dismiss Defendant's counterclaims for failure to state a claim for relief because Defendant cannot infringe patents that it has a license to use, so it is not plausible that Defendant could infringe on the Licensed Patents; (2) dismiss Defendant's counterclaims for lack of subject matter jurisdiction because the counterclaims seek a declaration of patent non-infringement (claims for relief 1 through 3) and patent invalidity (claims for relief 4 through 6), but Defendant lacks standing to pursue such claims, resulting in the absence of a justiciable case or controversy; and (3) remand the case to the San Diego Superior Court pursuant to 28 U.S.C. § 1447(c) due to the lack of federal subject matter jurisdiction. *Id.* at 2:7-18.

Defendant opposes by arguing that infringement is not the issue in this case, rather invalidity is, and if the patents are invalid, Defendant does not owe royalties, meaning that patent law is a central issue to the resolution of Plaintiff's claims for owed royalties. *See generally* Oppo. at 6:2-16. Defendant also notes that its filing of Amended counterclaims mooted Plaintiff's Motion to Dismiss. *Id.* at 6:24-28. Plaintiff replies by reiterating that (1) because Defendant's counterclaims present no "forward looking controversy" due to Plaintiff's covenant not to sue for royalties after the date it filed suit, there is no justiciable controversy; (2) Defendant's Amended Counterclaims should not be considered for purposes of determining this motion to remand; (3) Plaintiff's Complaint does not raise issues of federal law; (4) that *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) did not abrogate the *Super Sack* "covenant not to sue" doctrine or eliminate the *Lear* test; (5) Defendant's Counterclaims do not create a basis for federal jurisdiction because in reality, the counterclaims are affirmative defenses, and federal jurisdiction may not be created from defenses; and (6) the *Splick-It* decision is distinguishable because it "did not involve a covenant not to sue for contractual or infringement liability." *See* Reply at 5-14.

First, the Court considers Plaintiff's Motion to Remand the Case because if the Court lacks jurisdiction, it also lacks the authority to decide the motions to dismiss. *See, e.g., H.R. ex rel. Reuter v. Medtronic, Inc.*, 996 F. Supp. 2d 671, 675 n.2 (S.D. Ohio 2014) (noting that the plaintiff's "motion to remand must be resolved before the motion to dismiss, because if remand is appropriate, then the state court should decide the motion to dismiss"). However, because a motion to remand challenges the propriety of an action's removal to

federal court, 28 U.S.C. § 1447, the frame of reference when ruling on it is the four corners of the operative pleadings at the time of removal, *see Gracier v. Edwards Dental Supply Co.*, 86 F. Supp. 956, 957-58 (N.D. Cal. 1949) (citing 28 U.S.C. § 1447(c); *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 308 U.S. 283 (1939)). In this case, that frame of reference would be the original complaint and original counterclaims but not the amended counterclaims. Although the issue is complex, the Court finds that a basis for federal question jurisdiction exists, making remand improper.

Next, the Court considers Plaintiff's Motion to Dismiss for Lack of Subject Matter Jurisdiction. However, the Court finds that Defendant's Amended Complaint mooted that motion. Thus, the Court **DENIES** that motion as well.

### A. Plaintiff's Motion to Remand

A motion to remand may be brought due either to (1) lack of subject matter jurisdiction or (2) any defect in the removal procedure. *See* 28 U.S.C. § 1447(c). Plaintiff does not appear to take issue with the manner in which Defendant removed the action. As such, it appears Plaintiff's grounds for remand arise solely due to an alleged lack of subject matter jurisdiction. Plaintiff challenges the propriety of Defendant's removal by arguing that (1) Plaintiff's underlying complaint does not give rise to claims making removal appropriate; (2) affirmative defenses fail to create a basis for removal as a matter of law; and (3) Plaintiff's counterclaims fail to provide a basis for removal due to Plaintiff's covenant not to sue for future royalties, which defeats creation of the live case or controversy required for the Court to assert Article III jurisdiction. *See generally* Mot.

**\*9** Defendant responds that the Court should deny Plaintiff's Motion to Remand because it properly removed this case given (1) both its non-infringement and invalidity counterclaims (which are not mooted by Plaintiff's limited covenant not to sue) and Plaintiff's originally asserted claims arise under the federal patent laws; (2) claims arising under the patent laws must be brought in a federal court; and (3) even if this Court found that some of Plaintiff's claims do not arise under federal patent law, it would still have supplemental jurisdiction over those claims because Plaintiff's claims "are so related" to Defendant's cross-claims "that they form part of the same case or controversy." Oppo. at 12:16-13:2 (citing 28 U.S.C. § 1367(a)); *see also Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004) ("A state law claim is part of the same case or controversy when it shares a common nucleus of operative fact with the federal claims and the state and federal

2021 WL 3686056

claims would normally be tried together.") (internal quotation marks omitted).

Both parties to this case have filed claims seeking declaratory relief. An appropriate action for declaratory relief qualifies as a case or controversy within Article III. *MedImmune*, 549 U.S. at 128, 127 S.Ct. 764. Further, Section 1338 vests district courts with "original jurisdiction of any civil action" that arises "under any Act of Congress relating to patents." 28 U.S.C. § 1338(a)-(b). Section 1454 also provides federal courts "with a broader range of ... jurisdiction over claims arising under the patent laws *even* when asserted in counterclaims." *Vermont*, 803 F.3d at 643-44. Thus, the Court finds the issue of whether Plaintiff's complaint raises federal question jurisdiction does not settle the question because if Defendant's counterclaims give rise to jurisdiction, removal was still proper.

### 1. *Whether Plaintiff's Complaint Gives Rise to Federal Jurisdiction*

Plaintiff argues that Defendant's basis for removal was incorrect: Defendant removed on the basis that it is necessary to an adjudication of Plaintiff's complaint for breach of the of the Agreements is a determination of patent infringement and patent invalidity. Mot. at 13:9-12. However, Plaintiff contends that while the issue of patent validity might be relevant to whether Defendant would owe royalties in the future, "such potential future invalidations do not affect ChowNow's liability for royalty fees owed for period [sic] *prior to* any such final adjudications of invalidity." *Id.* at 15:20-23. Thus, according to Plaintiff, "because the causes of action of Ameranth's complaint are expressly limited to the time *before* October 1, 2020, and because Ameranth has covenanted not to sue for royalties that might otherwise be owed for period [sic] of time *after* October 1, 2020, the question of the determination of validity of the Ameranth patents is wholly *irrelevant* to Ameranth's state law claims, and provides no basis for federal subject matter jurisdiction." *Id.* at 15:24-16:5. In sum, Plaintiff's position is that its (1) "complaint expressly alleges that the parties' rights and obligations under the license agreement are *not* dependent on the issue of whether ChowNow's product practices the elements of the claims of Ameranth's patents,"; (2) the Agreements base Defendant's obligation to pay royalties on whether its activities fall within the Fields of Use rather than on whether Defendant practices the claimed inventions; and (3) as a result, Plaintiff's state law claims do not necessitate

determination of federal issues of patent infringement or validity. *Id.* 16:26-17:7 (citing Compl. at ¶ 8).

Plaintiff's first argument asserts that the Agreements base Defendant's "obligation to pay royalties on ChowNow's product deployments and commercial activities within the fields of use, and *not* on whether ChowNow practices the claimed inventions." Mot. at 17:2-5. Thus, Ameranth contends that "adjudication of [its] state law claims does *not* necessitate determination of federal issues of patent infringement or validity, and there is no basis to remove this action to federal court on any such ground." *Id.* at 17:5-7. Defendant responds that Plaintiff's "strained interpretation of the Amended License Agreement it both wrote and recharacterized in its Complaint is irrelevant at this stage of the litigation because disputes over the merits of a case, particularly contract interpretation, are not relevant to a court's jurisdictional determination." Oppo. at 20:13-21:2 (citing *Powertech Tech. Inc. v. Tessera, Inc.*, 660 F.3d 1301, 1310 (Fed. Cir. 2011) (holding "that the dispute between PTI and Tessera—as to whether the license agreement requires royalty payments to be tied to valid patent coverage— is sufficient to support declaratory judgment jurisdiction," while "leav[ing] the merits-based arguments to the district court to consider on remand"); *see also MedImmune*, 549 U.S. at 135-36, 127 S.Ct. 764 ("[E]ven if respondents were correct that the licensing agreement ... precludes this suit, the consequence would be that respondents win this case on the merits—not that the very genuine contract dispute disappears, so that Article III jurisdiction is somehow defeated.")). According to Defendant, under *MedImmune* and *Powertech*, federal jurisdiction is present for this case.

**\*10** As a jurisdictional cross-check, the Court may consider the plain language of the Agreements. Where a court does not rely on the interpretation of a contract but rather looks at the plain language of the agreements the parties provide (in a manner similar to the review the Supreme Court performed in *MedImmune*), it may look to such language in ruling on a motion to dismiss. *Id.* (citing *MedImmune*, 549 U.S. at 121, 127 S.Ct. 764 (citing to language of a licensing agreement in a case reviewing a motion to dismiss)). Thus, the Court finds it proper to look to the language of the Agreements, which neither party seems to dispute.

The Agreements, state that "[d]uring the term of this Agreement, and subject to full and timely payment of all amounts due to Ameranth[,] ... Ameranth hereby grants to ChowNow a non-exclusive, non-transferable ... worldwide

license ... **under the Licensed Patents** within the Field of Use." FAA at 3, § 2.1.1. In other words, Defendant only owes royalties for practicing Plaintiff's Licensed Patents within the Fields of Use, but if Defendant performs activities within the Fields of Use without implicating Plaintiff's Licensed Patents, Defendant would owe no royalties. This reading is bolstered by Section 5.2 of the FAA, which states that Defendant is only obligated to "pay [Plaintiff] a running royalty ... for the Patent License [under the Licensed Patents within the Field of Use] granted in [Section] 2.1 [discussed below] for all activities falling within the Fields of Use." FAA at 6, § 5.2. Defendant points out that "[b]y its own language, Section 5.2 is intended to be read in conjunction with Section 2.1.1, which clarifies that [Plaintiff] granted [Defendant] a Patent License 'under the Licensed Patents within the Field [sic] of Use.' " Oppo. at 18:28-19:3 (citing FAA at 6, at § 2.1.1). Thus, Defendant argues that Plaintiff's "own claims arise under federal patent laws" because 28 U.S.C. § 1338(a) makes clear that federal district courts have original jurisdiction of "*any* civil action arising under any Act of Congress **relating to** patents." *Id.* at 18:3-6.

As outlined below, the Court agrees that royalty obligations are contingent upon Defendant practicing the Licensed Patents within the designated Field of Use, which would require the Court to interpret the Licensed Patents as well as whether Defendant performs activities falling within the scope of their claims. A case qualifies as arising under federal law where (1) federal law creates the cause of action or (2) in a "special and small category of cases," arising under jurisdiction still lies. *Vermont*, 803 F.3d at 645 (quoting *Gunn v. Minton*, 568 U.S. 251, 258, 133 S.Ct. 1059, 185 L.Ed.2d 72 (2013)). As to the latter category, which applies to this case, courts find "federal jurisdiction over a state law claim" if, after applying the *Gunn* test, "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *AntennaSys, Inc. v. AQYR Techs., Inc.*, 976 F.3d 1374, 1381 (Fed. Cir. 2020).

Many courts, including the Federal Circuit Court of Appeals, have applied the *Gunn* test to determine that a breach of contract claim brought in state court arises under federal law where the case depends on a finding the defendant infringed on the plaintiff's patents. *See, e.g., Jang v. Boston Sci. Corp.*, 767 F.3d 1334, 1336-38 (Fed. Cir. 2014) (finding, after applying the *Gunn* test, that federal subject matter jurisdiction existed where "[a]lthough this case arises from a [state law breach of contract] claim [for royalties under a patent license],

rather than directly as a patent infringement claim, [plaintiff's] right to relief ... depends on an issue of federal patent law—whether the [products] sold by [defendants] would have infringed [plaintiff's patents]") (internal quotation marks omitted); *Levi Strauss & Co. v. Aqua Dynamics Sys.*, No. 15-cv-04718-WHO, 2016 WL 1365946 at *5, 2016 U.S. Dist. LEXIS 46738 at *13-14 (N.D. Cal. Apr. 6, 2016) (noting that by applying the *Gunn* test, "courts have repeatedly held that a state-law-based breach of contract claim arises under federal law where it depends on a finding that the defendant has infringed the plaintiff's patents").

**\*11** Defendant argues that this case meets all four factors of the *Gunn* test for the "special and small category of cases," but that only the first factor is in dispute. Oppo. at 18:19-22. Defendant also contends that contrary to Plaintiff's arguments, Plaintiff's claims "necessarily raise" issues of whether Ameranth's patents are valid, and if they are, whether Defendant's platform infringes the Patents-in-Suit. *Id.* at 18:22-24. Plaintiff, on the other hand, relies on the case of *In re Oximetrix, Inc.*, 748 F.2d 637 (Fed. Cir. 1984) as support for why the Court should remand this case. Reply at 6:25-7:21. In *Oximetrix*, the Federal Circuit denied the defendant-licensee's petition for a writ of mandamus seeking an order requiring the district court to vacate its order remanding a case filed by the licensor for breach of contract under a licensing agreement requiring royalty payments. 748 F.2d at 640. The breach of contract action was removed to the federal court after trial but prior to the issuance of a statement of decision; however, the district court later granted the plaintiff's motion to remand finding that federal courts do "not have 'exclusive jurisdiction over patent claims' that may arises in a state court action" under the version of Section 1338 at that time. *Id.* at 641-42. However, not only is *Oximetrix* distinguishable in that the defendant based its arguments for federal jurisdiction on affirmative defenses rather than counterclaims, but Plaintiff also fails to address the fact that this case preceded the 2011 amendments to the AIA, which expanded federal court jurisdiction over patent cases. *See, e.g., Vermont*, 803 F.3d at 643-44 (noting that these changes "were intended to provide federal courts ... with a broader range of jurisdiction; that is, with jurisdiction over claims arising under the patent laws *even* when asserted in counterclaims, rather than in an original complaint"). Based on the 2011 amendments, any authority remanding a case prior to 2011 has questionable application to the case at hand.

More importantly, Plaintiff failed to direct the Court to authority directly criticizing *Oximetrix.* For example, in

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.,* 986 F.2d 476, 479 (Fed. Cir. 1993),* the Federal Circuit cited to *Oximetrix* as a prior opinion denying federal jurisdiction but also noted that *Oximetrix* did not involve "a cause of action in which plaintiff's right to relief depended upon resolution of a substantial question of patent law." Thus, the *Additive Controls* court held that the district court correctly determined that the plaintiff's business disparagement claim arose under federal patent law because the plaintiff's right to relief depended upon the resolution of a substantial patent law question. *Id.* This was because the allegedly disparaging statement was that the plaintiff infringed on the patent-in-suit; however, in order to prove the disparagement case, the plaintiff must provide it did not infringe the patent. *Id.* at 478. As a result, the plaintiff's right to relief necessarily depended "upon resolution of a substantial question of patent law, in that proof relating to infringement is a necessary element of Alcon's business disparagement claim." *Id.* Similarly, in this case, whether Defendant owes Plaintiff royalties for using Plaintiff's patents necessarily depends upon resolution of a substantial question of patent law in that proof relating to patent validity and infringement are necessary elements of Plaintiff's claim for breach of contract: If the Licensed Patents are not valid, Defendant does not owe royalties after the date it provide *Lear* notice (described below). If the Defendant does not practice the Licensed Patents, it neither infringes nor owes royalties. Thus, this case is inapposite from the authority relied on by Plaintiff in its Motions to argue its complaint does not raise federal question jurisdiction.[12]

**\*12** This Court finds Plaintiff's Complaint implicates federal question jurisdiction. As described below, federal jurisdiction also exists to adjudicate Defendant's counterclaims.

**2.** *Whether Defendant's Affirmative Defenses and Counterclaims Provide a Basis for Federal Subject-Matter Jurisdiction*

Plaintiff argues that Defendant's second asserted basis for removal (e.g., Defendant's own affirmative defenses and cross-complaints) are not a "claim to relief," and as such, fail to provide a basis for removal. Mot. at 17:19-27 (citing, *inter alia, Comm'ty v. U.S. Dept. of Labor,* 827 F.3d 100, 107 (D.C. Cir. 2016) (noting that "affirmative defenses made '[i]n respon[se] to a pleading' are not themselves claims for relief")). Plaintiff elaborates that Defendant "fails to state claims for non-infringement and lacks standing to assert such claims in light of its status as a licensee." *Id.* at

17:13-14. According to Plaintiff, no justiciable controversy exists regarding patent validity because it "has covenanted not to sue ChowNow for any royalty obligations beyond October 1, 2020, and ChowNow never complied with the '*Lear* doctrine' by challenging the validity of Ameranth's patents prior to October 1, 2020 (the only period for which Ameranth seeks recovery of royalties)." *Id.* at 17:14-19. The Court addresses whether Defendant's affirmative defenses create a basis for federal jurisdiction followed by whether Defendant's counterclaims provide a basis for federal jurisdiction as well.

a. *Affirmative defenses*

Section 1454 provides for removal of patent cases to federal court by providing that "[a] civil action in which any party asserts a claim for relief arising under any Act of Congress relating to patents." 28 U.S.C. § 1454(a)-(b). As Plaintiff points out, the statute does not address whether affirmative defenses create a removable controversy. Mot. at 17:23-25. Plaintiff argues that "[i]t is well settled law that a case may *not* be removed to federal court on the basis of a federal defense." *Id.* at 17:25-27 (citing *Caterpillar,* 482 U.S. at 393, 107 S.Ct. 2425). However, Defendant does not base its removal on its affirmative defenses. *See* ECF No. 1 at 4, ¶ 12. Rather, Defendant pleads that it "has asserted Cross-Claims [sic] for relief and affirmative defenses arising under an Act of Congress relating to patents, and removal ... is authorized by at least 28 U.S.C. § 1454, which allows patent law counterclaims, or in this case, cross-claims, to serve as a basis for removal to federal court." *Id.* In other words, although Defendant references the fact that it has pled affirmative defenses, it relies only on its counterclaims as the basis for removal. Thus, the Court rejects Plaintiff's argument that Defendant relied on its affirmative defenses as a basis for removal.

Plaintiff advances a similar but different argument that Plaintiff's counterclaims for non-infringement and invalidity are actually affirmative defenses, so the Court should dismiss the counterclaims as redundant of Defendant's affirmative defenses. Mot. at 17:22-28. Plaintiff argues that "[i]f the question of whether [Defendant]'s products practiced the claims of [Plaintiff]'s patents was relevant to the issue of [Defendant]'s claim to collect royalties under the License Agreement (which it is *not*), it would be properly raised as an affirmative defense, not a cross-complaint." *Id.* at 19:23-18 (citing *C.J.L. Constr., Inc. v. Universal Plumbing,* 18 Cal. App. 4th 376, 391-92, 22 Cal.Rptr.2d 360 (1993) ("Given ...

the fact that declaratory relief by means of a cross-complaint may be denied when the same issue is raised by an affirmative defense, ... absent something more than the allegations in the amended cross-complaint in this case, such a claim may not be pursued where the employer has not intervened in the civil suit."). [13] Plaintiff elaborates that because affirmative defenses fail to provide a basis for federal jurisdiction, the Court should remand the case. *Id.* at 17:22-28. Defendant does not respond to this specific argument addressing whether its counterclaims are really affirmative defenses but rather generally argues that its counterclaims provide a basis for federal question jurisdiction. *See generally* Oppo.

**\*13** "Patent invalidity can be a counterclaim and/or an affirmative defense to patent infringement." *Deniece Design, LLC v. Braun*, 953 F. Supp. 2d 765, 773 (S.D. Tex. 2013). Claims for patent invalidity qualify as compulsory counterclaims in response to a claim arising under patent law. *In re Rearden LLC*, 841 F.3d 1327, 1331 (Fed. Cir. 2016). Meanwhile, invalidity also qualifies as "an affirmative defense that 'can preclude enforcement of a patent against otherwise infringing conduct.' " *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 644, 135 S.Ct. 1920, 191 L.Ed.2d 883 (2015) (quoting 6A Chisum on Patents § 19.01, p. 19-5 (2015)). Even though invalidity and non-infringement counterclaims are compulsory in response to a complaint raising patent issues, some courts have noted the absence of "authority that allows parties to assert an affirmative counterclaim for declaratory relief ... while simultaneously asserting an affirmative defense on precisely the same grounds." *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 69 F. Supp. 3d 1136, 1145 (D. Colo. 2014) (noting the defendant's "counterclaim sought only declaratory relief, making it essentially indistinguishable from an affirmative defense," and therefore, because it was duplicative from the pending affirmative defense, it was "properly dismissed"). Instead, FRCP 8(c) permits courts to treat a counterclaim as an affirmative defense where a party has mistakenly designates a defense as a counterclaim. [14] FED. R. CIV. P. 8(c)(2) ("If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so."); *see also Rayman v. Peoples Savings Corp.*, 735 F. Supp. 842, 851-53 (N.D. Ill. 1990) (denying the defendant's motion for leave to file a declaratory judgment counterclaim in a securities case because it was really an affirmative defense cast as a counterclaim).

This Court finds it would be improper to treat Defendant's counterclaims as affirmative defenses, and subsequently, remand to the state court for three reasons. First, "[u]nlike an affirmative defense, a counterclaim for patent invalidity survives the dismissal of patent infringement claims and presents a standalone issue." *Epic Games, Inc. v. Acceleration Bay LLC*, No. 4:19-CV-04133-YGR, 2020 WL 1557436, at \*1 (N.D. Cal. Apr. 1, 2020) (citing *Cardinal Chem. Co. v. Mortin Int'l, Inc.*, 508 U.S. 83, 100-03 n.11, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993) ("Although it is often more difficult to determine whether a patent is valid than whether it has been infringed, ... [a] company once charged with infringement must remain concerned about the risk of similar charges if it develops and markets similar products in the future")). In other words, the issue of whether Defendant practices Plaintiff's Licensed Patents, which the Court must determine in order to decide the royalty dispute, is distinct from whether those Licensed Patents are valid. Thus, even if the Court concludes that Defendant does not practice the Licensed Patents, Defendant's counterclaims seeking a declaration of invalidity would survive and require a determination by the Court despite its resolution of the infringement issues. *See Cardinal*, 508 U.S. at 100-03, 113 S.Ct. 1967. This is because "[a]n unnecessary ruling on an affirmative defense is not the same as the necessary resolution of a counterclaim for a declaratory judgment." *Cardinal*, 508 U.S. at 93-94, 113 S.Ct. 1967. Second, "[t]he Supreme Court has expressed a preference for deciding issues of patent validity independent of any infringement claim in order to prevent wasteful re-litigation and provide final resolution to accused infringers." *Epic*, 2020 WL 1557436, at \*3 (citing *Cardinal*, 508 U.S. at 100-01, 113 S.Ct. 1967 (noting that "the opportunity to relitigate might, as a practical matter, grant monopoly privileges to the holders of invalid patents")); *see also* Robert B. Orr, *The Doctrine of Licensee Repudiation in Patent Law*, 63 Yale L.J. 125, 125 (1953) ("The public has an interest in the adjudication of patents of questionable validity and the law provides procedures whereby private persons may advance this interest."). Thus, policy reasons support the Court determining the issues at hand and avoiding further litigation between the parties.

**\*14** In *Epic Games, Inc. v. Acceleration Bay LLC*, the Northern District of California denied a defendant's motion to strike the plaintiff's counterclaims-in-reply while holding that a finding of noninfringement did not moot a counterclaim of invalidity where the counterclaim "merely repeated the affirmative defense of invalidity." 2020 WL 1557436, at \*1. The *Epic* court held that the plaintiff's "counterclaims for

2021 WL 3686056

patent invalidity [were] redundant of its second affirmative defense of patent invalidity under Federal Rule 12(f)." 2020 WL 1557436, at *3. It reasoned that the plaintiff asserted no new matters that it did not *implicitly* assert through its affirmative defense and addressed the same claims in the same patents asserted in the defendant's infringement counterclaim. *Id.* However, the court also noted that "precisely because the issues raised by Epic Games' counterclaims-in-reply [were] redundant of its affirmative defenses, striking the counterclaims would be futile," *Id.* Thus, the Court denied the defendant's motion to strike or reclassify the plaintiff's counterclaims-in-reply. *Id.* at *4.

In *Epic*, the potential infringing party filed suit first, seeking a declaration of non-infringement, whereas in this case, Plaintiff filed suit, and then, the potential infringing party (ChowNow) filed counterclaims seeking a declaratory judgment of non-infringement. 2020 WL 1557436, at * 1. Thus, *Epic* is inapposite to the case at hand for several reasons, including but not limited to the fact that the *Epic* plaintiff originally filed suit in federal court, and the case litigated patent infringement issues as opposed to the contractual licensing issues between Ameranth and ChowNow. 2020 WL 1557436, at *1.

In this case, Defendant's original Answer filed on November 4, 2020, includes a Third Affirmative Defense for Non-Infringement of Patents, which pleads that Ameranth is not entitled to any payment under the Agreements because ChowNow has not infringed any valid or invalid claim of any patent owned by or licensed to Plaintiff. Ans. at 3-4. Its Fourth Affirmative Defense for Invalidity of Patents pleads that Ameranth is also not entitled to any royalty payments under the Agreements because each of the Licensed Patents is invalid. *Id.* at 3-4. That same day, Defendant also filed its original Counterclaims, which included four claims seeking a declaratory judgment of invalidity of each of the Licensed Patents pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. § 2201 (the "DJA"), along with two claims for invalidity of the two Licensed Patents that had not yet been declared invalid, also pursuant to the DJA. Cross-Compl. at 21-30. The Prayer for Relief seeks a declaratory judgment that pursuant to the DJA, (1) Defendant does not and has not directly or indirectly infringed the Licensed Patents, and (2) the 060 and 651 Patents are invalid for failure to comply with the one of more of the requirements of the AIA. Cross-Compl. at 30. Thus, the final reason it would be improper to treat Defendant's counterclaims as affirmative defenses is that Defendant's affirmative defenses, although

raising the issues of infringement and invalidity, do not seek affirmative relief. Defendant's counterclaims, on the other hand, seek affirmative relief that the Court declare the remaining Licensed Patents invalid, which would both prevent Plaintiff from (1) seeking to license the remaining patent to Defendant in the future and (2) pursuing Defendant for patent infringement as to that remaining Licensed Patent.

In sum, because Defendant's counterclaims respond to different issues (*i.e.*, potential infringement liability in the future) than Defendant's affirmative defenses, which respond to potential royalty obligations, the Court finds those counterclaims distinct enough to continue as separate claims rather than re-classifying them as affirmative defenses. Next, the Court addresses whether those counterclaims provide a basis for federal jurisdiction in the fact of Plaintiff's arguments to the contrary.

b. *Counterclaims*

 **\*15** Plaintiff argues that Defendant's counterclaims for declaratory relief as to non-infringement of Plaintiff's patents fail to create federal question jurisdiction for three reasons: First, because a patent license is a complete defense to infringement, Defendant's active license to each of the Licensed Patents it challenges prevents it from infringing any of Plaintiff's Licensed Patents, negating the need to bring a declaratory action for non-infringement. Mot. at 18:3-10; Reply at 9:19-27. Second, Plaintiff contends that under the Agreements, which give rise to the instant dispute, "the obligation to pay royalties does *not* depend on whether ChowNow's products practice the claims of the patents," only whether Defendant deploys products or conducts activities within the defined "fields of use." *Id.* at 18:11-17. Plaintiff avers that because Defendant fails to state a claim for declaratory relief of non-infringement given it never alleges in its counterclaims that the Agreements require it to practice the elements of Plaintiff's claims as a condition to its obligations to pay royalties, and even if it did, such a determination does not resolve the legal controversy—*i.e.*, whether Defendant owes royalties to Plaintiff. *Id.* at 18:21-25. Third, Plaintiff argues that Defendant cannot sustain its cross-complaints for declaratory relief as to invalidity because it never provided Plaintiff with *Lear* notice—or notice it was withholding royalty payments under the license agreement on the grounds that it had determined that the patents were invalid—before October 1, 2020 (the date Plaintiff filed suit in the Superior Court), and Plaintiff has given Defendant a covenant not

*Ameranth, Inc. v. ChowNow, Inc., Slip Copy (2021)*

2021 WL 3686056

to sue for any period of time *after* October 1, 2020. *Id.* at 6:22-24; 19:13-16. Defendant opposes by pointing out that Plaintiff does not contest that Defendant's counterclaims arise under patent laws but rather only challenges Defendant's standing to bring those claims. Oppo. at 24:1-3. Defendant argues, however, that the Court should deny Plaintiff's Motion to remand bcause (1) Defendant's counterclaims unquestionably present justiciable federal questions under the patent laws that can only be heard in federal court and (2) Plaintiff's limited covenant not to sue Defendant for future royalties does not negate the Court's jurisdiction. *Id.* at 24:5-9.

The Court finds Plaintiff's first argument unpersuasive. Plaintiff is correct that a patent license qualifies as a complete defense to infringement. *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1334 (Fed. Cir. 2006); *see also* 35 U.S.C. § 271(a) (providing that infringement only arises when a person "*without authority* makes, uses, offers to sell, or sells any patented invention, within the United States") (emphasis added). However, given the Agreements clearly state that the defense to infringement only applies so long as Defendant pays royalties, Defendant's cessation of royalty payments opens it up to liability for infringment.[15] For example, in *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 197, 134 S.Ct. 843, 187 L.Ed.2d 703 (2014), the court found federal subject matter jurisdiction over a similar dispute, albeit one that did not involve a covenant not to sue. The plaintiff-licensee, designed, made, and sold medical devices, while the defendant-licensor, owned patents related to implantable heart stimulators. *Id.* at 194, 134 S.Ct. 843. The parties entered into a license agreement similar to the Agreements in this case. *Id.* at 194-95, 134 S.Ct. 843. After a dispute arose, the plaintiff-licensee brought a declaratory judgment action in the Delaware District Court, seeking a declaration that its products did not infringe on the defendant's patents, and the defendant's patents were invalid. *Id.* at 195, 134 S.Ct. 843. The Supreme Court held that (1) the federal court had jurisdiction of the dispute and (2) the plaintiff, as the licensee, did not have the burden of proof in the declaratory judgment action. *Id.* It reasoned that the hypothetical threatened action of the defendant-licensor suing the plaintiff-licensee for patent infringement "is properly characterized as an action 'arising under an Act of Congress relating to patents.' " *Id.* at 198, 134 S.Ct. 843. "The patent licensing agreement specifie[d] that, if [the plaintiff] stop[ped] paying royalties, [the defendant could] terminate the contract and bring an ordinary patent infringement action." *Id.* at 197, 134 S.Ct. 843. If that occurred, "[s]uch an action would arise under federal patent law because 'federal patent law creates the cause of action.' " *Id.* at 198, 134 S.Ct. 843.

**\*16** Similar to *Medtronic*, in this case, the FAA provides that if a breaching party fails to cure a default within sixty (60) days of notice, the Agreement self-terminates, FAA at 8, §§ 6.3-6-4, meaning the breaching party, Defendant, is open to liability for patent infringement again. On August 31, 2018, Plaintiff provided a formal "Notice of Default of License Agreement for Failure to Pay Royalties." *See* ECF No. 12-3 at 54. The FAA clearly states that "[i]f [a] default is not cured within sixty (60) days of provision of such notice, ... the Agreement shall *automatically* terminate at the end of that [60 day] period." FAA at 8, ¶ 6.3 (emphasis added). Thus, the FAA terminated sixty (60) days after the August 31, 2018 Notice of Default, or in other words, on October 30, 2018. Accordingly, while Plaintiff can sue Defendant for patent infringement from October 30, 2018 to the present, Plaintiff's covenant not to sue for royalties from October 1, 2020 is meaningless. Plaintiff had no right to royalties on that date given the FAA stated it automatically terminated after a failure to cure within sixty (60) days of notice. Further, it also means that royalty obligations could only run from April 1, 2018 through October 30, 2018. Thus, the Agreements no longer provide a defense to such infringement. As in *Medtronic*, Defendant faces hypothetical threatened action by Plaintiff for patent infringement. 571 U.S. at 197-98, 134 S.Ct. 843. This "hypothetical threatened action" seems even more likely in light of Ameranth's pattern of litigation. Consequently, the threat of a lawsuit for patent infringement by Ameranth, sometimes referred to as a patent troll,[16] gives rise to federal question jurisdiction over ChowNow's counterclaims, which like the *Medtronic* plaintiff's complaint, seek a declaratory judgment of invalidity of the Licensed Patents and non-infringement.

As to Plaintiff's second argument that the Agreements do not make Defendant's royalty obligations dependent on Defendant practicing the Licensed Patents, that argument is likewise unpersuasive. As noted, the term "Fields of Use" references and incorporates the Licensed Patents, meaning Defendant's obligation to pay royalties depends on whether it practices the Licensed Patents. More importantly, in examining the Agreements, the Court notes that they contain a provision, Section 9.2.3, which provides that "[t]he Parties agree that any dispute ... shall be determined by the state or *federal courts* located in San Diego, California, and the Parties expressly consent to personal jurisdiction and venue before such courts." ECF No. 14-1 at 10-11. Thus, it

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3686056

would appear Plaintiff's contesting federal court jurisdiction breaches its own agreement under which it seeks relief.

Plaintiff's third argument raises more complex issues addressing whether (1) Defendant's standing to bring this lawsuit, (2) Defendant provided proper *Lear* notice, and (3) Plaintiff's covenant not to sue defeats federal subject matter jurisdiction. The Court addresses each argument below. However, the Court ultimately concludes that each argument fails to defeat federal subject matter jurisdiction.

i. Standing

The Declaratory Judgments Act of 1934 provides that "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see also Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239-40, 57 S.Ct. 461, 81 L.Ed. 617 (1937) (noting that the DJA "in its limitation to 'cases of actual controversy,' manifestly has regard to the constitution provision [*i.e.*, Article III] and is operative only in respect to controversies which are such in the constitutional sense"). The party seeking a declaratory judgment carries the burden of showing a justiciable case and controversy existed at the time the party filed for declaratory relief as well as throughout the case. *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344, 1346 (Fed. Cir. 2007) (concluding that the declaratory judgment plaintiff lacked standing because it admitted that it did not anticipate pursuing any infringing activity for several years, "if ever"). While a specific threat of infringement litigation is not required, where " 'a party has actually been charged with infringement of the patent, there is, *necessarily*, a case or controversy adequate to support jurisdiction' at that time." *Id.* at 1344.

**\*17** Plaintiff argues that Defendant "has no standing to seek declaratory relief for invalidity of the licensed patents for any time period *after* the filing date of the complaint (October 1, 2020) because [Plaintiff] has expressly covenanted not to sue [Defendant] for royalties or other fees for any period of time or events occurring *beyond* the date of filing of the Complaint." Mot. at 21:13-17. Plaintiff contends that "[p]ursuant to the Federal Circuit's decision in *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054. 1058-59 (Fed. Cir. [1995]), a patentee can eliminate any

justiciable issue about patent validity by covenanting not to sue the putative infringer" because "[s]uch a covenant not to sue eliminates any 'case or controversy' regarding patent validity," thereby divesting "this Court of subject matter jurisdiction to entertain a cross-complaint for declaratory relief of invalidity." *Id.* at 21:17-22:4. Thus, Plaintiff argues no case or controversy as to patent validity or infringement exists before the filing date of the complaint (due to the alleged improper *Lear* notice) or after the filing of the complaint (due to the covenant not to sue), resulting in Defendant lacking standing to maintain any declaratory relief claims for non-infringement or invalidity. *Id.* at 22:4-6.

In 1995, in *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, the Federal Circuit created what Plaintiff refers to as the "covenant not to sue doctrine," which allowed a patent holder to eliminate a potential dispute over patent validity or infringement—thereby also eliminating federal question jurisdiction—by covenanting not to sue for patent infringement. 57 F.3d 1054, 1060 (Fed. Cir. 1995). The *Super Sack* plaintiff-patent owner brought an infringement lawsuit against a competitor-defendant for infringement of two patents. *Id.* at 1055. In response, the defendant, like ChowNow, filed a counterclaim seeking declaratory judgments of both noninfringement and invalidity. *Id.* The plaintiff, like Ameranth, filed a motion to dismiss the counterclaim stating that it was "unconditionally agree[ing] not to sue [the defendant] for infringement as to any claim of the patents-in-suit based upon the products currently manufactured and sold by [the defendant]." *Id.* at 1056. The plaintiff argued that this removed "any apprehension by [the defendant] that it will face claims of infringement regarding the patents-in-suit," eliminating any actual case or controversy pertaining to patent law while also divesting the federal court of jurisdiction. *Id.* The Federal Circuit affirmed the lower court's dismissal of the case, agreeing that a plaintiff patent owner's withdrawal of infringement allegations and promise not to assert its patents against the defendant had rendered the controversy in the case moot, meaning that if the court issued an opinion, it would be "rendering a forbidden advisory opinion." *Id.* at 1060.

Plaintiff argues that this doctrine remains good law, Reply at 8:19-9:16. while Defendant argues it has been abrogated by the Supreme Court, Oppo. at 21:4-26. Following *Super Sack*, until 2007, "it had been the law of the Federal Circuit that a patent owner's unqualified covenant not to sue a competitor for infringement divested that competitor of standing to sue for declaratory relief, and thereby the court of subject matter

jurisdiction." *Apotex, Inc. v. Novartis AG*, Civil Action No. 3:06-CV-698, 2007 WL 5493499 at *4, 2007 U.S. Dist. LEXIS 98357 at *11 (E.D. Va. Aug. 31, 2007). The rationale behind this arose from the belief that a justiciable case or controversy required the plaintiff to "be under a reasonable apprehension of defending an imminent suit," but so as long as "an unqualified covenant not to sue" existed, the plaintiff was not in apprehension of an imminent suit, and therefore, lacked standing. *Id.* at *4, 2007 U.S. Dist. LEXIS 98357 at *11-12. However, "[t]hat is no longer the standard." *Id.* at *4, 2007 U.S. Dist. LEXIS 98357 at *12. Thus, the Court disregards Plaintiff's argument that its covenant not to sue justifies this Court finding it has no jurisdiction over this case without further analysis.

In 2007, the United States Supreme Court held in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 137, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007), that standing pursuant to the DJA, and by explicit reference, the AIA, *see* 35 U.S.C. § 271(e)(5), is coextensive with the constitutional limitations of Article III, meaning the Federal Circuit's "reasonable apprehension of imminent" suit standard has been abrogated. *See also Teva*, 482 F.3d at 1338-39. The *MedImmune* plaintiff-licensee manufactured a drug used to prevent respiratory tract disease in children and entered into a patent licensing agreement with the defendant covering one of the defendant's existing patents as well as a pending patent application. 549 U.S. at 121, 127 S.Ct. 764. The plaintiff agreed to pay royalties on sales of the defendant's licensed products while the defendant granted the plaintiff "the right to make, use, and sell them." *Id.* at 121, 127 S.Ct. 764. The agreement defined licensed products as the covered patents, "which have neither expired nor been held invalid by a court or other body of competent jurisdiction from which no appeal has or may be taken." *Id.* at 121, 127 S.Ct. 764. After the patent application matured into a patent, the plaintiff believed the new patent did not fall under the licensing agreement, and as a result, the plaintiff did not owe royalties on it. *Id.* at 121-22, 127 S.Ct. 764. It also contended the patent was invalid and unenforceable as well as that its claims were not infringed by the plaintiff's products. *Id.* A dispute arose, and the plaintiff filed suit for declaratory relief, seeking a declaration that the patents it licensed from the defendant were invalid or its products did not infringe the patents. *Id.* at 122-25, 127 S.Ct. 764.

***18** The Supreme Court held that nothing in Article III's case or controversy requirement meant that the licensee had to break or terminate a licensing agreement before seeking a declaratory judgment that the underlying patent in the agreement is invalid, unenforceable, or not infringed. 549 U.S. at 137, 127 S.Ct. 764. Consequently, it concluded that the Federal Circuit Court of Appeals erred in affirming dismissal of the case for lack of subject-matter jurisdiction, where the dismissal was based on the reasoning that "a patent licensee in good standing cannot establish an Article III case or controversy with regard to validity, enforceability, or scope of the patent because the license agreement 'obliterate[s]' any reasonable apprehension' that the licensee will be sued for infringement." *Id.* at 122, 127 S.Ct. 764. It reasoned "that 'the requirements of [a] case or controversy are met where payment of a claim is demanded as of right and where payment is made, but where the involuntary or coercive nature of the exaction preserves the right to recover the sums paid or to challenge the legality of the claim.' " *Id.* at 131, 127 S.Ct. 764. It also noted that "[p]romising to pay royalties on patents that have not been held invalid does not amount to a promise *not to seek* a holding of their invalidity." *Id.* at 135, 127 S.Ct. 764.

Thus, *MedImmune* replaced the imminent suit test. *Micron Technology, Inc. v. Mosaid Technologies, Inc.*, 518 F.3d 897, 901 (Fed. Cir. 2008). Instead, *MedImmune* established the standard for declaratory judgment justiciability, holding that a justiciable Article III case or controversy exists where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127, 127 S.Ct. 764 (quoting *Md. Cas. Co. v. P. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). Under the *MedImmune* standard, courts analyze whether a counterclaimant basing federal jurisdiction off of a declaratory judgment claim meets the party's burden by showing (1) a case or controversy of sufficient immediacy and reality and (2) that a declaratory judgment as to the patents-in-suit would affect the legal relationship between the counter-claimant and counter-defendant by finally and conclusively resolving the underlying controversy. *Id.*; *see also Qualcomm*, 2017 WL 5985598, at *20.

Plaintiff contends that "*Medimmune* simply held that a patent licensee had standing to file claims for declaratory relief challenging validity of licensed patents and whether its product practices the licensed patents without first breaching the license payment by withholding payment *where, if the licensee ceased making payments under the license agreement, it might be sued for patent infringement by*

the patent holder." Reply at 8:8-13. Plaintiff argues that *MedImmune*'s holding does not apply to this case, meaning the Court should apply *Super Sack* instead, for three reasons: First, unlike the *MedImmune* licensee, who continued paying royalties under protest while challenging the patents-in-suit, Defendant has already breached the Agreements by ceasing royalty payments and has been sued in state court for doing so. *Id.* at 8:19-9:1; *see also* Oppo. at 16:27-28. Second, Plaintiff argues that *MedImmune* is distinguishable because the *MedImmune* patent license required the licensee's products to practice the claims of the Licensed Patents, but the Agreements at issue in this case do not. Reply at 8:23-28, 9:2-4. As already noted, the Court finds the Agreements do require ChowNow to practice the Licensed Patents in order for ChowNow to bear responsibility for royalties, so this argument fails to distinguish *MedImmune.* Third, Plaintiff asserts that unlike the *MedImmune* licensee, ChowNow "does not face the threat—real or potential—of being sued by Amaranth for patent infringement, now or in the future, because Amaranth has expressly covenanted not to sue ChowNow for such a claim." *Id.* at 9:4-7. As also already noted, the covenant to sue only covered agreeing not to pursue royalties, but it did not covenant not to sue for patent infringement. Thus, this argument also fails to distinguish *MedImmune.* As such, the Court proceeds to apply *MedImmune* to the present controversy.

**\*19** The *MedImmune* "all the circumstances" analysis is "calibrated to the particular facts of each case." *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1328 (Fed. Cir. 2012). Courts have not developed a bright-line rule applicable to patent cases, but rather "Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380-81 (Fed. Cir. 2007). Since *MedImmune*, the Federal Circuit has held that, in the context of patent disputes, an "actual controversy" requires "an injury in fact traceable to the patentee," which exists only if the plaintiff alleges "both (1) an affirmative act by the patentee related to the enforcement of his patent rights and (2) meaningful preparation to conduct potentially infringing activity." *ActiveVideo Networks, Inc. v. Trans Video Elecs., Ltd.*, 975 F. Supp. 2d 1083, 1087 (N.D. Cal. 2013) (finding there was "no dispute regarding the second factor because AV already makes the products that are being accused of infringing"); *Qualcomm*, 2017 WL 5985598, at \*15 (holding that "there is no dispute as to the second

factor because Apple long engaged in the sale and, through its Contract Manufacturers, the production of iPhones and iPads").

Courts have found the first step satisfied where a patent holder files a lawsuit in state court seeking royalty payments owed in connection with use of the patent holder's patents. *Beverly Hills Teddy Bear Co., Inc. v. GennComm, LLC*, No. CV-2002849-CJCJEMX, 2020 WL 7049537, at \*2 (C.D. Cal. Oct. 1, 2020) (noting that the "[t]he first element is also satisfied" because the patent holder had "already filed a lawsuit in state court seeking the royalty payments owed by [the licensee] in connection with its alleged use of [the patent holder's] patents"). Further, "[p]rior litigious conduct is one circumstance to be considered in assessing whether the totality of circumstances creates an actual controversy." *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1364 (Fed. Cir. 2009). In this case, Amaranth has already filed suit seeking royalty payments in connection with its Licensed Patents. Amaranth also has an extensive history of prior litigious conduct. Thus, Amaranth has taken affirmative acts to enforce its patent rights in satisfaction of the first step.

A declaratory judgment plaintiff satisfies the second step where a license holder refuses to pay royalties owed under a license agreement. *See, e.g., Beverly Hills Teddy Bear Co., Inc. v. GennComm, LLC*, No. CV2002849CJCJEMX, 2020 WL 7049537, at \*2 (C.D. Cal. Oct. 1, 2020) ("Here, the second element is clearly satisfied as BH Teddy has refused to pay GennComm the royalties agreed to under the Agreement."); *see also MedImmune*, 549 U.S. at 128, 127 S.Ct. 764 ("There is no dispute that [a justiciable controversy would have existed] if petitioner had taken the final step of refusing to make royalty payments under the [ ] license agreement."). Thus, where an accused party, like ChowNow, contends that it has the right to engage in the accused activity without a license, "an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights." *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1346-47 (Fed. Cir. 2010) (citing *Revolution Eyewear*, 556 F.3d at 1297); *see also Hero Nutritionals, Inc. v. Vitastix, Inc.* 2010 WL 11580048, at \*4 (C.D. Cal. Apr. 23, 2010) (explaining that when the plaintiff refused to pay royalties under the license agreement because the underlying patent was invalid, the plaintiff's challenge to the patent was justiciable because "if Plaintiff successfully challenges the validity of Defendant's patent, the parties' License Agreement will be effectively undermined");

2021 WL 3686056

*Precision Shooting Equip. Co. v. Allen*, 646 F.2d 313, 314, 318-19 (7th Cir. 1981) (finding "there is sufficient controversy for jurisdiction" in a dispute between parties to a licensing agreement where the licensee challenges the validity of the licensor's patent in a declaratory judgment action; noting that "if it is determined that [the licensee] is paying royalties for nothing, its post-challenge royalties will likewise be in safekeeping for return by the court."). Here, ChowNow has taken meaningful preparation to conduct potentially infringing activity in satisfaction of the second step. Thus, an actual controversy exists under the *MedImmune* test. However, the Court must still address whether after applying *MedImmune*, Amaranth's covenant not to sue defeats a case or controversy.

**\*20** The parties dispute whether *MedImmune* abrogated *Super Sack's* covenant not to sue doctrine, which holds that a patent holder's covenant not to sue for patent infringement divests the district court of federal subject matter jurisdiction over claims of patent invalidity because the covenant eliminates any case or controversy between the parties. *See* Oppo. at 21:4-26 (arguing *MedImmune* abrogated the holding in *Super Sack* and "dramatically altered the applicable standard, making it easier for claimants to gain Declaratory Judgment Act standing"); Reply at 8:19-9:16 (arguing that "*MedImmune* did not abrogate the *Super Sack* procedure to eliminate a potential dispute over patent validity or infringement by providing a covenant not to sue). While *Super Sack* has not been entirely overruled, it has been clarified. *See, e.g., Benitec*, 495 F.3d at 1346 ("Although neither *Super Sack* nor *Amana* has been expressly overruled, both applied the disapproved 'reasonable apprehension of *imminent* suit' test."); *see also Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 880 (Fed. Cir. 2008) (noting that "[i]n the wake of *MedImmune*, several opinions of this court have reshaped the contours of the first prong of our declaratory judgment jurisprudence," and "*MedImmune* articulated a 'more lenient legal standard' for the availability of declaratory judgment relief in patent cases"). Defendant argues that Plaintiff fails to meet the formidable burden of showing that "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" because it fails to show that (1) Plaintiff could not reasonably be expected to resume its patent enforcement efforts against Defendant or (2) it is absolutely clear that Plaintiff will not sue Defendant in the future for issues related to the Licensed Patents. Oppo. at 22:3-7, 23:13-17.

"Whether a covenant not to sue will divest the trial court of jurisdiction depends on what is covered by the covenant." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 556 F.3d 1294, 1297 (Fed. Cir. 2009); *see also* Oppo. at 22:13-16 (citing same). For instance, in *Revolution Eyewear*, the court distinguished cases where "the covenants covered the current products whether they were produced and sold before or after the covenant, and the courts found [the] absence of continuing case or controversy" from the plaintiff's covenant, which "offered no covenant on the current products, stating that it is not obligated to 'repudiate suit for future infringement.' " *Id.* "[B]y retaining that right [to sue on current products], Revolution preserved this controversy at a level of 'sufficient immediacy and reality' to allow Aspex to pursue its declaratory judgment counterclaims." *Id.* Similarly, in *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 995-96 (Fed. Cir. 2007), the Federal Circuit noted that the plaintiff failed to make a blanket withdrawal by refusing to withdraw some of the claims and had also sued one of the defendants for infringement of those claims in another suit. Thus, the district court had appropriately retained jurisdiction over the patents in suit because the failure to withdraw all claims created a reasonable apprehension of suit for infringement. *Id.*

Here, as Defendant points out, Plaintiff's covenant not to sue "only guarantees that Amaranth will not sue ChowNow in the future 'for royalties or other fees.' " Oppo. at 22:16-17 (citing McNally Decl. at ¶ 14). It says nothing of whether it will sue for patent infringement. Defendant contends that it only entered into the Agreements to end a patent infringement lawsuit previously filed by Plaintiff, so because the covenant to sue "does not include an irrevocable and unconditional *guarantee* that Amaranth will not sue ChowNow for any alleged past or future *patent infringement*," it is facially deficient and cannot serve as the basis of mooting ChowNow's *non-infringement* and invalidity Cross-Claims. *Id.* at 22:17-24. Defendant also points out that the covenant not to sue fails to address the impact the covenant would have on successors to Plaintiff's patents, who could also sue Defendant for patent infringement; Defendant's successors and/or subsidiaries, who could potentially be sued by Plaintiff or its successors; and Defendant's customers and other third-parties, "who are expressly provided for in the Amended License Agreement, and Amaranth previously accused of infringement." *Id.* at 22:25-23:1. Thus, Defendant argues that Plaintiff's "covenant not to sue is not unconditional and irrevocable, and Amaranth's actions in related patent-infringement litigations lend support to the belief that

2021 WL 3686056

Ameranth could exploit the conditional nature of the covenant not to sue if it ever so desired." *Id.* at 23:7-10 (citing *In re Ameranth Cases*, No. 3:11-cv-01810 (S.D. Cal. 2020)). The Court agrees. The covenant not to sue is limited like the *Revolution* and *Honeywell* covenants. Plaintiff's complaint pleading the covenant not to sue shows the covenant only addresses royalties, not patent infringement:

**\*21** Ameranth does not seek to recover royalties for any period of time or events occurring beyond October 1, 2020, the date of filing of the Complaint. Ameranth specifically waives the right to seek recovery of running royalties or other license fees due from ChowNow pursuant to the First Amended Agreement for any period of time or events occurring *beyond* the date of filing of the Complaint, and covenants not to sue ChowNow for any running royalties or other license fees for any period of time or events occurring *beyond* the date of filing of the Complaint.

Compl. at 9, ¶ 24.

The Agreements indicate that once Defendant stopped paying royalties, the Agreements terminate, *see* ECF No. 14-1 at 8, ¶ 6.3, and Plaintiff can sue Defendant for patent infringement again, and in fact, would not have the ability to even seek royalties once the Agreements terminate. In other words, Plaintiff has only pointed out that it has waived rights it never had in the first place. Thus, Plaintiff's covenant not to sue does not negate the Court's ability to find an Article III case or controversy in this case.

In sum, the Court finds that Plaintiff's covenant not to sue does not defeat the existence of a case or controversy sufficient to give Defendant standing to pursue its counterclaims seeking declaratory judgments of non-infringement and invalidity. Plaintiff's arguments to the contrary are unavailing in light of post-*MedImmune* authority protecting licensees from abusive licensees abusive licensing and patent practices. *See, e.g.*, Michael Risch, *Patent Challenges and Royalty Inflation*, 85 Ind. L.J. 1003, 1057, n.39 (2010) (noting that "[t]he post-*MedImmune* Federal Circuit has been able to protect patent holders from abusive practices," and as a result, "[a] licensee can also seek declaratory judgment that it does not practice the patent and thus is not liable for royalties."). Having concluded that a case or controversy exists the Court must still address Plaintiff's arguments as to whether Defendant provided proper *Lear* notice.

### ii. *Lear* notice

Plaintiff argues that Defendant has no standing to pursue its counterclaims for declaratory relief as to invalidity because it never provided Plaintiff with *Lear* notice (*i.e.*, notice it was withholding royalty payments under the Agreement on the grounds that it had determined that the Licensed Patents were invalid) before October 1, 2020 (the date Plaintiff filed suit in the Superior Court), and Plaintiff has given Defendant a covenant not to sue for any period of time *after* October 1, 2020. Mot. at 6:22-24; 19:13-16. Absent standing, the Court would need to remand the case or dismiss it. Defendant opposes by arguing that Plaintiff's arguments regarding *Lear* notice fail for three reasons: (1) Defendant's 2018 correspondence met the standards for invoking rights under *Lear*; (2) even under Plaintiff's "mistaken understanding" of what *Lear* requires, Defendant's "2018 correspondence at least creates fact questions that cannot be decided without any discovery at this stage of the litigation"; and (3) regardless of whether Defendant's 2018 correspondence invoked its *Lear* rights, Plaintiff's covenant not to sue does not eliminate any controversy after the date of Ameranth's suit, and therefore, does not moot ChowNow's invalidity cross-claims. Oppo. at 15:20-16:3.

In 1969, the Supreme Court, in *Lear, Inc. v. Adkins*, 395 U.S. 653, 673, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), made clear that with respect to a breach of contract claim arising out of a licensing agreement, the licensee need not repudiate the licensing agreement—thereby subjecting itself to liability for infringement—in order to challenge the validity of a patent. *Id.* In doing so, it overruled the doctrine of licensee estoppel, which previously prevented a patent licensee from challenging the validity of a patent to which it possessed a license to use. Plaintiff argues that *Lear* notice, which the Court describes below, is relevant to determination of federal subject matter jurisdiction because no case or controversy exists between the licensor and licensee as to the validity of the licensed patents or obligation to pay royalties until the licensee challenges the licensed patents. Thus, by failing to provide proper *Lear* notice until filing its Amended Counterclaims, Defendant lacked standing at the time Plaintiff filed suit as well as at the time of removal.

**\*22** *Lear* involved a patent licensing agreement containing similar terms to the Agreements in this case: If the UPSTO refused to issue a patent or held any of the patents covered by the agreement invalid, the defendant-licensee could terminate

2021 WL 3686056

the agreement. 395 U.S. at 656-57, 89 S.Ct. 1902. Eventually, the defendant ceased paying royalties, and the plaintiff-licensor, like Ameranth, sued for breach of the patent licensing agreement. Id. at 660, 89 S.Ct. 1902. The Supreme Court held that a party seeking to repudiate a licensing agreement, like the Lear plaintiff and ChowNow, need not comply with the licensing agreement by continuing to pay royalties until the patent claim is declared invalid, even where an agreement expressly states royalties are owed until the patent claim is held invalid. Id. at 673-74, 89 S.Ct. 1902 (holding "that Lear must be permitted to avoid the payment of all royalties accruing after Adkins' 1960 patent issued if Lear can prove patent invalidity"). As applies to this case, Lear means ChowNow had a right to cease paying royalties while challenging the Licensed Patents and did not need to continue such payments until the final determination on the validity of those patents, even if the Agreements state otherwise.

One year later, in 1997, the Federal Circuit, in Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co., began requiring what is known as "Lear notice," pursuant to which "a licensee ... cannot invoke the protection of the Lear doctrine until it[17] (i) actually ceases payment of royalties, and (ii) provides notice to the licensor that the reason for ceasing payment of royalties is because it has deemed the relevant claims to be invalid." 112 F.3d 1561, 1568 (Fed. Cir. 1997); see also Dodocase VR, Inc. v. MerchSource, LLC, No. 17-CV-07088-JCS, 2020 WL 475494, at *4 (N.D. Cal. Jan. 29, 2020) (holding that "Defendant MerchSource satisfies the Kohle requirements because Defendant MerchSource (i) actually ceased payment of royalties, and (ii) provided notice to Plaintiff Dodocase on October 5, 2015 that the reason for ceasing payment was that it concluded that the relevant claims are invalid"). While "a licensee need not institute suit challenging the validity of the patent," it "must clearly notify the licensor that the licensee is challenging the patent's validity." Id. at 936-47. Studiengesellschaft also clarified that the Lear doctrine does not prevent a patent owner from recovering royalties up until the date the licensee first challenges the validity of the patent. 112 F.3d at 1568; see also Go Medical Industries, Pty., Ltd. v. Inmed Corp., 471 F.3d 1264, 1273 (Fed. Cir. 2006) (holding that the court erred in relieving the licensee of its obligation to pay royalties after a finding of invalidity during another lawsuit because that invalidity finding was still pending appeal, and thus, "had no effect on the contractual relationship" between the plaintiff and the defendant even though the agreement tied its duration to the life of the patent-in-suit).

Plaintiff argues that an October 11, 2018 letter sent by Defendant stated that its decision to cease paying royalties was based on a determination that its products did not practice the claims of Plaintiff's Licensed Patents within the Field of Use as defined by the FAA "and not on the basis of validity." Mot. at 10:24-11:2; Oppo. at 3:28. Defendant responds that even if the Licensed Patents were or are valid, it is of no import because its products and services do not practice the Licensed Patents. See Exhibit 3 to Mot., ECF No. 12-3 at 8-9.

The actual letter itself states that it believes "the question of validity of this patent is immaterial, at the present time, to ChowNow's decision to cease royalty payments," see Exhibit 3 to Mot., ECF No. 12-3 at 8-9 (emphasis added), but not necessarily that it did not factor into the decision in any respect. In fact, the letter explicitly noted that the 850, 325, 733, and 077 Patents had all been invalidated. Id. It also stated that Plaintiff had identified the 060 and 651 Patents, which Defendant "reviewed and reached the same conclusion of no infringement." Id. It concluded by stating that if Plaintiff believed its platform employed an "an enforceable and valid claim of Ameranth's patents," then, Plaintiff should provide Defendant "with any such claim chart for us to evaluate," Id. Because licensees pay royalties to allow them to practice patents without being sued for patent infringement, if a licensee does not practice the patents subject to the licensing agreement, the need for royalty payments disappears. In sum, the letter at issue, while noting it was not basing the decision to cease royalty payments on the basis of a belief of invalidity "at the present time," also asserted that the Licensed Patents had already been declared invalid and were, in fact, invalid. See Dodocase, 2020 WL 475494, at *4 (providing that "it is undisputed that on October 5, 2017, Defendant MerchSource sent Plaintiff Dodocase a letter stating that Defendant MerchSource had concluded that "all relevant claims are invalid under 35 U.S.C. § 102 and/or § 103."). This letter also clearly advised that Defendant would not paying royalties on any products sold thereafter. This satisfies the requirements to (1) actually cease payment of royalties and (2) provide notice that the reason for ceasing payment was that it concluded that the relevant claims were invalid. See Dodocase, 2020 WL 475494, at *4 (holding the defendant met the requirements because it "(1) actually ceased payment of royalties, and (ii) provided notice to Plaintiff... on October 5, 2015 that the reason for ceasing payment was that it concluded that the relevant claims are invalid.").

*23 Further, unlike in Studiengesellschaft, where the licensee continued to pay some royalties while hiding the

fact that it was withholding royalties on certain products, Defendant has withheld all royalties. Oppo. at 16:17-22. Defendant argues this distinction is important because "[i]t was in that *nonrepudiating* context that the Federal Circuit stated that [the defendant] could not 'invoke the protection of the *Lear* doctrine until it (i) actually ceases payment of royalties, and (ii) provides notice to the licensor that the reason for ceasing payment of royalties is because it has deemed the relevant claims to be held invalid." *Id.* at 16:22-17:2. Defendant contends that in this case, it has clearly satisfied both *Studiengesellschaft* requirements by (1) already ceasing royalty payments to Ameranth and (2) expressly telling Ameranth it was ceasing doing so, in part, because it believed the Licensed Patents were invalid. *Id.* at 17:3-9. Defendant also argues that "[t]he fact that ChowNow had multiple reasons for not paying Ameranth is irrelevant to whether ChowNow properly invoked its rights under *Lear.*" *Id.* at 17:14-16. This is because "Supreme Court held that MedImmune could invoke its *Lear* rights even though it raised *three* grounds for believing it owed no royalties, *i.e.,* that the 'patent was [1] invalid and [2] unenforceable, and that its claims were in any event [3] not infringed.' " *Id.* at 17:16-20 (citing *MedImmune,* 549 U.S. at 122, 127 S.Ct. 764) (reference numerals added). Thus, Defendant argues that "[a]t the very least, this record creates a factual question as to whether ChowNow invoked its *Lear* rights as required under *MedImmune* and/or [*Studiengesellschaft*], thus precluding remand on that basis." *Id.* at 17:20-22.

The Court agrees that under *MedImmune,* a repudiating licensee can provide multiple reasons for repudiating a license agreement, as ChowNow did here, which means ChowNow provided adequate *Lear* notice.

### iii. *Ameranth v. Splick-It, Inc.*

In the Notice of Removal, Defendant also cited to the *Splick-It* case, in which the contract involved a license agreement covering the 077 Patent, and the district court denied Ameranth's motions to remand and dismiss similar to the Motions here. ECF No. 1 at 5:13-6:6. Plaintiff argues that even though Defendant's Notice of Removal refers to the *Splick-It* Action, *Splick-It* is distinguishable for four reasons warranting this Court arriving at a different outcome. Mot. at 24:4-7. Plaintiff contends that these differences require the Court to dismiss Defendant's cross-complaints for declaratory relief because Defendant has no standing, resulting in the Court lacking jurisdiction over the case and requiring remand

pursuant to 28 U.S.C. § 1447(c). *Id.* at 24:4-7. Defendant opposes by arguing that Plaintiff's attempts to distinguish *Splick-It* is unavailing because that case "is nearly identical, both factually and procedurally, to this case." Oppo. at 24:11-13.

On April 26, 2017, Ameranth filed an action against the defendant, Splick-It, Inc. ("Splick-It"), in the San Diego Superior Court alleging two claims for (1) breach of contract and (2) declaratory relief, alleging that the defendant "breached the 1st Amended License Agreement by failing to provide the reports and royalties required by the 1st Amended License Agreement, while still using the family of Ameranth hospitality patents." 3:17-cv-01093-DMS-WVG, ECF No. 1 at 9-13 (the "*Splick-It*") *see also Ameranth, Inc. v. Splick-It, Inc.,* No. 17-cv-01093-DMS-WVG, 2017 WL 11422186, at *1 (S.D. Cal. Aug. 4, 2017) (Sabraw, Chief J.) (denying Ameranth's motion to remand); *see also Ameranth, Inc. v. Splick-It, Inc.,* No. 17-cv-01093-DMS-WVG, 2017 WL 11422187, at *1 (S.D. Cal. Aug. 18, 2017) (Sabraw, Chief J.) (denying Ameranth's motion to dismiss). On May 26, 2017, Splick-It filed an answer and cross-complaint, alleging, *inter alia,* that Ameranth's patents—including but not limited to the 060 and 077 Patents at issue in this case—were not infringed, invalid, and unenforceable. *Splick-It,* 2017 WL 11422186, at *1. After filing its cross-complaint, Splick-It also removed the case to the Southern District of California. *Id.* In June 2017, Plaintiff filed a Motion to Dismiss, *see Spick-It* Action, at ECF No. 16, Motion to Remand, *id.* at ECF No. 12. The court, however, denied the motion to dismiss and motion to remand, *id.* at ECF Nos. 27, 28.

In denying the motion to remand, the court reasoned that the facts underlying Ameranth's state law claims would "involve an inquiry into whether Splick-It is practicing the inventions claimed in the '077 Patent." *Splick-It,* 2017 WL 11422186, at *3. Thus, because the "issue, infringement of the '077 Patent, [was] currently being litigated in this Court, ... it would be more economical and efficient to litigate the issue as to Splick-It here, as well." *Id.* In denying the motion to dismiss for lack of subject-matter jurisdiction, the *Splick-It* court held that "as in *Powertech,* the dispute between Splick-It and Ameranth about 'whether the license agreement requires royalty payments to be tied to valid patent coverage–[was] sufficient to support declaratory judgment jurisdiction.' " *Splick-It,* 2017 WL 11422187, at *3.

**\*24** Plaintiff argues that *Splick-It* is distinguishable for four reasons: First, Plaintiff points out that the license agreement

in *Splick-It* "was a license to *use and practice* the Ameranth patents," and the *Splick-It* court "relied upon the linkage between practice of the patented inventions and obligation to pay royalties to find that adjudication of [Plaintiff]'s state law claims 'will involve an inquiry into whether Splick-It is practicing the inventions claimed in the '077 Patent.' " Mot. at 22:14-23:2 (citing *Splick-It*, 2017 WL 11422186, *3). Because "no such linkage exists here" requiring that Defendant must use or practice the patents in order to be liable for royalties, Plaintiff argues *Splick-It* does not warrant this Court finding jurisdiction over this case. *Id.* at 23:2-6 (quoting *Splick-It*, 2017 WL 11422186, at *3). Defendant responds that "Judge Sabraw made no such 'linkage.' " Oppo. at 25:4-5. In fact, Defendant points out that "Judge Sabraw *did not even address* this argument in any way, shape, or form in his order denying Ameranth's motion to remand," and "[i]n fact, the words 'pay,' 'royalty,' and 'linkage' do not appear in Judge Sabraw's order." Oppo. at 25:5-8 (citing *Splick-It*, 2017 WL 11422186, at *1-3). In a way, both parties are correct: *Splick-It* did discuss whether the defendant practiced Ameranth's patents-in-suit. *See Splick-It, Inc.*, 2017 WL 11422186, at *3. However, it never discussed Splick-It's practicing of Ameranth's patents with respect to Splick-It's royalty obligations in the manner Plaintiff suggests. *See id.*

Second, Plaintiff argues unlike this case, where the Agreements arose as the result of a settlement agreement between the parties to a lawsuit filed by Ameranth against ChowNow for patent infringement, in *Splick-It*, Ameranth had never sued Splick-It for patent infringement, so the license did not result from the settlement of a patent dispute. *Id.* at 23:7-17. Defendant responds that whether the license agreement at issue resulted from a complaint for patent infringement "is a distinction that, legally, makes no difference." Oppo. at 25:9-13. The Court agrees.

Third, Plaintiff argues that in *Splick-It*, its complaint against Splick-It sought royalties both before, during, and after the lawsuit began, seeking royalties through the end of the term of the license agreement, where in this case, Plaintiff limits the royalties it seeks through the date it filed the original complaint. Mot. at 23:18-24. Similarly, Plaintiff's final argument contends that in *Splick-It*, it never provided the defendant with a covenant not to sue for any periods of time beyond the filing date of its complaint against the defendant, whereas in this case, Plaintiff has covenanted not to sue for any royalties or fees after October 1, 2020. *Id.* at 23:25-24:3. Defendant responds to both arguments by stating that Plaintiff's "covenant is so limited that it does

not affect this Court's jurisdiction, and Ameranth's attempt to manipulate facts to reach a different outcome from *Splick-It* should be rejected." Oppo. at 25:16-21. Although Plaintiff attempts to distinguish this case from *Splick-It*, this Court finds that these arguments that *Splick-It* is distinguishable actually prove that Plaintiff learned from the 2017 *Splick-It* decision[18] by taking the reasons offered by the *Splick-It* court for finding jurisdiction and making a conscious effort to make those reasons inapplicable to this case—for example, by covenanting not to sue for royalties after it filed suit. *See, e.g.*, Reply at 14:10-11 (noting that this case differs from *Splick-It* because "*Splick-It* did not involve a covenant not to sue for future contractual or infringement liability"). However, because the Court has already noted that Plaintiff's covenant not to sue is meaningless in light of the Agreements, these distinctions do not warrant a different outcome in this case.

**\*25** Plaintiff's Motion to Remand is **DENIED** because the Complaint and Defendant's counterclaims give rise to a justiciable Article III case or controversy relating to patent law.

### B. Plaintiff's Motion to Dismiss the Cross-Complaints for Failure to State a Claim and Lack of Subject Matter Jurisdiction are Denied as Moot.

Plaintiff filed its Motion to Dismiss on November 19, 2020, which sought to dismiss Plaintiff's counterclaims. *See* Mot. However, on December 7, 2020, Defendant filed amended counterclaims, containing eight additional claims for relief. ECF No. 18. "It is well-established in our circuit that an 'amended complaint supersedes the original, the latter being treated thereafter as non-existent.' " *Ramirez v. Cty. of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015) (reversing the district court's granting of the defendants' motion to dismiss the superseded first amended complaint and the resulting dismissal of the case because the timely filed second amended complaint mooted the motion to dismiss targeted at Plaintiff's first amended complaint, which was no longer in effect). Here, Defendant filed its original counterclaims on November 4, 2020, *see* Cross-Compl., which Plaintiff responded to with the instant motion to dismiss filed on November 19, 2020, *see* ECF No. 12. FRCP 15(a)(1) allows a party to amend its pleading once as a matter of course within 21 days of serving the original pleading, or "[i]f the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), whichever is earlier." Thus, in response to Plaintiff's motion to dismiss the counterclaims,

2021 WL 3686056

Defendant filed its Amended Counterclaims, on December 7, 2020. ECF No. 18. Because Defendant filed the Amended Counterclaims within 21 days of Plaintiff filing the Motion to Dismiss the original Counterclaims, FRCP 15(a) allowed Defendant to amend the Counterclaims "as of course," or without leave of court, thereby mooting Plaintiff's Motion to Dismiss. *See, e.g., Apollo Enter. Sols., Inc. v. Lantern Credit*, LLC, No. 17-cv-02331-AB-JCX, 2018 WL 437472, at *1 (C.D. Cal. Jan. 16, 2018) (noting that the defendant "subsequently filed its First Amended Counterclaims on May 5, 2017, mooting Apollo's initial motion to dismiss").

In sum, Plaintiff's Motion to Dismiss sought to dismiss Defendant's original counterclaims, filed on November 4, 2020, *see* Cross-Compl., which are no longer operative due to Defendant's filing of the Amended Counterclaims, on December 7, 2020, *see* ECF No. 18. Thus, granting Defendant's Motion to Dismiss would have no effect within the confines of this case. *See, e.g., Tur v. YouTube, Inc.*, 562 F.3d 1212, 1214 (9th Cir. 2009) ("[A]n issue is moot when deciding it would have no effect within the confines of the case itself.").

### C. **Plaintiff's Objections to Defendant's Notices of Supplemental Authority**

Plaintiff objects to Defendant's Notices of Supplemental Authority, ECF Nos. 28, 29, which provided the Court with opinions from Chief Judge Dana Sabraw in *Ameranth, Inc. v. Domino's Pizza, Inc.*, No. 12-cv-0733-DMS-WVG, 2021 WL 409725, at *1 (S.D. Cal. Feb. 5, 2021), finding this case exceptional for purposes of 35 U.S.C. § 285. Plaintiff objects to these notices, and the orders attached to them, as "not relevant to the controlling legal issues." ECF No. 30 at 2:12-17. The Court agrees and disregards these notices in its consideration of the Motions. The orders provided to the Court have nothing to do with the jurisdictional issues before the Court.

### V. **CONCLUSION**

**\*26** Plaintiff argues that "[t]his is a garden variety state law action for breach of ChowNow's contractual duty to pay royalties to Ameranth under a written license agreement," so "[i]t belongs in San Diego County Superior Court, the venue in which Ameranth properly filed the complaint. Mot. at

24:9-12. Plaintiff accuses Defendant of attempting "to make a federal case out of this suit on several grounds, none of which are well-taken" because Plaintiff's "causes of action include no federal claims and do not depend upon determination of any patent law or other federal issues, and therefore provide no basis for removal." Mot. at 24:13-16. However, because the Agreements self-terminated, they provide no defense to a claim by Ameranth for infringement from the date of termination (*i.e.*, October 30, 2018) onwards. Further, the plain language of the Agreements shows royalties are due dependent on whether ChowNow practices the Licensed Patents, requiring the Court to determine the claims of the Licensed Patents as well as their validity. Finally, Plaintiff argues that Defendants' "cross-complaints for declaratory relief of invalidity are likewise defective because [Defendant] never provided *Lear* notice that it was challenging the validity of the patents prior to the initiation of this lawsuit, and [Plaintiff] has unconditionally covenanted not to sue [Defendant] for royalties or other fees for any period of time after the filing of the lawsuit." Mot. at 24:21-26. However, the Court has determined that ChowNow provided adequate *Lear* notice, and Ameranth's covenant not to sue for royalties does not address its desire or intent to sue for patent infringement, which it has done in the past. Thus, a controversy exists sufficient to create federal subject matter jurisdiction under the Declaratory Judgment Act.

Thus, for the above reasons, the Court:

1. **DENIES** Plaintiff's Motion to (a) Dismiss the Cross-Complaint for (i) Failure to State a Claim and (ii) Lack of Subject Matter Jurisdiction and (b) Remand to State Court, ECF No. 12.

2. **SUSTAINS** Plaintiff's Objections to Defendant's Notices of Supplemental Authority.

3. Any response to Defendant's Amended Counterclaims must be filed within ten (10) days of this order.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2021 WL 3686056

Footnotes

2021 WL 3686056

1    The Court takes judicial notice of the fact that as of the date of this order, PACER shows a total of 52 cases in which the plaintiff is Ameranth, Inc. *FED. R. EVID. 201(b) (1)-(2)* (providing that at any stage of a proceeding, courts may take judicial notice of (1) facts not subject to reasonable dispute and "generally known within the trial court's territorial jurisdiction" and (2) adjudicative facts, which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n.1 (9th Cir. 1996) (taking judicial notice of court records); *Langer v. Kiser*, 495 F. Supp. 3d 904, 911 (S.D. Cal. 2020) (taking judicial notice of the fact that "PACER shows a total of 1,498 cases in which the plaintiff is named 'Chris Langer' throughout all courts on PACER").

2    In its order, the Court primarily relies on facts stated in both Plaintiff's Motions as well as Defendant's Opposition given these appear to be facts neither party disputes. The majority of the facts set forth are also taken from the operative pleadings Plaintiff seeks to dismiss or disputes (*e.g.*, Defendant's notice of removal and Defendant's counterclaims), and for purposes of ruling on Plaintiffs' Motions, the Court assumes the truth of the allegations pled and liberally construes all allegations in favor of the non-moving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Additional facts were also taken from the relevant licensing agreements and documents relied upon in the pleadings. *See, e.g., Rosen v. Uber Techs., Inc.*, 164 F. Supp. 3d 1165, 1171 (N.D. Cal. 2016) (providing that "[f]or purposes of a Rule 12(b)(6) motion...the court can [also] 'augment' the facts and inferences from the body of the complaint with 'data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice' "); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied").

3    Unless otherwise indicated, all page number references are to the ECF-generated page number contained in the header of each ECF-filed document. All references to an ECF-generated filing number preceded by a case number differing from the present case refer to a filing on the docket in the case number that precedes that "ECF No." reference.

4    "In a patent license, a patent owner grants to someone else permission to tread upon the patent owner's property rights without legal consequence." Amelia Smith Rinehart, *The Federal Question in Patent-License Cases*, 90 Ind. L.J. 659, 660 (2015) (noting that "[w]hen one of the parties to a patent license decides to seek remedies from the other party for a license harm, ... [i]n most cases, the patent owner brings her suit against the licensee in federal court, alleging that the licensee breached the license contract and, as a result, now infringes the patent" because "[t]he license agreement, by its very nature, implicates patent issues").

5    The definition of "Fields of Use" is ultimately not helpful to the issues at hand, but because it is referenced throughout both parties' briefing as well as this order, the Court notes that both Agreements define the term as pertaining to electronic food ordering:

> **"Fields of Use"** shall mean use for: (a) hosting menus and receiving and processing orders for food and beverages from consumers, caterers, delivery services, and other third party aggregators and food service providers, and (b) payment/gift card processing via a wireless handheld computing device—including any of the uses in subsections ( a)-(b) by any of the following means: (i) online, including on its own and third party websites, (ii) on mobile devices, including through mobile websites and mobile applications, (iii) in call centers operated by ChowNow or third parties, (iv) on platforms such as game consoles, cable boxes, DVD and Blu-Ray players, web enabled televisions, media players, and other web enabled devices, (v) on web and social media platforms such as Linked-In, Facebook, My Space, and Four Square, and (vi) on other synchronized devices or platforms that may be developed in the future.

Licensing Agreement, ECF No. 14-1 at 2q, § 1.2; First Amended Agreement, ECF No. 14-1 ("FAA") at 2, § 1.2.

6    These adjudications on the merits bind this district with respect to the validity of the claims adjudicated in that case. *Yong v. INS*, 208 F.3d 1116, 1119 n. 2 (9th Cir. 2000) ("[O]nce a federal circuit court issues a decision, the district courts within that circuit are bound to follow it and have no authority to await a ruling by the Supreme Court before applying the circuit court's decision as binding authority....").

7    Although the *Natera* decision is from another district court, and as such, is not binding precedent on this Court, the Court accepts its conclusion as to patent invalidity on the basis of the doctrine of defensive non-mutual collateral estoppel. The doctrine of non-mutual defensive collateral estoppel "precludes a plaintiff from contesting an issue it has previously

litigated and lost in another case against a different defendant." *Pharm. Care Mgmt, Ass'n v. D.C.*, 522 F.3d 443, 446 (D.C. Cir. 2008) (noting that "[t]he preclusion [in that case] is defensive because the defendant invokes the bar against the plaintiff's claims"); *see also Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1313, 1320 (Fed. Cir. 2015) (holding the invalidity of the asserted claims of two patents-in-suit was established by issue preclusion). The Supreme Court has explicitly held that the defense of issue preclusion applies to a defendant "facing a charge of infringement of a patent that has once been declared invalid," even though the party asserting the defense was not a party to the action where the patent was invalidated. *Blonder-Tongue Labs., Inc v. Univ. of Ill. Found.*, 402 U.S. 313, 349-50, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *see also Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1577 (Fed. Cir. 1994). In order to apply issue preclusion, the Federal Circuit requires the party seeking to apply preclusion to meet four conditions: "(1) identity of the issues in a prior proceeding; (2) the issues were actually litigated; (3) the determination of the issues was necessary to the resulting judgment; and, (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Soverain*, 778 F.3d at 1315.

Here, the Court concludes that (1) the validity of the 651 Patent was litigated in the *Natera* proceeding; (2) that issue was actually litigated; (3) the U.S. District Court for the District of Delaware made a determination on the merits; and (4) the party defending against preclusion, which in this case, would be Plaintiff, had a full and fair opportunity to litigate the issues in that court. Thus, any attempt to dispute the invalidity of the 651 Patent is barred by issue preclusion, or more specifically, the doctrine of defensive non-mutual collateral estoppel.

8   So long as any single patent under a licensing agreement remains valid, the licensee must continue paying royalties until all covered patents have been held invalid or expire. *Brulotte v. Thys Co.*, 379 U.S. 29, 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964).

9   This date is significant as Defendant contends that Plaintiff is waiving its right to future potential royalties because "Ameranth is well aware that its final patent, the '060 Patent, is invalid, and it does not want to put the validity of this last patent at issue in federal court, where the other five patents in the family were previously invalidated." Oppo. at 10:11-15.

10   Because both parties to this case are Delaware corporations, no diversity of citizenship exists sufficient to create diversity jurisdiction. *See* 28 U.S.C. § 1332; *see also Hertz Corp. v. Friend*, 559 U.S. 77, 92-93, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010).

11   The well-pleaded complaint rule makes the plaintiff the master of his or her complaint by allowing the plaintiff to avoid federal jurisdiction by exclusively relying on state law. *See Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987).

12   The majority of the non-binding cases Plaintiff cites involved licensing agreements that did not require the licensee to practice the claims of the patent in order to incur royalty obligations. *See, e.g., Broadband iTV, Inc. v. OpenTV, Inc.*, No. 17-CV-06647-SK, 2018 WL 4927935, at *5, 7 (N.D. Cal. Feb. 22, 2018) (granting the plaintiff's motion to remand after dismissing the defendant's declaratory relief claims for non-infringement where the scope of the applicable license agreement was not limited to patent rights but also included copyrights, trademarks, and trade secrets, albeit relying predominantly on law preceding the 2011 amendments to the AIA in arriving at its holding); *Qualcomm*, 2017 WL 5985598, at *1, 21-22 (granting the counterdefendant's partial motion to dismiss a count of the defendants-counterclaimants' counterclaims where "[b]ecause the royalty rates in the SULAs are not contingent on patent invalidity or noninfringement, there is no case or controversy because any declaration of the Nine Additional Patents-in-Suit would not conclusively resolve the dispute regarding royalties owed to Qualcomm"); *Powertech Tech., Inc. v. Tessera, Inc.*, No. C 10-945 CW, 2013 WL 12324116, at *12, 19 (N.D. Cal. Apr. 15, 2013) (finding "that, as a result of the supplemental covenant [not to sue], there is no continuing case or controversy in this litigation" and dismissing "the case for lack of jurisdiction" where "the licensing agreement "did not tie the royalty obligation to coverage" of the patents); *Verance Corp. v. Digimarc Corp. (Delaware)*, No. CIV.A. 10-831, 2011 WL 2182119, at *1, 7 (D. Del. June 2, 2011), *dismissed*, 465 Fed. App'x 934 (Fed. Cir. 2012) (granting the defendant-licensor's motion to dismiss pursuant to FRCP 12(b)(1) where "the License Agreement [was] not contingent on the validity of the patent and, thus, a declaration of invalidity or non-infringement would obviate Verance's royalty obligation under its terms as a matter of federal patent law"). Thus, the aforementioned cases found jurisdiction did not exist while noting that the obligation to pay royalties did not depend on the validity of the patents. In *MedImmune*, on the other hand, the Supreme Court held that the case and controversy requirements had been met by a

2021 WL 3686056

licensee's claim for declaratory judgment as to patent invalidity and the licensing agreement itself provided that royalties were not owed if the patents were declared invalid. *549 U.S. at 130-31, 127 S.Ct. 764*. In this case, just as in *MedImmune*, the plain language of the Agreements indicates royalties are not owed if the Licensed Patents are invalid. *See* FAA at 7, § 5.3; *see also* Compl. at 4:14-18 (quoting same).

**13**   The case Plaintiff relies on for this proposition is a California workers' compensation case that is inapposite, and also said "declaratory relief by means of a cross-complaint *may* [not must] be denied when the same issue is raised by an affirmative defense." *C.J.L., 18 Cal. App. 4th at 391-92, 22 Cal.Rptr.2d 360*.

**14**   FRCP 8(a)(1) requires that for a pleading, such as a complaint or counterclaim, to state a claim for relief, it must contain a short and plain statement of the claim showing the pleader is entitled to relief as well as the grounds for the court's jurisdiction. In responding to a pleading, however, the responding party must (1) "state in short and plain terms its defenses to each claim asserted against it" and (2) "admit or deny the allegations asserted against it by an opposing party." *Fed. R. Civ. P. 8(b)(1)*. Thus, under *FRCP 8*, "affirmative defenses made 'in response to a pleading' are not themselves claims for relief." *Akiachak, 827 F.3d at 107*.

**15**   Both parties appear to concede that no royalties are owed before April 1, 2018. *See* Oppo. at 9:5-7 ("ChowNow ceased making royalty payments to Ameranth after April 30, 2018—the payment due date for the first quarter of 2018"); *see also* Mot. at 10:10-15 (providing that Defendant owed a report of and royalty payment for the second quarter of 2018, covering April 1 through June 30, 2018) on July 31, 2018). Thus, it appears both parties agree that the period of disputed royalties owed pertains only to the period of April 1, 2018 through October 1, 2020. *See* Compl. at 12:7-12. However, the Complaint also seeks "a further judicial declaration that ChowNow has miscalculated, under-reported, and underpaid royalties due under the First Amended License Agreements for prior periods of time within the last 4 years, and owes additional royalties to Ameranth for such time periods." Compl. at 12:9-12. This means that Plaintiff's complaint, on its face, seeks royalties due for the past four years. *Id.* However, according to the licensing agreement itself, no such royalties are owed if the Licensed Patents are invalid. *Id.* Defendant's Cross-Complaint "that this Court deny the relief sought by Ameranth in its Complaint and Prayer." Cross-Compl. at 30:24.

**16**   A "nonpracticing entity" has been defined as "[a] person or company that acquires patents with no intent to use, further develop, produce, or market the patented invention." Garner, Brian A., *Black's Law Dictionary*, NONPRACTICING ENTITY, (11th ed. 2019). "When a nonpracticing entity focuses on aggressively or opportunistically enforcing the patent against alleged infringers, it is also termed (pejoratively) a *patent troll.*" *Id.* Whether Ameranth qualifies as a "patent troll" has been raised by both the media, *see, e.g.*, https://reformingretail.com/index.php/2020/04/23/patent-troll-ameranth-disgustingly-seeks-to-benefit-from-online-ordering-popularity-during-covid-19/ (describing Plaintiff's extensive litigation history, dating back to 2007, and how it seeks to benefit from an increase in online ordering due to the COVID-19 pandemic), as well as in other courts. *See Ameranth Inc v. Genesis Gaming Solutions Inc et al.*, Case No. 8:11-cv-00189-AG-RNB. Ameranth even filed a motion in limine to exclude evidence that it was a patent troll in another case. *See, e.g., id.* at ECF No. 11 (Motion in Limine No. 11 to Exclude Evidence and Argument (1) that Ameranth is a "Patent Troll", "Non-Practicing Entity", "Patent Assertion Entity" or the Like, and (2) Referencing Ameranth's Licensing or Litigation Activities other than those at Issue in the Present Case); *see also* ECF No. 408 (Minutes of Pretrial Conference/Motions in Limine). However, because the parties settled prior to trial, all motions in limine were vacated, so the court did not rule on this issue. *See id.*

**17**   Plaintiff points out that it is not enough for someone else to challenge a licensed patent for the licensee to avoid paying royalties; rather, the licensee seeking to refrain from making royalty payments must challenge the patent. *Studiengesellschaft, 112 F.3d at 1568*; *see also* Mot. at 21:21-26. This means ChowNow cannot seek to avoid royalties based on the date someone else party challenged any of the Licensed Patents.

**18**   In fact, the Court notes that Ameranth is currently represented by the same counsel it had in *Splick-It. See Splick-It*, 2017 WL 1142186 *1*. Plaintiff's counsel is reminded of their obligations: "By presenting to the court a ... written motion ... an attorney ... certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances .... the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." *FED. R. CIV. P.*

11(B)(2). In this case, in light of (1) the number of cases filed by Plaintiff and (2) denial of previous motions to dismiss and remand in this district court, the Court questions Plaintiff's circumspection in filing the instant motions.

The AIA provides that reasonable attorney's fees may be awarded to the prevailing party in "exceptional cases." 35 U.S.C. § 285. A case is "exceptional" if it stands out from others with respect to either: (1) the substantive strength of a party's litigating position, or (2) the unreasonable manner in which the case was litigated. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 134 S. Ct. 1749, 1756, 188 L.Ed.2d 816 (2014). "[A] pattern of litigation *abuses* characterized by the repeated filing of patent infringement actions *for the sole purpose of forcing settlements*, with no intention of testing the merits of one's claims, is relevant to a district court's exceptional case determination under § 285." *Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1363 (Fed. Cir. 2019). Courts must discourage such behavior because some patent holders, known as nonpracticing entities or patent trolls, "with broad claims on platform technologies may try to use those claims to discourage competitors through licensing restrictions and litigation against technologies on similar products." Keith E. Maskus, *Reforming U.S. Patent Policy: Getting the Incentives Right*, COUNCIL ON FOREIGN RELATIONS, CSR No. 19, at 19 (Nov. 2006), *available at* http://www.cfr.org/content/publications/attachments/Patent CSR.pdf.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-00730 Document 37-1 Filed on 04/26/23 in TXSD Page 32 of 102

Board of Regents University of Texas System on behalf of..., Not Reported in Fed....

2006 WL 8436935

2006 WL 8436935
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

BOARD OF REGENTS, the UNIVERSITY
OF TEXAS SYSTEM, ON BEHALF OF The
UNIVERSITY OF TEXAS SOUTHWESTER
MEDICAL CENTER AT DALLAS, Plaintiff,

v.

MISSION PHARMACAL
COMPANY, Defendant.

CIVIL ACTION NO. 3:06-CV-0464-P
|
Signed 06/12/2006

**Attorneys and Law Firms**

Bill Dawson, Scott W. Breedlove, Stuart Tonkinson, Vinson
& Elkins LLP, Dallas, TX, for Plaintiff.

Sean W. Fleming, John H. McDowell, Jr., K&L Gates LLP,
Gregory Perrone, Kelsey M. Weir, Patton Boggs LLP, Dallas,
TX, for Defendant.

**ORDER**

JORGE A. SOLIS, UNITED STATES DISTRICT JUDGE

 **\*1** Presently before the Court is Plaintiff's Motion to
Remand and Brief in Support, filed on March 28, 2006.
Defendant Mission Pharmacal Company filed a Response to
the Motion to Remand on April 17, 2006. Plaintiff filed a
Reply on May 6, 2006. For the reasons set forth below, the
Court is of the opinion that Plaintiff's Motion to Remand
should be DENIED. Plaintiff's request for costs and attorney's
fees is DENIED.

**BACKGROUND**

Plaintiff The Board of Regents, The University of
Texas System, on behalf of the University of Texas
Southwestern Medical Center at Dallas ("UT Southwestern"
or "Plaintiff") filed this lawsuit in Texas state court against
Defendant Mission Pharmacal Company, Inc. ("Mission" or

"Defendant"). The lawsuit deals with a Technology License
Agreement ("Contract") between the two parties. (Pl.'s Mot.
to Remand 2.) In its lawsuit, UT Southwestern asserts a claim
based on breach of contract and also requests a declaratory
judgment that the Contract requires Mission to pay royalties
to UT Southwestern so long as Mission continues to sell
products incorporating the Licensed Technology. *Id.* at 2–3.
UT Southwestern claims that Mission anticipatorily breached
the Contract by unconditionally planning to terminate the
agreement and cease paying royalties or license fees relating
to the Licensed Technology after March 21, 2006. *Id.* at 2.
Mission filed a Notice of Removal on March 15, 2006.

**DISCUSSION**

**I. PLAINTIFF'S MOTION FOR REMAND**

Mission asserts that removal was proper under 28 U.S.C.
§ 1441 because the District Court of the United States
has exclusive original federal question jurisdiction over this
action under 28 U.S.C. § 1338(a). (Def.'s Notice of Removal
2.) The well-pleaded-complaint rule governs whether a case
"arises under" under federal patent law for purposes of §
1338. *Holmes Group, Inc. v. Vornado Air Circulation Sys.,
Inc.*, 535 U.S. 826, 829–30 (2002). The rule provides that
"whether a case 'arises under' patent law 'must be determined
from what necessarily appears in the plaintiff's statement of
his own claim in the bill or declaration....' " *Id.* at 830 (quoting
*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800,
809 (1988) ). The plaintiff's complaint must "establish either
that federal patent law creates the cause of action or that the
plaintiff's right to relief necessarily depends on resolution of
a substantial question of federal patent law, in that patent law
is a necessary element of one of the well-pleaded claims."
*Christianson*, 486 U.S. at 809. A case that raises a federal
patent law defense does not, for that reason alone, "arise
under" federal patent laws, even if the defense is the only issue
in the case. *Id.* However, "a plaintiff may not defeat § 1338(a)
jurisdiction by omitting to plead necessary federal patent-law
questions." *Id.* at 809 n.3.

The burden of establishing federal jurisdiction rests on the
party seeking removal. *Willy v. Coastal Corp.*, 855 F.2d
1160, 1164 (5th Cir. 1988). "The court may have to examine
pleadings filed by the defendant in order to determine whether
the plaintiff's complaint is in fact 'well pleaded.' Thus, when
a court performs its duty to verify that it has jurisdiction, it
may be required to survey the entire record, including the
defendant's pleadings, and base its ruling on the complaint,

**Board of Regents University of Texas System on behalf of..., Not Reported in Fed....**

2006 WL 8436935

on undisputed facts, and on its resolution of disputed facts." *Aquafaith Shipping, Ltd. v. Jarillas*, 963 F.2d 806, 808 (5th Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981); *Calvert v. Sharp*, 748 F.2d 861, 862–63 (4th Cir. 1984) ). The purpose and central focus of this survey is to shed light on the plaintiff's pleadings. *Aquafaith*, 963 F.2d at 808.

**\*2** "[T]he jurisdictional facts that support removal must be judged at the time of the removal, and any post-petition affidavits are allowable only if relevant to that period of time." *Allen*, 63 F.3d at 1335 (citing *Asociacion Nacional de Pescadores v. Dow Quimica*, 988 F.2d 559, 565 (5th Cir. 1993) ). These jurisdictional facts need only be proven by a preponderance of the evidence. *See Allen*, 63 F.3d at 1335–36. "[T]he trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson*, 645 F.2d at 412–13. "[T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* at 413 (citing *Mortenson v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir. 1977) ). "[A] district court has broader power to decide its own right to hear the case than it has when the merits of the case are reached." *Williamson*, 645 F.2d at 413. "Jurisdictional issues are for the court-not a jury-to decide, whether they hinge on legal or factual determinations." *Id.* The court is entitled to weigh the evidence presented and to make an independent factual determination regarding the existence of jurisdiction. *Id.* However, "the removing party bears the burden of establishing facts necessary to show that federal jurisdiction exists." *Allen*, 63 F.3d at 1335 (citing *Gaitor v. Peninsular & Occidental S.S. Co.*, 287 F.2d 252, 253–54 (5th Cir. 1961) ).

UT Southwestern's claims for breach of contract and for a declaratory judgment are based on state law contract rights. However, Mission asserts that these claims necessarily require resolution of a substantial question of federal patent law. (Def.'s Resp. 3.) Specifically, Mission claims that the Contract is a patent license and that UT Southwestern is asking the court to extend Mission's obligation to pay patent royalties beyond the life of the subject patents. *Id.* The enforceability of such an agreement "is a substantial question of federal patent law." *Natec, Inc. v. Deter Co.*, 28 F.3d 28, 29 (5th Cir. 1994).[1]

In order to support its claim that the agreement is a patent license, Mission has provided the Court with correspondence between the parties regarding an amendment to the Contract

that refers to the agreement as an "exclusive license" for U.S. Patent No. 4,814,177. (App. to Def.'s Resp. 1, 3.) Also, Mission claims that it received from UT Southwestern an implied license to practice the inventions claimed in U.S. Patent No. 4,772,467 as part of the Contract. (Def.'s Resp. 7–8.) To support this claim, Mission has provided the Court with a letter from the inventor of U.S. Patent No. 4,772,467 that reveals the intention on the part of UT Southwestern to derive a higher royalty payment from Mission in exchange for allowing it to practice the methods claimed in the patent as an additional implied license included in the Contract. (App. to Def.'s Resp. 5–7.)

UT Southwestern, on the other hand, contends that its right to relief does not necessarily depend upon the resolution of a substantial question of federal patent law. In particular, the university takes issue with Mission's characterization of the agreement as simply a "pure patent license." In its opinion, the agreement is not just a "pure patent license," rather it is a "technology license" whose plain language provides for the payment of royalties so long as Mission continues to distribute and sell calcium citrate. (Pl.'s Reply 2.) UT Southwestern further argues that Mission's attempt to characterize the Contract as a pure patent license through the introduction of parole evidence begs the preliminary question of whether the agreement is ambiguous such that it is proper to consider extrinsic evidence. *Id.* at 3–5. According to UT Southwestern, if a court finds that the Contract is unambiguous, then it will never reach the patent law issue.

**\*3** Neither UT Southwestern's complaint nor the Contract mentions any patent. However, if the Contract includes, at least in part, a patent license, then UT Southwestern's claims necessarily depend on the resolution of a substantial question of federal patent law and this Court is with jurisdiction to hear those claims. *See Natec*, 28 F.3d at 29; *Brulotte v. Thys Co.*, 379 U.S. 29, 31 (1964); *see also Baladevon, Inc. v. Abbott Labs., Inc.*, 871 F.Supp. 89, 94–95 (D. Mass. 1994) (discussing hybrid royalty agreements). It is unclear whether the parties dispute that the Contract includes, at least in part, a patent license. UT Southwestern, in its briefs, denies that the Contract is a "pure" patent license but never explicitly denies that the Contract is not at least partly a patent license. (Pl.'s Reply 3, 4.) However, to the extent that the issue is in dispute, the Court finds that the Contract does include, at least in part, a patent license based on the evidence submitted by the Mission.[2] Therefore, the Court finds that it does have jurisdiction based on the complaint supplemented by the

Case 4:23-cv-00730 Document 37-1 Filed on 04/26/23 in TXSD Page 34 of 102
Board of Regents University of Texas System on behalf of..., Not Reported in Fed....

2006 WL 8436935

undisputed facts, or, alternatively, its resolution of disputed facts. *See Williamson*, 645 F.2d at 413.

UT Southwestern claims that this case is analogous to *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567 (Fed. Cir. 1997). (Pl.'s Mot. 5.) In that case, the court determined that it lacked original subject matter jurisdiction because the plaintiff's complaint was premised entirely on state law claims. *Jim Arnold*, 109 F.3d at 1576. The court stated that "[a] court must review and analyze the plaintiff's pleadings, with special attention directed to the relief requested by the plaintiff, in making the determination as to whether a cause of action arises under the patent laws, or is a cause of action based upon a licensing agreement." *Id.* at 1575 (quoting *Air Prods. & Chems., Inc. v. Reichhold Chems., Inc.*, 755 F.2d 1559, 1562 (Fed. Cir. 1985)). In *Jim Arnold*, the relief requested by the plaintiff was rescission, a state law contract claim. *Jim Arnold*, 109 F.3d at 1574. Resolution of the rescission claim did not require resolution of any patent law issues. *Id.* However, in this case, because the contract in issue appears to be, at least in part, a patent license, the relief requested by UT Southwestern is for the enforcement of an agreement to obtain royalties for the use of a patent after it has expired, a substantial question of federal patent law. *Natec*, 28 F.3d at 29. Furthermore, the court in *Jim Arnold* reiterated that "the court must consider as a whole the substance of the claim in addition to the language of the complaint, and may also consider jurisdictional facts outside the pleadings." *Jim Arnold*, 109 F.3d at 1576 (quoting *Air Products*, 755 F.2d at 1561).

Mission has met its burden of establishing that this Court has original subject matter jurisdiction over this case. Under the well-pleaded-complaint rule, Mission has established that federal patent law is a necessary element of one of UT Southwestern's claims in that the relief requested by UT Southwestern is for the enforcement of an agreement to obtain royalties for the use of a patent after it has expired, a substantial question of federal patent law. *Natec*, 28 F.3d at 29. Therefore, the Plaintiff's Motion to Remand is DENIED.

## II. PLAINTIFF'S MOTION FOR COSTS AND ATTORNEY'S FEES

In its Motion for Remand, Plaintiff requests an award of costs and attorney's fees it has been forced to incur as a result of the removing Defendant's improper removal. Under 28 U.S.C. § 1447(c), a court remanding a case due to improper removal has discretion to "require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." Because the Court finds that Defendant's removal was proper, Plaintiff's motion for costs and attorney's fees is DENIED.

## CONCLUSION

*4 Having reviewed the arguments of the parties and the applicable law, the Court hereby DENIES Plaintiff's Motion to Remand. Further, the Court DENIES Plaintiff's motion for costs and attorney's fees.

**So Ordered.**

**All Citations**

Not Reported in Fed. Supp., 2006 WL 8436935

Footnotes

1  Such agreements have been found unenforceable for running counter to the policy and purpose of the patent laws. *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256 (1945); *Brulotte v. Thys Co.*, 379 U.S. 29, 31 (1964).

2  The Court is aware that it should not adjudicate genuine fact disputes if the jurisdictional issue is dependent upon the resolution of fact questions that are intertwined with the merits of the plaintiff's claims. *See Clark v. Tarrant County, Texas*, 798 F.2d 736, 742 (5th Cir. 1986). However, in this case, the merits of UT Southwestern's claims go to whether the royalties can be extended beyond the expiration of the patents. Also, it is unclear whether the interpretation of the Contract as partly a patent license is in dispute as discussed above.

**End of Document**                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Bradley Corporation v. Lawler Manufacturing Co., Inc., Slip Copy (2020)

2020 WL 7027875

2020 WL 7027875
Only the Westlaw citation is currently available.
United States District Court, S.D.
Indiana, Indianapolis Division.

BRADLEY CORPORATION, Plaintiff,

v.

LAWLER MANUFACTURING
CO., INC., Defendant.

No. 1:19-cv-01240-SEB-DML
|
Signed 11/30/2020

**Attorneys and Law Firms**

Jeffrey N. Costakos, Pro Hac Vice, Kevin J. Malaney, Pro Hac Vice, Matthew W. Peters, Pro Hac Vice, Sarah E. Rieger, Pro Hac Vice, Foley & Lardner LLP, Milwaukee, WI, Kathleen I. Hart, Riley Bennett Egloff LLP, Indianapolis, IN, for Plaintiff.

Daniel James Lueders, Michael M. Morris, Woodard Emhardt Henry Reeves & Wagner, LLP, Indianapolis, IN, Stephen E. Ferrucci, Clapp Ferrucci, Fishers, IN, for Defendant.

**ORDER ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

SARAH EVANS BARKER, JUDGE

**\*1** This cause is before the Court on the Defendant's Motion for Partial Summary Judgment [Dkt. 66] and Plaintiff's Motion for Partial Summary Judgment [Dkt. 67]. In its complaint, Plaintiff Bradley Corporation ("Bradley") seeks declaratory judgments regarding certain rights and obligations relating to a settlement and license agreement between Bradley and Defendant Lawler Manufacturing Co., Inc. ("Lawler"). In response, Lawler filed a counterclaim alleging that Bradley breached this same agreement in various ways. The parties seek summary judgment on various claims and counterclaims as discussed in detail below. For the following reasons, we GRANT Bradley's motion for partial summary judgment and GRANT IN PART and DENY IN PART Lawler's motion.

**Factual Background**

**I. Introduction**

Bradley and Lawler are competitors in the commercial washroom and emergency safety industry, specifically competing in the thermostatic mixing valve ("TMV")[1] and emergency safety shower and eyewash markets. In March 2001, following several years of litigation, Bradley and Lawler entered into a Settlement Agreement to resolve a lawsuit involving allegations of patent and trade dress/ trademark infringement as well as various state law claims. The Settlement Agreement contained several subparts, including confidentiality agreements, a patent and trade secret license agreement ("the License Agreement"), and consent decrees. This litigation arises out of the License Agreement, specifically, the parties' dispute regarding the interpretation and application of the royalty provisions.

**II. The License Agreement**

Under the terms of the License Agreement, Bradley received a license to make, use, and sell the "Licensed Product," to wit, TMVs covered by "Lawler Patent Rights" or that "utilize[ed] any Lawler Trade Secrets." Dkt. 1-1 §§ 1.4, 2. "Lawler Patent Rights" are defined in the License Agreement as "patent rights arising out of or resulting from U.S. Patent Nos. 5,323,960 ["the '960 patent"] and 5,647,531 ["the '531 patent"], U.S. Patent Application No. 09/165,880 ["the '880 application"], filed on October 2, 1988, and all continuations, divisions, continuations-in-part, resulting patents, reissues, reexaminations, foreign counterparts, patents of addition, and extensions thereof." Dkt. 1-1 § 1.2. In addition to the patent rights arising out of or resulting from the '960 and '531 patents, this definition also encompassed patent rights arising out of or resulting from the following additional patents issued from continuation and divisional applications claiming priority to the '880 application: U.S. Patent Nos. 6,315,210; 6,543,478; 6,851,440; 7,191,954; 8,579,206; 9,218,006; D494,252; and D762,818 (collectively, "Kline-1 Patents"). As defined by the License Agreement, "Lawler Trade Secrets" are "the trade secrets and confidential information of Lawler ... regarding the design, performance, testing, assembly, pricing, and marketing of [TMVs] to which Kevin B. Kline had access during his employment ... [by] Lawler between 1988 and 1997."[2] Id. § 1.3.

**\*2** Mr. Kline was a Lawler employee until 1997, when he joined Bradley. As part of the Settlement Agreement,

Mr. Kline signed a confidentiality agreement that covered confidential information he had obtained or created during his employment with Lawler, including information disclosed in Addendum A attached to the agreement. Addendum A was thereafter filed as part of a U.S. Provisional Patent Application No. 60/314,803 ("the '803 application"), filed August 24, 2001. The following patents issued from continuation and/or divisional patent applications claiming priority to the '803 application: U.S. Patent Nos. 7,717,351; 8,123,140; 8,544,760; 9,081,392; 9,625,920; and 10,216,203 (collectively, "Kline-2 Patents"). Bradley has marked TMVs with patent numbers from patents covered by the Lawler Patent Rights, including patents from the Kline-1 and Kline-2 families.

As consideration for the licenses granted in section 2 of the License Agreement, Bradley agreed to pay Lawler royalties on certain products sold by Bradley. Specifically, the royalty section of the License Agreement applies a 10% royalty on the "Selling Price" of "Licensed Units" or "Repair Parts." *Id.* § 3.1. The License Agreement defines "Selling Price" as "the actual price of the Licensed Unit less any actual shipping costs shown on the invoice for the Licensed Unit" and provides that the " 'Selling Price' shall be the highest of the actual selling price of the Licensed Unit to another by Bradley or an Affiliate." *Id.* § 1.9. "Licensed Units" are defined as "each unit of Licensed Product covered by one or more claims of the Lawler Patent Rights made by or for Bradley or an Affiliate as finished product in a [TMV]." *Id.* § 1.5. "Repair Parts" is defined as "all parts and kits used to replace or repair parts of [TMVs]....," (*id.* § 1.8), which are not, themselves, complete TMVs.

According to Bradley, throughout the life of the License Agreement, the royalties it has paid Lawler for Licensed Units and Repair Parts have been computed on the basis of 10% of the invoiced price, less shipping, for each Licensed Unit sold. The sum of these calculations, minus any allowable deductions, is then paid to Lawler as royalties. Griesmaier Decl. ¶¶ 4–7. Lawler has conducted audits of Bradley's royalty payments at several points during the term of the License Agreement and has never suggested that Bradley's interpretation of "Selling Price" was incorrect. *Id.* ¶ 8.

The License Agreement also contains an alternative royalty provision for certain products that applies when a Licensed Product is sold "in combination in another product, such as an emergency shower or eyewash." Dkt. 1-1 § 3.1. Specifically, the License Agreement provides that, "[i]f a Licensed Unit is invoiced or shipped in combination in another product such as an emergency shower or eyewash, the Selling Price of such Licensed Unit shall be the average of the Selling Prices of [TMVs] of such model invoiced by Bradley or an Affiliate (whichever is higher) not in combination in another product during the reported calendar quarter." *Id.*

The term of the License Agreement extends until the expiration "of the last to expire of the Lawler Patent Rights," unless terminated earlier for default. *Id.* §§ 6.1–6.2.

### III. Disputes Regarding Alternative Royalty Provision

#### A. 2005 Litigation

From 2001 to 2005, both parties continued to compete in the market and Bradley paid royalties to Lawler pursuant to the License Agreement. However, in 2005, Lawler sought to terminate the License Agreement for various reasons, including, *inter alia*, that Bradley was in default for its failure to pay the appropriate royalties on certain products that included TMVs. Litigation ensued to determine whether the products at issue came within the License Agreement's alternative royalty provision, in which case the royalty due would have been based on the selling price of the TMV alone rather than the price of the product as a whole. On appeal, the Federal Circuit ruled in line with Lawler's contentions that the Bradley products in dispute did not fall within the alternative royalty provision thus providing insufficient grounds for Lawler to terminate the License Agreement. Accordingly, both parties continued to be subject to the terms of the License Agreement.

#### B. Enclosed Safety Showers

**\*3** In 2016, a new dispute arose over the alternative royalty rate. Bradley asserted that certain products—specifically, Enclosed Safety Showers ("ESSs")—were subject to the alternative royalty provision, and Lawler maintained that Bradley was obligated to pay the standard royalty rate for those products. Bradley's ESSs incorporate a combination emergency shower and eyewash enclosed within a walk-in enclosure. Pfund Decl. ¶ 11. The units are customizable, offering various options to customers, including models that do not contain TMVs. *Id.* ¶¶ 12–13. Since 2016, Bradley has paid under protest the standard royalty rate to Lawler on these disputed products, reserving its rights to seek a refund of any excess payments found to have been made to Lawler. This dispute remains unresolved between the parties and is at issue in this litigation.

### C. Skid Products

The parties also disagree regarding whether Bradley's Navigator Tepid Water Skid Systems ("skid products"), model numbers NTS1 and NTS2, are subject to the alternative royalty provision. Bradley's skid products are water heating and storage systems designed for customers who do not have access to a hot water source and are thus unable to produce the tepid water required to run emergency showers and eyewashes in compliance with regulatory standards. *Id.* ¶ 5. The skid products each include a TMV, model numbers S19-2250 or S19-2350,[3] which mix the hot and cold-water supplies to produce tepid water for the emergency shower or eyewash system. Bradley offers customization options on its skid products unrelated to the TMVs, including multiple sizes of hot water storage tanks to service multiple combination eyewash and drench showers as well as a recirculation system designed to deliver tepid water to several combination units. *Id.* ¶ 11. Customers can also customize the skid product by, *inter alia*, installing booster pumps to increase water pressure delivered to the combination units. *Id.* ¶¶ 8, 10.

### IV. The '818 Design Patent

As discussed above, the expiration date for the License Agreement is set to occur following the expiration "of the last to expire of the Lawler Patent Rights." Dkt. 1-1 §§ 6.1–6.2. The last utility patent coming within the Lawler Patent Rights was U.S. Patent No. 8,579,206 ("the '206 patent"), which expired on February 26, 2019. Compl. ¶ 20. The only remaining unexpired patent after February 26, 2019 that is encompassed within the Lawler Patent Rights is Lawler's U.S. Design Patent No. D762,818 ("the '818 patent"), which was filed in 2015 and will expire on August 2, 2031. *Id.* ¶¶ 21–22; Dkt. 1-4. The '818 patent covers a TMV body design embodied in various Bradley TMVs that were released to the market as early as 1998, including TMV model numbers S19-2100 and S19-2200. Pfund Decl. ¶¶ 22–23, Exh. 15–17.



Fig. 1 '818 Patent          1998 S19-2100 TMV'          1998 S19-2200 TMV'

Although filed fourteen years after the effective date of the License Agreement, the '818 patent falls within the Agreement's definition of "Lawler Patent Rights" because Lawler claimed priority for the subject matter of its design

patent application via a series of eight continuation and divisional applications reaching back to the '880 utility patent application filed seventeen years earlier in October 1998. Unlike utility patents that generally expire 20 years from the filing date of the earliest application on which the patentee can claim priority, a design patent such as the '818 patent expires fifteen years from the issue date, regardless of its priority date. Thus, the issuance of the '818 patent extended the term of the License Agreement by twelve years (from February 2019, when the '206 patent expired, to 2031, when the '818 patent will expire).

### V. Bradley's TMV Redesign

**\*4** In 2018, Bradley introduced a new valve body style on certain of its TMVs, including model numbers S19-2100, S19-2150, S19-2200, S59-3080, S59-2045, S59-2080, and S59-3045. *Id.* ¶ 30. Bradley has not made or sold any TMVs having the pre-2018 valve body style after February 26, 2019, and the '818 patent does not cover Bradley's current TMVs. *Id.* ¶ 31; Compl. ¶¶ 40–41. Lawler concedes that "[a]fter the design change, ... [Bradley's current] valves are no longer covered by the '818 Patent due to Bradley's design around and should not be marked with the '818 patent number." Rieger Decl., Exh. 1 at 19. Thus, since February 26, 2019, Bradley has not sold any TMV products that are covered by any unexpired claim of the "Lawler Patent Rights."

### VI. The Instant Litigation

Bradley brought this declaratory action on March 27, 2019 in order to clarify the parties' respective rights on various issues related to the License Agreement. Specifically, Bradley's complaint seeks a declaratory judgment that: (1) it owes no royalties on TMV sales under the License Agreement after February 26, 2019; (2) it is not required to mark any current product with the '818 patent number; and (3) it is entitled to recover a portion of the royalty payments it had made to Lawler under protest. Lawler filed its counterclaim on May 1, 2019, alleging claims of breach of contract, and, in the alternative, *quantum meruit.*

Now before the Court are the parties' cross-motions for partial summary judgment. Bradley seeks a declaration on two of its claims: first, that it owes no royalties to Lawler for TMV sales after February 26, 2019, and, second, that sales of its ESSs are subject to the alternative royalty rate in the License Agreement thereby entitling Bradley to recover the excess payments previously made to Lawler under protest. Bradley also seeks summary judgment on Lawler's counterclaim

2020 WL 7027875

that Bradley breached the License Agreement by incorrectly calculating the "Selling Price" of certain of its products, thereby underpaying royalties due to Lawler.

Lawler, for its part, seeks a declaration that the License Agreement requires Bradley to pay royalties to Lawler until August 2, 2031 for Licensed Units covered by any claim in either the (now expired) '531 patent and/or the '960 patent and Repair Parts therefor; that there is no *per se* patent misuse on Lawler's part; and that Bradley's patent misuse defense otherwise fails as a matter of law. Lawler also seeks summary judgment on its breach of contract theories based on Bradley's alleged underpayment of royalties on its skid products as well as its failure to use the "highest" actual selling price to calculate royalties on various other products.

**Legal Analysis**

**I. Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, 106 S.Ct. 2505, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

In ruling on cross-motions for summary judgment, the Court applies the same Rule 56 standards to both, such that our review of the record will entail all inferences being drawn in favor of the party against whom a particular issue in the motion under consideration is asserted. *See O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

**II. Applicable Legal Principles**

 **\*5** The majority of the issues presented in the parties' respective summary judgment motions are involve disputes over contract interpretation. The parties agree that these

disputes must be resolved with reference to Indiana law, with which assertion the Court concurs, so we shall apply the law of our state without further elaboration or discussion. *See Wood v. Mid-Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991). Under Indiana law, "[t]he goal of contract interpretation is to determine the intent of the parties when they made the agreement." *Tender Loving Care Mgmt., Inc. v. Sherls*, 14 N.E.3d 67, 72 (Ind. Ct. App. 2014) (quotation marks and citation omitted). To that end, when contract language is clear and unambiguous, a court "must give those terms their clear and ordinary meaning," *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005), and "no extrinsic evidence is admissible to explain the terms of such an agreement." *Louis & Karen Metro Family, LLC v. Lawrenceburg Conservancy Dist.*, 616 F.3d 618, 622 (7th Cir. 2010) (citing *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006)). However, "[w]hen the contract is ambiguous, ... extrinsic evidence is permissible to explain the intentions of the parties." *Id.* (citing *Reuille v. E.E. Brandenberger Const., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008)).

" 'A contract is ambiguous if a reasonable person would find the contract subject to more than one interpretation.' " *Tender Loving Care*, 14 N.E.3d at 72 (quoting *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012)). While the interpretation of an unambiguous contract is a matter of law, ambiguous contracts interpreted in light of extrinsic evidence create issues that must be resolved by a jury. *Celadon Trucking Servs., Inc. v. Wilmoth*, 70 N.E.3d 833, 842 (Ind. Ct. App. 2017). With these legal principles in mind, we turn to address the merits of the parties' current dispute.

**III. Discussion**

 **A. Expiration of the License Agreement**

Each side seeks summary judgment as to whether Bradley continues to owe royalties to Lawler under the License Agreement through August 2, 2031, when the '818 patent expires, or whether Bradley's obligation to pay royalties ended on February 26, 2019, when the last Lawler patent practiced in Bradley's products expired. Lawler argues that the plain language of the License Agreement requires Bradley to continue paying royalties until August 2, 2031, and that this interpretation does not render the contract legally unenforceable under Bradley's patent misuse affirmative defense. Bradley, on the other hand, claims that a proper interpretation of the plain language of the License Agreement supports its position that its royalty obligations ended on February 26, 2019, when the last patent practiced

in its royalty-bearing products expired, and that Lawler's interpretation constitutes *per se* patent misuse under *Brulotte v. Thys Co.*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964). Because we find, for the reasons explained below, that any obligation Bradley may have under the plain language of the License Agreement to make royalty payments after February 26, 2019 constitutes *per se* patent misuse, we need not and do not address the parties' contract interpretation arguments.

"Federal law prohibits 'patent misuse,' which 'occurs when the scope of an otherwise valid patent monopoly extends beyond the prescribed boundaries of the patentee's control.' " *Knowles Electronics, LLC v. Am. Audio Component Inc.*, No. 06 C 6213, 2017 WL 3620808, at *5 (N.D. Ill. Aug. 23, 2017) (quoting *Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1118 (N.D. Ill. 2015)). Bradley has the burden to prove its patent misuse affirmative defense by a preponderance of the evidence. *See, e.g.*, *Ocean Tomo*, 133 F. Supp. 3d at 1118 (applying preponderance of the evidence standard); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2007 WL 2484877, at *1, 2008 U.S. Dist. LEXIS 4627, at *3 (N.D. Ill. Jan. 18, 2008) (same).

*\*6* Under the doctrine of patent misuse, "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se." *Brulotte*, 379 U.S. at 32, 85 S.Ct. 176. In *Brulotte*, an inventor licensed his patented hop-picking machine to farmers in exchange for royalties from hop crops harvested both before and after his patents' expiration dates. Although the licenses included twelve patents, only seven of those were used in the hop machines. All but one of the twelve patents expired prior to the expiration of the license agreement, including all seven patents practiced in the machines. *Id.* at 30, 85 S.Ct. 176 n.2. The Court held that the agreement was unenforceable and "unlawful *per se*" to the extent it provided for the payment of royalties "accru[ing] after the last of the patents incorporated into the machines had expired." *Id.* at 30, 32, 85 S.Ct. 176.

In reaching this result, the *Brulotte* Court distinguished the Supreme Court's holding in *Automatic Radio Manufacturing Co. v. Hazeltine Research*, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), where the licensor had granted to the licensee "a privilege to use any [of the licensor's] patent[s] ... in consideration of the payment of royalties." In *Automatic Radio Manufacturing*, the licensee had not yet developed a product, so it was unknown whether the licensed patents would cover any future product the licensee might develop. There, the Court held that royalties could be assessed on

this basis even if the patents were never used because "[p]ayment for the privilege is required regardless of use of the patents." *Id.* at 833, 70 S.Ct. 894. In distinguishing *Automatic Radio Manufacturing*, the *Brulotte* Court cited various factual differences between the two cases, including, first, that the effect of the expiration of any of the patents on the royalty agreement was not at issue in *Automatic Radio Manufacturing*, and second, that unlike the license at issue in *Brulotte*, the license in *Automatic Radio Manufacturing* exacted royalties for patents never used. *Brulotte*, 379 U.S. at 33, n.5, 85 S.Ct. 176.

Although *Brulotte* has been widely criticized over the years since it was decided by the High Court, including by the Seventh Circuit in *Scheiber v. Dolby Laboratories, Inc.*, 293 F.3d 1014 (7th Cir. 2002), the Supreme Court reaffirmed the decision in *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 135 S.Ct. 2401, 192 L.Ed.2d 463 (2015). In *Kimble*, the Court observed that *Brulotte* "is simplicity itself to apply. A court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Id.* at 459, 135 S.Ct. 2401. The *Kimble* Court did, however, point to several ways in which parties could structure agreements to avoid running afoul of *Brulotte*, while still achieving the same ends. For example, the Court observed:

> [P]arties have [ ] more options when a licensing agreement covers either multiple patents or additional non-patent rights. Under *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires. *See* 379 U.S. at 30, 85 S.Ct. 176. Too, post-expiration royalties are allowable so long as tied to a non-patent right —even when closely related to a patent.

*Kimble*, 576 U.S. at 455, 135 S.Ct. 2401.

Lawler argues that the circumstances presented here differ from the facts in *Brulotte* in several material ways, and, as a result, the License Agreement's royalty provision comes within the exceptions outlined in *Kimble* and is therefore enforceable. Lawler contends that Bradley "was granted a license under an extensive portfolio of patents and trade secrets," but, "for simplicity, royalties were to be calculated on Bradley products covered by a subset of the licensed technology," specifically, the claims of the '531 and '960 patents. According to Lawler, the royalty provision was structured to provide clarity as to which products were and were not royalty bearing, given that possible future coverage of the licensed '880 application and its progeny was unknown at the time the Settlement Agreement was

2020 WL 7027875

signed. Dkt. 69 at 16–17 (internal page numbers). Because the License Agreement encompasses a broad swath of patents as well as non-patent rights, namely, trade secrets, Lawler argues that the royalty provision requiring payment until the expiration of the last to expire of the Lawler Patent Rights does not constitute *per se* patent misuse under *Brulotte* and is enforceable under the principles set forth in *Kimble*.[4]

**\*7** It is true that, in *Kimble*, the Supreme Court ruled that "when a licensing agreement covers ... multiple patents ..., royalties may run until the latest-running patent covered in the parties' agreement expires," 576 U.S. at 454, 135 S.Ct. 2401, which holding appears to support Lawler's argument that a license covering a portfolio of patents with a non-diminishing royalty, like the License Agreement, is enforceable until the expiration of the last patent covered under the agreement, regardless of whether it is practiced by the royalty-bearing product(s). However, the only authority cited by *Kimble* was *Brulotte*, which explicitly held that it was error for a licensing agreement to "allow[ ] royalties to be collected which accrued after the last of *the patents incorporated into the machines* had expired." *Brulotte*, 379 U.S. at 30, 85 S.Ct. 176 (emphasis added). Thus, "when *Kimble* says that 'royalties may run until the latest-running patent covered in the parties' agreement expires,' ... it appears to assume that the licensee will be using or selling an apparatus or process that incorporates more than one of the licensor's patents, so [that] such use or sale without permission will naturally infringe at least one patent until the latest-running patent expires." *XY, LLC v. Trans Ova Genetics, LC*, No. 13-cv-0876-WJM-NYW, 2020 WL 2128739, at \*6 (D. Colo. May 5, 2020) (internal citation omitted), *appeal docketed*, No. 20-1942 (Fed. Cir. June 30, 2020).

In the case before us here, however, it is undisputed that, as of February 26, 2019, the royalty-bearing products explicitly identified in the License Agreement do not practice any unexpired patents encompassed in the Lawler Patent Rights.[5] Accordingly, under *Brulotte*, any royalty obligations imposed by the License Agreement after February 26, 2019 constitute *per se* patent misuse and are unenforceable. Even assuming, as Lawler argues, that the royalties collected under § 3.1 of the License Agreement are tied to both patent and trade secret rights, that fact does not skirt *Brulotte*'s prohibition on post-expiration royalties. While the Court in *Kimble* acknowledged that post-patent-expiration royalties are allowable if "tied to a non-patent right," the opinion continued, saying: "That means, for example, that a license involving both a patent and a trade secret can set a 5% royalty during the patent

period (as compensation for the two combined) and a 4% royalty afterward (as payment for the trade secret alone)." 576 U.S. at 454, 135 S.Ct. 2401. Unlike the separable pre- and post-patent-expiration royalties described as acceptable in *Kimble*, the License Agreement here sets forth a single, non-diminishing royalty rate without a clear indication that the royalties are not subject to patent leverage.[6] For these reasons, it is our determination that *Brulotte* controls and is dispositive here. Accordingly, Bradley's motion for summary judgment on its *per se* patent misuse affirmative defense is GRANTED and Lawler's cross motion is DENIED.[7]

**B. Applicability of Alternative Royalty Provision to Skids and ESSs**

**\*8** We turn next to resolve whether Bradley's skid and ESS products come within the License Agreement's alternative royalty provision for combination products. That section of the agreement provides that, "[i]f a Licensed Unit is invoiced or shipped in combination in another product such as an emergency shower or eyewash, the Selling Price of such Licensed Unit shall be the average of the Selling Prices of [TMVs] of such model invoiced by Bradley or an Affiliate (whichever is higher) not in combination in another product during the reported calendar quarter." Dkt. 1-1 § 3.1. Here, Bradley argues that it has been required to overpay royalties on the sales of its ESS products, which it has done under protest. Accordingly, Bradley seeks summary judgment on its claim that its ESS products are covered by the alternative royalty provision and thus subject to a lower royalty rate. Lawler, in turn, has moved for summary judgment on its claim that Bradley must pay royalties on the full selling price of its skid products because the skids do not come within the alternative royalty terms.

This is not the first time that Bradley and Lawler have sought judicial intervention to resolve their dispute regarding the proper interpretation of the License Agreement's alternative royalty provision. As long ago as 2005, Lawler sought to terminate the License Agreement on grounds that Bradley was in default for, among other things, failing to pay the appropriate royalty on certain combinations of products, none of which, happily, are the subjects of this litigation. That earlier dispute ultimately reached the Federal Circuit, which ruled that the products at issue did not come within the alternative royalty provision. However, the Court declined to decide whether Lawler was eligible to terminate the License Agreement on that basis. In reaching its determination, the Federal Circuit held that the term "such as an emergency

shower or eyewash" in § 3.1 "refers to items similar to what are recited rather than indicating that the recited items are just examples of what is covered by that provision." *Lawler Mfg. Co. v. Bradley Corp.*, 280 Fed. App'x 951, 954 (Fed. Cir. 2008).[8] Accordingly, "the alternative royalty provision of Section 3.1 applies only to combinations of products that are similar to emergency showers and eyewashes." *Id.* at 955.

In assessing the similarity of the combination products at issue in that litigation, namely, cabinets and piping, to emergency showers and eyewashes, the Federal Circuit considered evidence presented by Lawler "showing that emergency showers and eyewashes are products that have significant value whether or not they are sold in conjunction with a valve, while the cabinets and piping sold by Bradley are merely meant to encase the valve and have no value without the valve," as well as Lawler's evidence "showing that cabinets and piping are generic add-ons, with the valve constituting the bulk of the value to the customer." *Id.* This evidence, coupled with Bradley's failure to counter in any opposing factual evidence to Lawler's, resulted in the Court's conclusion that "the cabinets and piping at issue are not similar to emergency showers and eyewashes, and therefore are not eligible for the alternative royalty provision of Section 3.1." *Id.*

Against the backdrop of this discussion, we shall now address the parties' arguments as they apply to Bradley's ESS and skids products.

**1. ESS Products**

Bradley's ESS products consist of a combination emergency shower and eyewash enclosed within a walk-in enclosure. Bradley sells certain ESS models with TMVs and other models without TMVs. Bradley claims that its ESS models sold with TMVs must be considered "similar to emergency showers and eyewashes" and thus fall within the alternative royalty provision of the License Agreement because these products in fact *include* an emergency shower and eyewash, and, consistent with the Federal Circuit's analysis discussed above, have significant value whether or not they are sold in combination with a TMV. Bradley argues the alternative royalty provision should therefore be interpreted to apply to its ESSs so that applicable royalties are calculated based on the price of the TMV alone, not the ESS system as a whole. Lawler rejoins that Bradley's ESS products do not fall within the alternative royalty provision of the License

Agreement and thus higher royalties are appropriate because, while the TMV may be invoiced and shipped in conjunction *with* the emergency shower and eyewash as part of the ESS, § 3.1 requires that the TMV be "invoiced or shipped in combination *in*" a product such as an emergency shower or eyewash. Because the TMV is not incorporated in either the shower or eyewash that are part of the ESS system, Lawler maintains that the alternative royalty provision does not apply and Bradley must pay royalties based on the price of the total ESS system, as opposed to the price of the TMV alone.

**\*9** Guided by the Federal Circuit's analysis, we hold that TMVs included in the models of Bradley's ESS systems of the design at issue here constitute "Licensed Units invoiced or shipped in combination in another product such as an emergency shower or eyewash" and therefore are covered by the License Agreement's alternative royalty provision. We reach this conclusion by noting the obvious: Bradley's ESSs are emergency showers and eyewashes contained within an enclosure. It is therefore difficult to argue that these products are not "similar to" emergency showers or eyewashes. Moreover, unlike the cabinets and piping considered by the Federal Circuit, the evidence before us here establishes that Bradley's ESSs hold significant value with or without the TMV; thus, the TMV does not represent the bulk of the value of the ESS.

The Federal Circuit was not presented with the contract interpretation argument that Lawler raises here, to wit, that the TMV must be sold inside a product similar to an emergency shower or eyewash to trigger the alternative royalty provision. It is clear, nonetheless, that although the TMV is not *inside* the enclosed emergency shower or eyewash, the TMV becomes a part of, and thus is sold as part of, the particular ESS models at issue here. Thus, it is "in" a product which is "similar to" an emergency shower and eyewash, consistent with the Federal Circuit's guidance. Accordingly, we <u>GRANT</u> Bradley's motion for summary judgment on this issue.

**2. Skid Products**

Unlike the ESSs, however, Bradley's skid products cannot be deemed "similar to an emergency shower or eyewash"; as such, they are not covered by the alternative royalty provision. The undisputed evidence establishes that, as sold and invoiced, the skid is not part of or connected to an emergency shower or eyewash. While the product enables a customer without a hot water source to create the tepid water

required to run a functioning emergency shower and eyewash, the skid itself is not a replacement for an emergency shower or eyewash and does not provide a similar function. Like TMVs sold alone or in combination with pipes or cabinets (such as the products addressed by the Federal Circuit), the skid product is attached to an emergency shower or eyewash following purchase, usually by the end user or a plumber.

As previously noted, the primary purpose of the skid product is to enable consumers without access to a hot water supply to create tepid water necessary for an emergency shower or eyewash that meets regulatory standards, and the TMV is essential to that function. Without the TMV to "maintain the tempering of the water, regardless of extreme fluctuations in the supply of hot or cold water," (Exh. N., col. 1, lines 64–67), Bradley's skid product would not permit the customer to create a tepid water supply and any emergency shower and eyewash later connected to the skid product would not satisfy applicable regulatory standards. Thus, it is the TMV that provides value to the water heating and storage components of the skid products, not the reverse. As such, again in line with the Federal Circuit's analysis discussed above, Bradley's skid products are not as a matter of law "similar to emergency showers or eyewashes" and therefore are not covered by the alternative royalty provision of the License Agreement. Accordingly, Lawler is entitled to summary judgment on this portion of its counterclaim and its motion is therefore <u>GRANTED</u>.

**C. Definition of "Selling Price"**

Bradley and Lawler both seek summary judgment as to the correct definition of the term "Selling Price" as used in the License Agreement's royalty provision. Lawler claims that, properly interpreted, "Selling Price" requires that royalties for all Licensed Units be calculated based on 10% of the historically highest price then in existence for the Licensed Unit. Bradley proffers that "Selling Price" instead means the highest selling price of the Licensed Unit sold in a particular transaction, calculated quarterly at 10% of the invoiced price (less shipping) for each Licensed Unit sold. The sum of those calculations, minus any allowable deductions, is the amount Bradley has routinely reported and paid to Lawler as royalties throughout the life of the License Agreement. The parties invoke what each contends is the clear and unambiguous language of the contract, claiming that the other side, respectively, is impermissibly attempting to rewrite the contract. Each party, alternatively, contends that even if the court were to rule that the definition of "Selling Price"

is ambiguous, extrinsic evidence supports its respective interpretation.

**\*10** Applying well-established principles of contract interpretation, we examine first the plain language of the contract. Here, the License Agreement defines "Selling Price" as follows:

> "Selling Price" shall mean the actual price of the Licensed Unit less any actual shipping cost shown on the invoice for the Licensed Unit. The "Selling Price" shall be the highest of the actual selling price of the Licensed Unit to another by Bradley or an Affiliate.

Dkt. 1-1 at 16, § 1.9. Royalties are then calculated based on the "Selling Price." Specifically, the License Agreement provides that "[t]he Royalties paid by Bradley shall be ten percent (10%) of the Selling Price of Licensed Units and Repair Parts...." *Id.* at 17, § 3.1.

We hold this definition of "Selling Price" as contained in the License Agreement to be clear and unambiguous. The first sentence of the definition expressly states that the "Selling Price" of the Licensed Unit is to be determined with reference to the actual selling price listed on the invoice for the Licensed Unit; this is in line with Bradley's preferred interpretation. We do not accept Lawler's view that the use of the word "highest" in the second sentence of the definition means the historically highest price for which Bradley or its Affiliates have ever sold any Licensed Unit of that type. Importantly, the second sentence specifically refers to "the highest of the actual selling price of *the* Licensed Unit to another by Bradley or an Affiliate." Dkt. 1-1 at 16, § 1.9. "[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it proceeds." *Adgate v. Chip Shoppe, Inc.*, No. 13-C-163, 2013 WL 6981451, at \*9 (E.D. Wis. May 10, 2013) (quoting *Am. Bus. Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000)). Because "the" is singular, we find that the "highest" price reference in the second sentence of the "Selling Price" definition is correctly interpreted to mean the highest invoiced price of the particular Licensed Unit being considered, not the highest price of any Licensed Unit of that type ever sold by Bradley or its Affiliates. Thus, in a case where a Licensed Unit is invoiced by Bradley to an Affiliate at one price and subsequently by that Affiliate to an end user at a different price, the "highest" invoiced price of those two prices is to be used to calculate royalties for that Licensed Unit. When both sentences of the definition are read together and in context, this interpretation most reasonably harmonizes their meaning.

Case 4:23-cv-00730   Document 37-1   Filed on 04/26/23 in TXSD   Page 43 of 102
Bradley Corporation v. Lawler Manufacturing Co., Inc., Slip Copy (2020)

2020 WL 7027875

Interpreting "Selling Price" in this manner also aligns most logically with references to the term appearing elsewhere in the License Agreement. In the alternative royalty provision, set forth in § 3.1 of the License Agreement, "Selling Price" is used in determining the price to be used for royalty calculations for a Licensed Product that is sold in combination in another product such as an emergency shower or eyewash. Specifically, the alternative royalty provision states that the price to be used to calculate royalties for such products is "the average of the Selling Prices of Thermostatic Mixing Valves of such model invoiced by Bradley or an Affiliate (whichever is higher) not in combination in another product during the reported calendar quarter." Dkt. 1-1, § 3.1. Likewise, § 3.1 provides that, regarding sales of "Licensed Products" unlisted in Addendum B and "Repair Parts," Bradley's royalty payments are "ten percent (10%) of the Selling Price by Bradley or its Affiliate (whichever is greater) for each such Licensed Unit or Repair Part." *Id.*

 *11  We share Bradley's view that if "Selling Price" is interpreted to be the highest actual selling price then in existence when the Licensed Units were shipped or invoiced, as Lawler contends, there would be no need to determine "whichever is higher" or "whichever is greater" among the "Selling Prices" charged by "Bradley or its Affiliate," rendering this language in § 3.1 superfluous. "[A] 'venerable principle of contract law' instructs against interpreting contracts in a manner that renders terms superfluous if another interpretation lends meaning to those terms." *Comcast, Inc. v. Coconut Code, Inc.*, No. IP 02-0183-C-T/K, 2002 WL 1349913, at *3 (S.D. Ind. Apr. 17, 2002) (quoting *Fla. Polk County v. Prison Health Servs., Inc.*, 170 F.3d 1081, 1082 (11th Cir. 1999)). Here, Bradley's interpretation of the definition of "Selling Price" accomplishes that goal of internal consistency within the body of the entire Agreement.

For these reasons, we hold that the clear and unambiguous language of the License Agreement supports Bradley's interpretation of the definition of "Selling Price." We therefore need not, and will not rely on any extrinsic evidence referenced by the parties. Bradley's motion for summary judgment on this issue is <u>GRANTED</u> and Lawler's is <u>DENIED</u>.

## IV. Conclusion

For the reasons detailed above, Bradley's motion for partial summary judgment is <u>GRANTED</u> in its entirety. Lawler's motion for partial summary judgment is <u>GRANTED</u> as to its counterclaim alleging underpayment of royalties on Bradley's skid products and <u>DENIED</u> in all other respects. We will address Bradley's second motion for partial summary judgment in a separate entry in due course.

IT IS SO ORDERED.

## All Citations

Slip Copy, 2020 WL 7027875

## Footnotes

1    TMVs are used in safety showers and eyewashes to "maintain the tempering of the water regardless of extreme fluctuations in the supply of hot or cold water to the thermostatic mixing valve." Exh. N, Col. 1, lines 64–67.

2    The License Agreement twice references "Lawler Trade Secrets", once when the term is defined in § 1.3, and again in § 1.4, which defines "Licensed Product" as "any product manufactured, used, or sold that is covered by one or more claims of Lawler Patent Rights or utilizing any Lawler Trade Secrets." Dkt. 1-1 §§ 1.3, 1.4. The License Agreement's section on royalties does not mention trade secrets, nor are trade secrets referenced with respect to the term of the agreement (*i.e.*, the License Agreement provides only that it expires after the expiration "of the last to expire of the Lawler Patent Rights"). *Id.* §§ 3.1, 6.1–6.2.

3    It is undisputed that the TMVs used in Bradley's skid products are "Licensed Units" as defined by the License Agreement.

4    Lawler references several other distinctions between this case and *Brulotte*, including that the licenses at issue in *Brulotte* were not granted in the context of a settlement, and also that *Brulotte* dealt with a situation in which the licensees had purchased the patented product from the licensor, thus implicating patent exhaustion. However, we do not regard these as material distinctions, considering that the license agreement at issue in *Kimble*, like here, was entered into as part of a settlement and did not implicate patent exhaustion, and the Court found *Brulotte* controlling. Nor are we persuaded by Lawler's contention that *Brulotte* applies only in situations where *all* the patents under the license have expired,

considering that the *Brulotte* Court explicitly recognized that one of the patents that was covered by the license agreement but not practiced in the royalty-bearing product had not expired.

5   Lawler's counterclaim that Bradley designed around the sole remaining unexpired design patent encompassed by the Lawler Patent Rights in violation of the License Agreement is not at issue in either of the parties' motions for partial summary judgment addressed in this order. Accordingly, we do not discuss its possible impact on the *Brulotte* analysis at this time.

6   The Ninth Circuit opinion affirmed in *Kimble* set forth the rule as follows: "[A] so-called 'hybrid' licensing agreement encompassing inseparable patent and non-patent rights is unenforceable beyond the expiration date of the underlying patent, unless the agreement provides a discounted rate for the non-patent rights or some other clear indication that the royalty at issue was in no way subject to patent leverage." *Kimble v. Marvel Enterprises, Inc.*, 727 F.3d 856, 857 (9th Cir. 2013).

7   We are not persuaded by Lawler's contention that equitable defenses such as laches and unclean hands are applicable here. *See, e.g., Scheiber*, 293 F.3d at 1022 ("[T]o apply the doctrine of unclean hands in a case such as the present one would fatally undermine the policy of refusing enforcement to contracts for the payment of patent royalties after expiration of the patent. It would be (given the antimonopoly basis of *Brulotte*) inconsistent with the Supreme Court's rejection of the defense of *in pari delicto* ('equally at fault') in antitrust cases, [ ] since the effect of that rejection is to give a party to a contract that violates the antitrust laws a defense to a suit to enforce the contract even if he entered in to the contract with full knowledge.").

8   We note that, while the Federal Circuit's opinion is nonprecedential, the parties rely on the court's interpretation of the alternative royalty provision in support of their arguments here.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---


New York
Official Reports

87 A.D.2d 364, 451 N.Y.S.2d 171, 220
U.S.P.Q. 1077, 1982-2 Trade Cases P 64,800

Eugene Cohn et al., Respondents,

v.

Compax Corporation, Appellant

Supreme Court, Appellate Division,
Second Department, New York
2322 E/81
June 14, 1982

CITE TITLE AS: Cohn v Compax Corp.

## SUMMARY

Appeal from an order of the Supreme Court at Special Term
(Alexander Vitale, J.), entered December 18, 1980 in Nassau
County, which denied a motion by defendant for partial
summary judgment on its first counterclaim.

## HEADNOTES

Patents

Patent Misuse

Total-Use Royalties on Patent Package

(1) Defendant's motion for partial summary judgment
declaring that, under the contract in which plaintiffs assigned
to defendant all of their rights to pending patent applications
in consideration of a percentage of the royalties on the use
of all of the patented processes until the expiration of the
last patent issued, defendant is only obligated to make royalty
payments to plaintiffs based on the use of process embodied
in unexpired patents, was properly denied; although it is
generally unlawful to project royalties beyond the life of a
patent, a contract which calls for royalties based on total use
until the expiration of the patent last issued is lawful and
enforceable if the total-use royalty provision is the product
of the mutual convenience of the parties and not of unfair
patent leverage exerted by the patentee. Accordingly, a trial
is required on the issue of whether the negotiations which
resulted in the contract were marked by plaintiffs' use of unfair
patent leverage.

## APPEARANCES OF COUNSEL

*Skadden, Arps, Slate, Meagher & Flom* (*James E. Lyon,
Michael H. Diamond, Timothy G. Reynolds* and *Robert W.
Wien* of counsel), for appellant.
*Irving A. Cohn, P. C.* (*Allan D. Goldstein* and *Robert W.
Fiddler* of counsel), for respondents.

## OPINION OF THE COURT

Mollen, P. J.

On this appeal, we are called upon to examine the doctrine of
patent misuse. The issue at bar arises out of the defendant's
efforts to avoid its obligations under a contract for the transfer
of rights to certain patent applications and resulting patents.
We turn first to a brief review of the pertinent facts.

The Cohn family has been involved in the manufacture of
textile machinery since 1929. In 1957, Eugene Cohn and
his brother Joseph played a major part in the invention
of a process to eliminate shrinkage in the laundering of
tubular **\*365** knit garments. The process was performed
by a machine, known as the compactor, which would preshrink
knitted goods by rolling and compressing the fabric.

In February, 1957, the Cohns filed an application for a patent
in connection with their invention. In January, 1958, they
filed two additional patent applications for the compactor.
In July, 1958, while the three applications were pending,
the Cohns formed the Compax Corporation (Compax) and
entered into a contract with it for the transfer of rights under
the patent applications. The contract provided in pertinent part
that the Cohns "herewith sell, set over, assign and transfer to
COMPAX CORP., all of their right, title and interest in and to"
the three pending patent applications and any patents "which
may issue thereon". The Cohns further assigned "all of their
right, title and interest in and to any and all applications for
letters patent and the patents which may be issued thereon,
and which may be filed in any foreign jurisdiction on the basis
of the United States applications for letters patent and the
patents which may be issued."

As consideration for the transfer of these rights, Compax
agreed to pay a "purchase price" consisting, *inter alia*,
of "$2,000, together with 1/4th of all rents, royalties or
commissions collected by COMPAX CORP. during the life of
the patents on all machinery which it may license and which

embodies the methods, apparatus or equipment described in the applications for patents aforementioned or the patents to be issued thereon in the United States or elsewhere." Contemplating a subsequent reduction in the payments due, the contract provided additionally that, if "the machinery, method, apparatus or equipment which is sold or licensed embodies the ... patents, as well as methods, improvements and apparatus covered by other patents, or embodies the standard finishing operations, methods and apparatus not covered by patents, then ... the rent, royalties, commissions, costs and profits shall be pro-rated and allocated in such a manner that an equitable sum be reflected as the royalty or profit ... for the subject invention giving proper effect and valuation to the royalty or profit applicable to the other patented items as well as the standard finishing operations."

**\*366**

All payments described in the contract were to continue "until the expiration of the last patent to be issued in the United States or elsewhere."[1]

On January 2, 1962, patents were issued on two of the Cohns' patent applications. On April 2, 1963, a third patent was issued. Thereafter, some 15 foreign patents were issued throughout the world. The last of these, issued in Austria, is due to expire on June 15, 1985.

Compax, which passed out of the Cohns' hands in 1968, abided by the contract and did not question its obligations thereunder until July, 1979, when the corporation's president gave notice that the Cohns had been overpaid and that future royalties, if due, would be reduced to reflect the overpayment. It was Compax' position that it was entitled to a proportionate reduction in payments as various patents encompassed by the contract expired. Eugene Cohn and the successors in interest of his now-deceased brother rejected this suggestion, relying on the language of the contract which required Compax to make full royalty payments "until the expiration of the last patent to be issued in the United States or elsewhere."

When Compax refused to make the payments called for under the contract, plaintiffs commenced this action seeking an accounting and damages for breach of contract.[2] Compax interposed two counterclaims, one of which sought a judgment declaring (1) that payments under the contract be limited to royalties, rents and commissions for the use of those processes for which patents have not yet expired, and (2) that, pursuant to the contract, there be a pro rata reduction in payments due for the period between January 3, 1979, the

date upon which the first two United States patents expired, and April 2, 1980, the date on which the third and last United States patent expired. Subsequently, Compax moved for partial summary judgment on this counterclaim, seeking a judgment declaring (1) that there be a pro rata reduction in payments due for the period between January 3, 1979 and April 2, 1980, (2) that Compax **\*367** not be obligated to make payments based upon the use of processes embodied in the United States patents after April 2, 1980, and (3) that, with respect to any period after April 2, 1980, Compax be obligated to make payments based only on the use of processes embodied in unexpired foreign patents and only to the extent that such use is related to the foreign country in which the patent is in effect.

Special Term denied the motion, and Compax now appeals.

Compax does not deny that the plain language of the contract obligates it to pay full royalties until the expiration of the patent last issued--here, the Austrian patent due to expire in 1985. Nevertheless, Compax argues that the contractual provisions are unenforceable because they constitute patent misuse and, therefore, are contrary to public policy. Plaintiffs contend that the doctrine of patent misuse has no application in the context of this case since the contract is not a licensing agreement, but rather an unencumbered sale of all rights to patent applications and resulting patents. Compax replies that the form of the transaction--whether a licensing or a sale--is immaterial to the policy considerations underlying the doctrine of patent misuse.

At the outset, we agree with the plaintiffs' contention, which is not seriously disputed by Compax, that the contract here represents not a licensing agreement but a full assignment and sale of all the Cohns' rights. (See, e.g., *Waterman v Mackenzie*, 138 U.S. 252; *Hook v Hook & Ackerman*, 187 F2d 52; *Hooker Chems. & Plastics Corp. v United States*, 591 F2d 652.) Contrary to the plaintiffs' view, however, we see no conceptual significance in the distinction. (See *Compton v Metal Prods.*, 453 F2d 38, 46, cert den 406 U.S. 968.) Nor is it of any particular importance that the contract was entered into before any patents were issued on the Cohns' applications. (See *Reich v Reed Tool Co.*, 582 SW2d 549 [Tex], cert den 446 U.S. 946.) The issue before us, therefore, may be framed as whether a sale of rights under pending patent applications is enforceable where the consideration consists of periodic payments, based on use, to continue unabated and undiminished until **\*368** the expiration of the last patent issued on the basis of the pending applications. We

hold that such a contract may indeed be enforceable and that, on the papers submitted, Compax' motion for partial summary judgment was properly denied.

A patent is a limited monopoly which, for a term of 17 years, confers upon an inventor the right to exclude others from making, using or selling his invention. (See US Code, tit 35, § 154.) By rewarding inventive genius, the patent laws serve to promote the progress of science and the useful arts. (See, e.g., United States v Masonite Corp., 316 U.S. 265, 278.) And, by restricting the reward to a limited period of time, the patent laws assure "not only that members of the public shall be free to manufacture the product or employ the process disclosed by the expired patent, but also that the consuming public at large shall receive the benefits of the unrestricted exploitations, by others, of its disclosures." (Scott Paper Co. v Marcalus Co., 326 U.S. 249, 255.)

Although the terms of the patent monopoly are limited, patent holders have often been known to seek benefits not contemplated within the grant. Among the devices employed to this end is the imposition of unrelated conditions upon the sale or licensing of the patent. Early cases viewed these attempts as permissible and merely incidental to the lawful implementation of the patent rights. (Heaton-Peninsular Button-Fastener Co. v Eureka Specialty Co., 77 F 288, 296; see also, Henry v A.B. Dick Co., 224 U.S. 1.) With the passage of time, however, our "historical antipathy to monopoly" (Deepsouth Packing Co. v Laitram Corp., 406 U.S. 518, 530) led to the imposition of "strict limitations on the power of the patentee to attach conditions to the use of the patented article." (United States v Masonite Corp., 316 U.S. 265, 277, supra. And, in order to enforce those limitations, the courts developed the doctrine of patent misuse which, operating much like the doctrine of unclean hands in equity, embraces "[t]he idea that a patentee should be denied relief against infringers if he has attempted illegally to extend the scope of his patent monopoly" (Dawson Chem. Co. v Rohm & Haas Co., 448 U.S. 176, 180).

An analysis of the cases dealing with patent misuse strongly suggests that the underlying policy of the doctrine **\*369** is twofold: to prevent distortions in free competition in the marketing of unpatented products, and to prevent unfair bargaining leverage arising out of the patent grant. (See American Securit Co. v Shatterproof Glass Corp., 268 F2d 769, 777, cert den 361 U.S. 902; Columbia Broadcasting System v American Soc. of Composers, Authors & Publishers, 620 F2d 930, 935, cert den 450 U.S. 970.) In some instances,

these considerations overlap, the use of unfair patent leverage resulting in distortion of free competition in the marketing of unpatented goods. An example of this overlapping is found in the so-called "tying agreement" which coerces the purchase of unpatented material as a condition to the use of a valid patent. Hence such agreements have generally been held to be unlawful and unenforceable as patent misuse. (See Motion Picture Patents Co. v Universal Film Mfg. Co., 243 U.S. 502; Carbice Corp. of Amer. v American Patents Dev. Corp., 283 U.S. 27; Leitch Mfg. Co. v Barber Co., 302 U.S. 458; Morton Salt Co. v Suppiger Co., 314 U.S. 488; B.B. Chem. Co. v Ellis, 314 U.S. 495; see, also, National Lockwasher Co. v Garrett Co., 137 F2d 255; but see Dawson Chem. Co. v Rohm & Haas Co., 448 U.S. 176, supra.)

Similarly, courts have found patent misuse in the practice of "mandatory packaging" whereby a prospective licensee is coerced into accepting unwanted licenses in order to gain the use of a desired patent. (See, e.g., American Securit Co. v Shatterproof Glass Corp., 268 F2d 769, supra.) This practice is proscribed because it is said to permit the patentee to employ "one patent as a lever to compel the acceptance of a license under another." (Supra, at p 777.) Nevertheless, the courts have been careful to distinguish between mandatory packaging agreements and voluntary ones. If business convenience, rather than the patentee's insistence, dictates a packaging provision, the agreement will be upheld against a claim of patent misuse. (See Zenith Corp. v Hazeltine, 395 U.S. 100; Automatic Radio Co. v Hazeltine, 339 U.S. 827.)

A third category of patent misuse--and the one claimed to be at issue in the case at bar--is the practice of attempting to extend the patent monopoly beyond the expiration of the patent. Most frequently such misuse is **\*370** charged where an agreement calls for the payment of royalties after the patent has expired.

Early cases operated under the implicit assumption that, if a contract unambiguously provided for such royalties, they could be lawfully collected. (See, e.g., Squibb & Sons v Chemical Foundation, 93 F2d 475, 477; Pressed Steel Car Co. v Union Pacific R.R. Co., 270 F 518, 525; Sproull v Pratt & Whitney Co., 108 F 963, 965; Tate v Lewis, 127 F Supp 105; H-P-M Dev. Corp. v Watson-Stillman Co., 71 F Supp 906; McLeod v Crawford, 176 Neb 513; Adams v Dyer, 129 Cal App 2d 160; Six Star Lubricants Co. v Morehouse, 101 Col 491.) This view began to change, however, with the advent of

Cohn v Compax Corp., 87 A.D.2d 364 (1982)

451 N.Y.S.2d 171, 220 U.S.P.Q. 1077, 1982-2 Trade Cases P 64,800

the Supreme Court's decision in *Scott Paper Co. v Marcalus Co.* (326 U.S. 249, *supra*).

There, a patentee assigned his patent to another, and then himself infringed upon the assigned patent. When the assignee commenced an infringement action, the patentee raised as a defense the contention that the machine in question was a copy of that of an expired, prior art patent. The assignee argued that the patentee was estopped from attacking the validity of the patent he had assigned, but the Supreme Court, rejecting this estoppel argument, observed (326 US, at pp 255-256): "If a manufacturer or user could restrict himself, by express contract, or by any action which would give rise to an 'estoppel,' from using the invention of an expired patent, he would deprive himself and the consuming public of the advantage to be derived from his free use of the disclosures. The public has invested in such free use by the grant of a monopoly to the patentee for a limited time. *Hence any attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws.*" (Emphasis supplied.)

Seizing upon the emphasized language above, several subsequent cases began to question the validity of agreements which called for royalties beyond the life of the patent. (See, e.g., *April Prods. v Schirmer, Inc.*, 308 NY 366, 373; *Scapa Dryers v Abney Mills*, 269 F2d 6; *Prestole Corp. v Tinnerman Prods.*, 271 F2d 146; *Technograph Printed Circuits v Bendix Aviation Corp.*, 218 F Supp 1, **\*371** affd 327 F2d 497, cert den 379 US. 826.) And, finally, in 1962, the Third Circuit Court of Appeals unequivocally declared that any attempt to exact royalties after the expiration of the patent was unenforceable. (*Ar-Tik Systems v Dairy Queen*, 302 F2d 496, 510.)

Two years later, the Supreme Court addressed the issue in *Brulotte v Thys Co.* (379 U.S. 29), the case upon which Compax here places almost complete reliance in attempting to have its contract held unenforceable. We turn, therefore, to an examination of the holding of *Brulotte*.

In *Brulotte*, the respondent, who owned patents for hop picking, sold several machines to the petitioners. Each machine incorporated seven of the respondent's patents. The machines were sold for a flat sum and, in addition, the respondent issued to each petitioner a license for the use of the machine. Under the licenses, the respondent was to

receive from each petitioner a royalty of $500 for each hop picking season, or $3.33 1/3 per 200 pounds of dried hops harvested by the machine, whichever was greater. It was also agreed that the licenses could not be assigned nor could the machines be removed from the county of sale. All seven patents incorporated in the machines expired prior to the expiration date of the licenses.

In addressing the legality of the licensing agreements, the Supreme Court wrote (379 US, at pp 32-33):

"'[W]hatever the legal device employed' ... a projection of the patent monopoly after the patent expires is not enforceable. The present licenses draw no line between the term of the patent and the post-expiration period. The same provisions as respects both use and royalties are applicable to each. The contracts are, therefore, on their face a bald attempt to exact the same terms and conditions for the period after the patents have expired as they do for the monopoly period ...

"[W]e conclude that a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se*. If that device were available to patentees, the free market visualized for the post-expiration period would be subject to monopoly influences that have no proper place there ... **\*372**

"A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly. But to use that leverage to project those royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent by tying the sale or use of the patented article to the purchase or use of unpatented ones."

Ultimately the court held that the judgment rendered for the respondent in the State court "must be reversed insofar as it allows royalties to be collected which accrued *after the last of the patents incorporated into the machines had expired*" (*supra*, at p 30; emphasis supplied). In reaching its conclusion, the court distinguished its earlier holding in *Automatic Radio Co. v Hazeltine* (339 U.S. 827, *supra*).

There the respondent was a radio research organization which derived its income from licensing its patents. It entered into a contract with the petitioner, a manufacturer of radio broadcasting receivers, whereby, in return for royalties amounting to a percentage of petitioner's selling price of its receivers, the petitioner obtained a nonexclusive license to use any or all of the 570 patents which the respondent

held and any others to which it might acquire rights. Under the contract, the petitioner was required to pay the royalty whether or not it used any of the respondent's patents. The Supreme Court upheld the contract essentially as a voluntary packaging agreement.

Significantly, the *Brulotte* court, in distinguishing *Automatic Radio*, observed that there, "[w]hile some of the patents ... apparently had expired, *the royalties claimed were not for a period when all of them had expired.*" (*Brulotte v Thys Co., supra*, p 33; emphasis supplied.) Thus, the precise holding of *Brulotte* appears to be that, although it is generally unlawful to project royalties beyond the life of a patent, where a package of patents is involved, it is unlawful only to collect royalties after the last of the patents has expired.

Nevertheless, some courts have extended the *Brulotte* rule to require a proportionate reduction in royalties as individual patents encompassed by an agreement expire. (See **\*373** *Rocform Corp. v Acitelli-Standard Concrete Wall*, 367 F2d 678; *American Securit Co. v Shatterproof Glass Corp.*, 268 F2d 769, *supra*.) But those cases generally involve mandatory packaging agreements whereby the inclusion of several patents is at the patentee's insistence. In contrast, in post-*Brulotte* cases involving voluntary packaging agreements, courts have found no prohibition against fixed royalties, based on total sales, payable until the expiration of the patent last issued. (See *Well Surveys v Perfo-Log, Inc.*, 396 F2d 15, 18; *Beckman Instruments v Technical Dev. Corp.*, 433 F2d 55, 60-61, cert den 401 U.S. 976; *GAF Corp. v Eastman Kodak Co.*, 519 F Supp 1203, 1236.)

We are not persuaded that the *Brulotte* holding ought to be extended so as to require a proportionate reduction in royalties to reflect individual patent expiration in all cases involving the sale or licensing of several patents. Instead, we hold that a contract which calls for royalties based on total use until the expiration of the patent last issued is lawful and enforceable if the total-use royalty provision is the product of the mutual convenience of the parties and not of unfair patent leverage exerted by the patentee.

The contract at bar, in essence, is a packaging agreement, assigning rights to three separate patent applications and to any resulting patents, domestic or foreign, based on those applications. The enforceability of the total-use royalty provision at issue, therefore, must depend upon the nature of the negotiations which led to it. In its papers submitted in support of its motion for partial summary judgment, Compax has failed to demonstrate that the negotiations which resulted in the contract were marked by the Cohns' use of unfair patent leverage. Whether Compax can establish the use of such leverage, therefore, is a question which must await a plenary trial and, hence, we hold that Compax' motion for partial summary judgment was properly denied.

Accordingly, the order appealed from should be affirmed.

Weinstein, Gulotta and Thompson, JJ., concur.
Order of the Supreme Court, Nassau County, dated December 18, 1980, affirmed, with $50 costs and disbursements.  **\*374**

Copr. (C) 2023, Secretary of State, State of New York

Footnotes

1   In 1961, the parties to the contract agreed to reduce the payments due under the contract from 25% to 10% of all royalties, rents and commissions collected by Compax.

2   The plaintiffs in this action are Eugene Cohn and the successors in interest of the deceased Joseph Cohn under his will and the will of his wife.

End of Document                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 6202690
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

CORROSION PREVENTION
TECHNOLOGIES LLC, Plaintiff,

v.

Loren L. HATLE, et al, Defendants.

Civil Action No. 4:20-CV-2201
|
Entered 10/22/2020

**Attorneys and Law Firms**

Corinne Stone, Hyun Min Han, Winston and Strawn LLP, Houston, TX, John R. Keville, Houston, TX, for Plaintiff.

Robb David Edmonds, Edmonds & Nolte, PC, Houston, TX, for Defendants.

**ORDER**

Andrew S. Hanen, United States District Judge

*1 Pending before the Court is Plaintiff Corrosion Prevention Technologies LLC's ("CPT" or "Plaintiff" or "Counterclaim Defendant") Motion to Dismiss Defendants', Loren L. Hatle, Santiago Hernandez, Timothy Mulville, Bear Metal Technologies, LLC, and Corrosion Exchange, LLC (collectively the "Defendants" or "Counterclaim Plaintiffs"), Counterclaims. (Doc. No. 19). The Defendants filed a Response, (Doc. No. 20), and CPT filed a Reply. (Doc. No. 21). After considering the briefing and applicable law, the Court grants the Plaintiff's motion.

**I. Background[1]**

CPT manufactures, markets, and sells treatment kits for corrosion, which is a problem in various industries, such as oil and gas, shipping trades, and others. CPT allegedly created corrosion prevention technology that takes fewer steps to complete, saving time and energy of users. Its main product, which is allegedly trademarked, is called CorrX. The individual Defendants are former employees of CPT. Defendant Bear Metal Technologies was allegedly started by the individual Defendants when they left CPT's employ and Defendant Corrosion Exchange was subsequently started by Defendant Hatle.

CPT sued all Defendants for alleged violations of the Lanham Act, the Federal Defend Trade Secrets Act, and the Texas Uniform Trade Secrets Act, and for common law misappropriation. It also sued the individual Defendants for breach of confidentiality agreements they allegedly signed and for conversion. Finally, CPT sued only Hatle for breach of an assignment agreement under which Hatle was allegedly obligated to transfer the rights to certain intellectual property to CPT.

Subsequently, the Defendants answered and filed counterclaims against CPT for declaratory judgment of noninfringement of two patents (US Patent No. 9,782,804 (the "'804 patent") and US Patent No. 9,193,943 (the "'943 patent")), and state-law claims of tortious interference with potential business relationship, business disparagement, and defamation. (*See* Doc. No. 16).

CPT has now moved to dismiss all of the Defendants' counterclaims, or, in the alternative, for a more definite statement as to the state-law claims. (*See* Doc. No. 19). CPT moves for dismissal of the declaratory judgment claims under Rule 12(b)(1) contending that this Court has no subject-matter jurisdiction over them. (*See id.* at 7–9); Fed. R. Civ. Pro. 12(b)(1). Further, CPT asks that this Court dismiss the Defendants' tort claims under Rule 12(b)(6) for failure to state a claim, or, in the alternative, to order the Defendants to re-plead with more clarity under Rule 12(e). (*See* Doc. No. 19 at 9–17); Fed. R. Civ. Pro. 12(b)(6), (e).

**II. Legal Standard**

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Krim v. PCOrder.com*, 402 F.3d 489, 494 (5th Cir. 2005) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)). The burden of proof for a 12(b)(1) motion to dismiss is on the party asserting jurisdiction, who must prove by a preponderance of the evidence that the court has jurisdiction based on the complaint (or, in this case, answer) and evidence. *Gilbert v. Donahoe*, 751 F.3d 303, 307 (5th Cir. 2014). The Declaratory Judgment Act does not by itself confer subject-matter jurisdiction on

Corrosion Prevention Technologies LLC v. Hatle, Slip Copy (2020)
2020 WL 6202690

this Court because it is "procedural only." *Vaden v. Discover Bank*, 556 U.S. 49, 70 n.19 (2009) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)). Federal courts do have exclusive jurisdiction over any case "arising under any Act of Congress relating to patents." 28 U.S.C. § 1338(a). Nonetheless, Article III of the Constitution requires that federal courts only decide "Cases" and "Controversies," which is reflected in the Declaratory Judgment Act's "actual controversy" requirement. 28 U.S.C. § 2201(a); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 120 (2007).

**\*2** A party may file a motion to dismiss claims against it for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). To defeat a motion under Rule 12(b) (6), a plaintiff (or counter-plaintiff) must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556). In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint (or answer) as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept factual assumptions or legal conclusions as true, and only a complaint (or answer) that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

Rule 12(e) provides that a party may "move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. Pro. 12(e). "In contrast to a Rule 12(b)(6) Motion, a Rule 12(e) Motion is appropriate where 'a pleading fails to specify the allegations in a manner that provides sufficient notice.' " *Aguirre v. Tristar Risk Mgmt.*, No. C-10-394, 2011 WL 248199, at \*3 (S.D. Tex. Jan. 24, 2011) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

### III. Analysis

### A. Declaratory Judgment Claims

As explained above, the Declaratory Judgment Act does not provide an independent basis for federal jurisdiction; this Court is, as always, limited in its exercise of jurisdiction to actual "cases" and "controversies." *MedImmune*, 549 U.S. at 120. To have subject-matter jurisdiction over the Defendants' declaratory-judgment counterclaims, there must be an actual controversy. *Id.* CPT contends that, because it has made no allegation of patent infringement against the Defendants, there is no actual controversy over the patents. (*See* Doc. No. 19 at 7–9). The Defendants claim that, despite CPT making no allegation of patent infringement, CPT's complaint still raises an actual controversy over the '804 and '943 patents. (*See* Doc. No. 20 at 11–12). The question here, then, is whether there is an actual controversy over Defendants' potential infringement of the '804 and '943 patents sufficient to confer jurisdiction upon this Court.

The Supreme Court has clarified when a court has jurisdiction over a declaratory-judgment claim. A court must decide whether there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 128 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Nonetheless, a party is not required to "bet the farm" by pursuing arguably illegal activity before seeking a declaration of its contested legal rights. *Id.* at 129. The Federal Circuit has further expounded upon this standard in the patent context: "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007). Declaratory-judgment jurisdiction will not arise without some affirmative act by the patentee. *Id.* An affirmative act by the patentee in this context is "conduct that can reasonably be inferred as demonstrating intent to enforce a patent." *UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, 787 F. App'x 691, 698 (Fed. Cir. 2019) (citations omitted).

**\*3** Here, CPT is the patentee in the would-be infringement suit and has certainly taken an affirmative act—it filed suit against the Defendants. The question, then, is whether the filing of its complaint can reasonably be inferred as demonstrating an intent to enforce patents '804 and '943. *See id.* The Defendants contend:

Plaintiff's Complaint alleges that the '804 and '943 Patents "embody CorrX™," which is the Plaintiffs trademark associated with its corrosion prevention technology. ECF No 1 ¶¶ 12-15. *Plaintiff's Complaint then explicitly alleges that Defendants have misappropriated Plaintiff's information* and used products without Plaintiff's "express or implied consent" that have a "substantial similarity" to Plaintiff's "own CorrX™." *Id.* ¶¶ 72, 74. This is the very definition of patent infringement. Whether Plaintiff's Complaint explicitly used the word "patent infringement" is wholly irrelevant.

(Doc. No. 20 at 11) (emphasis added). The Defendants would likely be correct in their assessment if the "information" that CPT alleged the Defendants have misappropriated was patents. *See SanDisk*, 408 F.3d at 1383 (holding that an express accusation of patent infringement is not dispositive of declaratory judgment jurisdiction and that a "promise not to sue" does not, on its own, destroy such jurisdiction). Instead, though, the "information" to which CPT refers is "confidential and trade secret information," (Doc. No. 1 at ¶¶ 72, 74), which, as discussed below, is the polar opposite of a published patent.

The Defendants claim that CPT has "taken a position that puts [Defendants] in the position of either pursuing arguably illegal behavior or abandoning that which [they] claim[ ] a right to do." (Doc. No. 20 at 12) (quoting *SanDisk*, 470 F.3d at 1381). This is certainly true with respect to the alleged confidential and trade secret information; CPT has accused the Defendants of trade secret misappropriation. Nevertheless, it is not true with respect to the '804 and '943 patents. Even though CPT mentions the '804 and '943 patents when describing Defendant Hatle's relationship with CPT, (*Id.* at ¶ 17), nowhere does CPT "assert rights under a patent," nor has it identified any allegedly infringing activity by the Defendants. *SanDisk*, 408 F.3d at 1381. Unlike the patentee in *SanDisk*, CPT has not sent the Defendants any communication with "a detailed presentation which identified, on an element-by-element basis, the manner in which" the patentee believed the declaratory-judgment plaintiff was infringing. *Id.* at 1382; *see also Element Six U.S. Corp. v. Novatek Inc.*, No. CV 14-0071, 2014 WL 12586395, at *4 (S.D. Tex. June 9, 2014) (finding that patentee sending correspondence asking other party to cease use of certain technology was not sufficient to create an actual controversy).

Indeed, as CPT explains in its reply, if the information that the Defendants have allegedly misappropriated consists of trade secrets, then by its very nature, that information cannot

be patented. (Doc. No. 21 at 3) (citing *Newport Indus. v. Crosby Naval Stores*, 139 F.2d 611, 612 (5th Cir. 1944) ("A process that is a secret cannot be one that is patented."). "A trade secret differs fundamentally from a patent in that a patent is information which gains legal protection precisely because it is made public." *Carson Prod. Co. v. Califano*, 594 F.2d 453, 461 (5th Cir. 1979). To characterize CPT's claims of trade secret misappropriation as claims of patent infringement would directly contradict this settled law. Even though CPT has clearly demonstrated intent to enforce its alleged intellectual property, it has not shown "conduct that can be reasonably inferred as demonstrating intent to enforce a patent." *Balsam Brands.*, 787 F. App'x at 698. The Court holds that the Defendants have not demonstrated that there is an "actual controversy" regarding the '804 and '943 patents; therefore, this Court has no subject-matter jurisdiction over Defendants' declaratory judgment claims for noninfringement. Those claims are dismissed.

## B. State-Law Tort Claims

**\*4** The Defendants have also asserted various tort claims against CPT that all arise from the same event. Defendants allege that, shortly after CPT filed its Complaint (Doc. No. 1), CPT contacted representatives of several of Defendants' vendors and customers. (Doc. No. 16 ¶ 134, 141, 146). CPT allegedly informed those representatives about its Complaint, forwarded them a copy of the Complaint and made "disparaging, defaming, misleading, and otherwise fraudulent claims" about Defendants, including allegations "regarding theft and underhanded business tactics." (*Id.*). CPT has moved to dismiss all the tort counterclaims under Rule 12(b)(6), or, in the alternative, for more definite pleading under Rule 12(e). The Court will address each counterclaim in turn.

### 1. Tortious Interference with Potential Business Relationship

"To establish tortious interference with a prospective business relationship, a plaintiff must prove (i) a reasonable probability that the plaintiff would have entered into a business relationship; (ii) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (iii) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (iv) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Smith v. Royal Seating, Ltd.*, 03-09-00114-CV, 2009 WL

2020 WL 6202690

3682644, at *3 n.6 (Tex. App.—Austin Nov. 6, 2009, no pet.) (citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001)). To show "independently tortious conduct," the plaintiff must "prove that the defendant's conduct would be actionable under a recognized tort." *Sturges*, 52 S.W.3d at 726. "Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations." *Id.*

The Defendants allege that CPT committed the independent tort of business disparagement and/or defamation, (*See* Doc. No. 16 at 15-16), which can support recovery under tortious interference with business relations. *See Cramer v. Logistics Co., Inc.*, 13-CV-333-KC, 2014 WL 652319, at *7–8 (W.D. Tex. Feb. 19, 2014). CPT contends that the claim nevertheless fails because the Defendants have done no more than make "threadbare recitals" of the elements of the claim, and have not alleged facts "establishing a reasonable probability that any Defendant would have entered a business relationship, and fails to establish any actual damages." (Doc. No. 19 at 15).

Courts have found that the element of "reasonable probability" of a business relationship was sufficiently alleged when the plaintiff can describe the specifics of a proposed agreement that never came to fruition. *See Cooper v. Harvey*, 108 F. Supp. 3d 463, 472 (N.D. Tex. 2015). Here, the Defendants state merely that CPT contacted several of Defendants' "vendors and customers, including but not limited to, Schmidt Manufacturing, The Warehouse Rental and Supply and PolyLab," and that CPT attempted "to persuade these companies from continuing to do business with Counterclaim Plaintiffs or start doing business [with] Counterclaim Plaintiffs." (Doc. No 16 at 15). Further, Defendants allege that they have "suffered irreparable harm to their future business opportunities, present client negotiations, good will, and all other economic opportunity losses." (*Id.* at 16). Courts have found allegations more substantial than this to fail to sufficiently allege a reasonable probability of a business relationship. For example, in *M-I LLC v. Stelly*, the plaintiff alleged "that it 'has provided [w]ellbore cleanout tools and services to BP for other ThunderHorse wells, and expected to provide the same for 778 # 2,' but instead lost the project to WES." 733 F. Supp. 2d 759, 776 (S.D. Tex. 2010). The court found that even this allegation of a specific previous business arrangement and its loss did not sufficiently plead a reasonable probability that the plaintiff would have entered into a contractual relationship. *Id.*

**\*5** The Defendants' allegations here fall short even of the allegations in *Stelly*. They have not alleged any facts showing what business relationship they expected to have with the listed businesses or pointed to a specific contract they allegedly lost because of CPT's actions. The Court finds that the Defendants have failed to allege facts that plausibly state a counterclaim for tortious interference with a prospective business relationship.

**2. Business Disparagement**

Under Texas law, "[t]o prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff." *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003). CPT contends that the "Defendants' business disparagement claim is devoid of facts underlying malice or of any special damages." (Doc. No. 19 at 13).

In a business disparagement case, a plaintiff can plead malice by alleging facts that "the defendant knew its statements were false or acted with reckless disregard for their falsity; [or] acted with ill will or with an intent to interfere in the plaintiffs economic interests." *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 671 (S.D. Tex. 2010) (citing *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987)). The Defendants pleaded that CPT made allegations about them "regarding theft and underhanded business tactics without regard for the truth of these statements" that were "yet untried before a finder of fact and [were] contrary to even the evidence presented by CPT in this Complaint." (Doc. No 16 at 17). These allegations seem to imply that the Defendants' claim is that CPT knew its statements were false; but, in their response, the Defendants argue instead that their "pleading is more than sufficient to show Plaintiff showed ill will and an intent to interfere with the plaintiff's economic interest." (Doc. No. 20 at 14). They further state, "The very act of contacting customers of competitors to dissuade future business, on its face, shows an intent to interfere with economic interests, if not ill will. *Res ipsa loquitur.*" (*Id.*).

Intent is a notoriously difficult element to plead and prove. *See Iqbal*, 556 U.S. at 675–86 (plaintiff had not sufficiently pleaded discriminatory intent when there was an obvious alternative explanation for defendants' conduct). Here, the Defendants have stated the intent element, described the allegedly disparaging action by CPT, and alleged that action

Corrosion Prevention Technologies LLC v. Hatle, Slip Copy (2020)
2020 WL 6202690

"speaks for itself" to show CPT's intent. It is doubtful that this is sufficient to plausibly allege the malice element of Defendants' business disparagement counterclaim, but the Court need not decide this because the counterclaim fails on another element: special damages.

In the business disparagement context, special damages means that "the disparaging communication p[l]ayed a substantial part in inducing third parties not to deal with the plaintiff, resulting in a direct pecuniary loss that has been realized or liquidated, such as specific lost sales, loss of trade or loss of other dealings." *TMIRS Enterprises, Ltd. v. Godaddy.com, Inc.*, CIV. A. H-09-2858, 2010 WL 3063659, at *5 (S.D. Tex. Aug. 3, 2010). "Special damages ... are never presumed as they represent specific economic losses that must be proven." *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). Here, as to the damages element, the Defendants allege:

  **\*6** Because of CPT's deliberate actions, Counterclaim Plaintiffs' businesses have suffered irreparable harm to their present and future business opportunities, present client negotiations, good will, and all other economic opportunity losses. Anti-corrosion project solutions, when properly performed and maintained, rarely require repeated involvement by corrosion specialists like Counterclaim Plaintiffs for any given project. Therefore, loss of economic opportunity with any client denies good will and profits that may not arise for more than a decade, if not longer.

(Doc. No. 16 at 18). Assuming as true, as this Court is bound to do at this stage of the proceeding, that the Defendants did lose "present and future business opportunities, present client negotiations, [and] good will," this still does not sufficiently plead special damages. These allegations do not demonstrate specific contracts or sales that the Defendants lost because of CPT's actions. *See TMIRS*, CIV.A. H-09-2858, 2010 WL 3063659, at *5. Consequently, the Court dismisses this counterclaim as well.

### 3. Defamation
The Defendants contend that the action taken by CPT constitutes not only business disparagement, but also defamation. In Texas, "[c]orporations and other business entities have reputations that can be libeled apart from the businesses they own, and such entities can prosecute an action for defamation in their own names." *Lipsky*, 460 S.W.3d at 593. "Moreover, a corporation or other business entity asserting a claim for business disparagement may also assert additional or alternative claims for defamation to recover non-economic general damages such as injury to reputation that

are not recoverable on a business-disparagement claim." *Id.* The elements of a defamation claim are "(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases." *Id.* Where, as here, the plaintiff (or counterclaim plaintiff) is not a public figure or official, the "requisite degree of fault" is only negligence. *Id.* Further, when the alleged statements are defamatory per se, including those that "adversely reflect on a person's fitness to conduct his or her business or trade," general damages are presumed and the plaintiff need not prove any specific loss. *Id.* at 596.

The damages that the Defendants alleged from their defamation counterclaim are identical to those alleged from their business-disparagement claim. (*Compare* Doc. No. 16 ¶¶ 143, 147). This Court has already held that these allegations are insufficient to plausibly allege special damages. (*See* Section III.2). The question, then, is whether the alleged defamatory statements by CPT would constitute defamation per se such that the Defendants did not have to plead special damages to proceed. *See Lipsky*, 460 S.W.3d at 595–96 (explaining that, after the Court found plaintiff had not sufficiently proved special damages, the next inquiry was whether defendant's statements were defamatory per se, thus relieving plaintiff from obligation to prove special damages).

The facts alleged by Defendants regarding the defamatory statements by CPT are as follows:

  On or around July 15, 2020, CPT contacted representatives of several Counterclaim Plaintiffs' vendors and customers, including but not limited to, Schmidt Manufacturing, The Warehouse Rental and Supply and PolyLab. CPT contacted these representatives to inform them of this Complaint and on information and belief, CPT forwarded a copy of their Complaint to at least one if not all of those representatives. In CPT's communications with these third parties, CPT claimed false and disparaging information about Counterclaim Plaintiffs' businesses. Specifically, CPT asserted allegations against Counterclaim Plaintiffs' businesses regarding theft and underhanded business tactics without regard for the truth of these statements. CPT knows these allegations are yet untried before a finder of fact and are contrary to even the evidence presented by CPT in this Complaint. Therefore, CPT published false and disparaging statements, with reckless disregard for the truth of these statements, about Counterclaim Plaintiffs' businesses.

*7 (Doc. No. 16 ¶ 146). CPT contends that these allegations are insufficient to plead a defamatory statement at all, much less a defamatory per se statement. (*See* Doc. No. 19 at 20–21). First, CPT argues that, to the extent the Defendants rely on the Complaint as containing defamatory statements, such statements were privileged as being made in connection with a legal proceeding. (*Id.*) (citing *DirecTV, Inc. v. Nguyen,* No. H-03-1757, 2003 WL 27381297, at *3 (S.D. Tex. Oct. 8, 2003)) ("Statements made in connection with a legal proceeding are absolutely privileged and not actionable in defamation."). Then, according to CPT, the Defendants are left only with a "naked assertion that CPT purportedly made statements against Defendants' businesses regarding 'theft and underhanded business tactics.' " (*Id.* at 21).

The Defendants respond that CPT made "defamatory statements separate and apart from the allegations contained within Plaintiff's Complaint" and that "[n]o one is afforded absolute immunity from liability for statements made to others simply because a portion of the conversation references privileged statements." (Doc. No 20 at 15). Further, the Defendants assert that "discovery needs to be had to fully develop the truths regarding this matter." (*Id.*).

The most specific fact the Defendants allege is that "CPT asserted allegations against Counterclaim Plaintiffs' businesses regarding theft and underhanded business tactics." (Doc. No. 16 ¶ 146). Even though such statements may "adversely reflect on [Defendants'] fitness to conduct [their] business or trade," *Lipsky,* 460 S.W.3d at 596, the

Defendant's allegations are too conclusory and vague. They fail to allege a "specific defamatory statement" as required by Texas law. *Stukes v. Nehls,* 614 Fed. Appx. 792, 794 (5th Cir. 2015), as revised (Sept. 2, 2015). The Defendants' allegations are insufficient to state a plausible claim for defamation. *See Desperado Motor Racing & Motorcycles, Inc. v. Robinson,* CIV.A. H-09-1574, 2010 WL 2757523, at *3 (S.D. Tex. July 13, 2010) ("Robinson's scant factual allegations that he falsely was called a 'thief' might be enough for the Court to infer the 'possibility' of misconduct. The allegations are insufficient, however, for the Court to draw a reasonable inference that Desperado Motor Racing and/or Nicklus are liable for the alleged misconduct or that Robinson is entitled to relief."). The Defendants' defamation counterclaim is therefore dismissed.

## IV. Conclusion

For the foregoing reasons, the Court grants Plaintiff CPT's motion to dismiss the Defendants' counterclaims. The Defendants' counterclaims are hereby dismissed in their entirety. Defendants are given permission to re-plead their state-law counterclaims to cure their deficiencies if they do so by November 20, 2020.

## All Citations

Slip Copy, 2020 WL 6202690

---

Footnotes

1    The Background comes from the facts alleged in CPT's complaint. (*See* Doc. No. 1). Where appropriate for analysis of the motion, however, the facts will be recited in the light most favorable to non-moving party, the Defendants. *See Sonnier v. State Farm Mut. Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

530 P.2d 1340, 185 U.S.P.Q. 688

12 Wash.App. 613

Court of Appeals of Washington, Division 1.

Charles J. GREEN, Respondent,

v.

ROCKET RESEARCH CORPORATION,

a Washington Corporation, Appellant.

No. 1722—I.
|
Jan. 20, 1975.

**Synopsis**

Employee brought action against employer to recover for money allegedly due under employment contract under which employee assigned patent rights of his invention to employer in exchange for a percentage of money received by employer in payment for assignment or license of invention and to have contract between employer and third party regarding invention rescinded. The Superior Court, King County, James J. Dore, J., awarded employee $27,500 and denied other relief, and employer appealed and employee cross-appealed. The Court of Appeals, Williams, J., held that employee was entitled under employment contract to percentage of money paid employer for license to use invention; that failure to order rescission of contract between employer and third party granting license for use of invention was not error; and that claim was liquidated, allowing employee's recovery of prejudgment interest.

Affirmed as modified.

West Headnotes (6)

**[1]** **Patents** 🗝️ Rights and liabilities of assignees and grantees

Assignee of patentee of invention may grant separately the right to make, right to sell, and right to use invention and is the sole judge as to what party or parties should be given any one or all of such rights. 35 U.S.C.A. § 154.

**[2]** **Patents** 🗝️ Construction and Operation of Assignments and Grants

**Patents** 🗝️ In general; nature of license

Agreement whereby employer, which had been assigned patent rights to employee's invention for inflating escape slides for aircraft, granted third party the right to use invention in manufacture of escape system and right to sell it as integral part of that system and retained right to manufacture inflation device and to permit others to manufacture or sell device constituted a license; thus, employee was entitled to percentage of payment for license under employment contract assigning patent rights to all inventions to employer in exchange for percentage of amount paid for any license or assignment.

**[3]** **Patents** 🗝️ Construction and Operation of Assignments and Grants

Fact that employment contract under which employee assigned patent rights of inventions to employer in exchange for percentage of money received by employer in payment for assignment or license of inventions gave employer sole right to determine amount charged for invention and to apportion amount received to other inventions, proprietary rights or information and assistance did not preclude employee from receiving percentage of money paid employer for license to use invention, where price paid for license was established by employer but was not apportioned to pay for any other invention, proprietary right or information, or assistance.

**[4]** **Antitrust and Trade Regulation** 🗝️ Oil, gas and mining

Contract granting license to use gas inflation device in manufacture of escape system for aircraft was not subject to rescission on ground that it violated antitrust laws, resulted in restraint of trade, and was illegal tying arrangement, where nothing in contract tied parties into any kind of exclusive arrangement and licensor was free to enter into similar contracts with other

Green v. Rocket Research Corporation, 12 Wash.App. 615 (1975)

530 P.2d 1340, 185 U.S.P.Q. 688

parties and did not refuse to deal with any other party wishing to use device.

**[5]** **Interest** 🔑 Liquidated or unliquidated claims in general

Prejudgment interest is properly awarded from date claim becomes liquidated.

2 Cases that cite this headnote

**[6]** **Interest** 🔑 Creation or accrual of indebtedness

Where amount due employee from employer under employment contract providing that employee would be paid percentage of money received by employer in payment for assignment or license of employee's invention to other parties could be computed with exactness, without reliance upon opinion or discretion, in that employer received definite amount for license of invention, amount owing employee was liquidated, allowing employee's recovery of prejudgment interest from date of payment to employer of money for license.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*614 \*\*1341** Jones, Grey, Bayley & Olsen, Hugo E. Oswald, Jr., George W. Steers, Seattle, for appellant.

Shidler, McBroom, Gates & Baldwin, James R. Irwin, F. Ross Boundy, Seattle, for respondent.

**Opinion**

WILLIAMS, Judge.

Charles J. Green brought this action against Rocket Research Corporation to recover judgment for money said to be due for use of his patented invention, and to have certain contracts between the parties rescinded. The court, sitting without a jury, awarded Green judgment of $27,500 and denied other relief. Rocket appeals, and Green cross-appeals.

Rocket Research Corporation is engaged in the invention, development, manufacture and sale of sophisticated apparatus, some of which is used in the aerospace industry. Rocket employed Green as an inventor. The employment contract, which was in writing, required that Green assign the patent rights of his inventions to Rocket. Green was to receive a salary, and for each invention assigned upon which an application for a patent was filed he was to be paid a modest sum and

(a) percentage of any monies actually received by RRC in payment for the assignment or license of such invention to others, except where such invention is assigned or licensed to a RRC subsidiary, or is assigned or licensed to a third party incidental to an agreement relating to the further development or manufacture by the third party of a major product or system developed by RRC. This percentage is to be 20% Of the first $50,000 received on a cumulative basis, 15% Of the next $50,000, and 10% Of any amount received above $100,000.

During the period of his employment, Green was given the task of inventing a machine to rapidly inflate escape slides required for large passenger aircraft. He did so by inventing a cool gas inflation device, which he covered by **\*615** two basic patents and a patent application. As required by the contract, Green assigned his patent rights to Rocket.

The first opportunity to sell the machine came when The Boeing Company invited proposals for escape slides for its model 747. Four manufacturing companies, one of which was the Garrett Corporation, asked Rocket for information about Green's machine for incorporation in their escape systems. Rocket supplied each company with the necessary data, including trade secrets and confidential information about the machine not appearing in the patents. Later, Boeing requested separate bids on the slide and inflation systems. Both Rocket and Garrett bid on this request, with the award going to Garrett. Rocket, contending that Garrett's inflation device was remarkably similar to Green's machine, sued Garrett for $5 million for unfair competition and patent infringement. It subsequently developed that Garrett's inflation system was unsatisfactory, and Boeing again called for proposals. This time, Rocket was awarded the contract.

Rocket and Garrett then entered into a written contract. In the first nine paragraphs of this contract, Rocket agreed to **\*\*1342** furnish Garrett with information about Green's machine which was necessary for it to proceed with competitive negotiations then pending with Lockheed

Aircraft Corporation for the supply of escape slide systems. In turn, Garrett agreed to purchase all of its needs for the cool gas inflation system from Rocket if it was awarded the Lockheed contract. Rocket agreed not to prosecute the $5 million suit against Garrett if Garrett abstained from infringing upon the patents on Green's machine.

Paragraph 10 of the agreement is as follows:
The foregoing paragraphs 1 through 9 shall become effective immediately upon the signing of this Agreement and shall continue in effect for the periods of time above mentioned irrespective of whether or not the entire suit is settled as described below. In addition, in the event that the pending Lockheed L—1011 contract is awarded to a bidder who has included ROCKET as the supplier of the **\*616** inflation system as defined in paragraph 3, the parties agree to settle the entire controversy and terminate the litigation in accordance with the following paragraphs 11 through 16.

Paragraph 11 stated, in part, that:
One of ROCKET's claims in the pending litigation is that the value of its proprietary information relating to cool gas generators was materially impaired by wrongful acts of GARRETT. Therefore, in order to make restitution to ROCKET on account of such claim and as a material part of the consideration for termination of the litigation, and the disclosures heretofore mentioned in connection with the L—1011 pending contract, GARRETT agrees to use its best efforts to promote the ROCKET cool gas inflation system in all contract proposals on which GARRETT elects to bid and where a cool gas generator inflation system is appropriate.

Other pertinent paragraphs are as follows:
12. ROCKET shall exercise its best efforts to become the supplier of the inflation system for the McDonnell-Douglas DC—10 contract for escape systems and to that end shall, subject to all of the provisions of paragraph 4 through 6 and 8 hereof, furnish GARRETT with such information concerning ROCKET's inflation system as is reasonably required by GARRETT to enable it to include such inflation system in its proposal to McDonnell-Douglas.

13. If ROCKET shall have exercised its best efforts as set forth in paragraph 12 above and despite this fact is not included as the supplier of the inflation system in said DC—10 contract when it is awarded then, and in that event, GARRETT shall pay to ROCKET the sum of $200,000.00 as a material part of the consideration for this Agreement.

14. If ROCKET shall have exercised its best efforts as set forth in paragraph 12 above and despite this fact GARRETT's proposal is not accepted by ROCKET is included as the supplier of the inflation system, then and in that event, GARRETT shall pay to ROCKET the sum of $100,000 as a material part of the consideration for this Agreement.

15. Upon a determination one way or the other of the Douglas DC—10 contract referred to in paragraphs 12 through 14 and the payment, if any therein, required **\*617** upon such determination, the parties agree to stipulate to entry of a judgment without findings or conclusions but providing for an injunction in favor of Plaintiff against Defendant's infringing Plaintiff's patent in suit for a period of two and one-half years from the date of this Agreement and otherwise dismissing the action and all claims therein.

After the agreement was signed, Garrett was awarded the Lockheed contract, and subcontracted with Rocket for it to supply the inflation system. An award from Douglas which was anticipated in paragraphs 12, 13 and 14 did not materialize. Garrett paid Rocket $200,000, and the parties **\*\*1343** stipulated that a judgment of dismissal of Rocket's suit against Garrett be entered.

Green then brought this action against Rocket contending that Rocket had licensed his invention to Garrett, that Rocket had received $200,000 therefor, and that he, Green, was entitled to $27,500 as his percentage share. Rocket took the position that the $200,000 was paid for settlement of its lawsuit against Garrett and not as royalty for giving Garrett a license to use Green's invention. In its findings, the court determined that Rocket had licensed Green's invention to Garrett and that (t)he principal motivation by Garrett in entering into the Agreement was to obtain the right to bid and market the Rocket Mark X cool gas generator . . . The payment of the sum of $200,000 by Garrett to Rocket was for the right to bid and market the Mark X cool gas generator and inflation system as part of Garrett's evacuation slide where Garrett elected to propose its evacuation slides to airframe manufacturers and airlines.

Finding of fact No. 21.

The patents on Green's invention gave Rocket the right to exclude everyone from its manufacture, use, or sale because of 35 U.S.C. Patents s 154 (1970), which provides:

Green v. Rocket Research Corporation, 12 Wash.App. 615 (1975)

530 P.2d 1340, 185 U.S.P.Q. 688

Every patent shall . . . grant to the patentee, his heirs or assigns, . . . the right to exclude others from making, using, or selling the invention throughout the United States, . . .

**\*618**  [1]  Prior to the agreement between Rocket and Garrett, Garrett did not have the right to make, use, or sell the invention, and Rocket did have the right, through legal process, to prevent Garrett from doing so. Rocket, as assignee of the patentee of the invention, could grant separately the right to make, the right to sell, and the right to use the invention (60 Am.Jur.2d Patents s 331, at 509 (1972)), and was the sole judge as to what party or parties would be given any one or all of those rights. Extractol Process v. Hiram Walker & Sons, 153 F.2d 264 (7th Cir. 1946).

 [2]  The agreement between Rocket and Garrett granted Garrett the right to use Green's invention in the manufacture of its escape system and the right to sell it as an integral part of that system. Rocket retained the right to manufacture the device and, also, the right to permit others to manufacture, use, or sell it. The grant to Garrett of the right to use and sell the device was, therefore, a license. Talbot v. Quaker-State Oil Refining Co., 104 F.2d 967 (3d Cir. 1939); General Motors Corporation v. Dailey, 93 F.2d 938 (6th Cir. 1937); George Close Co. v. Ideal Wrapping Mach. Co., 29 F.2d 533 (1st Cir. 1928); Lukens Steel Co. v. American Locomotive Co., 99 F.Supp. 442, aff'd, 197 F.2d 939 (2d Cir. 1952). See also Thys Co. v. Brulotte, 62 Wash.2d 284, 382 P.2d 271 (1963).

There is substantial evidence in the record to support the court's finding that the overall purpose of the agreement, in addition to possibly settling the lawsuit, was to promote the manufacture and sale of Rocket's gas inflation device and that Garrett paid $200,000 for a license to use and market it.

Rocket contends that it had the sole right to determine the character of the $200,000 payment because of the following paragraph appearing in the employment contract:

RRC shall have the right to determine in its sole and absolute discretion whether a price or royalty will be charged for an assignment or license of such invention to others, the amount of any such charge, whether any **\*619** charge for such assignment or license previously granted will be waived, and whether a portion of any amount received in payment for the assignment or license also constitutes payment for other inventions, proprietary rights or information, or assistance.

 [3]  This paragraph gives Rocket the right to determine the amount which will be charged for an invention and to

apportion **\*\*1344**  the amount received to other inventions, proprietary rights or information, and assistance. As seen, Rocket decided that Garrett should pay $200,000 for certain rights in Green's invention. There is no evidence that Rocket apportioned any of that sum to pay for any other invention, proprietary right or information, or assistance. It was Green's invention and he should be paid for it as provided in the employment contract.

 [4]  Green's cross-appeal challenges the trial court's determination that the assignments of the patents from Green to Rocket should not be rescinded. He contends that the contract between Rocket and Garrett was in violation of antitrust laws, in that it resulted in a restraint of trade, the division of markets among competitors, and was an illegal tying arrangement. He also contends that there was a 'patent misuse' of his invention. In support of these contentions, Green states in his brief:

The agreement between Rocket and Garrett is a blatant example of a combination between competitors in restraint of trade. The main purpose of the agreement was to join forces to attempt to capture the slide inflation market and an important by-product was the elimination of AiResearch as a competitor of Rocket Research.

The record does not support these contentions. There is nothing in the contract which ties Rocket and Garrett into any kind of an exclusive arrangement. Rocket was free to enter into similar contracts with other suppliers, and would undoubtedly do so if there was a reasonable expectation of profit. If appears that there were at least three other escape slide manufacturers with whom Rocket was co-operating, and there is nothing in the record to suggest that Rocket **\*620** would refuse to deal with a manufacturer who wished to incorporate Green's invention in its slide escape system.

 [5]   [6]  Green also contends that he should be allowed prejudgment interest. Prejudgment interest is properly awarded from the date a claim becomes liquidated.

'A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion. Examples are claims upon promises to pay a fixed sum, claims for money had and received, claims for money paid out, and claims for goods or services to be paid for at an agreed rate.'

Mall Tool Co. v. Far West Equipment Co., 45 Wash.2d 158, 170, 273 P.2d 652, 659 (1954); Beedle v. General Inv. Co., 2 Wash.App. 594, 469 P.2d 233 (1970). It was established

that Rocket received $200,000 for the license of Green's invention. The amount due Green can be computed with exactness, without reliance upon opinion or discretion. The amount owing was therefore liquidated and interest should be paid.

The judgment of the trial court is affirmed on the appeal, and modified on the cross-appeal by the addition of an award of

interest at the statutory rate from the date of the payment of $200,000 by Garrett to Rocket.

SWANSON, C.J., and CALLOW, J., concur.

**All Citations**

12 Wash.App. 613, 530 P.2d 1340, 185 U.S.P.Q. 688

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 9123531
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, McAllen Division.

Elizama C. LANDEROS, Plaintiff,

v.

TRANSAMERICA LIFE INSURANCE
COMPANY, et al, Defendants.

Civil Action No. 7:17-CV-00475
|
Signed 09/17/2019

**Attorneys and Law Firms**

Robert A. Allen, Allen Stein Durbin PC, San Antonio, TX, Van A. Hutchins, Attorney at Law, Edinburg, TX, for Plaintiff.

Angela Yi-Dan Kao, Jason R. Bernhardt, Winstead, PC, Houston, TX, for Defendants.

## ORDER DENYING PLAINTIFF'S MOTION TO REMAND

Randy Crane, United States District Judge

*1 Now before the Court is Plaintiff Elizama C. Landeros's Motion to Remand this action to the 92nd District Court of Hidalgo County, Texas, from which it was removed as well as Plaintiff's supplemental motions to remand and supporting briefs. Dkt. Nos. 3, 32, 55–56, 59, 67. Also before the Court is Defendant Transamerica Life Insurance Company's Response to Plaintiff's Motion to Remand and additional responses to Plaintiff's supplemental motions submitted by Defendants Lopez and Transamerica Life Insurance Company. Dkt. Nos. 7, 34–35, 60. After considering the Motions and supporting briefs, the responsive pleadings, and the applicable law, the Court is of the opinion that the Motion should be denied.

## I. Factual and Procedural Background

In December 2014, Defendant Lopez, an insurance agent, assisted Mr. Landeros in purchasing a Transamerica life insurance policy. Dkt. No. 1, Ex. 1, at ¶¶ 5.1, 5.4, Ex. 1-A, Ex. 8. Plaintiff was named the sole primary beneficiary under the policy which was issued in January 2015. Dkt. No. 1, Ex.

8. Plaintiff represents that Mr. Landeros passed away on July 21, 2016, and that she thereafter filed a claim for the death benefits provided under the policy. Dkt. No. 1, Ex. 1 at ¶ 5.4.

Defendant Transamerica denied Plaintiff's claim for death benefits and informed Plaintiff that it would be rescinding the policy. Dkt. No. 1, Ex. 1-B. Transamerica based its rescission on "material omissions" regarding Mr. Landeros's medical history as provided on the policy application, namely that the application did not disclose Mr. Landeros's heart conditions. *Id.* (stating Mr. Landeros's application failed to include his "past medical history of peripheral vascular disease, carotid bruit, abnormal ECG, left bundle branch block, hypertension, coronary atherosclerosis and coronary artery stenosis with an echocardiogram.")

Following this denial, Plaintiff filed a civil lawsuit in state court individually and as representative of the estate of Mr. Landeros. Dkt. No. 1, Ex. 1. On December 28, 2017, Defendant Transamerica removed the case from state court on the grounds that the action meets the requisites of federal diversity jurisdiction: an amount in controversy exceeding $75,000, exclusive of interests and costs, and opposing parties who are citizens of different States absent the improper joinder of non-diverse Defendants Lopez, Bartimus and Carrillo. *See* Dkt. No. 1; 28 U.S.C. §§ 1332(a)(1), 1441(a), 1446. Plaintiff now moves to remand for lack of subject matter jurisdiction, contesting only the allegation that the non-diverse Defendants are improperly joined. Dkt. No. 3. Plaintiff argues that a reasonable basis exists for predicting that she might be able to recover from the non-diverse Defendants. *Id.* Defendants Lopez and Transamerica contest remand on the grounds that Plaintiff failed to state a viable claim against the non-diverse Defendants and, alternatively, that a summary inquiry reveals Plaintiff will be unable to recover from the in-state Defendants. Dkt. Nos. 7, 34–35, 60.

*2 After Plaintiff's initial Motion to Remand and Defendant Transamerica's initial response, Plaintiff voluntarily dismissed Defendants American Para Professional Systems, Inc., Portamedic, Inc., Maria Elena Bartimus, individually and doing business as American Para Professional Systems, Inc. and/or Portamedic, Inc., and Sugerya Carrillo, leaving Defendants Transamerica and Lopez as the only remaining defendants in the case. Dkt. Nos. 26–30. The Court considers the issue of jurisdiction and improper joinder as to Defendant Lopez, the remaining non-diverse defendant, below. *See Great N. Ry. Co. v. Alexander*, 246 U.S. 276, 281 (1918) (noting cases that are not removable based on the controlling

Landeros v. Transamerica Life Insurance Company, Slip Copy (2019)

2019 WL 9123531

complaints may become so should the plaintiffs voluntarily dismiss all non-diverse defendants).

## II. Overview of Applicable Law

The federal diversity jurisdiction statute provides district courts with original, subject matter jurisdiction over all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between parties diverse in citizenship. 28 U.S.C. § 1332(a)(1). The statute has long been interpreted as establishing a rule of complete diversity, meaning that all persons on one side of the controversy must be diverse in citizenship from all persons on the other side. *McLaughlin v. Miss. Power Co.*, 376 F.3d 344, 353 (5th Cir. 2004) (citing *Harrison v. Prather*, 404 F.2d 267, 272 (5th Cir. 1968)). "The doctrine of improper joinder is a narrow exception to the rule of complete diversity, and the burden of persuasion on a party claiming improper joinder is a heavy one." *Campbell v. Stone Ins. Inc.*, 509 F.3d 665, 669 (5th Cir. 2007) (quoting *McDonal v. Abbott Labs.*, 408 F.3d 177, 183 (5th Cir. 2005)) (internal quotation marks omitted).

The Fifth Circuit has identified two ways to establish improper joinder: "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004) (en banc) (quoting *Travis v. Irby*, 326 F.3d 644, 647 (5th Cir. 2003)).

Defendants do not dispute that Defendant Lopez is a Texas resident; therefore, this Court's inquiry focuses on whether a reasonable basis exists for predicting that Plaintiff might be able to recover against Defendant Lopez, the only remaining non-diverse defendant.[1] Dkt. No. 1; *see Smallwood*, 385 F.3d at 573. "This means that there must be a reasonable possibility of recovery, not merely a theoretical one." *Ross v. Citifinancial, Inc.*, 344 F.3d 458, 462 (5th Cir. 2003) (emphasis omitted).

The Fifth Circuit has likened this inquiry to the standard of review for evaluating a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b) (6).[2] *Campbell*, 509 F.3d at 669; *see also Smallwood*, 385 F.3d at 573. At all times, the court must focus its inquiry "on the joinder, not the merits of the plaintiff's case." *Smallwood*, 385 F.3d at 573. Ordinarily, no improper joinder exists if a plaintiff survives this Rule 12(b)(6)-type analysis. *Id.* However, in cases "in which a plaintiff has stated a claim, but

has misstated or omitted discrete [and undisputed] facts that would determine the propriety of joinder," the district court may, in its discretion, "pierce the pleadings and conduct a summary inquiry." *Id.*

**\*3** When conducting this summary inquiry, a court must resolve "[a]ny contested issues of fact and any ambiguities of state law ... in [the plaintiff's] favor." *Travis*, 326 F.3d at 649. Further, the court "must also take into account all unchallenged factual allegations, including those alleged in the complaint, in the light most favorable to the plaintiff." *Id.* However, when there is no factual controversy, the court is not to assume the plaintiff could or would prove the requisite facts. *Badon v. R J R Nabisco, Inc.*, 224 F.3d 382, 393–94 (5th Cir. 2000) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)) (finding no reasonable possibility of recovery on plaintiffs' conspiracy claim where defendants' affidavits disproved the conspiracy allegations and plaintiffs responded with no contradictory evidence nor any evidence supporting the allegations). When conducting a summary inquiry, the court must consider "the status of discovery" and "what opportunity the plaintiff has had to develop its claims against the non-diverse defendant." *McKee v. Kan. City S. Ry. Co.*, 358 F.3d 329, 334 (5th Cir. 2004) (internal quotation marks omitted) (citing *Travis*, 326 F.3d at 649).

The Fifth Circuit has cautioned that this summary inquiry should only be used to identify those discrete and undisputed facts that would prevent the plaintiff's recovery from the non-diverse defendant. *Smallwood*, 385 F.3d at 573–74. Examples of such discrete facts include "the in-state doctor defendant did not treat the plaintiff patient, the in-state pharmacist defendant did not fill a prescription for the plaintiff patient, a party's residence was not as alleged, or any other fact that easily can be disproved if not true." *Id.* at 574 n.12. Should such an undisputed fact come to light, then, despite the plaintiff's pleadings surviving a 12(b)(6)-type analysis, the joinder of the non-diverse defendant is improper. *Id.* at 573–74.

## III. Argument and Authority

Plaintiff moves to remand on the ground that Defendant Transamerica has not met its heavy burden of showing that there is " absolutely no possibility" that Plaintiff will be able to establish a cause of action against Defendant Lopez in state court. Dkt. No. 3 at ¶ 4; Dkt. No. 32 at ¶ 3. Defendant Lopez is a citizen and resident of Texas for purposes of determining

subject-matter jurisdiction, which makes him a non-diverse defendant. Dkt. No. 1 at ¶ 14; Dkt. No. 1, Ex. 1 at ¶ 2.3.

Plaintiff's Original Petition alleges that Mr. Landeros and Defendant Lopez entered into a contract in which Defendant Lopez was to assist Mr. Landeros in applying for life insurance. Dkt. No. 1, Ex. 1 at ¶ 5.1. Plaintiff argues that because Defendant Lopez allegedly breached certain duties he undertook related to Mr. Landeros's application for life insurance, contractual and otherwise, she has a cause of action against him for negligence and breach of contract. Dkt. No. 3 at ¶ 8 (citing *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) for the proposition that under Texas law, "a common law duty to perform with care and skill accompanies every contract and that the failure to meet this implied standard might provide a basis for recovery in tort, contract, or both under [appropriate] circumstances"). As the Court must decide whether Plaintiff stated a claim against Defendant Lopez in her Original Petition, the Court takes up each cause of action in turn below. *See Smallwood*, 385 F.3d at 573 (noting that a summary inquiry is appropriate in certain cases only after the court has found the plaintiff stated a claim against the non-diverse defendant).

**1. Negligence**

The Court finds as a matter of law that Plaintiff failed to state a viable negligence cause of action against Defendant Lopez. "Negligence actions in Texas require 'a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach.' " *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009) (internal citations omitted).

**\*4** Plaintiff claims Defendant Lopez had the duty to "exercise reasonable care, skill and diligence in performing the services he promised to [Mr. Landeros] in the taking, recording, and transmittal of the information to be included in the application," and that the failure to do so was negligence which proximately caused Plaintiff's damages. Dkt. No. 1, Ex. 1 at ¶ 5.2. Defendant Transamerica, however, argues that Plaintiff cannot establish the existence of the duties she claims were breached under Texas law or that Defendant Lopez breached any duties owed to Mr. Landeros. Dkt. No. 7 at ¶¶ 11, 13.

Defendant Transamerica points to *May v. United Services Association of America*, where the Texas Supreme Court identified only two duties insurance agents owe to the insured.

Dkt. No. 34 at ¶ 19 (citing *May v. United Servs. Ass'n of Am.*, 844 S.W.2d 666, 669 (Tex. 1992) ("It is established in Texas that an insurance agent who undertakes to procure insurance for another owes a duty to a client to use reasonable diligence in attempting to place the requested insurance and to inform the client promptly if unable to do so.") However, Plaintiff argues Defendant Lopez's duty to exercise reasonable care arose both from the promises he made to Mr. Landeros in the contract between the two and from Defendant Lopez's undertaking to assist Mr. Landeros with the application process. Dkt. No. 1, Ex. 1 at ¶¶ 5.2–5.3.

Resolving this ambiguity of state law in favor of the plaintiff, Plaintiff's arguments fall short not because *May* conclusively precludes insurance agents from undertaking duties other than the two identified in *May* but because the breaches of duty Plaintiff alleges do not allow her to recover in tort for her economic loss under the life insurance contract. *See Travis*, 326 F.3d at 649 ("[A]ny ambiguities of state law must be resolved in [the plaintiff's] favor.").

First, although Plaintiff contends that the Texas Supreme Court in *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.* held that "a common law duty to perform with care and skill accompanies every contract and that the failure to meet this implied standard might provide a basis for recovery in tort," (Dkt. No. 3 at ¶ 8), the *Chapman* court also held to state a tort claim, the damages allegedly caused by the breach of a duty must extend beyond the economic loss of any anticipated benefit under a contract. *Chapman Custom Homes, Inc.*, 445 S.W.3d at 718–19. Plaintiff states in her Motion that she "sustained no injury supporting a common-law cause of action against the Non-Diverse Defendants until the time her claim [for death benefits] was denied and the policy [insuring the life of Mr. Landeros] was unilaterally rescinded." Dkt. No. 3 at ¶ 30. Accordingly, the Court considers that "the only loss or damage is to the subject matter of the contract"—death benefits—and thus Plaintiff's action more appropriately lies in breach of contract and not negligence. *See Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991).

Second, Plaintiff's claim arising out of Defendant Lopez's affirmative undertaking fails due to the economic nature of her alleged harm. *See* Dkt. No. 3 at ¶¶ 8, 15 (asserting Defendant Lopez's undertaking to procure life insurance for Mr. Landeros obligated Defendant Lopez "to exercise reasonable care," citing *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex. 1976)). The Texas Supreme

Court in *Taylor*, however, held that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for *physical* harm resulting from his failure to exercise reasonable care to perform his undertaking ...." *Taylor*, 544 S.W.2d at 120 (emphasis added). In the present case, no such physical harm is alleged. Dkt. No. 3 at ¶ 30.

 *5  Moreover, Plaintiff does not allege in her Original Petition that Defendant Lopez told Mr. Landeros that he did not need to include certain information in his application for life insurance or that Defendant Lopez made any other negligent misrepresentation like the one in *Nast v. State Farm Fire & Cas. Co.*, which Plaintiff cites in support of her argument that she has a viable cause of action against Defendant Lopez for negligence. Dkt. No. 3 at ¶ 24 (citing 82 S.W.3d 114, 118 (Tex. App.—San Antonio 2002, no pet.)); *see* Dkt. No. 1, Ex. 1 at ¶ 5.2, 5.5 (alleging an omission of information, not an affirmative misrepresentation).

In *Nast*, an insurance agent told plaintiffs that "their home was not in a location that would qualify them to obtain flood insurance" and that the plaintiffs' "neighbors would essentially never recover" under the flood insurance policies they had purchased from a different insurance agent. Dkt. No. 3 at ¶ 24 (citing *Nast*, 82 S.W.3d at 119). The Texas appellate court in *Nast* ultimately held that the plaintiffs had viable causes of action against the agent because of the agent's "duty not to misrepresent material facts about their eligibility for [ ] insurance." *Nast*, 82 S.W.3d at 124.

Plaintiff raises allegations of misrepresentation made by Defendant Lopez for the first time in her Supplemental Motion to Remand. Dkt. No. 32 at ¶ 5 (alleging a violation of Texas Insurance Code § 541.061). Plaintiff argues her original pleadings provided Defendant with fair notice of the claim. Dkt. No. 59 at ¶ 4. However, Plaintiff's Original Petition makes no allegation of misrepresentation but rather alleges Defendant Lopez failed to advise Mr. Landeros in various ways and failed to transmit information to Transamerica. Dkt. 1, Ex. 1 at ¶¶ 5.2, 5.5. As the Court considers the pleadings at the time of removal, no allegations of misrepresentation by Defendant Lopez are properly before this Court. *See Griggs v. State Farm Lloyds*, 181 F.3d 694, 700 (5th Cir. 1999) (noting post-removal filings cannot be considered to the extent they present new theories not raised in the controlling state court petition); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (requiring pleadings

to give the opposing party fair notice of the claims against it). Therefore, as there is no allegation that Defendant Lopez made any misrepresentations properly before this Court, *Nast* is distinguishable on that basis.

Plaintiff similarly raises allegations that Defendant Lopez violated his duty under Texas Insurance Code § 705.103 to provide Mr. Landeros with a complete copy of the policy application and any questions and answers provided to Mr. Landeros during its completion in her Supplemental Motion to Remand. Dkt. No. 32 at ¶¶ 8–9. In defense of her failure to make any reference to the Texas Insurance Code in her original allegations against Defendant Lopez, Plaintiff asserts that she is not required to cite to specific statutes in her Original Petition. Dkt. No. 59 at ¶ 4. While Plaintiff is correct, she is required to state factual allegations such that the opposing party is given notice of the claims against it. *See Twombly*, 550 U.S. at 555.

Plaintiff's Original Petition refers to Defendant Lopez's duty, arising from the contract between Mr. Landeros and Defendant Lopez, to use care in performing the services promised "in the taking, recording and transmittal of the information to be included in the application." Dkt. No. 1, Ex. 1 at ¶ 5.2 However, Plaintiff fails to include any allegations regarding Defendant Lopez's failure to provide Mr. Landeros with a complete copy of the application. *See* Dkt. No. 1, Ex. 1 at 5.2 (alleging Defendant Lopez "failed to include some or all of such [medical history] information in the application"). Therefore, no allegation of any violation of Texas Insurance Code § 705.103 by Defendant Lopez is properly before the Court.[3]

 *6  As a result, the Court considers that Plaintiff fails to state a viable negligence cause of action against Defendant Lopez. Based on the Court's finding of failure to establish a negligence cause of action, the Court does not address the issue of statute of limitations in this case.

**2. Breach of Contract**
Upon consideration of Plaintiff's Original Petition, the Court finds as a matter of law that Plaintiff pled sufficient facts to state a breach of contract claim upon which relief could plausibly be granted. However, after a summary inquiry, the undisputed facts in the record establish that there is no reasonable possibility for Plaintiff to recover on her breach of contract claim against Defendant Lopez. *See Smallwood*, 385 F.3d at 573 (noting that in some cases, after the court

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

has found the plaintiff stated a claim against the non-diverse defendant, it may conduct a summary inquiry into whether undisputed facts preclude relief on the stated claim).

### a. 12(b)(6)-type Analysis

A breach of contract claim in Texas requires the existence of a valid contract, performance by the plaintiff, breach of the contract by the defendant, and damages resulting from that breach. *Foley v. Daniel*, 346 S.W.3d 687, 690 (Tex. App.— El Paso 2009, no pet.). Under Texas law, a contract is legally binding if it is "sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). If an essential term of an agreement is still open for negotiation, there is no binding contract. *Id.*

Plaintiff alleges a breach of contract arising from a contract between Defendant Lopez and Mr. Landeros. Dkt. No. 1, Ex. 1 at ¶¶ 5.1–5.2. Plaintiff's Original Petition states Defendant Lopez "offered, for valuable consideration, to assist Ruben Delgado Landeros in applying for life insurance on the life of Ruben Delgado Landeros." *Id.* at ¶ 5.1. The Petition alleges that this agreement included Defendant Lopez's undertaking of duties to accurately record and transmit the information provided by Mr. Landeros to Defendant Transamerica. *Id.* at ¶¶ 5.1–5.2. The Petition further contends that this agreement included duties undertaken by Defendant Lopez related to advising Mr. Landeros of the importance of providing information specific enough to prevent the policy from being rescinded in the event Mr. Landeros died before the second-year anniversary of the policy's issuance. *See id.* at ¶ 5.5; Dkt. No. 3 at ¶ 9.

Plaintiff additionally alleges that a duty to exercise reasonable care, skill, and diligence in the performance of these services —the taking, recording, and transmitting of information to Transamerica—arose from the contract. Dkt. No. 1, Ex. 1 at ¶¶ 5.1–5.2. Plaintiff contends that she has a cause of action against Defendant Lopez for breach of contract because she "was the intended beneficiary of the life insurance contract" and "a third party beneficiary of the contract" between Defendant Lopez and Mr. Landeros. *Id.* at ¶¶ 5.1, 5.5.

Defendant Transamerica, however, argues that Plaintiff's allegations that Defendant Lopez helped Mr. Landeros apply for life insurance are insufficient to show contract formation or that an implied duty of reasonable care arose. Dkt. No. 7 at ¶¶ 8–10. Transamerica asserts that Plaintiff's Petition "contains no facts alleging how this supposed 'contract' came

to be, what consideration was given to [Defendant] Lopez, what the terms and conditions were, or what the scope of [Defendant] Lopez's or [Mr.] Landeros's contractual duties were." *Id.* at ¶ 9. Further, Transamerica argues that the Court must disregard Plaintiff's attempt to add to her pleadings in her Motion to Remand and corresponding supplements because they are post-removal filings which should not be considered in assessing this Court's jurisdiction as it existed at the time of removal. *Id.* (citing *Griggs*, 181 F.3d at 700).

*7 The Court finds Plaintiff stated a breach of contract claim upon which relief could plausibly be granted in her Original Petition. Defendant Transamerica's objections are each addressed in the text of Plaintiff's Original Petition. Paragraph 5.1 provides the timeframe (December 2014), the parties (Defendant Lopez and Mr. Landeros), the offeror (Defendant Lopez), the offeree (Mr. Landeros), and the expected duration of the contract (the length of the application process to acquire a life insurance policy). Dkt. No. 1, Ex. 1 at ¶ 5.1. Further, Plaintiff specifies various duties placed upon Defendant Lopez through the execution of the contract, such as the duty "to exercise reasonable care, skill and diligence when advising Mr. Landeros of the terms, meanings, consequences, pitfalls and ambiguities of both the written application and of the application process for life insurance." *Id.* at ¶ 5.5. Plaintiff additionally specifies duties allegedly breached and the resulting damages.*Id.* at ¶¶ 5.2, 5.5 (asserting that Defendant Lopez's failure to include medical information in the policy application as well as his failure to adequately advise Mr. Landeros led to the denial of Plaintiff's benefits under the life insurance contract). Paragraph 5.1 alleges the existence of consideration and suggests the intent to prove it specifically with future evidence. *See id.* at ¶ 5.1. The absence of the specific amount and type of consideration from Plaintiff's Original Petition, filed prior to any discovery in the case, does not alone negate the possibility of a binding contract between Defendant Lopez and Mr. Landeros. As pled by Plaintiff, no essential elements of the contract were open to negotiation. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 221. Therefore, the Court finds as a matter of law that Plaintiff has pled sufficient facts to establish a breach of contract cause of action.

### b. Summary Inquiry

After finding a plaintiff has pled a viable claim, the court may, in its discretion, "pierce the pleadings" and conduct a summary inquiry into whether the plaintiff has misstated or omitted discrete and undisputed facts. *Smallwood*, 385 F.3d at 573. The court should consider the "status of discovery" and the

opportunity the plaintiff has had to develop its claims when making this summary inquiry. *McKee*, 358 F.3d at 334 (citing *Travis*, 326 F.3d at 649). The Fifth Circuit, after engaging in a summary inquiry, has found improper joinder where defendants put forth uncontroverted deposition testimony that denied a plaintiffs' factual allegations and plaintiffs came forward with no contrary evidence. *Guillory v. PPG Indus., Inc.*, 434 F.3d 303, 312–13 (5th Cir. 2005); *see also Badon*, 224 F.3d at 393–94 (finding plaintiffs failed to state a viable conspiracy claim where uncontroverted evidence provided by defendants disproved the conspiracy allegations).

Here, Defendants Transamerica and Lopez point to Plaintiff's deposition in which she states that neither she nor her husband told Defendant Lopez about Mr. Landeros's heart condition. Dkt. No. 34, Ex. A, p. 9 at lines 8-24; Dkt. No. 35 at ¶ 11. Defendants' raised this deposition testimony in their responses to Plaintiff's Supplemental Motion to Remand (Dkt. Nos. 34–35), which they filed May 8, 2019. Since that time, Plaintiff has submitted two additional supplemental filings in support of remand (Dkt. Nos. 55–56, 67) and appeared at the August 16, 2019 Motion Hearing yet has not disputed the above admission made in Plaintiff's deposition.[4]

This uncontroverted deposition testimony refutes Plaintiff's allegations. *See* Dkt. No. 1, Ex. 1 at ¶ 5.2 ("Plaintiff will show, however, that Lopez, although provided with or knowing the correct medical history of Mr. Landeros, failed to include all of such information in the application. Because of such failure, the Defendant Insurance company denied the benefits to the Plaintiff which, but for the negligence of [Defendant] Lopez, such benefits would otherwise have been paid to the Plaintiff under the policy.") Further, Plaintiff provides undisputed deposition testimony that Defendant Lopez told Mr. Landeros of the importance of giving truthful answers to the questions on the policy application, which included questions regarding heart health,[5] and does not contest Defendant Lopez's deposition testimony describing more specifically how he emphasized the importance of being honest to Mr. Landeros. Dkt. No. 34, Ex. A at p. 8, lines 1–7; *see* Dkt. No. 34, Ex. B. at pp. 4–5.

**\*8** The undisputed fact that neither Plaintiff nor Mr. Landeros provided Defendant Lopez with the health information omitted from the insurance application together with Defendant Lopez's undisputed discussion with Mr. Landeros of the importance of truthfulness breaks the causal connection between the damages Plaintiff claims, denial of benefits under the insurance contract, and any breach of contract by Defendant Lopez.[6] This admission by Plaintiff is akin to the key facts in the "prototypical cases" provided in *Smallwood*. *Cumpian v. Alcoa World Alumina, L.L.C.*, 910 F.3d 216, 221 (5th Cir. 2018) (quoting *Smallwood*, 385 F.3d at 574 n.12) (providing examples such as "the in-state doctor defendant did not treat the plaintiff patient"). Plaintiff alleges Defendant Lopez failed to include material health information in Mr. Landeros's policy application, yet Defendant Lopez was never provided with the information he allegedly failed to include. Dkt. No. 1, Ex. 1 at ¶ 5.2; Dkt. No. 34, Ex. A, p. 9 at lines 8-24; Dkt. No. 35 at ¶ 11.

Furthermore, the source of the undisputed fact—Plaintiff herself—merits emphasis. While the plaintiffs in *Guillory* merely failed to dispute the defendants' denial of their allegations, here Plaintiff is one source of the uncontroverted testimony which refutes her own allegations. *See Guillory*, 434 F.3d at 312–13. Therefore, as the court in *Guillory* found the undisputed facts provided by the defendants precluded the plaintiffs' ability to recover on the stated claim, the Court here finds the undisputed facts, in part provided by Plaintiff, preclude recovery on her breach of contract claim against Defendant Lopez. *See Foley*, 346 S.W.3d at 690 (noting that a breach of contract claim requires damages *resulting from* the breach).

Because the Court finds Plaintiff is unable to establish a cause of action against the non-diverse Defendant upon which she may possibly recover, the Court considers that Defendant Lopez was improperly joined. *See Smallwood*, 385 F.3d at 573.

### IV. Conclusion

For the foregoing reasons, the Court concludes that it has diversity jurisdiction over this action absent the improper joinder of Defendant Lopez. Accordingly, the Court hereby **ORDERS** that Plaintiff's Motion to Remand and all supplemental motions (Dkt. Nos. 3, 32, 55) are **DENIED** and Mr. Lopez is **DISMISSED** as a Defendant to this action.

SO ORDERED this 17th day of September, 2019, at McAllen, Texas.

### All Citations

Slip Copy, 2019 WL 9123531

**Landeros v. Transamerica Life Insurance Company, Slip Copy (2019)**

2019 WL 9123531

Footnotes

1    At the August 16, 2019 Motion Hearing, the Court found Defendant Lopez's Motion for Sanctions raised the question of fraudulent misjoinder. *See* Dkt. No. 38. As the Court finds the non-diverse defendant improperly joined and no party has raised the issue of fraudulent misjoinder in response to Plaintiff's Motion to Remand, the Court does not address the question of fraudulent misjoinder here.

2    The Fifth Circuit has clarified that federal pleading standards apply when examining the propriety of an in-state defendant's joinder. *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.,* 818 F.3d 193, 202 (5th Cir. 2016).

3    As no such allegation is properly before the Court, the Court does not reach Defendant Transamerica's argument that § 705.103 of the code is not an independent cause of action against Defendant Lopez. *See* Dkt. No. 34 at ¶¶ 15–16.

4    Included in Plaintiff's additional filings in support of remand is the expert report of Thomas H. Veitch. Dkt. No. 55–56. The report played no role the Court's decision today as the focus of this summary inquiry is the Plaintiff's undisputed admissions. The Court reserves judgment on Defendant Transamerica's Motion to Strike this expert report (Dkt. No. 60). The Court similarly reserves judgment on Defendant Transamerica's objections to the deposition testimony of Jolynn Barnes. *See* Dkt. No. 34 at ¶ 4.

5    The policy application includes the question "Have you ever had, been told by a member of the medical profession that you have, or been diagnosed with or treated for: ... b. High blood pressure, heart attack murmur, palpitation, or anemia or any disease or abnormality of the heart, blood vessels, or blood?" Dkt. No. 1, Ex. 1-A.

6    The Court notes this undisputed fact breaks the causal connection between Defendant Lopez's alleged failure to transmit part of the insurance application to Transamerica, first specifically alleged in Plaintiff's Supplemental Motion to Remand. *See* Dkt. No. 32 at ¶ 9. As Defendant Lopez did not have the omitted medical information to transmit, any information transmitted by Defendant Lopez would not have cured the material omissions which led to the denial of Plaintiff's benefits.

**End of Document**       © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1365946

KeyCite Yellow Flag - Negative Treatment

Distinguished by Jacksen v. Chapman Scottsdale Autoplex, LLC, D.Ariz., July 21, 2021

2016 WL 1365946
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

LEVI STRAUSS & CO., Plaintiff,

v.

AQUA DYNAMICS

SYSTEMS, INC., Defendant.

Case No. 15-cv-04718-WHO
|
Signed 04/06/2016

**Attorneys and Law Firms**

Robert Allan McFarlane, Hanson Bridgett LLP, San Francisco, CA, for Plaintiff.

Timothy Martin Flaherty, Morris Polich & Purdy LLP, San Francisco, CA, for Defendant.

**ORDER DENYING MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, OR IN THE ALTERNATIVE, TO DISMISS OR STAY PENDING ARBITRATION**

Re: Dkt. No. 30

WILLIAM H. ORRICK, United States District Judge

**INTRODUCTION**

 *1 This is a declaratory relief action arising from a contract dispute between plaintiff Levi Strauss & Co. ("Levi" or "LS&Co.") and defendant Aqua Dynamics Systems, Inc. ("Aqua"). Aqua recently initiated an arbitration against Levi for alleged breach of a license agreement that requires Levi to pay royalties to Aqua's alleged predecessor-in-interest for the use of certain processes relating to the colorization of fabrics and garments. Levi responded by filing this lawsuit, seeking declaratory judgment that (1) Aqua, as a nonsignatory to the license agreement, lacks standing to enforce its arbitration provision; (2) Aqua waived its rights, if any, to enforce

the arbitration provision; and (3) Levi has not breached the license agreement. Aqua moves to dismiss for lack of subject matter jurisdiction. In the alternative, it asks that the case be dismissed or stayed in light of the pending arbitration.

I find that federal question jurisdiction exists and, accordingly, DENY Aqua's motion to dismiss for lack of subject matter jurisdiction. I also DENY Aqua's motion to dismiss or stay the case pending arbitration. While Levi's waiver argument is for the arbitrators to decide, its nonsignatory standing argument is properly resolved in this Court. Accordingly, this action will proceed as set out at the conclusion of this Order.

**BACKGROUND**

In 1993, Aqua's alleged predecessor in interest, Earth Aire Corporation ("Earth Aire" or "EAC"), Eric Wasinger, and Levi entered a written license agreement. First Amended Complaint ¶ 16 ("FAC") (Dkt. No. 22); *see also* FAC Ex. B (the "Agreement" or "License Agreement"). The Agreement granted Levi the right to use certain processes relating to the colorization of fabrics and garments using ozone. FAC ¶ 16. In exchange, Levi agreed to pay royalties to Earth Aire. *Id.* The Agreement refers to the licensed processes as "Licensed Ozone Processes" and identifies two categories of such processes: (1) Licensed Ozone Processes "covered by a valid and enforceable patent;" and (2) Licensed Ozone Processes "not covered by a valid and enforceable patent." Agreement ¶¶ 10.1.1, 10.1.2. I refer to these two categories as "Covered Processes" and "Uncovered Processes," respectively, in this Order.

The Agreement provides that it "will continue in effect and royalties will be paid" during the following time periods for Covered versus Uncovered Processes:

> 10.1.1 For the use of any Licensed Ozone Process which is *covered by a valid and enforceable patent*, during the life of the patent as to product produced by the process claimed by that patent, but in no event for more than seventeen (17) years after the end of the Development Period.

> 10.1.2 For the use of any Licensed Ozone Process *not covered by a valid and enforceable patent*, for seven (7) years after the end of the Development Project. LS&CO may freely use the affected Licensed Ozone Process after the expiration of this Agreement as to it.

Case 4:23-cv-00730   Document 37-1   Filed on 04/26/23 in TXSD   Page 69 of 102
Levi Strauss & Co. v. Aqua Dynamics Systems, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 1365946

Agreement ¶¶ 10.1.1, 10.1.2 (emphasis added). The parties do not dispute that both the "Development Period" and the "Development Project" ended on December 14, 1994, at which point the Agreement became effective, and that the Agreement terminated on December 14, 2011. *See* Oppo. at 4 (Dkt. No. 33); FAC Ex. G. Using a start date of December 14, 1994, the Agreement required Levi to pay royalties on the Uncovered Processes through December 14, 2001, and on the Covered Processes through the termination of the Agreement on December 14, 2011. *See* Oppo. at 4 (noting same).

**\*2** The Agreement includes an arbitration provision stating that

> all disputes, differences of opinion, or controversies which may arise between the parties hereto out of or in relation to or in connection with this Agreement or the breach thereof, shall be finally settled by arbitration in Chicago, Illinois...by a panel of three (3) arbitrators in accordance with the Rules of the American Arbitration Association.

Agreement ¶ 15.2. A subsequent amendment to the arbitration provision states as follows:

AMENDMENT TO ARBITRATION AGREEMENT

[...]

WHEREAS, Aqua alleges that it is the successor in interest to [EAC]; and

WHEREAS, EAC and LS&Co. are parties to [the Agreement]; and

WHEREAS, the Agreement contains certain provisions relating to Arbitration; and

WHEREAS, the Parties,[1] by their attorneys, wish to vary certain terms of the Agreement relating to only the place at which arbitration may take place and the organization which shall conduct the Arbitration;

THEREFORE, IT IS AGREED AS FOLLOWS:

1. This Agreement does not constitute a waiver, abandonment or modification of any claim, defense or counterclaim of either Party or to LS&Co.'s right to assert that this case is not subject to arbitration, but, to the contrary, effects only the provision of paragraph 15.2 referenced below.

2. The Parties agree that paragraph 15.2 of the Agreement shall be modified only to the extent that the place of

arbitration, if any shall take place, shall be San Francisco, California, and such arbitration shall be conducted before a JAMS panel of three neutral arbitrators and pursuant to "JAMS Comprehensive Arbitration Rules & Procedures," effective July 1, 2014.

3. Except as set forth in paragraph 2 above, the Agreement remains unchanged and unmodified.

FAC Ex. C.

The Agreement's severability provision states that in relevant part that "[i]f any part of this Agreement shall be declared invalid or unenforceable by a court of competent jurisdiction, it shall not affect the validity of the balance of this Agreement." Agreement ¶ 16.7.

On February 4, 2015, Aqua filed an action against Levi in the United States District Court for the Southern District of New York for breach of contract and patent infringement (the "New York action"). FAC Ex. E (original complaint in the New York action). Its original complaint alleged that "[i]n or around 2002," Levi stopped paying royalties to Earth Aire, thereby breaching the Agreement. *Id.* ¶ 9. Aqua subsequently amended its complaint to drop the patent infringement cause of action. FAC Exs. F, G (first amended complaint and second amended complaint in the New York action).[2]

On September 15, 2015, Aqua filed a "Demand for Arbitration Before JAMS" seeking to arbitrate the same breach of contract dispute at issue in the New York action. FAC Ex. A. Levi filed this action on October 13, 2015 and its FAC on January 1, 2016. Dkt. Nos. 1, 22. The FAC contains three causes of action for declaratory judgment. FAC ¶¶ 42-64.

**\*3** The first cause of action, titled, "Lack of Standing," seeks a declaration that Aqua, as a nonsignatory to the Agreement, "has no standing to assert any claim or request any relief related to the License Agreement, including the right to commence the Arbitration against LS&Co. for breach of the License Agreement." FAC ¶ 48; *see also* FAC at Prayer for Relief (requesting an order declaring that Aqua "has no standing to enforce the License Agreement because it is not a party to the License Agreement"). Levi alleges that the Agreement "requires LS&Co.'s consent for Earth Aire Corporation, or any subsequent assignee, to assign its rights in the License Agreement to any other party," and that "LS&Co. has identified no record that it ever provided, or was ever asked to provide, its consent to any assignment of Earth Aire

Levi Strauss & Co. v. Aqua Dynamics Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1365946

Corporation's ownership or rights in the License Agreement." FAC ¶¶ 46-47.

The second cause of action, titled, "Waiver," seeks a declaration that Aqua waived its rights to enforce the Agreement's arbitration provision by failing to demand arbitration until approximately 13 years after the alleged breach commenced, and approximately 9 years after it sent Levi a Notice of Default in 2006. FAC ¶¶ 56-58; *see also* FAC at Prayer for Relief (requesting an order declaring that Aqua "has waived its rights, if any, to enforce the License Agreement in arbitration"). Levi alleges that Aqua "sat on whatever rights it had or has in the License Agreement until it filed [the New York action]," and that "LS&Co. has been materially prejudiced by the long delay." FAC¶¶ 56-57.

The third cause of action, titled, "No Breach of Contract; Performance by LS&Co.," seeks a declaration that "LS&Co. has not breached the License Agreement, at least for the reason that none of LS&Co. or its suppliers' processes or devices are covered by any valid and enforceable patent [under] the License Agreement." FAC ¶ 64; *see also* FAC at Prayer for Relief (requesting an order declaring that Levi "is not in breach of the License Agreement"). In support of this theory, Levi points to the Agreement's differing time periods for Covered Processes versus Uncovered Processes. *See* Oppo. at 4. Levi explains that because Aqua's breach of contract theory is that Levi began breaching the Agreement in 2002 – after Levi's obligation to pay royalties on the Uncovered Processes had expired on December 14, 2001 – Aqua's breach of contract claim depends on a finding that Levi continued using the Covered Processes after 2001. *Id.* "[I]f there is no such patent infringement," Levi contends, "there is no breach of contract." *Id.* In the FAC, Levi "denies that it or its vendors used a process covered by a valid and enforceable patent under the License Agreement during the time frame relevant to this dispute and, therefore, denies that it has breached the License Agreement." FAC ¶ 21.

The FAC alleges that subject matter jurisdiction exists under 28 U.S.C. §§ 1331 and 1338, on the ground that Aqua's "right to relief necessarily depends on resolution of a substantial question of federal patent law." FAC ¶ 7. Section 1331 provides jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Section 1338 provides jurisdiction over "any civil action arising under any Act of Congress relating to patents." 28 U.S.C. § 1338.

On January 21, 2016, the parties stipulated to extend Aqua's time to respond to the FAC, and for Aqua's motion to dismiss the FAC, if any, to be heard on March 30, 2016. Dkt. Nos. 25-26. Shortly thereafter, on February 12, 2016, Levi moved for a temporary restraining order prohibiting Aqua from pursuing the JAMS arbitration. Dkt. No. 26. I denied the motion but ruled that I would treat it as a motion for a preliminary injunction to be heard along with the motion to dismiss on March 30, 2016. Dkt. No. 29. Aqua then filed the instant motion, Dkt. No. 30 ("Mot."), and the parties stipulated to stay the JAMS arbitration, Dkt. No. 32. I heard argument on March 30, 2016. Dkt. No. 36.

## LEGAL STANDARD

### I. FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

 **\*4**  Federal Rule of Civil Procedure 12(b)(1) allows a party to bring a motion to dismiss for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A challenge under Rule 12(b)(1) may be "facial or factual." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). Where, as here, the challenge is facial – meaning that it is confined to whether the allegations in the complaint are sufficient "on their face" to invoke subject matter jurisdiction, *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) – the court applies essentially the same standard as in considering a motion to dismiss under Rule 12(b)(6), assuming the allegations to be true and drawing all reasonable inferences in the complaining party's favor, *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004); *see also Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012); *Colony Cove Properties, LLC v. City Of Carson*, 640 F.3d 948, 955 (9th Cir. 2011).

### II. FEDERAL ARBITRATION ACT

Under 9 U.S.C. § 2, the "primary substantive provision" of the Federal Arbitration Act ("FAA"), *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983), a written agreement to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce...shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2. This provision reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT & T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011) (internal quotation marks and citations omitted). "Because arbitration is fundamentally a matter

Case 4:23-cv-00730 Document 37-1 Filed on 04/26/23 in TXSD Page 71 of 102
Levi Strauss & Co. v. Aqua Dynamics Systems, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 1365946

of contract, the central or primary purpose of the FAA is to ensure that private agreements to arbitrate are enforced according to their terms." *Momot v. Mastro*, 652 F.3d 982, 986 (9th Cir. 2011) (internal quotation marks omitted).

Where a claim is subject to arbitration, the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

## DISCUSSION

Aqua's motions raise two basic questions: (1) whether subject matter exists; and (2) whether the issues underlying Levi's first and second causes of action (i.e., nonsignatory standing and waiver) are for this Court or the arbitrators to decide. I address the questions in turn.

## I. SUBJECT MATTER JURISDICTION

"Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense," that determines whether there is subject matter jurisdiction over the case. *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 248 (1952). "In other words, the court examines the declaratory *defendant's* hypothetical well-pleaded complaint to determine if subject matter jurisdiction exists." *ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1349-50 (Fed. Cir. 2011) (emphasis in original); *see also Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 848 (2014) ("The relevant question concerns the nature of the threatened action in the absence of the declaratory judgment suit."). As stated above, Levi asserts subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338, which together confer jurisdiction over all civil actions "arising under" either "the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, or, more particularly, "any Act of Congress relating to patents," 28 U.S.C. § 1338. Thus, to establish subject matter jurisdiction, Levi must show that Aqua's hypothetical breach of contract action is one "arising under" federal law.

**\*5** For the purposes of both section 1331 and section 1338, "a case can 'arise under' federal law in two ways." *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013). First, and most commonly, "a case arises under federal law when federal law creates the cause of action asserted." *Id.* Second, even

when a claim "finds its origins in state rather than federal law," the claim nevertheless arises under federal law where it "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 1064-65. That is, a state law claim provides a basis for federal question jurisdiction where a federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.*

Only the second of these two means of determining subject matter jurisdiction is at issue here. *See* Oppo. at 8-13; Reply at 2-4 (Dkt. No. 35). Applying that framework, courts have repeatedly held that a state-law-based breach of contract claim arises under federal law where it depends on a finding that the defendant has infringed the plaintiff's patents. *See, e.g., Jang v. Boston Sci. Corp.*, 767 F.3d 1334, 1336 (Fed. Cir. 2014) (subject matter jurisdiction existed where "[a]lthough this case arises from a [state law breach of contract] claim, rather than directly as a patent infringement claim, [plaintiff's] right to relief...depends on an issue of federal patent law – whether the [products] sold by [defendants] would have infringed [plaintiff's patents]") (internal quotation marks omitted); *U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1372 (Fed. Cir. 2000) (subject matter jurisdiction existed where, to show that the defendant breached an exclusive license agreement, the plaintiff "must show that [the defendant] sold [products] covered by the licensed patents"); *Alexsam, Inc. v. Green Dot Corp.*, No. 15-cv-05742, 2015 WL 6520917, at *4 (C.D. Cal. Sept. 28, 2015) ("Just as in *Dray*, any determination of whether the agreement was breached will require the Court to interpret the...patents to determine if defendants' products in fact infringe on the patents."); *Berman v. OpenTV Corp.*, No. 09-cv-04065-MMC, 2010 WL 3987448, at *3 (N.D. Cal. Oct. 12, 2010) ("Where a plaintiff asserts that a breach of contract occurs from a defendant's infringement of the plaintiff's patents, the breach of contract claim necessarily depends on resolution of a substantial question of patent law.").

Resolution of Aqua's hypothetical breach of contract claim depends on a finding that Levi has infringed its patents. Aqua's breach of contract theory (assuming that its pleadings in the New York action accurately reflect that theory) is that Levi stopped paying royalties in 2002, after its obligation to pay royalties on the Uncovered Processes had expired on December 14, 2001. Thus, to prove that Levi breached the

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1365946

Agreement by failing to pay royalties, Aqua will have to show that Levi continued using the Covered Processes after 2001. In other words, Aqua will have to show that Levi continued to use a process that was "covered by a valid and enforceable patent." Agreement ¶ 10.1.1. Aqua offers no reason to doubt this characterization of its hypothetical breach of contract claim. Although it argues that the patent issues in this case are mere "affirmative defenses," it fails to explain how it could establish that Levi breached the Agreement without also establishing that Levi committed patent infringement. *See* Reply at 2-4; *see also Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 n.3 (1988) ("[M]erely because a claim makes no reference to federal patent law does not necessarily mean the claim does not 'arise under' patent law.").

**\*6** Aqua's attempt to analogize this case to *Gunn*, 133 S. Ct. 1059, is unpersuasive. In *Gunn*, the plaintiff brought a state court action accusing his attorneys of malpractice for failing to timely raise an exception to the on-sale bar in federal district court litigation that ultimately resulted in his patent being held invalid. 133 S. Ct. at 1062-63. After the state court granted summary judgment for the attorneys, the plaintiff argued on appeal that the state court lacked jurisdiction over the case, and that its summary judgment order should be vacated, leaving him "free to start over" in federal court. *Id.* The Supreme Court found that the patent issue underlying the malpractice action was "not substantial in the relevant sense," in that "[t]he substantiality inquiry...looks...to the importance of the issue to the federal system as a whole," not to the importance of the issue "to the particular parties in the immediate suit." *Id.* at 1066. The patent issue raised by the plaintiff's malpractice claim was not substantial in this sense because it was "backward-looking" and "hypothetical." *Id.* at 1066-67. The Court concluded, "[A]lthough the state courts must answer a question of patent law to resolve [plaintiff's] malpractice claim, their answer will have no broader effects. It will not stand as binding precedent for any future patent claim; it will not even affect the validity of [plaintiff's] patent." *Id.* at 1068. Thus, the patent issue did not support "arising under" jurisdiction. *Id.*

Aqua contends that the patent issues in this case are also "backward-looking" and "hypothetical" and thus insufficient to support federal question jurisdiction. Mot. at 7-8. The Federal Circuit rejected this argument in *Jang*, 767 F.3d 1334. There, the Federal Circuit had previously determined that it had jurisdiction over the plaintiff's contract claim because the plaintiff's "right to relief...depends on an issue of federal patent law – whether the [products] sold by [defendants]

would have infringed [plaintiff's patents]." 767 F.3d at 1336 (internal quotation marks omitted). The court held that *Gunn* did not alter this conclusion. *Id.* It found that the patent issues presented by the plaintiff's contract claim were "neither entirely backward-looking nor hypothetical" for two reasons. *Id.* at 1337. First, "the court may be called upon to determine the extent to which validity is made relevant to the resolution of the [contract] claim by the language of the contract itself," which extended only to products covered by patent claims that had not "been held invalid." *Id.* Second, the court reasoned that in "disputes like the one at issue here in which resolution of the contract claim itself requires resolution of underlying issues of infringement, there exists the possibility that the patentee would file suits alleging infringement by others and may even be contractually obligated to do so." *Id.* at 1337-38. It concluded that "[m]aintaining Federal Circuit jurisdiction over such contractual disputes to avoid such conflicting rulings is important to 'the federal system as a whole' and not merely 'to the particular parties in the immediate suit.'" *Id.* at 1338 (quoting *Gunn*, 133 S. Ct. at 1066).

Aqua does not dispute that resolution of its breach of contract claim would require a determination of the validity of the relevant patents. *See* Oppo. at 11 (raising this point). Nor does it dispute that there exists the possibility of subsequent infringement suits based on those same patents. *See id.* (same). Accordingly, in line with *Jang*, I find that Levi has shown that the patent issues in this case are sufficient to support "arising under" jurisdiction, and that subject matter jurisdiction exists under sections 1331 and 1338. Aqua's motion to dismiss under Rule 12(b)(1) is DENIED.

## II. NONSIGNATORY STANDING AND WAIVER

In the alternative, Aqua asks that I dismiss or stay the case in light of the JAMS arbitration. *See* Mot. at 9-13; Reply at 8-12. It contends that the parties clearly and unmistakably delegated questions of arbitrability to the arbitrators, and that as a result Levi's arbitrability challenges (i.e., Levi's first and second causes of action, regarding nonsignatory standing and waiver) must be resolved by the arbitrators. Levi argues that, for a variety of reasons, its nonsignatory standing and waiver challenges are properly resolved by this Court. I find that each party is half-right. The waiver issue is a question for the arbitrators, while the nonsignatory standing issue is a question for the Court.

**\*7** "The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses*, 460 U.S. at 24-25.

2016 WL 1365946

Nevertheless, "so-called 'question[s] of arbitrability' [–] which include certain gateway matters, such as whether parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a [particular] controversy [–] are presumptively for courts to decide." *Oxford Health Plans LLC v. Sutter*, 133 S.Ct. 2064, 2068 n.2 (2013) (some internal quotation marks omitted); *see also Momot*, 652 F.3d at 987 (issues that "contracting parties would likely have expected a court to have decided" are "gateway questions of arbitrability" to be determined by the court, not the arbitrator). This rule flows from the "principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995).

"Although gateway issues of arbitrability presumptively are reserved for the court, the parties may agree to delegate them to the arbitrator." *Momot*, 652 F.3d at 987. In other words, parties can "agree to arbitrate" questions of arbitrability. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010) (internal quotation marks omitted). For arbitration agreements governed by the FAA, courts considering whether the parties have agreed to arbitrate questions of arbitrability "should apply federal arbitrability law absent clear and unmistakable evidence that the parties agreed to apply nonfederal arbitrability law." *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 921 (9th Cir. 2011) (internal quotation marks omitted); *accord Brennan v. Opus Bank*, 796 F.3d 1125, 1129 (9th Cir. 2015). Under federal arbitrability law, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts...should apply ordinary state law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944. Because questions of arbitrability are presumptively for courts to decide, however, courts "apply a more rigorous standard in determining whether the parties have agreed to arbitrate [such] question[s]." *Momot*, 652 F.3d at 987. "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options*, 514 U.S. at 944 (internal quotations marks and alterations omitted); *accord Rent-A-Ctr.*, 561 U.S. at 69 n.1.

Aqua contends that the parties clearly and unmistakably agreed to delegate questions of arbitrability to the arbitrators by agreeing to amend the Agreement to provide for arbitration under the JAMS Comprehensive Arbitration Rules & Procedures (the "JAMS Rules"). *See* Mot. at 10-11. Rule 11(b) of the JAMS Rules provides in relevant part:

Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

JAMS Rules § 11(b) (effective July 1, 2014) (RJN Ex. 3, Dkt. No. 30-5).[3]

Viewed in a vacuum, the incorporation of the JAMS Rules might be sufficient to establish a clear and unmistakable delegation. Viewed holistically, however, the Agreement is ambiguous on this point. The Agreement's severability provision states that "[i]f any part of this Agreement shall be declared invalid or unenforceable *by a court of competent jurisdiction*, it shall not affect the validity of the balance of this Agreement." Agreement ¶ 16.7 (emphasis added). The parties do not dispute that by referring to "any part of this Agreement," the severability provision extends to the Agreement's arbitration provision.

**\*8** A number of courts have held that contracts including similar evidence of delegation, as well as similarly worded severability provisions, fail to evince a clear and unmistakable agreement to delegate questions of arbitrability to the arbitrator. *See Vargas v. Delivery Outsourcing, LLC*, No. 15-cv-03408-JST, 2016 WL 946112, at *6-7 (N.D. Cal. Mar. 14, 2016) ("[D]espite clear language delegating arbitrability to the arbitrator, the issue of delegation is made ambiguous by the language of the arbitration provision that permits modification of the [Agreement] should 'a court of law or equity' hold any provision of the Agreement unenforceable."); *Parada v. Superior Court*, 176 Cal. App. 4th 1554, 1565-66 (2009) (finding no clear and unmistakable delegation where the contract included a severability provision applicable "[i]n the event that any provision of this Agreement shall be determined *by a trier of fact of competent jurisdiction* to be unenforceable;" reasoning that this language suggested that "the trial court also may find a provision, including the arbitration provision, unenforceable"); *Baker v. Osborne Dev. Corp.*, 159 Cal. App. 4th 884, 891, 893-94 (2008) (finding no clear and mistakable delegation where the contract included a severability provision applicable if "any provision of this arbitration agreement shall be determined by the arbitrator or by any court to be unenforceable;" reasoning that "although one provision of the arbitration agreement stated that issues of enforceability or voidability were to be decided by the

2016 WL 1365946

arbitrator, [the severability] provision indicated that the court might find a provision unenforceable") (emphasis omitted); *see also Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185, 1198 (N.D. Cal. 2015).

These courts have reasoned that, "[a]s a general matter, where one contractual provision indicates that the enforceability of an arbitration provision is to be decided by the arbitrator, but another provision indicates that the court might also find provisions in the contract unenforceable, there is no clear and unmistakable delegation of authority to the arbitrator." *Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 792 (2012); *see also Mohamed*, 109 F. Supp. 3d at 1202 ("[I]t is reasonable to assume that the typical Uber drivermight read this severability language to provide further evidence that Uber intended any determination as to whether 'any provision of this Agreement is invalid or unenforceable' to be made in court, and not arbitration.") (internal footnotes and emphasis omitted).

In line with these cases, I find that the parties did not clearly and unmistakably agree to delegate questions of arbitrability to the arbitrators.

This resolves the question of who decides the nonsignatory standing issue, as that particular issue is not arbitrable absent a clear and unmistakable delegation of it to the arbitrator. *See Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1127 (9th Cir. 2013) (holding that "the district court had authority to decide whether Toyota, a nonsignatory to the [agreements], can compel plaintiffs to arbitrate," where there was no "clear and unmistakable evidence that plaintiffs and Toyota agreed to arbitrate arbitrability").

On the other hand, I find that the waiver issue is not actually a gateway question of arbitrability and is thus properly resolved by the arbitrator even in the absence of clear and unmistakable evidence of an agreement to delegate it. "[C]ontract-based challenges to the validity of arbitration agreements come in two types: one type challenges specifically the validity of the agreement to arbitrate and the other challenges the contract as a whole." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (internal quotation marks and alterations omitted). While a court presumptively determines the validity of an arbitration clause where the challenge is "specifically to the validity of the agreement to arbitrate," where the challenge is "that [the] contract as a whole is unenforceable, the arbitrator decides the validity of the contract, including derivatively the validity of its constituent provisions (such

as the arbitration clause)." *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1000 (9th Cir. 2010) (internal quotation marks and alterations omitted). In other words, it is only when "the crux of [the] complaint is a challenge to the arbitration provision itself," and that challenge to the arbitration provision does not "threate[n] to invalidate or otherwise directly affect the entire contract," that the question is presumptively decided by the court. *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1271 (9th Cir. 2006); *see also Bridge Fund*, 622 F.3d at 1000 ("When a plaintiff argues that an arbitration clause, standing alone, is unenforceable – *for reasons independent of any reasons the remainder of the contract might be invalid* – that is a question to be decided by the court.") (emphasis added).

**\*9** The waiver challenge raised by Levi is not independent of any reasons the remainder of the Agreement might be invalid; it directly affects the entire Agreement. In contrast with cases like *Cox*, 533 F.3d 1114, in which the waiver challenge is based on a party's conduct with respect to the specific right to arbitrate under the contract at issue, *see id.* at 1124-26, Levi's waiver challenge is based on Aqua's general delay in seeking to enforce its purported rights under the Agreement and on the Notice of Default Aqua sent Levi in 2006, *see* FAC ¶¶ 24-30, 53-58. This conduct goes as much to Aqua's ability to enforce the Agreement at all as to its ability to enforce the Agreement's arbitration provision in particular. Indeed, the portion of the FAC setting out the facts regarding the waiver challenge is titled, "Waiver/Statute of Limitations," and Levi's counsel conceded at oral argument that Levi's waiver challenge overlaps with the statute of limitations defense Levi states it will assert if Aqua brings a breach of contract claim in this action. *See* FAC ¶¶ 24, 41. Levi's waiver challenge is properly decided by the arbitrator, not this Court.

Nevertheless, because the nonsignatory standing issue is properly resolved here, Aqua's request that I dismiss or stay this case pending the JAMS arbitration is DENIED, at least for the time being.[4]

## CONCLUSION

For the foregoing reasons, Aqua's motion is DENIED. Unless the parties agree otherwise, they shall have 60 days from the date of this Order to conduct discovery on the nonsignatory standing issue, and Aqua shall file any motion to compel arbitration no more than 15 days thereafter. The

**Levi Strauss & Co. v. Aqua Dynamics Systems, Inc., Not Reported in Fed. Supp. (2016)**

2016 WL 1365946

Case Management Conference set for May 10, 2016 is CONTINUED until September 6, 2016.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1365946

Footnotes

1   The amendment to the arbitration provision was executed on August 17, 2015 by Aqua and Levi. FAC Ex. C. The amendment defines the "Parties" as Aqua and Levi. *Id.*

2   On February 10, 2016, Aqua voluntarily dismissed the New York action, stating that "no federal question...or diversity of citizenship now exists between the parties." McFarlane Decl. Ex. 1 (Dkt. No. 34-1).

3   Aqua's request for judicial notice, Dkt. No. 30-1, is GRANTED.

4   I do not address Levi's other arguments for denying Aqua's motion to dismiss or stay the case pending the JAMS arbitration.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

126 N.W.2d 663, 141 U.S.P.Q. 45

176 Neb. 513
Supreme Court of Nebraska.

Richard L. McLEOD and

Lottie M. McLeod, Appellees,

v.

H. R. CRAWFORD and Violet

M. Crawford, Appellants.

No. 35515.
|
March 6, 1964.

**Synopsis**

Action for breach of territorial agreements as to use of 'Dairy Queen' soft ice cream trademark and soft ice cream machine used in connection therewith. The District Court, York County, Kokjer, J., entered judgment for the plaintiff, and the defendants appealed. The Supreme Court, White, C. J., held that parties who contracted prior to 1954 with licensee of patented freezer machine and trade name used in connection with vending of soft ice cream for territorial rights to use machine and trade name, who had actual or constructive notice of 1954 expiration of patent on machine used in connection with trade name, and who thereafter received benefits under contract for over seven years after patent expiration date were estopped from asserting invalidity of contract on ground that it licensed use of patent beyond 17 year period of patent monopoly.

Judgment affirmed.

West Headnotes (9)

[1] **Trademarks** 🔑 Change in subject matter underlying mark

Right to exclusive use of trademark or trade name continues in trademark owner despite expiration of patent on machine required to be used in connection with trademark or trade name.

[2] **Contracts** 🔑 Presumptions and burden of proof

It is assumed that parties to contract know best what is meant by its terms and that whatever is done by parties during period of performance is done as they intended it should be.

3 Cases that cite this headnote

[3] **Contracts** 🔑 Construction by Parties

Interpretation given contract by parties themselves, while engaged in performance of it, is one of best indications of their true intent and should be given great, if not controlling, influence, and courts ordinarily should enforce such construction.

5 Cases that cite this headnote

[4] **Contracts** 🔑 Waiver of Breach

Generally, assertion of invalidity of contract is nullified by subsequent acceptance of benefits growing out of contract claimed to have been breached.

3 Cases that cite this headnote

[5] **Patents** 🔑 When liability for royalty ceases

Generally, parties to patent licensing agreement may contract for payment of royalties beyond expiration of patent, unless contract constitutes device to evade patent laws or violation of principle of combinations in restraint of trade.

1 Case that cites this headnote

[6] **Patents** 🔑 Rights and Remedies of Contractor

Parties who contracted prior to 1954 with licensee of patented freezer machine and trade name used in connection with vending of soft ice cream for territorial rights to use machine and trade name, who had actual or constructive notice of 1954 expiration of patent on machine used in connection with trade name, and who thereafter received benefits under contract for over seven years after patent expiration date were estopped from asserting invalidity of contract on ground that it licensed use of patent beyond 17 year period of patent monopoly.

126 N.W.2d 663, 141 U.S.P.Q. 45

1 Case that cites this headnote

**[7]    Trademarks** 🔑 Control over use or quality; "naked" licenses

Trademark licensor has not only right, but duty, to control circumstances under which name is used.

**[8]    Trademarks** 🔑 Control over use or quality; "naked" licenses

Preservation of unique value of trademark and retention of enjoyments of it require trademark owner to include controls over nature, quality, type of machines, and method of production of finished product associated with trade name.

**[9]    Contracts** 🔑 Nature and Form of Remedy

Provision in contract giving party right to terminate for failure of other party to make required payments under contract is not exclusive remedy.

2 Cases that cite this headnote

**664** *Syllabus by the Court*

**513** 1. The right to the exclusive use of a trademark or a trade name continues in a trademark owner despite expiration of the patent required to be used in connection with the trademark or trade name.

2. It is assumed that parties to a contract know best what was meant by its terms and that whatever is done by the parties during the period of performance is done as they intended it should be.

3. The interpretation given contracts by the parties themselves, while engaged in their performance of it, is one of the best indications of their true intent and should be given great, if not controlling, influence and the courts ordinarily should enforce such construction.

4. Generally, the assertion of the invalidity of a contract is nullified by the subsequent acceptance of benefits growing out of the contract claimed to have been breached.

5. Generally, parties to a patent licensing agreement may contract for the payment of royalties beyond the expiration of the patent, unless such contract, under the circumstances, constitutes a device to evade the patent laws or a violation of the principle of combinations in restraint of trade.

6. A trademark licensor has not only the right, but the duty to control the circumstances under which the name is used.

7. Preservation of the unique value of a trademark and the retention of the enjoyments of it require a trademark owner to include controls over the nature, quality, type of machines, and the method of production of the finished product associated with the trade name.

8. A provision in a contract giving a party the right to terminate for failure of the other party to make required payments under the contract is not an exclusive remedy.

9. Generally, contract disclosure of a patent expiration date, which is of public record, is not required.

**Attorneys and Law Firms**

Ray L. Svehla, York, Miles N. Lee, C. L. Robinson, Broken Bow, for appellants.

**514** Robert L. Jeffrey, Richard L. Goos, Lincoln, for appellees.

Heard before WHITE, C. J., and CARTER, MESSMORE, SPENCER, BOSLAUGH, and BROWER, JJ., and LYNCH, District Judge.

**Opinion**

WHITE, Chief Justice.

This is an action for breach of contract growing out of three territorial agreements in the State of Nebraska between the plaintiffs, McLeods, and the defendants, Crawfords, as to the use of the 'Dairy Queen' soft ice cream trademark and the soft ice cream machine used in connection therewith, being described herein as Patent No. 2080971. The questions presented in this case arise out of the defendants' claim that the territorial contracts entered into were illegal, being a 'patent

McLeod v. Crawford, 176 Neb. 513 (1964)

126 N.W.2d 663, 141 U.S.P.Q. 45

misuse' because they were agreements against public policy in extending the patent monopoly beyond the expiration date of the patent. These contracts gave the use of the Nebraska trademark 'Dairy Queen' and the use of the machine to the defendants. The defendants agreed to operate 'Dairy Queen' stores and to make payments to the plaintiffs according to the number of gallons of soft ice cream mix used and sold in the 'Dairy Queen' stores. The amounts actually used were stipulated and agreed to so no question arises in this respect. The district court rejected the defense of illegality, held the contracts enforceable to the extent of the actual use by the defendants of the trademark **665 and the machines in the territories contracted for, and entered judgment for the plaintiffs in the sum of $18,357.30, interest, and costs. Defendants' counterclaim for payments that had been made on the contracts was also dismissed. The defendants appeal.

The material facts as to the issues presented are not essentially in dispute. On June 24, 1950, June 4, 1951, and March 3, 1953, the parties executed agreements covering the respective territories of Harlan and Hamilton, Saline, and York Counties. From these almost identical contracts, we extract the pertinent recitals and **515 provisions with respect to the issues presented. They are:

1. The plaintiffs have purchased from McCulloughs Dairy Queen of Geneseo, Illinois, the right to use the registered Nebraska trademark 'Dairy Queen' and the right to use the freezing and dispensing machine connected therewith, being Patent No. 2080971. The right to the use of the machine was acquired by McCulloughs Dairy Queen from the patent owner, Ar-Tik Systems, Inc., Miami, Florida.

2. For the right to use the trade name 'Dairy Queen' and the dispensing machines, the defendants agree to pay a cash sum (about which there is no controversy), and 'the sum of sixteen (16¢) cents on each and every gallon of mix used, or sold within said territory, *hereinafter.*' (Emphasis supplied.) The second and third contracts for Saline and York Counties provided for 26¢ and 23¢ per gallon of mix, respectively.

3. The defendants, Crawfords, agree to keep records of the amount of mix used, and the Crawfords have the right to subcontract their rights, which they did, with the consent of the plaintiffs, McLeods.

4. The defendants, Crawfords, agree not to sell any other frozen or semifrozen dairy product, nor to use any other type of dispensing machine without obtaining the consent of the McLeods.

5. The Crawfords agree to maintain standards as to quality of mix, dress, and uniform by the 'Dairy Queen' store operators, and agree as to when the first store will be in operation and when the first freezer will be purchased.

6. On failure to make the required payments for mix used, plaintiffs may terminate the contract 30 days' notice.

7. The plaintiffs, McLeods, agree to pay the patent owner, Ar-Tik Systems, Inc., 4¢ per gallon of mix used. The defendants assume no obligation in this respect.

 *516  The record reveals the following facts as to the contracts and their performance:

1. Patent No. 2080971 (the dispensing machine), in full force and effect at the time of the execution of the contracts, expired May 18, 1954.

2. The defendants, Crawfords, opened 'Dairy Queen' stores, bought and used the dispensing machines, and operated 'Dairy Queen' stores in the territories contracted for through the year 1961. The petition in this case was filed January 2, 1959.

3. Crawfords paid the mix 'royalty' or gallonage fee until about November 1957, and have not paid since, although operating 'Dairy Queen' stores using the trademark and the dispensing machine in connection therewith through the year 1961.

4. No fixed time is specified in the contracts. The obligation of the Crawfords is measured by how long and how much of the mix is used and sold 'hereinafter.' There is no obligation to use in point of time or amount, only to pay on the contingency of voluntary use of the trademark and machine.

5. The plaintiffs, McLeods, neither guarantee the validity of the patent, nor do they have a right to terminate the contract at any time, except for nonpayment of the mix fee on mix actually used.

6. No dispute exists as to how long the stores were operated, the use of the trademark **666 'Dairy Queen,' the use of the machine, or the amount of mix used. The amounts were stipulated to, showing amounts used under the terms of the contract including and through the year 1961.

As mentioned before, the court found the contracts enforceable, and entered judgment for the mix fee due under their terms in the sum of $18,357.30.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

126 N.W.2d 663, 141 U.S.P.Q. 45

The defendants cite numerous propositions of law and list many assignments of error. They all flow from, or boil down to, one fundamental contention that the contracts were illegal and unenforceable because they **\*517** licensed or contracted for the use of Patent No. 2080971 beyond the 17-year period of the patent monopoly granted by the United States. The patent expired May 18, 1954, several years after the first contract was executed and a little over a year after the last one of March 3, 1953. They argue that the contracts required payments beyond the patent expiration date and were therefore illegal and against public policy; and then they proceed to consecutively argue failure of substantial performance, their innocence as to the claimed illegality, their right to use the trademark and machines free of the mix charge, and their affirmative right to recover all back payments made under the contract. This contention is based primarily on the doctrine of patent misuse and illegality set out in Ar-Tik Systems, Inc. v. Dairy Queen, Inc. (3 Cir.), 302 F.2d 496, and the cases cited therein supporting it. Scott Paper Co. v. Marcalus Mfg. Co., Inc., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47; American Securit Co. v. Shatterproof Glass Corp. (3 Cir.), 268 F.2d 769; and on the effect of illegality, United States Gypsum Co. v. National Gypsum Co., 352 U.S. 457, 77 S.Ct. 490, 1 L.Ed.2d 465.

Substantially similar, if not identical, 'Dairy Queen' franchise contracts have been construed as to aspects of these same issues in Ar-Tik Systems, Inc. v. McCullough (D.C.), 133 F.Supp. 807; Medd v. Boyd Wagner, Inc. (D.C.), 132 F.Supp. 399; Temperato v. LaBrot (Mo.App.), 358 S.W.2d 106; Capital Dairy Queen v. McCullough's Dairy Queen, 125 U.S.P.Q. 540, and the federal district court decision in Ar-Tik Systems, Inc. v. Dairy Queen, Inc., supra.

All of the 'Dairy Queen' cases cited above have found it necessary, as we do, to review the history of the development of the 'Dairy Queen' trademark and the tie-in with the use of the soft ice cream machine. A case very aptly reviewing this development and history, and meeting the same issues we have before us here, is Medd v. Boyd Wagner, Inc., supra. There, the McCulloughs **\*518** had granted franchise rights to the plaintiffs, the same as they had to the plaintiffs here who, in turn, under contracts similar to the ones here, had subcontracted to parties in the same status as the defendants, Crawfords, here who were in turn granted the right to subcontract.

The defense was the same as here, based on the expiration date of Patent No. 2080971 on May 18, 1954. The court

stated the issues as follows: 'From all of the foregoing, we take it, therefore, that defendants, first, deny ownership of the trade name in plaintiffs and, second, contend that, with the *expiration of the patent*, plaintiffs lost all right to the exclusive use of the trade name 'Dairy Queen'. * * * The foregoing contentions designated A, B, C, D and E, which are set forth in defendants' brief, when grouped together, seem to contest the right of plaintiffs in the name and *conclude that somehow*, after the expiration of the patent, property in the name became lodged in the defendants.' (Emphasis supplied.)

The court reviewed the history of the same trademark 'Dairy Queen' that we are dealing with here as follows: 'McCullough opened the first 'Dairy Queen' store in the year 1939 and thereafter, until the close of the year 1946, he opened and operated some twenty-one stores dispensing ice milk and operating under the trade name 'Dairy Queen'. These stores were located in the **\*\*667** States of Iowa and Illinois. Therefore, at the time that he acquired the patent license from Ar-Tik in 1946, *he had already established a trade name at least in the States of Iowa and Illinois*. He had a right, by license, to introduce his trade name and create a demand for his variety of goods in a new territory by licenses. E. F. Prichard Co. v. Consumers Brewing Co., supra. The fact that he licensed the use of the name in connection with a license of the patent right renders his position much stronger. He was not entering into a mere naked license agreement. See **\*519** E. I. Du Pont De Nemours & Co. v. Celanese Corporation of America, 167 F.2d 484, 35 C.C.P.A., Patents, 1061, 3 A.L.R.2d 1213. * * * When McCullough licensed plaintiffs to the use of the patent and the trade name in the State of Ohio in December of 1946, he had established the trade name 'Dairy Queen' as being distinctive of a style and mode of operation in the sale of an ice milk product. *Plaintiffs, by virtue of their license agreement, set out immediately to extend their business, to exploit the patent and the trade name in the State of Ohio by way of sub-licenses to district operators*. Some twenty-two such sub-licenses were issued to district operators in the State of Ohio before the district operator's license was extended to Boyd Wagner, Incorporated, and during this time plaintiffs themselves operated some four or five stores in the State of Iowa. In less than eight years, from January of 1947 to May 18, 1954, plaintiffs and their licensors, McCulloughs, extended the business, *not only throughout the States of Ohio, Illinois and Iowa, but into most of the States of the Union, until the 'Dairy Queen' enterprise numbered last year some 2,600 retail stores scattered throughout the county, 200 of which were in the State of Ohio*.' (Emphasis supplied.)

McLeod v. Crawford, 176 Neb. 513 (1964)
126 N.W.2d 663, 141 U.S.P.Q. 45

Then, going to the stated issue in the case, the court said: 'We believe, from all of this, that plaintiffs were offering more than a naked license to these store operators. Through their district operator, they were offering an established name that had property value of great worth from which they should not be divested without their consent. * * * We are here confronted with a situation where the defendants knowingly entered into a license agreement to use the trade name and the trade phrase and paid compensation therefor over a period of years. *We believe that they are precluded from taking possession of the trade name and the trade phrase without compensation therefor and without the consent of the rightful owners.*' (Emphasis supplied.)

[1] This case also meets head-on the basic contention of patent monopoly, misuse, and illegality strenuously asserted **\*520** by the defendants here. The court said: 'We turn now to the second named defense, to wit, that, with the expiration of the patent on the freezer machine, plaintiffs' rights to the exclusive use of the trade name 'Dairy Queen' and the trade phrase 'The Cone with the Curl on Top' ceased to exist. * * * Defendants, in advancing the second defense, place reliance chiefly on Singer Manufacturing Co. v. June Manufacturing Co., 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118; Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73; Scott Paper Co. v. Marcalus Manufacturing Co., Inc., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47; and Checker Cab Mfg. Corporation v. Green Cab Co., 6 Cir., 35 F.2d 631. * * * The above cases are not convincing and are not determinative of the issue raised here by the defendants. We are convinced, from the evidence, that the trade name 'Dairy Queen' and the trade phrase 'The Cone with the Curl on Top' are not associated in the public mind with the patented freezer machine, and that no attempt was made to so associate them; and there is not here an attempt to extend the life of the patent by use of the trade name and the trade phrase. * * * *the right to the exclusive use of the trade name continues in the patentee despite expiration of the patent.* Telechron, Inc. v. Telicon Corp., 3 Cir., 198 F.2d 903; **\*668** Ironite Co. v. Cement Waterproofing & Ironite Co., D. C., 20 F.Supp. 603; Prest-O-Lite v. Davis, 6 Cir., 215 F. 349. * * * If an accounting of all gains and profits made by defendants by reason of the acts complained of and damages that may have been suffered by plaintiffs are claimed, then that matter may be pursued in due time.' (Emphasis supplied.)

But, we need not look solely to the construction placed on this trademark and the contract as construed by the Medd case,

supra. We are aided by the conduct of the defendants and the interpretation they *placed on these* contracts themselves.

[2] [3] [4] It is to be assumed that parties to a contract *know best what was meant* by its terms, and that whatever **\*521** is done by the parties *during the period of performance is done as they intended it should be.* The interpretation given a contract, by the parties themselves while engaged in their performance of it, is one of the best indications of *their true intent,* should be given great, if not controlling influence, and the courts ordinarily should enforce such construction. Dunn v. Mutual Ben. Health & Acc. Assn., 135 Neb. 506, 282 N.W. 487; 12 Am.Jur., Contracts, s. 249, p. 787; C.W. Hull Co. v. Westerfield, 107 Neb. 705, 186 N.W. 992, 29 A.L.R. 105; 4 Neb. Law Bulletin 149; Ord Hardware Co. v. J. I. Case Threshing Machine Co., 83 Neb. 353, 119 N.W. 682. Correlated to and following this basic principle is the rule that the assertion of the invalidity of a contract is nullified by the subsequent *acceptance of benefits growing out of the contract* claimed to have been breached. Wegner v. West, 169 Neb. 546, 100 N.W.2d 542; Einot, Inc. v. Einot Sales Co., Inc., 154 Neb. 760, 49 N.W.2d 625; Dakota County v. Central Bridge & Constr. Co., 136 Neb. 118, 285 N.W. 309.

The defendants, Crawfords, were already operating ice cream and frozen food stores, and desired to acquire and operate 'Dairy Queen' stores. They wanted the trade name and the use of the machine that was tied in with it. The McLeods could not grant this, nor could the defendants secure what they wanted unless they got the right to use the machine, McCulloughs controlling both the trademark and the use of the machine down through the line of contractees. McCulloughs, *not the patent owner,* required the use of the machine. The contracts entered into were the only way the parties could put their scheme of operation into effect *at the time of the original contracts.* If we assume, as defendants argue, that both parties were free to use the machine on May 18, 1954, the defendants could have abandoned the machines and the trade name and ceased operating 'Dairy Queen' stores. Or, they could have attempted to purchase the machine independently for **\*522** some other type of operation. This latter they did not and could not do because the trademark owner required that 'Dairy Queen' trademark and the machine go together. This, both the McCulloughs and the McLeods, the trademark owners, had a right to do whether the machine or product was patented or not. So, being free to choose their own course of action at all times, what did the defendants actually do? They fixed their own obligation under the contracts by their own voluntary performance. They operated the stores, used the required machine in connection therewith, and performed

and received the benefits of the contract through the year 1961, over 7 years after the patent expiration. The defendant, H. R. Crawford, testified that the first time he became concerned about the patent was approximately January 10, 1958. There is no evidence in this case that the expiration of the patent affected the defendants' business in any way. The increase in the amount of mix sold would indicate the opposite. The plaintiffs did not agree to guarantee or to bear the risks of the competitive use of the machine by others. And, there is no evidence that when the patent expired that the machines were used at all in defendants' territories, much less any evidence as to damage from competitive use. The defendants own continued performance demonstrates that they realized that the required tie-in of the trademark **669 with the machine actually protected them from the imaginary competitive assault that they now, on hindsight, complain could have existed. It not only protected them, but the defendants' voluntary performance prevented the plaintiffs from contracting the use of the trademark to other parties. It is clear, therefore, that the defendants voluntarily took advantage of a trademark business scheme with the incidental right and duty to use a particular type of machine. The plaintiffs performed everything necessary for the defendants' actual use and enjoyment of the benefits growing out of the contracts.

**\*523** This retroactive attack on the expiration date of the patent amounts to no more than a claim that someone other than the defendants could have used the machine after May 18, 1954. There is no evidence that anyone did. To sum it up, the conduct of the defendants, their acceptance of benefits, and their continued use demonstrate conclusively that they themselves interpreted the contracts squarely consistent with the interpretation and the reasons therefor set out in Medd v. Boyd Wagner, Inc., supra; Ar-Tik Systems, Inc. v. McCullough, supra; Capital Dairy Queen, Inc. v. McCullough's Dairy Queen, supra; Estate of Gowdey v. Commissioner of Internal Revenue (4 Cir.), 307 F.2d 816.

Defendants, nevertheless, strenuously urge Ar-Tik Systems, Inc. v. Dairy Queen, Inc., supra, asserting it is the latest (March 1962, 3rd Circuit) and highest federal decision. We note that it was a three-judge decision with one judge dissenting, who agreed with the lower court decision and the holding in Medd v. Boyd Wagner, Inc., supra.

In Ar-Tik Systems, Inc. v. Dairy Queen, Inc., supra, relied upon by the defendants, the patent owner, *not the franchise grantor*, sued a subcontractee of McCulloughs, the same as the McLeods here, for the 4¢ per gallon mix fee or 'royalty'

due it on mix used after the expiration date of the patent, May 18, 1954. This follows the contract provision requiring, as the McLeods were here, that each franchise grantor pay that amount direct to the patent owner for the use of the machine. The suit was brought as a third party beneficiary and against a franchise grantor, the same as the McLeods were here. In none of these franchise contracts are the 'Dairy Queen' store operators required to pay this; it is a liability imposed on the franchise grantor. The court held that the 4¢ payment to Ar-Tik Systems was a severable consideration in the contract, and as such condemned as illegal relying on Scott Paper Co. v. Marcalus Mfg. Co., Inc., supra. Said the court, one judge **\*524** dissenting: 'As stated heretofore *a separate consideration is set forth in paragraph 4 of the agreement of October 18, 1949, supra, for this right. The obligation to pay the four cent royalty is found in paragraph 3 of the said agreement and is solely for the use of the patented machines*. After the expiration of Patent No. 2080971 on May 18, 1954, the grant of patent monopoly was spent. An attempt to extend that monopoly by the exaction of royalties thereafter was unenforceable. Such action clearly appears to be interdicted by Scott Paper Co. v. Marcalus Co., supra, and American Securit Co. v. Shatterproof Glass Corp., supra.' (Emphasis supplied.)

The majority opinion in the above case marked the clear difference between that case, the Medd case, supra, and the present case before us. It said: 'The marked distinction between that case (Medd v. Boyd Wagner, Inc., supra) and this is that it revolved completely around the ownership of the trade name and trade phrase. Ar-Tik did not appear in the suit and the issue of the payment to it of royalties on the freezer was not raised.'

In further distinguishing the two cases, the majority opinion said: 'There is no evidence in this case to support any claim that Ar-Tik was vested with any ownership or interest in the trade name Dairy Queen, in Pennsylvania. The name was created by McCullough and has been exploited in **670 Pennsylvania by the defendant, Dairy Queen, Inc., under the title it acquired stemming originally from McCullough. Ar-Tik's royalty as contracted for by the McCulloughs and their assigns down to the defendant was solely for the use of its patent. * * * The continued payments by defendant (here the defendants, Crawfords) to its assignors and the McCulloughs (here the plaintiffs, McLeods) under its obligations to them *only indicates the recognition of its duty to pay for the right to develope the described territory* **\*525** *for its operation of Dairy Queen stores.*' (Emphasis supplied.)

It seems to us that this case is authority for the holding that the patent holder may not collect royalties beyond the expiration date, but that a licensee may couple a valid trademark with the required use of a specific machine, patented or not, and enforce such an agreement. No case has been cited holding the 'Dairy Queen' trademark franchise contracts invalid. The validity of the 'Dairy Queen' agreements has been upheld in Medd v. Boyd Wagner, Inc., supra; Ar-Tik Systems, Inc. v. McCullough, supra; Temperato v. LaBrot, supra; Capital Dairy Queen v. McCullough's Dairy Queen, supra; and the quoted portions of Ar-Tik Systems, Inc. v. Dairy Queen, Inc., supra.

Beyond this, the restricted holding in Ar-Tik Systems, Inc. v. Dairy Queen, Inc., supra, of illegality as to collection by the patent owner beyond patent term, seems to be contrary to authority and the best reasoning, and has already been refused acceptance by the courts. In that case, the court noted that the general rule seemed to be to the contrary and cited to this effect: Walker, Patents, p. 456 (1961 Supp. to Vol. II Deller's ed.); Ellis Patent Licenses, s. 109, p. 128 (3rd ed. Deller, 1958) and 69 C.J.S. Patents § 262, p. 802. The court then proceeded to analyze the cases supporting the rule and, resting its decision on Scott Paper Co. v. Marcalus Mfg. Co., supra, and American Securit Co. v. Shatterproof Glass Corp., supra, reached an opposite conclusion and, therefore, held Ar-Tik's severable 4¢ royalty illegal.

[5]  This issue, including the validity of the holding in Ar-Tik Systems, Inc. v. Dairy Queen, Inc., supra, has been met in a very recent (June 1963, Washington) case, Thys Company v. Brulotte, 382 P.2d 271. In that case, the contract was direct with the patent holder, no tieing-in with a trademark franchise was involved, and it was for a fixed term extending beyond the expiration date of the patent. The court held: 'The next contention is  *526  that the contracts were unenforcible because they licensed the use of patents beyond the 17-year period of monopoly granted by the sovereign. * * * The great weight of authority, as well as the stronger reasoning, is that parties to a licensing agreement may contract for the payment of royalties beyond the expiration of the patent, although, in the absence of such an agreement, a license contract expires when the licensed patent expires. Among the authorities so holding are E. R. Squibb & Sons v. Chemical Foundation, Inc., 2 Cir., 93 F.2d 475; Starke v. Manufacturers Nat. Bank of Detroit, D.C., 174 F.Supp. 882; Tate v. Lewis, D.C., 127 F.Supp. 105; H-P-M Development Corp. v. Watson-Stillman Co., D.C., 71 F.Supp. 906; and Six Star Lubricants Co. v. Morehouse, 101 Colo. 491, 74 P.2d 1239. * * * We are aware of a recent contrary decision in Ar-Tik Systems, Inc. v.

Dairy Queen, Inc., 302 F.2d 496 (C.A.3d 1962). In that case the payment of royalties was required throughout the life of the machines sold. This was held to be a misuse of patents. We may assume that the agreement was enough like those involved in this case to make the rule applicable. We find the reasoning of the earlier cases more appealing, however, and we are not obliged to follow decisions of lower federal courts.' (Emphasis supplied.)

At the risk of belaboring the point, the Thys case, supra, and Medd v. Boyd Wagner, Inc., supra, analyze the supporting **671  cases of Scott Paper Co. v. Marcalus Mfg. Co., Inc., supra, and American Securit Co. v. Shatterproof Glass Corp., supra, which are the basis of the Ar-Tik Systems, Inc. v. Dairy Queen, Inc., supra, holding. We shall not extend this opinion by an analysis of these holdings. They all involve the attempt to recreate a patent monopoly on completely expired patents, or an attempt to tie in a group of patents in violation of the principle of combinations in restraint of trade. The distinction between legitimate 'tie-ins,' such as a trademark with products of machines, and a device to evade  *527  the rules against combinations in restraint of trade or monopoly, is pointed out in Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312; Susser v. Carvel Corp. (D.C.), 206 F.Supp. 636; Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc. (D.C.), 178 F.Supp. 655; Morse-Starrett Products Co. v. Steccone (D.C.), 86 F.Supp. 796; Brosious v. Pepsi-Cola Co. (3 Cir.), 155 F.2d 99.

[6]  We point out in this case that there was a valid trademark and live patent when the parties entered into the contracts; that the exact patent by number was disclosed to defendants and recited in the contracts; and that there was no obligation for the defendants to use the condemned 'tie in' agreement for any period of time and certainly not beyond May 18, 1954. We point out that defendants' obligation to pay the mix fee was coextensive with their voluntary decision to enjoy the benefits of the contracts. It terminated when the defendants decided not to enjoy the benefits accruing thereunder. The defendants either had actual or constructive notice of the expiration date of May 18, 1954, it was disclosed, published of record, and ascertainable by them at any time. No cases are cited requiring contract disclosure of a patent expiration date which is of public record and required to be so. See, 40 Am.Jur., Patents, s. 9, p. 537; Sontag Chain Stores Co. v. National Nut Co., 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204. The defendants received the benefits for over 7 years after the patent expiration date. Moreover, they were given the right to subcontract, which they did, and there is no evidence of any

nature whatsoever that they were injured by any competitive use of the machines or the trademark. *Plaintiffs were thus, in effect, effectively prevented from contracting the trademark franchise to others because of the conduct of the defendants in continuing the performance of the contracts and the use of the trademark.* **\*528** Under these circumstances, defendants are estopped to set up the invalidity of these contracts. Medd v. Boyd Wagner, Inc., supra; E. F. Prichard Co. v. Consumers Brewing Co. (6 Cir.), 136 F.2d 512; Smith v. Dental Products Co., Inc. (7 Cir.), 140 F.2d 140.


We point out further that plaintiffs' claim is not the product of a veiled technique to create a patent monopoly case in the form of a 'tie-in' agreement to extend its date. Plaintiffs forced defendants to do nothing in relation to the patent. After May 18, 1954, they were free to use the machine alone, and freed of the patent restriction. What they were forbidden to do was to use the machine in a 'Dairy Queen' store, unless they paid a mix fee on whatever amount they voluntarily used. That the plaintiffs had the right to require certain products or machines, patented or unpatented, as a condition of the use of the trademark, cannot be questioned. It may be that the fact the patent didn't expire until May 18, 1954, was an inducing incentive for them to enter into the contracts. But, it becomes no more than just that. The defendants could be relieved at any time by voluntary nonuse. The undisputed testimony as to the large amount of mix sold, the continued operation of the stores, and the use of the name 'Dairy Queen' for many years after May 18, 1954, refute completely any claim of damage. Turning the situation around, the defendants would have us believe that they had a right to buy and use the machines, use the trademark name, operate the stores, and be completely **\*\*672** free of their voluntarily assumed obligation under the contracts. All this because the patent on the machine required to be used with the trademark expired as a matter of public record on May 18, 1954. Such a position is untenable.

 **[7]**   **[8]**   As an addendum to their basic argument as to patent misuse and illegality, defendants argue that the contracts were void and illegal because of the restrictions placed in the contracts on the use of the machines. The patent license cases cited are not in point. A trademark licensor has not only the right, but the duty, to control the circumstances under which the name is used. **\*529** Capital Dairy Queen v. McCullough's Dairy Queen, supra; Brosious v. Pepsi-Cola Co., supra. As we have pointed out, the plaintiffs in addition to controls over the quality of the mix and uniforms of operators, could control the type of freezers to be used in the stores in connection with the trademark, even if there had been no patent on the freezers at any time. The fact that

they had the exclusive rights to the patent at the time they made the agreements is entirely incidental. The 'Dairy Queen' restrictive agreements on the defendants' use of the machines have been attacked in several cases, and have been held valid, substantially on the same grounds as given herein. See, Engbrecht v. Dairy Queen Co. of Mexico, Missouri (D.C.), 203 F.Supp. 714, Moberg v. Baker, 217 Or. 551, 307 P.2d 759, 342 P.2d 828; Medd v. Boyd Wagner, Inc., supra; Susser v. Carvel Corp., supra. Preservation of the unique value of the trademark and the retention of the enjoyments of it require a trademark owner to include controls over the nature, quality, and the method of production of the finished product associated with the trade name. Morse-Starrett Products Co. v. Steccone, supra; Brosious v. Pepsi-Cola Co., supra.


Defendants further plead fraud and yet in their brief abandon this defense. They further argue that illegality taints the whole contracts and yet they are severable as far as defendants are concerned, giving them as innocent parties a right to recover back payments made. This, in effect, would amount to a right to collect a forfeiture, based on the contention of illegality. What we have said on the basic issues in the case eliminates these assertions from further consideration.

 **[9]**   Defendants, in a many cited and shifting defense, further argue that when the defendants ceased payments after 1957, they therefore terminated the contracts and are not liable for mix used in the operation of the stores after that date. This, they argue, is true because of paragraph 11 of the contracts which provides that if they cease to make payments, the plaintiffs may notify the **\*530** defendants in writing and, if payments are made in 30 days, no further action may be taken. It then provides, '*but if payments are not made then the First Party (plaintiffs) shall have the right to terminate this agreement.*' (Emphasis supplied.) The answer to this argument is almost apparent from the emphasized language quoted. Provisions of this nature do not furnish an exclusive measure of the remedy. 18 Am.Jur., Election of Remedies, s. 36, p. 155.


Substantially the same provision in a 'Dairy Queen' contract was construed in Moberg v. Baker, supra, exactly contrary to defendants' contention. Further, such a construction would give defendants a right, despite operation of the stores and use of the 'Dairy Queen' trade name, to terminate liability by their own breach. There is no merit to this contention.

Defendants argue the failure of the McLeods, at least at this time, to have paid all of the 4¢ mix royalty they (the

**McLeod v. Crawford, 176 Neb. 513 (1964)**

126 N.W.2d 663, 141 U.S.P.Q. 45

McLeods) are obligated to pay Ar-Tik. As pointed out, this is no obligation of the defendants. It flows to Ar-Tik as third party beneficiary under the contracts and is not an issue in this case. It is a severable and distinct separate obligation of the plaintiffs and not the defendants. Ar-Tik Systems, Inc. v. Dairy Queen, Inc., supra. But, it is further **\*\*673** apparent that the contracts only call for this payment in event defendants pay, which they have not done. In any event, there is a complete absence of showing of any damage to defendants.

From what has been said, these contracts are valid, enforceable agreements. They are not tainted with illegality.

The defendants voluntarily measured their obligation by the extent they used the trademark and the machine in operating 'Dairy Queen' stores. No reason exists why they should not pay for the benefits they received and the obligations they caused themselves under the contracts. The trial judge in this case came to the correct conclusion. The judgment is affirmed.

Affirmed.

**All Citations**

176 Neb. 513, 126 N.W.2d 663, 141 U.S.P.Q. 45

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-00730 Document 37-1 Filed on 04/26/23 in TXSD Page 85 of 102

Recif Resources, LLC v. Juniper Capital Advisors, L.P., Not Reported in Fed. Supp. (2019)

2019 WL 5457705

2019 WL 5457705
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

RECIF RESOURCES, LLC, Plaintiff,

v.

JUNIPER CAPITAL ADVISORS,
L.P., et al., Defendants.

Civil Action No. H-19-2953
|
Signed 10/24/2019

**Attorneys and Law Firms**

Avery Nicholas Sheppard, Ware Jackson et al, Kevin Knox Nunnally, Houston, TX, for Plaintiff.

Andrew William Zeve, William Andrew Moss, Bracewell LLP, Houston, TX, for Defendants.

## MEMORANDUM AND ORDER

NANCY F. ATLAS, UNITED STATES DISTRICT JUDGE

**\*1** This case is before the Court on the Motion to Remand and Request for Attorneys' Fees ("Motion") [Doc. # 17] filed by Plaintiff Recif Resources, LLC ("Recif"). Defendant Juniper Capital Advisors, LP ("Juniper") filed a Response [Doc. # 24], Recif filed a Reply [Doc. # 31], Juniper filed a Sur-Reply [Doc. # 38], and Recif filed a Sur-Sur-Reply [Doc. # 43]. Having reviewed the full record and the applicable legal authorities, the Court **denies** the Motion.

## I. BACKGROUND

In 2017, Recif and Juniper discussed jointly pursuing a prospective oil and gas opportunity. In connection with the discussions, Juniper signed a confidentiality agreement. Each party made its intellectual property and other proprietary information available to the other. Recif alleges that Juniper "backed out of the deal in May 2018." *See* Motion, p. 2. Recif alleges that it learned Juniper "was developing the [opportunity] without them in violation of the parties' confidentiality agreement." *Id.*

Recif filed this lawsuit in Texas state court, asserting only Texas law causes of action.[1] On August 8, 2019, Juniper filed a counterclaim against Recif, including a claim for copyright infringement.[2] That same day, Juniper filed a Notice of Removal [Doc. # 1].

Recif moved to remand, arguing that the Notice of Removal was untimely. Recif argues that, even if the Court retains the copyright infringement counterclaim, Recif's state law claims and Juniper's state law counterclaims should be remanded. The Motion has been fully briefed and is now ripe for decision.

## II. TIMELINESS OF NOTICE OF REMOVAL

It is undisputed that this lawsuit as originally filed by Recif was not removable. Therefore, Juniper's Notice of Removal was timely if "filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3).

Juniper bases its removal of this case on its Copyright Act counterclaim. To state a claim for relief under the Copyright Act, a plaintiff must allege: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 439 (5th Cir.), *cert. denied*, 138 S. Ct. 236 (2017) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)); *see also Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012).

**\*2** Recif has established and, indeed, Juniper has admitted, that by March 26, 2019, Juniper had received a discovery response that "made clear that Recif had cut and pasted [Juniper's] maps and well log interpretations into a PowerPoint document." *See* Response [Doc. # 24], p. 8. At that point, Juniper had received "other paper" from which it could ascertain that Recif had copied elements of a work to which Juniper claims copyright protection. The Notice of Removal, filed August 8, 2019, was untimely pursuant to § 1446(b)(3).

Juniper argues that it could not ascertain that it had a copyright infringement counterclaim until August 8, 2019, when it received a deposition transcript containing testimony regarding Recif's use of the PowerPoint containing copies of Juniper's work. "Use" of the allegedly infringing document,

here the PowerPoint, is not a required element of a copyright infringement claim. One who makes a copy of a copyrighted work infringes even if he does not sell or otherwise distribute the copy. *See Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 788 n.54 (5th Cir. 1999). Copyright infringement can occur even if the unauthorized copy is "solely for the private purposes of the reproducer." *Id.* Therefore, the deposition testimony regarding Recif's use of the allegedly unauthorized copy did not constitute "other paper" from which Juniper could first ascertain that there were copyright infringement issues that made the case removable.

The Notice of Removal was filed August 8, 2019, more than thirty days after Juniper's March 26, 2019 receipt of "other paper" that indicated the existence of a copyright infringement counterclaim against Recif. Consequently, removal was untimely pursuant to § 1446(b)(3).

## III. EXISTENCE OF GOOD CAUSE FOR UNTIMELY REMOVAL

A civil action asserting a claim for relief under United States copyright law is removable pursuant to 28 U.S.C. § 1454(a). Therefore, the time limitation contained in § 1446(b)(3) "may be extended at any time for cause shown." 28 U.S.C. § 1454(b)(2). In determining whether a removing party has shown cause under § 1454(b)(2), district courts in Texas look to Federal Rule of Procedure 6(b)(1)(B) for guidance. *See Hill Country Tr. v. Silverberg*, 2018 WL 6267880, *8 (W.D. Tex. Nov. 28, 2018)*, and cases cited therein. Relevant factors include (1) the potential for prejudice to the other parties, (2) the length of the delay and its impact on the case, (3) the reason for the delay and whether it was within the removing party's control, and (4) whether the removing party has acted in good faith. *See id.* (citing *Salts v. Epps*, 676 F.3d 468, 474 (5th Cir. 2012)). The Court has "broad discretion to grant or deny an extension." *Salts*, 676 F.3d at 474.

The Court finds that there is little potential for prejudice to Recif. It is uncontested that the case is removable, and this Court clearly has subject matter jurisdiction over the copyright infringement counterclaim. This Court will permit the parties to use in this case any discovery obtained while the case was pending in state court, and will likely adopt any state court rulings on discovery disputes where those rulings are memorialized in a written order or transcript.

The delay between the removal deadline of April 26, 2019, and removal on August 8, 2019, was not substantial. Recif argues that the delay had an adverse impact on its ability to

obtain documents relating to Juniper's partnership with EOG Resources, Inc. The hearing on this discovery dispute was not scheduled in state court until August 30, 2019, and the dispute is currently being considered by this Court. Therefore, there has been no adverse impact on Recif's ability to obtain discovery to which it is entitled and, at most, there has been minimal delay.

**\*3** Juniper argues that any delay in the filing of the Notice of Removal was the result of Recif's failure to comply with its discovery obligations while the case was pending in state court. It appears, however, that the delay was caused by Juniper's failure to recognize that Recif's March 26, 2019 production of the PowerPoint into which elements of Juniper's work had been "cut and pasted" raised copyright infringement issues that caused the case to become removable. This factor, unlike the other factors, weighs against extending the deadline for removal.

The Court finds that Juniper has acted in good faith in connection with the removal timing. Indeed, there is nothing that demonstrates bad faith on Juniper's part in deciding when to file the Notice of Removal.

Based on the foregoing, and taking all circumstances into account, the Court finds that Juniper has shown good cause for extending the removal deadline. Therefore, the Court extends the time for filing the Notice of Removal to and including the August 8, 2019, filing date.

## IV. EXERCISE OF SUPPLEMENTAL JURISDICTION

In the Notice of Removal, Juniper asserts correctly that the Court has supplemental jurisdiction over Recif's state law causes of action and over Juniper's counterclaims that are based on Texas state law, citing 28 U.S.C. § 1367(a). Recif argues in conclusory fashion that the Court should decline to exercise its supplemental jurisdiction because the state law claims substantially predominate over the federal claim. *See* Motion, p. 12 (citing 28 U.S.C. § 1367(c)(2)). The Court finds Recif's position unpersuasive.

The state law claims and counterclaims are closely related to the copyright infringement counterclaim. The parties' respective claims arise out of their discussions, and their exchange of proprietary information, in connection with the same original oil and gas opportunity. Although other nearby oil and gas opportunities may be relevant factually, the parties' initial exchange of intellectual property and other proprietary information, and the alleged misuse of that

Recif Resources, LLC v. Juniper Capital Advisors, L.P., Not Reported in Fed. Supp. (2019)

2019 WL 5457705

information, is the genesis of the claims in this lawsuit, both the state law claims and the federal copyright claim. The rights the parties assert in their respective intellectual property and other proprietary information – rights that form the basis for the state law claims and counterclaims – are similar in nature. At this early stage of this case, the Court cannot find factually that the state law claims predominate over the federal copyright counterclaim. Therefore, the Court will exercise its supplemental jurisdiction at this time.

## V. CONCLUSION AND ORDER

Juniper's Notice of Removal was untimely pursuant to 28 U.S.C. § 1446(b)(3). Pursuant to 28 U.S.C. § 1454(b)(2), however, Juniper has shown good cause for extending the deadline for removal. Therefore, the Motion to Remand the entire case to state court is denied.

The Court cannot find that the state law claims and counterclaims predominate over the Copyright Act counterclaim. As a result, the Court will exercise supplemental jurisdiction over the state law claims. The Court notes that should the Copyright Act counterclaim be dismissed prior to trial, the Court at that time may decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Based on the foregoing, it is hereby

**ORDERED** that Recif's Motion to Remand and Request for Attorneys' Fees [Doc. # 17] is **DENIED**.

### All Citations

Not Reported in Fed. Supp., 2019 WL 5457705

---

Footnotes

1  In the original state court Petition, Recif asserted causes of action for breach of contract, fraudulent inducement, fraudulent misrepresentation, trade secret misappropriation, detrimental reliance/promissory estoppel, and unjust enrichment. *See* Original Petition, Exh. 2 to Notice of Removal.

2  In addition to the copyright infringement counterclaim, Juniper asserted state law counterclaims for malicious prosecution and "bad faith claim of misappropriation." *See* First Amended Answer and Counterclaim, Exh. 10 to Notice of Removal.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

405 N.W.2d 474
Court of Appeals of Minnesota.

The REGENTS of the UNIVERSITY
OF MINNESOTA, Respondent,

v.

MEDICAL INCORPORATED, Appellant.

Nos. C8–86–1717, CX–86–1718.
|
May 12, 1987.
|
Review Denied July 15, 1987.

**Synopsis**

State university licensor brought action against licensee for royalties and specific performance allegedly due under patent licensing agreement. Following verdict for university, licensee moved for relief from judgment. The Court of Appeals, 382 N.W.2d 201, affirmed in part, reversed in part, and remanded. On appeal after remand, the Court of Appeals,, Forsberg, J., held that: (1) trial judge was not disqualified on ground that his mother-in-law eight years previously had worked for licensee, had been laid off, and had sought and was denied worker's compensation benefits; (2) alleged newly discovered evidence that witness for university had stolen and destroyed secret documents from licensee, his former employer, did not warrant relief from judgment on ground of discovery of new evidence which by due diligence could not have been discovered in time to move for new trial, on ground of misconduct by party, or on other grounds warranting relief in extraordinary circumstances; (3) there was no patent misuse with respect to grant back provision in patent license as to improvement patent; and (4) royalty payment credits and deductions claimed by licensee were improper.

Affirmed.

West Headnotes (16)

**[1]** **Judges** 🔑 Relationship to party or person interested

There was no basis for disqualifying trial judge on ground that eight years previously his mother-in-law had worked for a party, had been laid

off, and had sought and was denied worker's compensation benefits. M.S.A. § 542.16; 48 M.S.A., Rules Civ.Proc., Rules 63.02–63.04; 52 M.S.A., Code of Jud.Conduct, Canons 2, 3, subd. C(1).

**[2]** **Judgment** 🔑 Newly discovered evidence

In order for relief from judgment to be granted where there is newly discovered evidence, such evidence must be relevant and admissible at trial, must be likely to have an effect on the result of a new trial, and must not be merely collateral, impeaching or cumulative. 48 M.S.A., Rules Civ.Proc., Rule 60.02(2).

13 Cases that cite this headnote

**[3]** **Appeal and Error** 🔑 For newly discovered evidence

When reviewing denial of motion for new trial based on newly discovered evidence, Court of Appeals need only determine whether trial court's refusal to grant new trial involved violation of clear legal right or manifest abuse of judicial discretion. 48 M.S.A., Rules Civ.Proc., Rules 59.03, 60.02(2).

6 Cases that cite this headnote

**[4]** **Judgment** 🔑 Newly discovered evidence

For purposes of establishing that new evidence could not by due diligence have been discovered in time to move for new trial, so as to be entitled to relief from judgment because of that evidence, party did not establish that evidence of alleged theft of certain documents was unobtainable on the ground that, once theft was suspected before trial, investigations were suspended in reliance on representations from the very person suspected of the theft. 48 M.S.A., Rules Civ.Proc., Rules 59.01(4), 60.02(2).

8 Cases that cite this headnote

**[5]** **New Trial** 🔑 Impeachment of witness

Newly discovered evidence that merely impeaches a witness is generally not the basis for

a new trial, though there are exceptions in the most extraordinary circumstances. 48 M.S.A., Rules Civ.Proc., Rule 60.02(2).

**[6]**    **Judgment**    Newly discovered evidence

Party's assertion that it was denied an opportunity to properly impeach an important witness concerning a collateral matter did not present extraordinary circumstances warranting relief from judgment on ground of alleged newly discovered evidence. 48 M.S.A., Rules Civ.Proc., Rule 60.02(2).

14 Cases that cite this headnote

**[7]**    **Judgment**    Persons entitled to relief

For purposes of rule providing for relief from judgment based on conduct of adverse party, person is not a "party" merely because he is directly interested in the result; "party" is one who has the right to control the proceedings, examine and cross-examine the witnesses, and appeal from the order or judgment finally entered. 48 M.S.A., Rules Civ.Proc., Rule 60.02(3).

1 Case that cites this headnote

**[8]**    **Judgment**    Right to relief in general

For purposes of rule providing for relief from judgment on the ground of misconduct of adverse party, witness' alleged misconduct was not attributable to party on agency theory on ground that witness was an employee of the party at time of trial, where the alleged theft of documents by the witness did not occur while witness was employed by party nor was there any showing that subsequent misconduct was directed or known by the party or in any way connected with the witness' employment. 48 M.S.A., Rules Civ.Proc., Rule 60.02(3).

5 Cases that cite this headnote

**[9]**    **Judgment**    Right to relief in general

Party was not entitled to relief from judgment on ground of misconduct of nonparty witness

involving merely collateral issue having little to do with the ultimate issues of case, particularly where party failed to use what evidence of misconduct it did possess at time of trial to impeach the witness so accused, and there was substantial other evidence to support the verdict. 48 M.S.A., Rules Civ.Proc., Rule 60.02(3).

10 Cases that cite this headnote

**[10]**    **Judgment**    Right to relief in general

Missed opportunity to adequately impeach one of many witnesses was not extraordinary within rule providing for relief from judgment under extraordinary circumstances, even though witness stood to benefit from party's success in the matter, where the party had sufficiently proved its case. 48 M.S.A., Rules Civ.Proc., Rule 60.02(6).

3 Cases that cite this headnote

**[11]**    **Patents**    Questions of fact, verdicts, and findings in general

Issue of patent misuse is appropriately treated as a fact issue, subject to clearly erroneous standard of review, particularly where scope of patent claim is disputed and in need of explanation by resort to extrinsic evidence.

**[12]**    **Patents**    Construction and Operation of Licenses

Mere existence of a grant-back provision in patent license, requiring licensee to assign to patent holder improvements on the patent, is not enough to prove patent misuse.

**[13]**    **Patents**    Misuse of patent

There was no patent misuse on theory that assignment of improvement patent to patent holder by licensee pursuant to terms of licensee agreement substantially extended the temporal scope of the patent monopoly, where original patent had expired and patent holder had not required payment of royalties past that date, even though parties would have to enter into a new

license agreement if licensee desired to use the improvement patent.

**[14]** **Patents** 🔑 Profits and damages

Trial court's assessment of damages in patent infringement cases is given great deference and appellate court must affirm the award if there is substantial record evidence to support it and the trial court's findings are not clearly erroneous.

**[15]** **Appeal and Error** 🔑 Province of, and deference to, lower court in general

Where critical evidence is documentary, appellate court need not defer to trial court's assessment of the meaning and credibility of that evidence.

**[16]** **Patents** 🔑 Elements, measure, and amount

Record established that patent licensee's attempted credits and deductions were improper attempt to reduce damage awards determined by jury based on subsequent events, to arbitrarily and unilaterally impose a new accounting procedure from that agreed on the parties, and to deduct an amount which the trial court had previously determined had been waived.

**\*476** *Syllabus by the Court*

1. Appellant is not entitled to a new trial based on the claimed disqualification of the trial judge.

2. In the absence of extraordinary circumstances, cumulative impeachment evidence involving conduct of a nonparty which was not newly discovered and would not have affected the trial outcome was not an adequate basis for granting a new trial.

3. The trial court did not err in determining that there was no patent misuse since assignment of the Huffstutler patent under the license agreement did not substantially extend the scope of the Kaster patent.

4. The trial court did not err in its construction of the license agreement provisions governing calculation of post-judgment royalties.

**Attorneys and Law Firms**

Thomas Tinkam, Leslie J. Anderson, Dorsey & Whitney, Minneapolis, for respondent.

Harold D. Field, Jr., Nancy C. Dreher, Robert P. Thavis, Leonard, Street and Deinard, Minneapolis, Charles A. Bassford, Jr., Baker & Bassford, P.A., Edina, for appellant.

**\*477** Heard, considered and decided by FORSBERG, P.J., and RANDALL and STONE,[*] JJ.

**OPINION**

FORSBERG, Judge.

This is an appeal from the trial court's decision on patent issues remanded from this court on a prior appeal and from denial of a motion for a new trial.

The original action was brought by respondent Regents of the University of Minnesota (University) against appellant Medical, Incorporated (Medical) for royalties and specific performance under a patent license agreement. The patent was obtained by Robert Kaster in 1969. The agreement licensing the patent to Medical was entered into on October 19, 1971, and amended November 20, 1975.

A jury trial was held from October 15 to November 30, 1984. The jury returned a verdict for the University, and judgment was entered accordingly. Medical subsequently appealed from the judgment, but prior to the hearing on appeal, moved the trial court for a new trial under Minn.R.Civ.P. 60.02(2), (3) and (6). The trial court denied relief based on lack of jurisdiction while the case was on appeal.

This court affirmed in part, reversed in part, and remanded the case to the trial court on February 11, 1986. The trial court subsequently denied Medical's motions for a new trial, and determined the remanded issue and a new issue concerning the calculation of royalties against Medical. We affirm.

Regents of University of Minnesota v. Medical Inc., 405 N.W.2d 474 (1987)

39 Ed. Law Rep. 797

## FACTS

The history of this case is outlined in *Regents of the University of Minnesota v. Medical, Inc.,* 382 N.W.2d 201 (Minn.Ct.App.1986), and will not be repeated here.

Prior to the hearing on appeal from the trial court's judgment, Medical filed a Rule 60.02 motion with the trial court asking for a new trial. Medical claimed entitlement to a new trial because the trial judge had failed to recuse himself from the case even though his mother-in-law had been a Medical employee 8 years prior to this action, had been laid off, and had sued for and was denied worker's compensation. Medical served a notice to remove, which motion was denied as moot since the case was on appeal. Medical then sought to remove the judge from further consideration of the case, which request was denied by the Chief Judge of Dakota County. This court denied Medical's motion to have the case remanded for consideration of its new trial motion. Medical then sought a writ of prohibition to prevent the judge from hearing the remanded issues, which was also denied by this court.

Medical also claimed entitlement to a new trial based on newly discovered evidence of perjury and destruction of subpoenaed documents by Robert Kaster, inventor and witness for the University at trial. Medical claimed to have discovered, from a former co-worker of Kaster's, that Kaster had stolen secret documents from Medical when he left the company in 1975 and had lied about the theft at his deposition. By way of affidavit, Kaster's co-worker claimed to have observed Kaster destroy stolen documents after he was ordered by the court to produce them.

An additional issue raised during pendency of the appeal concerned computation of royalty payments. After the trial Medical had been ordered to submit royalty reports to the University every six months. The University claimed that contrary to the terms of their contract, Medical had taken certain credits and deductions in three reporting periods, from August 1, 1984 to January 31, 1986. The University claimed it was owed $685,691 in post-trial royalties, while Medical contended its accounting procedure was accurate and reflected the amount owed as $31,348.

On remand from this court, the trial court considered Medical's Rule 60 motions, the issue of the license agreement grant-back provision and its effect on the scope of the Kaster

patent, and the royalty calculation dispute. The trial court found for the University in all respects.

**\*478** Medical moved for amended findings and for a new trial on these issues. Following denial of its motion by the trial court, Medical appealed to this court.

## ISSUES

1. Did the trial court err in denying Medical's Rule 60.02(2) motion for a new trial based on newly discovered evidence that the trial judge's mother-in-law was previously antagonistically involved with Medical, Inc.?

2. Did the trial court err in denying Medical's Rule 60.02(2), (3) and (6) motions for a new trial based on newly discovered evidence of Robert Kaster's alleged theft and destruction of subpoenaed documents and his subsequent perjury on this matter?

3. Did the trial court err in determining that assignment of the Huffstutler patent under the license agreement did not substantially extend the scope of the Kaster patent?

4. Did the trial court err in its construction of the provisions of the license agreement governing calculation of post-judgment royalties?

## ANALYSIS

### I.

[1] Appellant moved for and was denied relief under Minn.R.Civ.P. 60.02 on the basis of newly discovered evidence that the trial judge failed to disclose that eight years ago his mother-in-law had worked for Medical, had been laid off, and had sought and was denied worker's compensation benefits. The trial court denied Medical's motions under 60.02(2), noting first that the matter of the alleged disqualification had been previously decided in the negative by both the Chief Judge of Dakota County and by the Court of Appeals. We agree with the trial court that there is no basis in Minn.Stat. § 542.16 (1986), Minn.R.Civ.P.Rules 63.02, 63.03 or 63.04, or Canon 2 or Canon 3 C(1) of the Code of Judicial Conduct for disqualifying the trial judge. The claim is without substance and its renewal specious.

II.

Appellant also moved for and was denied relief under Minn.R.Civ.P. 60.02(2), (3) and (6) on the basis of newly discovered evidence that Robert Kaster had stolen and destroyed secret documents from his former employer, Medical, which documents detailed advances in heart valve manufacturing made by Medical.

*60.02(2)*

**[2]** **[3]** Minn.R.Civ.P. 60.02(2) provides that a judgment may be vacated if a party discovers new evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59.03. In order for relief from judgment to be granted where there is newly discovered evidence, such evidence must be relevant and admissible at trial, must be likely to have an effect on the result of a new trial, and must not be merely collateral, impeaching, or cumulative. *Gruenhagen v. Larson,* 310 Minn. 454, 459, 246 N.W.2d 565, 569 (1976). When reviewing denial of a motion for a new trial based on newly discovered evidence, this court need only determine whether the trial court's refusal to do so involved the violation of a clear legal right or a manifest abuse of judicial discretion. *Minder v. Peterson,* 254 Minn. 82, 92, 93 N.W.2d 699, 707 (1958), *quoting Vietor v. Costello,* 203 Minn. 41, 46, 279 N.W. 743, 745 (1938).

Appellant's motion for relief under Rule 60.02(2) was based on new evidence concerning Robert Kaster's alleged theft and destruction of documents stolen from Medical when Kaster left Medical's employ in 1975. The trial court denied the motion based on a determination that the evidence was not newly discovered, that even if it was newly discovered it would not have affected the outcome of the trial, and that in any event it was merely cumulative impeachment evidence. We agree.

In bringing its Rule 60.02(2) motion, Medical claimed that after the trial of this case, it obtained critical new information from a former employee of Angicor (a competitor of Medical and the company with which Kaster is now associated). By way **\*479** of affidavit, Monte Lawrence stated that during the time of Kaster's deposition, he observed Kaster shredding and altering numerous documents he believed to have been stolen from Medical relating to the design, manufacture, and testing of Medical's heart valves.

**[4]** Medical claimed that this information was newly discovered evidence. The trial court correctly noted that to require a new trial, the evidence must be such that with reasonable diligence could not have been found and produced at trial. Minn.R.Civ.P. 59.01(4) and 60.02(2). It has been held that diligence requires the use of available discovery tools as well as reasonable investigation efforts. *Brown v. Bertrand,* 254 Minn. 175, 184–85, 94 N.W.2d 543, 550 (1959).

From a review of the record, it is clear that Medical suspected Kaster had stolen secret documents as far back as 1983. As the trial court noted, Medical charged Kaster with theft of its documents in motions over a year before the case came to trial. In an affidavit accompanying Medical's motion for a protective order in 1983, Marshall Kreisel, then the president of Medical, stated that from his review of their files and current Angicor developments, he believed Kaster had stolen secret documents from Medical. Indeed, in his 1984 deposition, in response to a request to produce any stolen documents, Kaster denied he had any in his possession.

Medical's argument that the evidence was unobtainable because Kaster deceived Medical into believing it was unavailable is not acceptable. Once theft was suspected, further investigation was open to Medical and the assertion that investigations were suspended in reliance on representations from the very person suspected of the theft is unconvincing. What Medical has here is new evidence to support old suspicions; evidence that was available to it before trial through reasonable investigative efforts.

Medical argues that evidence showing that Kaster, in 1975, had stolen documents detailing Medical's advances in heart valve development constitutes significant affirmative evidence which, if known, would likely produce a different result in a new trial. Medical argues alternatively that even if it is only impeachment evidence, it should be allowed as a basis for a new trial because these are "extraordinary" circumstances warranting such relief.

Appellant argues that evidence of Kaster's theft would likely result in a different outcome at trial because it would contradict the University's argument and Kaster's testimony on the two main issues at trial: 1) whether the 1971 license agreement required Medical to pay royalties on "each and every" valve it sold, regardless of whether it was covered by the Kaster patent, and 2) whether the Kaster patent covered Medical's L–K, OS, and OC heart valves.

Regents of University of Minnesota v. Medical Inc., 405 N.W.2d 474 (1987)

39 Ed. Law Rep. 797

Appellant's argument reduces the entire issue of patent coverage to a contest of credibility between Marshall Kriesel, Medical's former president, and Robert Kaster. While Kaster was an important witness, he was only one of four witnesses who testified for the University on the patent coverage issue. Three expert witnesses testified as to the coverage of the patent, and indeed, as a result of motions by Medical to prevent Kaster from seeing confidential documents, Kaster was unable to testify on this issue as fully as the three experts. Far from being an issue of credibility, the question of the scope of the Kaster design was largely a technical one, to which experts on both sides testified. While credibility is, of course, always a factor, the ultimate question was not who was telling the truth, but rather, which descriptive, comparative analysis was more accurate.

On the issue of construction of the license agreement, the University argued at trial that because the Kaster patent was so valuable to Medical, in 1971, Medical agreed to a provision in the licensing agreement requiring them to pay royalties on "each and every" heart valve manufactured, regardless of whether it was covered by the Kaster patent. Medical argued that it would never have agreed to pay royalties on whatever valves it might develop in the future just to obtain license to the Kaster patent, claiming that the Kaster patent was **\*480** not that valuable since it needed substantial improvements. Medical argues that the new evidence of Kaster's theft of documents detailing advances made by Medical in heart valve manufacturing serves to refute the University's argument, while bolstering its own position because it is affirmative proof of the existence and need of improvements to the patent. While the relevance of the 1975 theft to the intent of the parties and the contract they entered into in 1971 is doubtful, even if this evaluation of the evidence is correct, it is merely cumulative of other evidence offered in support of Medical's position and not necessarily of such importance that a different outcome at trial would likely result.

 [5]   [6]   While the evidence appears to have little, if any, substantive value, it may have had great impeachment value. Although newly discovered evidence that merely impeaches a witness is generally not the basis for a new trial, there are exceptions in the most extraordinary circumstances. *Albertson v. Albertson,* 243 Minn. 212, 217, 67 N.W.2d 463, 467 (1954); *Disch v. Helary, Inc.,* 382 N.W.2d 916, 919 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. Apr. 24, 1986). Medical's assertion that they were denied an opportunity to properly impeach an important

witness concerning a collateral matter does not present an extraordinary circumstance warranting the relief requested. Where, as in this case, there is doubt whether "newly discovered" evidence would materially affect the result or could have been discovered before trial by the exercise of reasonable diligence, this court cannot justifiably hold that the trial court abused its discretion in ruling as it did. *Albertson,* 243 Minn. at 217–18, 67 N.W.2d at 467.

*60.02(3)*

Minn.R.Civ.P. 60.02(3) provides that relief from a final judgment will be authorized if fraud, misrepresentation, or other misconduct of an adverse party exists. To prevail, the moving party must establish by clear and convincing evidence that the adverse party engaged in fraud or other misconduct which prevented it from fully and fairly presenting its case. *Stridiron v. Stridiron,* 698 F.2d 204, 206–07 (3rd Cir.1983); *e.g., Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1339 (5th Cir.1978).

 [7]   Medical's request for relief under 60.02(3) was based on the "discovery" of Kaster's theft and destruction of Medical's secret documents detailing advances in heart valve manufacturing, and his subsequent pre-trial deposition perjury concerning the fact of the theft. The basis for relief under 60.02(3) is misconduct *of an adverse party.* *Metlyn Realty Corp. v. Esmark, Inc.,* 763 F.2d 826, 832 (7th Cir.1985).

Medical strains unsuccessfully to construe Kaster's involvement in this case so as to identify him as an adverse party. However, a person is not a party merely because he is directly interested in the result. *State v. Tri-State Telephone and Telegraph Co.,* 146 Minn. 247, 251, 178 N.W. 603, 604 (1920). A "party" is one who has the right to control the proceedings, examine and cross-examine the witnesses, and appeal from the order or judgment finally entered. *Id.* Robert Kaster was not a party to this action, he was merely a witness, and a party does not vouch for its witnesses. *Metlyn,* 763 F.2d at 833.

 [8]   Equally strained is Medical's agency argument, which attributes Kaster's conduct to the University because Kaster was an employee of the University at the time of trial. The alleged theft of documents, however, did not occur while Kaster was employed by the University. Neither was there any showing that the subsequent misconduct was directed or known by the University, or in any way connected with Kaster's employment.

**[9]**  Rule 60.02(3) also requires that the misconduct have gone to the ultimate issue of the case. *See Harre v. A.H. Robins Co.,* 750 F.2d 1501, 1503 (11th Cir.1985), *Simons v. Gorsuch,* 715 F.2d 1248, 1253 (7th Cir.1983). The trial court determined that facts of document theft and related pre-trial perjury added no more to this action than the opportunity for impeachment.  **\*481**  We agree that, although strong impeachment evidence, the facts lend little to resolution of the substantive issues here. Further, it is doubtful whether Kaster's misconduct denied Medical the opportunity to fully present its case: since the misconduct here was not that of a party; it involved a merely collateral issue and had little to do with the ultimate issues of the case; Medical failed to use what evidence of misconduct it possessed to impeach the witness so accused; and there was substantial other evidence to support the verdict. Under the circumstances, the trial court did not abuse its discretion in denying relief under 60.02(3).

*60.02(6)*

**[10]**  Rule 60.02(6) provides that relief from the final judgment may be permitted for any reason justifying relief from the operation of the judgment. Relief under this rule requires a showing of "extraordinary circumstances," on the basis of a judicial balancing of the need for finality and the need to do justice in the individual case. *Ackermann v. United States,* 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950).

Medical argues that Kaster's perjury, document destruction, and violation of a court order to produce documents is gross misconduct which should not be rewarded by enforcement of this judgment. Relief under 60.02(6) is required here, Medical asserts, to maintain the integrity of the judicial process.

While Kaster's actions, if proved, are indeed reprehensible, the granting of a new trial on that basis places undue importance on the significance of his actions. First, these are not "extraordinary circumstances" warranting relief from the judgment. A missed opportunity to adequately impeach one of many witnesses is not extraordinary. It is, in fact, relatively unimportant to the issues tried and result reached in this case. Second, one should question the effect on the integrity of the judicial process of subjecting the system to another trial of this case, where the only new evidence would be on an incidental, collateral matter. Third, while it may be unfortunate that Kaster stands to benefit from the University's success in this matter, justice does not require a new trial where the University sufficiently proved its case, and Kaster's conduct is currently the subject of a criminal investigation.

## III.

On remand after the first appeal, the trial court decided that Medical had not met its burden of proving that assignment of the Huffstutler patent to the University constituted patent misuse by substantially extending the claims of the Kaster patent.

Medical argues that the trial court erred in not finding patent misuse because the Huffstutler patent substantially enhances the physical and temporal scope of the Kaster patent. Medical's argument as to extention of the physical scope of the patent involves a comparative analysis presented for the first time on appeal. Medical offered no evidence or testimony to support this argument at trial. Since the trial court was instructed to look at the record and determine whether Medical had met its burden of proving patent misuse at trial, consideration of this new analysis is precluded.

**[11]**  In the first appeal, this court described the remanded issue as one "peculiarly within the factfinder's province." *Regents,* 382 N.W.2d at 211. Treating this as an issue of fact is particularly appropriate in this case, where the scope of a patent claim is disputed, and in need of explanation by resort to extrinsic evidence. *McGill, Inc. v. John Zink Co.,* 736 F.2d 666, 671–72 (Fed.Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). The findings of the trial court on this issue of fact should not be disturbed unless they are clearly erroneous, either without evidentiary support or induced by an erroneous view of the law. *Reserve Mining Co. v. State,* 310 N.W.2d 487, 490 (Minn.1981).

There is ample support in the testimony of three experts at trial to support the trial court's findings. In addition, as this court noted on the first appeal, the jury specifically found that the OC and OS (Huffstutler)  **\*482**  valves were covered by the Kaster patent. The jury finding that the valves were covered by the Kaster patent necessarily implies that the Huffstutler patent was merely an improvement patent and did not substantially extend the scope of the Kaster patent. This court was apparently disturbed, however, that there was no specific jury question on the issue of substantial extension of the Kaster patent, and refused to imply an answer. A technical comparison had been thoroughly provided at trial, and the jury determination that the physical scope of the Kaster patent covered the OC and OS (Huffstutler) valves is now supported by the trial court's specific findings as derived from the record.

The trial court did not address the temporal scope issue directly on remand. The University argues that the issue of temporal scope was not remanded and need not have been addressed by the trial court. Medical argues that a determination of patent misuse by extension of the scope of a patent necessarily included an analysis of possible temporal scope extension.

The trial court was to determine if there had been patent misuse by assignment of the Huffstutler patent to the University. As the court stated in the first appeal, if the grant-back provision is applied to substantially extend the scope of the patent monopoly, there is patent misuse. *Regents,* 382 N.W.2d at 211. One way the scope of the patent might be substantially enhanced is by extending the temporal scope of the patent, that is, by extending the time under which royalties may be due. Expansion of the temporal scope of the patent by the grant-back provision is a legitimate concern, and the determination of which is both appropriate and necessary to a determination of whether there has been patent misuse.

The trial court determined that the Huffstutler patent was an improvement patent and, as such, within the scope of the Kaster patent. This results in the Huffstutler patent being assigned to the University under the grant-back provision in the license agreement. The Kaster patent and the license agreement expire in 1986. The Huffstutler patent expires in 1997. The problem, as seen by Medical, is that after the Kaster patent expires, the University will have the Huffstutler patent for eleven more years. Medical claims this results in patent misuse because it extends the patent monopoly beyond the expiration of the patent. Medical relies strongly on *Brulotte v. Thys Co.,* 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964) for the proposition that using the leverage of a patent to obtain benefits for the patentee after the patent expires is patent misuse per se. What was determined illegal, and what *Brulotte* precludes, is the use by the patentee of a license agreement to extend the scope of the patent's monopoly past the date of patent expiration. *Id.* at 33, 85 S.Ct. at 179. In *Brulotte,* this was achieved by contracting for payment of royalties after the patent had expired. *Id.* at 30, 85 S.Ct. at 178. The assignment of patents in license agreements has never been determined to be misuse per se. *Transparent-Wrap Machine Corp. v. Stokes & Smith Co.,* 329 U.S. 637, 648, 67 S.Ct. 610, 616, 91 L.Ed. 563 (1947).

 [12]   *Transparent-Wrap* makes clear that the mere existence of a grant-back provision, such as the one used by the

University here, is not enough to prove patent misuse. Patent misuse exists only if the condition in the license agreement violates some other principle of law or public policy. *Id.* at 643, 67 S.Ct. at 614. For example, if the patent license agreement is used to violate antitrust laws by fixing prices or by conditioning a license on agreement to buy unpatented products, the agreement would be patent misuse. Again, if by "the use of patent pools or multiple licensing agreements the fruits of invention of an entire industry [were] systematically funneled into the hands of the original patentee," there would be patent misuse. *Id.* at 647, 67 S.Ct. at 616. There is nothing of this nature alleged in this case. Medical asserts that the mere assignment of the Huffstutler patent under the license agreement is patent misuse. Clearly, under *Transparent-Wrap,* this is incorrect.

 **\*483**  [13]   There is no patent misuse in this case because, as this court has already determined, the Kaster patent and the license agreement expired in 1986. *Regents,* 382 N.W.2d at 212. When the Kaster patent expired in 1986, it passed into the public domain. The University has not required payment of royalties past this date. After the Kaster patent expires, the University will retain the Huffstutler patent. The parties will have to enter into a new license agreement at that time if Medical desires to use the Huffstutler patent. Medical agreed to this when it entered into the license agreement with the University, and there is no violation of law or public policy to prevent its enforcement.

### IV.

The final issue in this case involves a dispute concerning the calculation of post-judgment royalties.

During the pendency of the first appeal and remand of this case, Medical Incorporated was obligated to submit royalty reports to the University of Minnesota for three periods: August 1, 1984 to January 31, 1985; February 1, 1985 to July 31, 1985; and August 1, 1985 to January 31, 1986. The reports submitted to the University for those time periods claimed

   1.) A credit for royalties or heart valve sales that were included by the jury in its damage award and thus included in the judgment, but which were subsequently returned to Medical's ownership, but not its physical possession;

   2.) a 25% deduction for a "distributor inventory" credit, which resulted from a post-trial restatement of sales records for the period of Aug. 1, 1984 to Jan. 31, 1986 that reflected

sales at the time of implant rather than at the time of transfer to the distributor, which method was not the previously agreed upon practice; and

3.) a deduction of $21,885.00 for patent filing costs incurred prior to July 31, 1984, which costs Medical had failed to include as part of its pre-trial itemized deductions and thus was precluded from introducing at trial.

**[14]** **[15]** All of these credits were denied by the trial court. As stated in *Creative Cookware v. Northland Aluminum Products,* 678 F.2d 746, 750 (8th Cir.1982), the trial court's assessment of damages in patent infringement cases is given great deference. An appellate court must affirm the award if there is substantial record evidence to support it: the trial court's findings will not be set aside unless it is shown that they are clearly erroneous. *Milgo Electronic Corp. v. United Business Communications, Inc.,* 623 F.2d 645, 663 (10th Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). Balanced against this is the standard for review of documentary evidence cited by Medical, which states that where the critical evidence is documentary, an appellate court need not defer to the trial court's assessment of the meaning and credibility of that evidence. *In Re Trust Known as Great Northern Iron Ore Properties,* 308 Minn. 221, 243 N.W.2d 302, 305 (1976).

**[16]** It is clear that Medical's attempted credits and deductions are an improper attempt to 1) reduce the damage award as determined by the jury, not because it was unsupported by the evidence but because of subsequent events; 2) arbitrarily and unilaterally impose an entirely new accounting procedure from that agreed upon by the parties in their original agreement, and used by the parties

previously; 3) deduct an amount which the trial court previously determined had been waived due to Medical's failure to include the amount in pre-trial itemizations, and which amount had not been allowed to be proved or presented at trial. Even if this court accepts the "de novo" standard of review, the trial court must be affirmed.

## DECISION

There is no basis in the law or in the code of judicial conduct to support appellant's request for disqualification of the trial judge.

Evidence of misconduct of a nonparty involving a collateral issue which was discoverable before trial did not present extraordinary **\*484** circumstances or warrant the granting of a new trial.

Assignment of the Huffstutler patent under the grant-back provision of the license agreement did not constitute patent misuse because it did not substantially extend the scope of the Kaster patent.

Royalty payment credits and deductions claimed by appellant were improper and inconsistent with the terms of the license agreement.

Affirmed.

## All Citations

405 N.W.2d 474, 39 Ed. Law Rep. 797

Footnotes

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

582 S.W.2d 549

Court of Civil Appeals of Texas, Dallas.

Wendell REICH and Robert Paul, Appellants,

v.

REED TOOL COMPANY, Appellee.

No. 19812.
|
May 14, 1979.
|
Rehearing Denied June 18, 1979.

**Synopsis**

Suit was brought for commissions alleged to be due under written contract for sale of invention and inventor's right to patent, which had been applied for but not issued when contract was signed. The 15th District Court, Grayson County, R. C. Vaughan, J., rendered judgment for defendant, and appeal was taken. The Court of Civil Appeals, Guittard, C. J., held that: (1) defense of patent misuse was available even though inventor had no patent when he sold invention and his prospective rights under patent application, and (2) patent misuse was established by evidence.

Affirmed.

West Headnotes (12)

**[1]    Antitrust and Trade Regulation**  ⚷  **Patent misuse**

Doctrine of patent misuse was developed to prevent holder of patent from using his statutory and constitutional monopoly power to coerce economic benefits not directly flowing from rights granted by patent.

**[2]    Antitrust and Trade Regulation**  ⚷  **Patent misuse**

An applicant who assigns his prospective patent rights may in some instances be guilty of patent misuse.

**[3]    Antitrust and Trade Regulation**  ⚷  **Patent misuse**

It is not essential to patent misuse doctrine that inventor continues to use leverage of his monopoly after patent has been issued.

**[4]    Antitrust and Trade Regulation**  ⚷  **Restraints and misconduct in general**

In suit brought for commissions alleged to be due under written contract for sale of invention and inventor's rights to patent, which had been applied for but not issued when contract was signed, patent misuse was established by evidence.

1 Case that cites this headnote

**[5]    Antitrust and Trade Regulation**  ⚷  **Patent misuse**

In the case of a patent license, it is not per se a misuse to measure consideration by percentage of licensee's total sales, including sales of products not within patent.

1 Case that cites this headnote

**[6]    Antitrust and Trade Regulation**  ⚷  **Patent misuse**

Patent misuse occurs when patentee conditions license on payments based on sales of other products, and thus uses leverage of his monopoly to coerce an agreement to make payments based on sales of merchandise not employing the discovery which claims of patent define.

**[7]    Antitrust and Trade Regulation**  ⚷  **Admissibility**

**Antitrust and Trade Regulation**  ⚷  **Presumptions and burden of proof**

Negotiations leading up to contract for sale of invention and inventor's rights to patent are relevant to determine whether improper

conditioning has occurred; party asserting patent misuse has burden of proof.

**[8]** **Antitrust and Trade Regulation** 🖘 Questions of law and fact

Determination of whether patent misuse has occurred requires a finding of fact.

**[9]** **Appeal and Error** 🖘 Necessity of timely objection

Where issue was submitted in connection with defendant's plea and gave notice to plaintiffs that affirmative answer might be taken as basis for judgment sustaining that plea, plaintiffs were required to point out any defects by timely objection to issue and could not wait until after judgment and then assert that finding should be disregarded in rendering judgment.

**[10]** **Appeal and Error** 🖘 Necessity of timely objection

**Trial** 🖘 Objections and exceptions

A complaint that an issue is evidentiary rather than ultimate is among those that are waived by failure to make timely objection, and in absence of such objection, issue subject to such complaint may form basis for judgment.

**[11]** **Appeal and Error** 🖘 Setting aside verdict; new trial

Even if plaintiffs properly objected to issue submitted in trial court, they waive it by not bringing it forward in their brief on appeal as ground for new trial.

**[12]** **Appeal and Error** 🖘 Absence of findings; assumed or implied findings

Even if additional finding was necessary to establish defense, such finding must be deemed to have been made by trial court in support of judgment in absence of objections to failure

to submit omitted component. Rules of Civil Procedure, rule 279.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*550** Jack G. Kennedy, C. Larry Cain, Kennedy, Minshew, Evans, Campbell & Cain, Sherman, for appellants.

A. H. Evans, William L. LaFuze, Vinson & Elkins, Houston, for appellee.

Before GUITTARD, C. J., and STOREY and HUMPHREYS, JJ.

**Opinion**

GUITTARD, Chief Justice.

This suit was brought for commissions alleged to be due under a written contract for sale of an invention and the inventor's rights to a patent, which had been applied for but not issued when the contract was signed. One of the defenses was that the inventor had "misused" the patent by requiring the purchaser to pay commissions on sales of equipment not covered by the patent applied for. After a trial and verdict, the judge disregarded findings favorable to plaintiffs and rendered judgment for defendant based on a single finding relating to the defense of patent misuse. Plaintiffs appeal on the ground that the court erred in applying the "patent misuse" doctrine under the circumstances of this case and also on the ground that the issue of misuse was not correctly submitted. We affirm on the ground that the doctrine applies, even though the inventor's right to the patent was only prospective when the contract was signed, and that the finding on the issue in question is sufficient, in the absence of objection, to support the judgment.

The inventor in this case was plaintiff Wendell Reich, who was in the business of making and selling rotary earth-drilling **\*551** equipment for water wells. Reich had invented a type of mobile rotary drill and had applied for a patent. While application for this patent was pending, Reich and plaintiff Robert Paul, a business associate, entered into negotiations with Texoma, Incorporated, a subsidiary of defendant Reed Tool Company, for sale of this invention and the inventor's rights under the patent application. These negotiations resulted in the contract in question. The contract

provides for sale of the invention and prospective patent rights in consideration of certain payments, including the commissions now claimed. These commissions are payable at specified rates on sales of the "product," defined in the contract as including not only the invention covered by the claims of the patent application, but also other types of rotary earth-drilling equipment. The crucial language of the definition covering such other types of equipment is paragraph (1)(d), as follows:

(A)ny other rotary earth-drilling equipment manufactured and sold by TEXOMA during the continuance of this Agreement, provided, however, that this Sub-section (d) shall not be deemed to apply to or to include such equipment which is the subject of either a bona fide and genuine patent application filed by any third party(ties) or covered by United States Letters Patent owned by TEXOMA or any third party(ies) and contains only such other elements or features which are within the public domain. (Emphasis added.)

The contract continues for a period of five years or until three hundred "products" shall be sold or $1,500,000 in commissions paid. During this period Texoma is given the right to an injunction restraining Reich and Paul from competing in the manufacture and sale of rotary drilling machines. The contract further provides that if Texoma should decide to terminate the manufacture and sale of "products" as defined in the contract, it should have no further liability, but must give notice to Reich and Paul, who have the option to require a reassignment to them of all rights under the patent application and any patent issued on it.

After the contract was signed, Reich discontinued his own business and entered the employment of Texoma, which was succeeded by defendant Reed Tool Company. Neither Texoma nor defendant had previously been in the business of making and selling earth-drilling equipment. When Reich's patent application was granted, the patent was issued to defendant as assignee. Defendant made and attempted to sell several of the machines, but according to defendant's evidence, the venture was not a financial success. Defendant then gave Reich and Paul notice that it was terminating manufacture and marketing of the "product." Reich exercised his option to require a reassignment of the patent, and defendant made such a reassignment. Defendant did not, however, terminate the business of manufacture and sale of earth-drilling equipment. Instead, it undertook the manufacture and sale of another machine, known as the "Stonekiller," on which an earlier patent had expired. Defendant took the position that this machine was not within

the definition of "product" in section (1)(d) of the contract. Reich and Paul, on the other hand, asserted that the Stonekiller was within this definition, and they brought this suit to recover commissions on these sales at the rates provided in the contract. Defendant pleaded also that their agreement to make payments on the sale of machines not covered by the Reich patent was a misuse of the patent and of the patent application and, therefore, unenforceable.

1. Misuse of Patent Application

[1]    Patent misuse is a doctrine developed by the federal courts to prevent the holder of a patent from using his statutory and constitutional monopoly power to coerce economic benefits not directly flowing from the rights granted by the patent. For example, the holder cannot tie sales of a patented device to purchase of unpatented supplies. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). He cannot exact royalties for *552 the use of a patented invention after the patent expires. Brulotte v. Thys, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964). Also, he cannot control the resale price of patented products. Straus v. Victor Talking Machine Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866 (1917).

Appellants Reich and Paul contend that the doctrine of patent misuse does not apply to the sale of an application for a patent, as distinguished from the sale of a patent already issued, because until the patent is issued the applicant has no monopoly power subject to abuse. On this question the authorities are inconclusive.

Appellants rely principally on Heltra, Inc. v. Richen-Gemco, Inc., 395 F.Supp. 346 (D.S.C.1975), Rev'd on other grounds 540 F.2d 1235 (4th Cir. 1976). Heltra, as we view it, does not bear on this point. Although the contract in Heltra was similar in some respects to that in this case, the question was not one of patent abuse, but rather whether one who had purchased the rights to an invention, including the rights under a patent application, could deny liability for the purchase money on the ground that the patent, when later issued, was invalid. Heltra stands for the rule that in this situation the validity of the patent is immaterial to the purchaser's liability. There was no provision in the Heltra contract for payments based on sales of other devices, nor was patent abuse raised as a defense to the suit.

The cases cited by appellee lend some support to appellee's position, though none presented the exact question now

before us. Appellee contends that the rationale of the misuse doctrine is equally applicable to agreements involving prospective or inchoate patent rights, such as those flowing from patent applications, as to agreements involving issued patents. It relies on the test of patent misuse laid down by the Supreme Court in Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), and on decisions of federal trial courts and courts of other states. The Zenith case concerned issued patents rather than patent applications. Hazeltine owned patents on television sets which it offered for license to Zenith on condition that Zenith pay royalties on all television sets manufactured, regardless of whether any of the inventions subject to Hazeltine's patents were employed. Zenith refused the offer, and Hazeltine sued Zenith for infringing some of its patents. The Supreme Court held in favor of Zenith on its defense that Hazeltine's offer constituted patent misuse. The Court said:

We hold that conditioning the grant of a patent license upon payment of royalties on products which do not use the teaching of the patent does amount to patent misuse. 395 U.S. at 135, 89 S.Ct. at 1583. And just as the patent's leverage may not be used to extract from the licensee a commitment to purchase, use, or sell other products according to the desires of the patentee, neither can that leverage be used to garner as royalties a percentage share of the licensee's receipts from sales of other products. In either case, the patentee seeks to extend the monopoly of his patent to derive a benefit not attributable to use of the patent's teachings. 395 U.S. at 136, 89 S.Ct. at 1583. . . . But we discern no basis in the statutory monopoly granted the patentee for his using that monopoly to coerce an agreement to pay a percentage royalty on merchandise not employing the discovery which the claims of the patent define. 395 U.S. at 140, 89 S.Ct. at 1585.


Appellee relies on two state-court cases involving contracts made when applications for patents were pending, but in each the misuse doctrine was held inapplicable under the Zenith test because the evidence failed to show that the patent applicant had conditioned his assignment or license or prospective patent rights on payments unrelated to sales of products covered by the patent application. Mutchnik v. M. S. Willett, Inc., 274 Md. 610, 337 A.2d 72 (1975); Richards v. Liquid Controls Corp., 26 Ill.App.3d 111, 325 N.E.2d 775, 784 (1975). In Mutchnik, the court observed that when the agreement was negotiated, no patent had been issued and at most the licensee's bargaining  *553  position was influenced by the existence of the pending patent application.

Appellee relies also on three federal district court opinions. In Key Pharmaceuticals, Inc. v. Lowey, 373 F.Supp. 1190, 1193 (1974), the grantee of an exclusive license to make certain pharmaceuticals according to a process described in a patent application sued to rescind the agreement and was allowed by the court to amend its complaint to add a count alleging misuse in that the licensee was required to pay royalties on specified products, regardless of whether produced by the processes described in the patent application. The opinion does not discuss application of the misuse doctrine to a patent application, but seems to assume that it would apply if the allegations should be supported by proof.

The other two federal district court cases were patent infringement suits in which the patentees were held disqualified to sue on the ground that they had misused their patents by making license agreements with third parties tending to restrict sales of similar products. Krampe v. Ideal Industries, Inc., 347 F.Supp. 1384, 1386-87 (N.D.Ill.1972); Anderson Company v. Trico Products Corp., 237 F.Supp. 834, 838 (W.D.N.Y.1964). In each of these cases the agreements had been made when the application for the patent was pending, but the plaintiff had undertaken to enforce the restriction after the patent had been issued to him. In Krampe the court observed that the plaintiff "possessed inchoate rights" in the invention from the time he filed his application and held:

Accordingly, this Court finds that plaintiff's use of the rights which he possessed in his invention to secure an additional right to which he was not entitled, combined with his maintaining the objectionable terms of the contract after these rights had ripened into a patent monopoly, constitutes misuse of his patent for the cable stripper.

 [2]   Appellants point out that in the present case, unlike the plaintiffs in Krampe and Anderson, Reich never owned the patent in question and the parties never contemplated that he would because, by the contract in question, he assigned all his rights under the applications to Texoma, to whose successor the patent was issued pursuant to the assignment. Appellants also argue that there could be no misuse of the monopoly rights granted by the patent in question here because an applicant has no monopoly until the patent is issued, and, since no patent was ever issued to Reich, he could not be guilty of misuse. We do not agree that an applicant who assigns his prospective patent rights can never be guilty of misuse. An inventor who has applied for a patent on a marketable invention may indeed have bargaining leverage to exact benefits he could never get if he did not have a patent

application with a fair prospect of success. If he conditions the sale of his prospective patent rights on a promise of payments based on sales of unrelated products, he is using his prospective monopoly power to obtain benefits beyond the scope of his prospective monopoly. He should be in no better position than if the patent had already been issued.

[3]   Neither is it essential to the misuse doctrine that the inventor continue to use the leverage of his monopoly after the patent has been issued. If he has obtained a promise of benefits unrelated to the patent on condition of an assignment of his patent rights, whether actual or prospective, such a promise is within the rationale of the misuse doctrine, as stated by the Supreme Court in Zenith. Consequently, we hold in this case that the defense of patent misuse is available, even though Reich had no patent when he sold his invention and his prospective rights under the patent application.

2. Evidence and Findings of Patent Misuse

Appellants contend further that even if the misuse doctrine is available as a defense to a suit on a contract made before the patent is issued, no misuse is established by the evidence and verdict in this case. They argue that a fact issue on misuse is made by the evidence in this case, and that appellee failed to obtain a jury finding that would support the judgment in appellee's favor.

[4]   **554  We agree with appellants that a fact issue is raised. Appellee's evidence tends to show that Texoma's representatives proposed the contract without paragraph (1)(d), which brings other drilling equipment manufactured and sold by Texoma within the definition of "products" on which commissions must be paid. Appellee's witnesses testified that Reich insisted on this provision and that Texoma agreed to it only because Reich's rights to the invention and his prospective patent rights could not be obtained on any other terms. On the other hand, appellants' evidence tended to show that the patent application was not a primary item in the negotiations leading to the contract. Appellants assert that appellee was eager to get into the shallow-well drilling equipment business in which Reich was already established, that appellee, through its subsidiary, Texoma, not only bought the invention and the patent application from Reich, but took over his business, obtained his services, and secured his agreement not to compete. Thus, according to appellants, it was reasonable and proper for the parties to agree on a consideration that included commissions on sales of equipment, whether or not covered by the claims of the patent

application assigned in the contract. In response appellee points out that the contract by which Reich entered appellee's employment and agreed not to compete was a separate transaction supported by an independent consideration, and it insists that the agreement in the contract in question to pay commissions on unrelated products must be taken as part of the consideration for Reich's assignment of his prospective patent rights.

[5]   [6]   [7]   [8]   This question is not resolved by the provisions of the contract itself, as both parties agree. In the case of a patent license, it is not Per se a misuse to measure the consideration by a percentage of the licensee's total sales, including sales of products not within the patent. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 834, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). Misuse occurs when the patentee conditions the license on payments based on sales of other products, and thus uses the leverage of his monopoly to coerce an agreement to make payments based on sales of merchandise not employing the discovery which the claims of the patent define. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 139-40, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Consequently, the negotiations leading up to the contract are relevant to determine whether improper conditioning has occurred, and the party asserting misuse has the burden of proof. Mutchnik v. M. S. Willett, Inc., 274 Md. 610, 337 A.2d 72, 75-77 (1975). Determination of this issue requires a finding of fact. Glen Mfg., Inc. v. Perfect Fit Industries, Inc., 420 F.2d 319 (2d Cir. 1970).

Appellants insist that no such fact finding has been made in this case. The finding on which appellee relies to support its defense of misuse is the following:
SPECIAL ISSUE NO. 2: Do you find from a preponderance of the evidence that Plaintiff Reich would not have entered into the agreement sued upon if Article (1)(d) thereof had not been included in the agreement?

ANSWER: We do.

Appellants argue that this issue is evidentiary and that the answer is immaterial because the proper issue under Zenith and the other authorities above cited is whether appellants conditioned their assignment of patent rights on the payments promised; that is, whether plaintiffs used their patent power to compel insertion of paragraph (1)(d) in the contract. Appellants bring forward no objection to the issue as submitted. They assert that they had no burden to point out

the defect in the issue because the burden was on appellee to obtain a finding establishing the defense of misuse.

**[9]  [10]  [11]** We conclude that the issue as submitted and answered is sufficient, in the absence of objection, to support the defense of misuse. Though possibly subject to objection as evidentiary, it was submitted in connection with appellee's plea of patent misuse and gave notice to plaintiffs that an affirmative answer might be taken as a basis for a judgment sustaining that plea.  **\*555** Consequently, appellants were required to point out any defect by a timely objection to the issue. Allen v. American Nat'l Ins. Co., 380 S.W.2d 604 (Tex.1964). They could not wait until after judgment and then assert that the finding should be disregarded in rendering judgment. Lanphier Const. Co. v. Fowco Const. Co., 523 S.W.2d 29, 43 (Tex.Civ.App. Corpus Christi 1975, writ ref'd n.r.e.); Panhandle & S. F. Ry. v. Friend, 91 S.W.2d 922, 930 (Tex.Civ.App. Austin 1936, writ ref'd). A complaint that an issue is evidentiary rather than ultimate is among those that are waived by failure to make a timely objection, and in the absence of such an objection, an issue subject to such a complaint may form the basis of a judgment. Weingarten, Inc. v. Scott, 456 S.W.2d 266, 271 (Tex.Civ.App. Houston (14th Dist.) 1970, no writ). Although in the cases cited the courts rested the waiver on the complaining party's failure to make a timely objection, the same rule, in our opinion, applies if an objection is made but is not brought forward on appeal as a ground for a new trial. Consequently, even if appellants objected to the issue in the trial court, they have waived it by not bringing it forward in their brief on this appeal as a ground for a new trial.

**[12]** Although issue number two may be subject to objection, it bears directly on the defense of misuse. In Zenith the concept of "conditioning" a patent license is explained as "where the patentee refuses to license on any other basis and leaves the licensee with a choice between a license so providing and no license at all." 395 U.S. at 135, 89 S.Ct. at 1583. The same test has been applied to an assignment. Compton v. Metal Products, Inc., 453 F.2d 38, 46 (4th Cir. 1971). The jury found in answer to issue number two that Reich "would not have entered into the agreement sued upon if Article (1)(d) had not been included." This answer is equivalent to a finding that plaintiffs refused to assign their patent application on any other basis and left Texoma with a choice between an assignment containing article (1)(d) and no assignment at all. Appellants have not suggested any additional factual element that should have been submitted to establish that plaintiffs conditioned the assignment on Texoma's promise to pay commissions on sales of products not covered by the claims of the patent application. If any additional finding was necessary to establish the defense of misuse, such a finding must be deemed to have been made by the trial court in support of the judgment in the absence of objections to failure to submit the omitted component. Rule 279, Tex.R.Civ.P.; Kirk v. Standard Life & Accident Ins. Co., 475 S.W.2d 570, 572 (Tex.1972); Rogers v. Ellsworth, 501 S.W.2d 756, 757 (Tex.Civ.App. Houston (14th Dist.) 1973, writ ref'd n.r.e.). No such objection appears in the present record. We hold, therefore, that the answer to issue number two is material, that appellants waived any defect in it, and that the trial judge did properly base his judgment on it.

Affirmed.

**All Citations**

582 S.W.2d 549

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.