# Exhibit 4

2020 WL 7027875
Only the Westlaw citation is currently available.
United States District Court, S.D. Indiana, Indianapolis Division.

BRADLEY CORPORATION, Plaintiff,

v.

LAWLER MANUFACTURING CO., INC., Defendant.

No. 1:19-cv-01240-SEB-DML

|

Signed 11/30/2020

**Attorneys and Law Firms**

Jeffrey N. Costakos, Pro Hac Vice, Kevin J. Malaney, Pro Hac Vice, Matthew W. Peters, Pro Hac Vice, Sarah E. Rieger, Pro Hac Vice, Foley & Lardner LLP, Milwaukee, WI, Kathleen I. Hart, Riley Bennett Egloff LLP, Indianapolis, IN, for Plaintiff.

Daniel James Lueders, Michael M. Morris, Woodard Emhardt Henry Reeves & Wagner, LLP, Indianapolis, IN, Stephen E. Ferrucci, Clapp Ferrucci, Fishers, IN, for Defendant.

### ORDER ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

SARAH EVANS BARKER, JUDGE

 *1 This cause is before the Court on the Defendant's Motion for Partial Summary Judgment [Dkt. 66] and Plaintiff's Motion for Partial Summary Judgment [Dkt. 67]. In its complaint, Plaintiff Bradley Corporation ("Bradley") seeks declaratory judgments regarding certain rights and obligations relating to a settlement and license agreement between Bradley and Defendant Lawler Manufacturing Co., Inc. ("Lawler"). In response, Lawler filed a counterclaim alleging that Bradley breached this same agreement in various ways. The parties seek summary judgment on various claims and counterclaims as discussed in detail below. For the following reasons, we GRANT Bradley's motion for partial summary judgment and GRANT IN PART and DENY IN PART Lawler's motion.

### Factual Background

**I. Introduction**

Bradley and Lawler are competitors in the commercial washroom and emergency safety industry, specifically competing in the thermostatic mixing valve ("TMV")[1] and emergency safety shower and eyewash markets. In March 2001, following several years of litigation, Bradley and Lawler entered into a Settlement Agreement to resolve a lawsuit involving allegations of patent and trade dress/trademark infringement as well as various state law claims. The Settlement Agreement contained several subparts, including confidentiality agreements, a patent and trade secret license agreement ("the License Agreement"), and consent decrees. This litigation arises out of the License Agreement, specifically, the parties' dispute regarding the interpretation and application of the royalty provisions.

[1] TMVs are used in safety showers and eyewashes to "maintain the tempering of the water regardless of extreme fluctuations in the supply of hot or cold water to the thermostatic mixing valve." Exh. N, Col. 1, lines 64–67.

**II. The License Agreement**

Under the terms of the License Agreement, Bradley received a license to make, use, and sell the "Licensed Product," to wit, TMVs covered by "Lawler Patent Rights" or that "utilize[ed] any Lawler Trade Secrets." Dkt. 1-1 §§ 1.4, 2. "Lawler Patent Rights" are defined in the License Agreement as "patent rights arising out of or resulting from U.S. Patent Nos. 5,323,960 ["the '960 patent"] and 5,647,531 ["the '531 patent"], U.S. Patent Application No. 09/165,880 ["the '880 application"], filed on October 2, 1988, and all continuations, divisions, continuations-in-part, resulting patents, reissues, reexaminations, foreign counterparts, patents of addition, and extensions thereof." Dkt. 1-1 § 1.2. In addition to the patent rights arising out of or resulting from the '960 and '531 patents, this definition also encompassed patent rights arising out of or resulting from the following additional patents issued from continuation and divisional applications claiming priority to the '880 application: U.S. Patent Nos. 6,315,210; 6,543,478; 6,851,440; 7,191,954; 8,579,206; 9,218,006; D494,252; and D762,818 (collectively, "Kline-1 Patents"). As defined by the License Agreement, "Lawler Trade Secrets" are "the trade secrets and confidential information of Lawler ... regarding the design, performance, testing, assembly, pricing, and marketing of [TMVs] to which Kevin B. Kline had access during his employment ... [by] Lawler between 1988 and 1997." *Id.* § 1.3.

2   The License Agreement twice references "Lawler Trade Secrets", once when the term is defined in § 1.3, and again in § 1.4, which defines "Licensed Product" as "any product manufactured, used, or sold that is covered by one or more claims of Lawler Patent Rights or utilizing any Lawler Trade Secrets." Dkt. 1-1 §§ 1.3, 1.4. The License Agreement's section on royalties does not mention trade secrets, nor are trade secrets referenced with respect to the term of the agreement (*i.e.*, the License Agreement provides only that it expires after the expiration "of the last to expire of the Lawler Patent Rights"). *Id.* §§ 3.1, 6.1–6.2.

**\*2** Mr. Kline was a Lawler employee until 1997, when he joined Bradley. As part of the Settlement Agreement, Mr. Kline signed a confidentiality agreement that covered confidential information he had obtained or created during his employment with Lawler, including information disclosed in Addendum A attached to the agreement. Addendum A was thereafter filed as part of a U.S. Provisional Patent Application No. 60/314,803 ("the '803 application"), filed August 24, 2001. The following patents issued from continuation and/or divisional patent applications claiming priority to the '803 application: U.S. Patent Nos. 7,717,351; 8,123,140; 8,544,760; 9,081,392; 9,625,920; and 10,216,203 (collectively, "Kline-2 Patents"). Bradley has marked TMVs with patent numbers from patents covered by the Lawler Patent Rights, including patents from the Kline-1 and Kline-2 families.

As consideration for the licenses granted in section 2 of the License Agreement, Bradley agreed to pay Lawler royalties on certain products sold by Bradley. Specifically, the royalty section of the License Agreement applies a 10% royalty on the "Selling Price" of "Licensed Units" or "Repair Parts." *Id.* § 3.1. The License Agreement defines "Selling Price" as "the actual price of the Licensed Unit less any actual shipping costs shown on the invoice for the Licensed Unit" and provides that the " 'Selling Price' shall be the highest of the actual selling price of the Licensed Unit to another by Bradley or an Affiliate." *Id.* § 1.9. "Licensed Units" are defined as "each unit of Licensed Product covered by one or more claims of the Lawler Patent Rights made by or for Bradley or an Affiliate as finished product in a [TMV]." *Id.* § 1.5. "Repair Parts" is defined as "all parts and kits used to replace or repair parts of [TMVs]....," (*id.* § 1.8), which are not, themselves, complete TMVs.

According to Bradley, throughout the life of the License Agreement, the royalties it has paid Lawler for Licensed Units and Repair Parts have been computed on the basis of 10% of the invoiced price, less shipping, for each Licensed Unit sold. The sum of these calculations, minus any allowable deductions, is then paid to Lawler as royalties. Griesmaier Decl. ¶¶ 4–7. Lawler has conducted audits of Bradley's royalty payments at several points during the term of the License Agreement and has never suggested that Bradley's interpretation of "Selling Price" was incorrect. *Id.* ¶ 8.

The License Agreement also contains an alternative royalty provision for certain products that applies when a Licensed Product is sold "in combination in another product, such as an emergency shower or eyewash." Dkt. 1-1 § 3.1. Specifically, the License Agreement provides that, "[i]f a Licensed Unit is invoiced or shipped in combination in another product such as an emergency shower or eyewash, the Selling Price of such Licensed Unit shall be the average of the Selling Prices of [TMVs] of such model invoiced by Bradley or an Affiliate (whichever is higher) not in combination in another product during the reported calendar quarter." *Id.*

The term of the License Agreement extends until the expiration "of the last to expire of the Lawler Patent Rights," unless terminated earlier for default. *Id.* §§ 6.1–6.2.

### III. Disputes Regarding Alternative Royalty Provision

**A. 2005 Litigation**

From 2001 to 2005, both parties continued to compete in the market and Bradley paid royalties to Lawler pursuant to the License Agreement. However, in 2005, Lawler sought to terminate the License Agreement for various reasons, including, *inter alia*, that Bradley was in default for its failure to pay the appropriate royalties on certain products that included TMVs. Litigation ensued to determine whether the products at issue came within the License Agreement's alternative royalty provision, in which case the royalty due would have been based on the selling price of the TMV alone rather than the price of the product as a whole. On appeal, the Federal Circuit ruled in line with Lawler's contentions that the Bradley products in dispute did not fall within the alternative royalty provision thus providing insufficient grounds for Lawler to terminate the License Agreement. Accordingly, both parties continued to be subject to the terms of the License Agreement.

#### B. Enclosed Safety Showers

*3 In 2016, a new dispute arose over the alternative royalty rate. Bradley asserted that certain products—specifically, Enclosed Safety Showers ("ESSs")—were subject to the alternative royalty provision, and Lawler maintained that Bradley was obligated to pay the standard royalty rate for those products. Bradley's ESSs incorporate a combination emergency shower and eyewash enclosed within a walk-in enclosure. Pfund Decl. ¶ 11. The units are customizable, offering various options to customers, including models that do not contain TMVs. Id. ¶¶ 12–13. Since 2016, Bradley has paid under protest the standard royalty rate to Lawler on these disputed products, reserving its rights to seek a refund of any excess payments found to have been made to Lawler. This dispute remains unresolved between the parties and is at issue in this litigation.

#### C. Skid Products

The parties also disagree regarding whether Bradley's Navigator Tepid Water Skid Systems ("skid products"), model numbers NTS1 and NTS2, are subject to the alternative royalty provision. Bradley's skid products are water heating and storage systems designed for customers who do not have access to a hot water source and are thus unable to produce the tepid water required to run emergency showers and eyewashes in compliance with regulatory standards. Id. ¶ 5. The skid products each include a TMV, model numbers S19-2250 or S19-2350,[3] which mix the hot and cold-water supplies to produce tepid water for the emergency shower or eyewash system. Bradley offers customization options on its skid products unrelated to the TMVs, including multiple sizes of hot water storage tanks to service multiple combination eyewash and drench showers as well as a recirculation system designed to deliver tepid water to several combination units. Id. ¶ 11. Customers can also customize the skid product by, inter alia, installing booster pumps to increase water pressure delivered to the combination units. Id. ¶¶ 8, 10.

[3] It is undisputed that the TMVs used in Bradley's skid products are "Licensed Units" as defined by the License Agreement.

### IV. The '818 Design Patent

As discussed above, the expiration date for the License Agreement is set to occur following the expiration "of the last to expire of the Lawler Patent Rights." Dkt. 1-1 §§ 6.1–6.2. The last utility patent coming within the Lawler Patent Rights was U.S. Patent No. 8,579,206 ("the '206 patent"), which expired on February 26, 2019. Compl. ¶ 20. The only remaining unexpired patent after February 26, 2019 that is encompassed within the Lawler Patent Rights is Lawler's U.S. Design Patent No. D762,818 ("the '818 patent"), which was filed in 2015 and will expire on August 2, 2031. Id. ¶¶ 21–22; Dkt. 1-4. The '818 patent covers a TMV body design embodied in various Bradley TMVs that were released to the market as early as 1998, including TMV model numbers S19-2100 and S19-2200. Pfund Decl. ¶¶ 22–23, Exh. 15–17.



Although filed fourteen years after the effective date of the License Agreement, the '818 patent falls within the Agreement's definition of "Lawler Patent Rights" because Lawler claimed priority for the subject matter of its design patent application via a series of eight continuation and divisional applications reaching back to the '880 utility patent application filed seventeen years earlier in October 1998. Unlike utility patents that generally expire 20 years from the filing date of the earliest application on which the patentee can claim priority, a design patent such as the '818 patent expires fifteen years from the issue date, regardless of its priority date. Thus, the issuance of the '818 patent extended the term of the License Agreement by twelve years (from February 2019, when the '206 patent expired, to 2031, when the '818 patent will expire).

### V. Bradley's TMV Redesign

*4 In 2018, Bradley introduced a new valve body style on certain of its TMVs, including model numbers S19-2100, S19-2150, S19-2200, S59-3080, S59-2045, S59-2080, and S59-3045. Id. ¶ 30. Bradley has not made or sold any TMVs having the pre-2018 valve body style after February 26, 2019, and the '818 patent does not cover Bradley's current TMVs. Id. ¶ 31; Compl. ¶¶ 40–41. Lawler concedes that "[a]fter the design change, ... [Bradley's current] valves are no longer covered by the '818 Patent due to Bradley's design around and should not be marked with the '818 patent number." Rieger Decl., Exh. 1 at 19. Thus, since February 26, 2019, Bradley has not sold any TMV products that are covered by any unexpired claim of the "Lawler Patent Rights."

**VI. The Instant Litigation**
Bradley brought this declaratory action on March 27, 2019 in order to clarify the parties' respective rights on various issues related to the License Agreement. Specifically, Bradley's complaint seeks a declaratory judgment that: (1) it owes no royalties on TMV sales under the License Agreement after February 26, 2019; (2) it is not required to mark any current product with the '818 patent number; and (3) it is entitled to recover a portion of the royalty payments it had made to Lawler under protest. Lawler filed its counterclaim on May 1, 2019, alleging claims of breach of contract, and, in the alternative, *quantum meruit.*

Now before the Court are the parties' cross-motions for partial summary judgment. Bradley seeks a declaration on two of its claims: first, that it owes no royalties to Lawler for TMV sales after February 26, 2019, and, second, that sales of its ESSs are subject to the alternative royalty rate in the License Agreement thereby entitling Bradley to recover the excess payments previously made to Lawler under protest. Bradley also seeks summary judgment on Lawler's counterclaim that Bradley breached the License Agreement by incorrectly calculating the "Selling Price" of certain of its products, thereby underpaying royalties due to Lawler.

Lawler, for its part, seeks a declaration that the License Agreement requires Bradley to pay royalties to Lawler until August 2, 2031 for Licensed Units covered by any claim in either the (now expired) '531 patent and/or the '960 patent and Repair Parts therefor; that there is no *per se* patent misuse on Lawler's part; and that Bradley's patent misuse defense otherwise fails as a matter of law. Lawler also seeks summary judgment on its breach of contract theories based on Bradley's alleged underpayment of royalties on its skid products as well as its failure to use the "highest" actual selling price to calculate royalties on various other products.

**Legal Analysis**

**I. Summary Judgment Standard**
Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, 106 S.Ct. 2505, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

In ruling on cross-motions for summary judgment, the Court applies the same Rule 56 standards to both, such that our review of the record will entail all inferences being drawn in favor of the party against whom a particular issue in the motion under consideration is asserted. *See O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

**II. Applicable Legal Principles**
*5 The majority of the issues presented in the parties' respective summary judgment motions are involve disputes over contract interpretation. The parties agree that these disputes must be resolved with reference to Indiana law, with which assertion the Court concurs, so we shall apply the law of our state without further elaboration or discussion. *See Wood v. Mid-Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991). Under Indiana law, "[t]he goal of contract interpretation is to determine the intent of the parties when they made the agreement." *Tender Loving Care Mgmt., Inc. v. Sherls*, 14 N.E.3d 67, 72 (Ind. Ct. App. 2014) (quotation marks and citation omitted). To that end, when contract language is clear and unambiguous, a court "must give those terms their clear and ordinary meaning," *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005), and "no extrinsic evidence is admissible to explain the terms of such an agreement." *Louis & Karen Metro Family, LLC v. Lawrenceburg Conservancy Dist.*, 616 F.3d 618, 622 (7th Cir. 2010) (citing *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006)). However, "[w]hen the contract is ambiguous, ... extrinsic evidence is permissible to explain the intentions of the parties." *Id.* (citing *Reuille v. E.E. Brandenberger Const., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008)).

" 'A contract is ambiguous if a reasonable person would find the contract subject to more than one interpretation.' " *Tender Loving Care*, 14 N.E.3d at 72 (quoting *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012)). While the interpretation of an unambiguous contract is a matter of law, ambiguous contracts interpreted in light of extrinsic evidence create issues that must be resolved by a jury.

*Celadon Trucking Servs., Inc. v. Wilmoth*, 70 N.E.3d 833, 842 (Ind. Ct. App. 2017). With these legal principles in mind, we turn to address the merits of the parties' current dispute.

### III. Discussion

#### A. Expiration of the License Agreement

Each side seeks summary judgment as to whether Bradley continues to owe royalties to Lawler under the License Agreement through August 2, 2031, when the '818 patent expires, or whether Bradley's obligation to pay royalties ended on February 26, 2019, when the last Lawler patent practiced in Bradley's products expired. Lawler argues that the plain language of the License Agreement requires Bradley to continue paying royalties until August 2, 2031, and that this interpretation does not render the contract legally unenforceable under Bradley's patent misuse affirmative defense. Bradley, on the other hand, claims that a proper interpretation of the plain language of the License Agreement supports its position that its royalty obligations ended on February 26, 2019, when the last patent practiced in its royalty-bearing products expired, and that Lawler's interpretation constitutes *per se* patent misuse under *Brulotte v. Thys Co.*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964). Because we find, for the reasons explained below, that any obligation Bradley may have under the plain language of the License Agreement to make royalty payments after February 26, 2019 constitutes *per se* patent misuse, we need not and do not address the parties' contract interpretation arguments.

"Federal law prohibits 'patent misuse,' which 'occurs when the scope of an otherwise valid patent monopoly extends beyond the prescribed boundaries of the patentee's control.' " *Knowles Electronics, LLC v. Am. Audio Component Inc.*, No. 06 C 6213, 2017 WL 3620808, at *5 (N.D. Ill. Aug. 23, 2017) (quoting *Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1118 (N.D. Ill. 2015)). Bradley has the burden to prove its patent misuse affirmative defense by a preponderance of the evidence. *See, e.g.*, *Ocean Tomo*, 133 F. Supp. 3d at 1118 (applying preponderance of the evidence standard); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2007 WL 2484877, at *1, 2008 U.S. Dist. LEXIS 4627, at *3 (N.D. Ill. Jan. 18, 2008) (same).

**\*6** Under the doctrine of patent misuse, "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se." *Brulotte*, 379 U.S. at 32, 85 S.Ct. 176. In *Brulotte*, an inventor licensed his patented hop-picking machine to farmers in exchange for royalties from hop crops harvested both before and after his patents' expiration dates. Although the licenses included twelve patents, only seven of those were used in the hop machines. All but one of the twelve patents expired prior to the expiration of the license agreement, including all seven patents practiced in the machines. *Id.* at 30, 85 S.Ct. 176 n.2. The Court held that the agreement was unenforceable and "unlawful *per se*" to the extent it provided for the payment of royalties "accru[ing] after the last of the patents incorporated into the machines had expired." *Id.* at 30, 32, 85 S.Ct. 176.

In reaching this result, the *Brulotte* Court distinguished the Supreme Court's holding in *Automatic Radio Manufacturing Co. v. Hazeltine Research*, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), where the licensor had granted to the licensee "a privilege to use any [of the licensor's] patent[s] ... in consideration of the payment of royalties." In *Automatic Radio Manufacturing*, the licensee had not yet developed a product, so it was unknown whether the licensed patents would cover any future product the licensee might develop. There, the Court held that royalties could be assessed on this basis even if the patents were never used because "[p]ayment for the privilege is required regardless of use of the patents." *Id.* at 833, 70 S.Ct. 894. In distinguishing *Automatic Radio Manufacturing*, the *Brulotte* Court cited various factual differences between the two cases, including, first, that the effect of the expiration of any of the patents on the royalty agreement was not at issue in *Automatic Radio Manufacturing*, and second, that unlike the license at issue in *Brulotte*, the license in *Automatic Radio Manufacturing* exacted royalties for patents never used. *Brulotte*, 379 U.S. at 33, n.5, 85 S.Ct. 176.

Although *Brulotte* has been widely criticized over the years since it was decided by the High Court, including by the Seventh Circuit in *Scheiber v. Dolby Laboratories, Inc.*, 293 F.3d 1014 (7th Cir. 2002), the Supreme Court reaffirmed the decision in *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 135 S.Ct. 2401, 192 L.Ed.2d 463 (2015). In *Kimble*, the Court observed that *Brulotte* "is simplicity itself to apply. A court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Id.* at 459, 135 S.Ct. 2401. The *Kimble* Court did, however, point to several ways in which parties could structure agreements to avoid running afoul of *Brulotte*, while still achieving the same ends. For example, the Court observed:

> [P]arties have [ ] more options when a licensing agreement covers either multiple patents or additional non-patent rights. Under *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires. *See* 379 U.S. at 30, 85 S.Ct. 176. Too, post-expiration royalties are allowable so long as tied to a non-patent right—even when closely related to a patent.

*Kimble*, 576 U.S. at 455, 135 S.Ct. 2401.

Lawler argues that the circumstances presented here differ from the facts in *Brulotte* in several material ways, and, as a result, the License Agreement's royalty provision comes within the exceptions outlined in *Kimble* and is therefore enforceable. Lawler contends that Bradley "was granted a license under an extensive portfolio of patents and trade secrets," but, "for simplicity, royalties were to be calculated on Bradley products covered by a subset of the licensed technology," specifically, the claims of the '531 and '960 patents. According to Lawler, the royalty provision was structured to provide clarity as to which products were and were not royalty bearing, given that possible future coverage of the licensed '880 application and its progeny was unknown at the time the Settlement Agreement was signed. Dkt. 69 at 16–17 (internal page numbers). Because the License Agreement encompasses a broad swath of patents as well as non-patent rights, namely, trade secrets, Lawler argues that the royalty provision requiring payment until the expiration of the last to expire of the Lawler Patent Rights does not constitute *per se* patent misuse under *Brulotte* and is enforceable under the principles set forth in *Kimble*.[4]

[4] Lawler references several other distinctions between this case and *Brulotte*, including that the licenses at issue in *Brulotte* were not granted in the context of a settlement, and also that *Brulotte* dealt with a situation in which the licensees had purchased the patented product from the licensor, thus implicating patent exhaustion. However, we do not regard these as material distinctions, considering that the license agreement at issue in *Kimble*, like here, was entered into as part of a settlement and did not implicate patent exhaustion, and the Court found *Brulotte* controlling. Nor are we persuaded by Lawler's contention that *Brulotte* applies only in situations where *all* the patents under the license have expired, considering that the *Brulotte* Court explicitly recognized that one of the patents that was covered by the license agreement but not practiced in the royalty-bearing product had not expired.

**\*7** It is true that, in *Kimble*, the Supreme Court ruled that "when a licensing agreement covers ... multiple patents ..., royalties may run until the latest-running patent covered in the parties' agreement expires," 576 U.S. at 454, 135 S.Ct. 2401, which holding appears to support Lawler's argument that a license covering a portfolio of patents with a non-diminishing royalty, like the License Agreement, is enforceable until the expiration of the last patent covered under the agreement, regardless of whether it is practiced by the royalty-bearing product(s). However, the only authority cited by *Kimble* was *Brulotte*, which explicitly held that it was error for a licensing agreement to "allow[ ] royalties to be collected which accrued after the last of *the patents incorporated into the machines* had expired." *Brulotte*, 379 U.S. at 30, 85 S.Ct. 176 (emphasis added). Thus, "when *Kimble* says that 'royalties may run until the latest-running patent covered in the parties' agreement expires,' ... it appears to assume that the licensee will be using or selling an apparatus or process that incorporates more than one of the licensor's patents, so [that] such use or sale without permission will naturally infringe at least one patent until the latest-running patent expires." *XY, LLC v. Trans Ova Genetics, LC*, No. 13-cv-0876-WJM-NYW, 2020 WL 2128739, at \*6 (D. Colo. May 5, 2020) (internal citation omitted), *appeal docketed*, No. 20-1942 (Fed. Cir. June 30, 2020).

In the case before us here, however, it is undisputed that, as of February 26, 2019, the royalty-bearing products explicitly identified in the License Agreement do not practice any unexpired patents encompassed in the Lawler Patent Rights.[5] Accordingly, under *Brulotte*, any royalty obligations imposed by the License Agreement after February 26, 2019 constitute *per se* patent misuse and are unenforceable. Even assuming, as Lawler argues, that the royalties collected under § 3.1 of the License Agreement are tied to both patent and trade secret rights, that fact does not skirt *Brulotte*'s prohibition on post-expiration royalties. While the Court in *Kimble* acknowledged that post-patent-expiration royalties are allowable if "tied to a non-patent right," the opinion continued, saying: "That

means, for example, that a license involving both a patent and a trade secret can set a 5% royalty during the patent period (as compensation for the two combined) and a 4% royalty afterward (as payment for the trade secret alone)." 576 U.S. at 454, 135 S.Ct. 2401. Unlike the separable pre- and post-patent-expiration royalties described as acceptable in *Kimble*, the License Agreement here sets forth a single, non-diminishing royalty rate without a clear indication that the royalties are not subject to patent leverage.[6] For these reasons, it is our determination that *Brulotte* controls and is dispositive here. Accordingly, Bradley's motion for summary judgment on its *per se* patent misuse affirmative defense is GRANTED and Lawler's cross motion is DENIED.[7]

[5]   Lawler's counterclaim that Bradley designed around the sole remaining unexpired design patent encompassed by the Lawler Patent Rights in violation of the License Agreement is not at issue in either of the parties' motions for partial summary judgment addressed in this order. Accordingly, we do not discuss its possible impact on the *Brulotte* analysis at this time.

[6]   The Ninth Circuit opinion affirmed in *Kimble* set forth the rule as follows: "[A] so-called 'hybrid' licensing agreement encompassing inseparable patent and non-patent rights is unenforceable beyond the expiration date of the underlying patent, unless the agreement provides a discounted rate for the non-patent rights or some other clear indication that the royalty at issue was in no way subject to patent leverage." *Kimble v. Marvel Enterprises, Inc.*, 727 F.3d 856, 857 (9th Cir. 2013).

[7]   We are not persuaded by Lawler's contention that equitable defenses such as laches and unclean hands are applicable here. *See, e.g.*, *Scheiber*, 293 F.3d at 1022 ("[T]o apply the doctrine of unclean hands in a case such as the present one would fatally undermine the policy of refusing enforcement to contracts for the payment of patent royalties after expiration of the patent. It would be (given the antimonopoly basis of *Brulotte*) inconsistent with the Supreme Court's rejection of the defense of *in pari delicto* ('equally at fault') in antitrust cases, [ ] since the effect of that rejection is to give a party to a contract that violates the antitrust laws a defense to a suit to enforce the contract even if he entered in to the contract with full knowledge.").

### B. Applicability of Alternative Royalty Provision to Skids and ESSs

**\*8**  We turn next to resolve whether Bradley's skid and ESS products come within the License Agreement's alternative royalty provision for combination products. That section of the agreement provides that, "[i]f a Licensed Unit is invoiced or shipped in combination in another product such as an emergency shower or eyewash, the Selling Price of such Licensed Unit shall be the average of the Selling Prices of [TMVs] of such model invoiced by Bradley or an Affiliate (whichever is higher) not in combination in another product during the reported calendar quarter." Dkt. 1-1 § 3.1. Here, Bradley argues that it has been required to overpay royalties on the sales of its ESS products, which it has done under protest. Accordingly, Bradley seeks summary judgment on its claim that its ESS products are covered by the alternative royalty provision and thus subject to a lower royalty rate. Lawler, in turn, has moved for summary judgment on its claim that Bradley must pay royalties on the full selling price of its skid products because the skids do not come within the alternative royalty terms.

This is not the first time that Bradley and Lawler have sought judicial intervention to resolve their dispute regarding the proper interpretation of the License Agreement's alternative royalty provision. As long ago as 2005, Lawler sought to terminate the License Agreement on grounds that Bradley was in default for, among other things, failing to pay the appropriate royalty on certain combinations of products, none of which, happily, are the subjects of this litigation. That earlier dispute ultimately reached the Federal Circuit, which ruled that the products at issue did not come within the alternative royalty provision. However, the Court declined to decide whether Lawler was eligible to terminate the License Agreement on that basis. In reaching its determination, the Federal Circuit held that the term "such as an emergency shower or eyewash" in § 3.1 "refers to items similar to what are recited rather than indicating that the recited items are just examples of what is covered by that provision." *Lawler Mfg. Co. v. Bradley Corp.*, 280 Fed. App'x 951, 954 (Fed. Cir. 2008).[8] Accordingly, "the alternative royalty provision of Section 3.1 applies only to combinations of products that are similar to emergency showers and eyewashes." *Id.* at 955.

[8]   We note that, while the Federal Circuit's opinion is nonprecedential, the parties rely on the court's interpretation of the alternative royalty provision in support of their arguments here.

In assessing the similarity of the combination products at issue in that litigation, namely, cabinets and piping, to emergency showers and eyewashes, the Federal Circuit considered evidence presented by Lawler "showing that emergency showers and eyewashes are products that have significant value whether or not they are sold in conjunction with a valve, while the cabinets and piping sold by Bradley are merely meant to encase the valve and have no value without the valve," as well as Lawler's evidence "showing that cabinets and piping are generic add-ons, with the valve constituting the bulk of the value to the customer." *Id.* This evidence, coupled with Bradley's failure to counter with any opposing factual evidence to Lawler's, resulted in the Court's conclusion that "the cabinets and piping at issue are not similar to emergency showers and eyewashes, and therefore are not eligible for the alternative royalty provision of Section 3.1." *Id.*

Against the backdrop of this discussion, we shall now address the parties' arguments as they apply to Bradley's ESS and skids products.

### 1. ESS Products

Bradley's ESS products consist of a combination emergency shower and eyewash enclosed within a walk-in enclosure. Bradley sells certain ESS models with TMVs and other models without TMVs. Bradley claims that its ESS models sold with TMVs must be considered "similar to emergency showers and eyewashes" and thus fall within the alternative royalty provision of the License Agreement because these products in fact *include* an emergency shower and eyewash, and, consistent with the Federal Circuit's analysis discussed above, have significant value whether or not they are sold in combination with a TMV. Bradley argues the alternative royalty provision should therefore be interpreted to apply to its ESSs so that applicable royalties are calculated based on the price of the TMV alone, not the ESS system as a whole. Lawler rejoins that Bradley's ESS products do not fall within the alternative royalty provision of the License Agreement and thus higher royalties are appropriate because, while the TMV may be invoiced and shipped in conjunction *with* the emergency shower and eyewash as part of the ESS, § 3.1 requires that the TMV be "invoiced or shipped in combination *in*" a product such as an emergency shower or eyewash. Because the TMV is not incorporated in either the shower or eyewash that are part of the ESS system, Lawler maintains that the alternative royalty provision does not apply and Bradley must pay royalties based on the price of the total ESS system, as opposed to the price of the TMV alone.

**\*9** Guided by the Federal Circuit's analysis, we hold that TMVs included in the models of Bradley's ESS systems of the design at issue here constitute "Licensed Units invoiced or shipped in combination in another product such as an emergency shower or eyewash" and therefore are covered by the License Agreement's alternative royalty provision. We reach this conclusion by noting the obvious: Bradley's ESSs are emergency showers and eyewashes contained within an enclosure. It is therefore difficult to argue that these products are not "similar to" emergency showers or eyewashes. Moreover, unlike the cabinets and piping considered by the Federal Circuit, the evidence before us here establishes that Bradley's ESSs hold significant value with or without the TMV; thus, the TMV does not represent the bulk of the value of the ESS.

The Federal Circuit was not presented with the contract interpretation argument that Lawler raises here, to wit, that the TMV must be sold inside a product similar to an emergency shower or eyewash to trigger the alternative royalty provision. It is clear, nonetheless, that although the TMV is not *inside* the enclosed emergency shower or eyewash, the TMV becomes a part of, and thus is sold as part of, the particular ESS models at issue here. Thus, it is "in" a product which is "similar to" an emergency shower and eyewash, consistent with the Federal Circuit's guidance. Accordingly, we GRANT Bradley's motion for summary judgment on this issue.

### 2. Skid Products

Unlike the ESSs, however, Bradley's skid products cannot be deemed "similar to an emergency shower or eyewash"; as such, they are not covered by the alternative royalty provision. The undisputed evidence establishes that, as sold and invoiced, the skid is not part of or connected to an emergency shower or eyewash. While the product enables a customer without a hot water source to create the tepid water required to run a functioning emergency shower and eyewash, the skid itself is not a replacement for an emergency shower or eyewash and does not provide a similar function. Like TMVs sold alone or in combination with pipes or cabinets (such as the products addressed by the Federal Circuit), the skid product is attached to an emergency shower or eyewash following purchase, usually by the end user or a plumber.

As previously noted, the primary purpose of the skid product is to enable consumers without access to a hot water supply to create tepid water necessary for an emergency shower or eyewash that meets regulatory standards, and the TMV is essential to that function. Without the TMV to "maintain the tempering of the water, regardless of extreme fluctuations in the supply of hot or cold water," (Exh. N., col. 1, lines 64–67), Bradley's skid product would not permit the customer to create a tepid water supply and any emergency shower and eyewash later connected to the skid product would not satisfy applicable regulatory standards. Thus, it is the TMV that provides value to the water heating and storage components of the skid products, not the reverse. As such, again in line with the Federal Circuit's analysis discussed above, Bradley's skid products are not as a matter of law "similar to emergency showers or eyewashes" and therefore are not covered by the alternative royalty provision of the License Agreement. Accordingly, Lawler is entitled to summary judgment on this portion of its counterclaim and its motion is therefore GRANTED.

### C. Definition of "Selling Price"

Bradley and Lawler both seek summary judgment as to the correct definition of the term "Selling Price" as used in the License Agreement's royalty provision. Lawler claims that, properly interpreted, "Selling Price" requires that royalties for all Licensed Units be calculated based on 10% of the historically highest price then in existence for the Licensed Unit. Bradley proffers that "Selling Price" instead means the highest selling price of the Licensed Unit sold in a particular transaction, calculated quarterly at 10% of the invoiced price (less shipping) for each Licensed Unit sold. The sum of those calculations, minus any allowable deductions, is the amount Bradley has routinely reported and paid to Lawler as royalties throughout the life of the License Agreement. The parties invoke what each contends is the clear and unambiguous language of the contract, claiming that the other side, respectively, is impermissibly attempting to rewrite the contract. Each party, alternatively, contends that even if the court were to rule that the definition of "Selling Price" is ambiguous, extrinsic evidence supports its respective interpretation.

*10 Applying well-established principles of contract interpretation, we examine first the plain language of the contract. Here, the License Agreement defines "Selling Price" as follows:

> "Selling Price" shall mean the actual price of the Licensed Unit less any actual shipping cost shown on the invoice for the Licensed Unit. The "Selling Price" shall be the highest of the actual selling price of the Licensed Unit to another by Bradley or an Affiliate.

Dkt. 1-1 at 16, § 1.9. Royalties are then calculated based on the "Selling Price." Specifically, the License Agreement provides that "[t]he Royalties paid by Bradley shall be ten percent (10%) of the Selling Price of Licensed Units and Repair Parts....' *Id.* at 17, § 3.1.

We hold this definition of "Selling Price" as contained in the License Agreement to be clear and unambiguous. The first sentence of the definition expressly states that the "Selling Price" of the Licensed Unit is to be determined with reference to the actual selling price listed on the invoice for the Licensed Unit; this is in line with Bradley's preferred interpretation. We do not accept Lawler's view that the use of the word "highest" in the second sentence of the definition means the historically highest price for which Bradley or its Affiliates have ever sold any Licensed Unit of that type. Importantly, the second sentence specifically refers to "the highest of the actual selling price of *the* Licensed Unit to another by Bradley or an Affiliate." Dkt. 1-1 at 16, § 1.9. "[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it proceeds." *Adgate v. Chip Shoppe, Inc.*, No. 13-C-163, 2013 WL 6981451, at *9 (E.D. Wis. May 10, 2013) (quoting *Am. Bus. Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000)). Because "the" is singular, we find that the "highest" price reference in the second sentence of the "Selling Price" definition is correctly interpreted to mean the highest invoiced price of the particular Licensed Unit being considered, not the highest price of any Licensed Unit of that type ever sold by Bradley or its Affiliates. Thus, in a case where a Licensed Unit is invoiced by Bradley to an Affiliate at one price and subsequently by that Affiliate to an end user at a different price, the "highest" invoiced price of those two prices is to be used to calculate royalties for that Licensed Unit. When both sentences of the definition are read together and in context, this interpretation most reasonably harmonizes their meaning.

Interpreting "Selling Price" in this manner also aligns most logically with references to the term appearing elsewhere in the License Agreement. In the alternative royalty provision, set forth in § 3.1 of the License Agreement, "Selling Price" is used in determining the price to be used for royalty calculations for a Licensed Product that is sold in combination in another product such as an emergency shower or eyewash. Specifically, the alternative royalty provision states that the price to be used to calculate royalties for such products is "the average of the Selling Prices of Thermostatic Mixing Valves of such model invoiced by Bradley or an Affiliate (whichever is higher) not in combination in another product during the reported calendar quarter." Dkt. 1-1, § 3.1. Likewise, § 3.1 provides that, regarding sales of "Licensed Products" unlisted in Addendum B and "Repair Parts," Bradley's royalty payments are "ten percent (10%) of the Selling Price by Bradley or its Affiliate (whichever is greater) for each such Licensed Unit or Repair Part." *Id.*

 *11  We share Bradley's view that if "Selling Price" is interpreted to be the highest actual selling price then in existence when the Licensed Units were shipped or invoiced, as Lawler contends, there would be no need to determine "whichever is higher" or "whichever is greater" among the "Selling Prices" charged by "Bradley or its Affiliate," rendering this language in § 3.1 superfluous. "[A] 'venerable principle of contract law' instructs against interpreting contracts in a manner that renders terms superfluous if another interpretation lends meaning to those terms." *Comcount, Inc. v. Coconut Code, Inc.*, No. IP 02-0183-C-T/K, 2002 WL 1349913, at *3 (S.D. Ind. Apr. 17, 2002) (quoting *Fla. Polk County v. Prison Health Servs., Inc.*, 170 F.3d 1081, 1082 (11th Cir. 1999)). Here, Bradley's interpretation of the definition of "Selling Price" accomplishes that goal of internal consistency within the body of the entire Agreement.

For these reasons, we hold that the clear and unambiguous language of the License Agreement supports Bradley's interpretation of the definition of "Selling Price." We therefore need not, and will not rely on any extrinsic evidence referenced by the parties. Bradley's motion for summary judgment on this issue is GRANTED and Lawler's is DENIED.

### IV. Conclusion

For the reasons detailed above, Bradley's motion for partial summary judgment is GRANTED in its entirety. Lawler's motion for partial summary judgment is GRANTED as to its counterclaim alleging underpayment of royalties on Bradley's skid products and DENIED in all other respects. We will address Bradley's second motion for partial summary judgment in a separate entry in due course.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 7027875

---